**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR    :
and JETSUITEX, INC.; XO GLOBAL, LLC; and    :
BLADE URBAN AIR MOBILITY, INC.,    :    Civil Action No.:
   :
         Plaintiffs,    :
   :
      v.    :    **COMPLAINT FOR DECLARATORY AND**
   :    **INJUNCTIVE RELIEF AND DEMAND**
COUNTY OF WESTCHESTER, NEW YORK, a    :    **FOR JURY TRIAL**
charter county; APRIL GASPARRI, in her official    :
capacity as AIRPORT MANAGER; and    :
AVPORTS, LLC,    :

         Defendants.

     Plaintiffs Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc.; XO Global,

LLC; and, Blade Urban Air Mobility, Inc. (collectively, "Plaintiffs"), by and through their

undersigned attorneys, allege the following against Defendants County of Westchester, New

York ("County"); April Gasparri, in her official capacity as Airport Manager; and AvPorts, LLC

("AvPorts") (collectively, "Defendants"):

**PRELIMINARY STATEMENT**

     1.     Plaintiffs have continuously provided safe, economical, and federally authorized

air transportation services to the public at Westchester County Airport ("HPN" or "Airport").

Plaintiffs are federally authorized direct and/or indirect air carriers that comply with all

applicable federal laws and regulations. Plaintiffs offer a convenient alternative to the large,

well-funded air carriers (colloquially referred to as airlines) by (a) providing access to small

airports and underserved cities/markets not regularly serviced by the large airlines, and (b)

providing customers with convenient flying services the large airlines cannot offer customers,

including—a Transportation Security Administration ("TSA")-approved and compliant security

screening process that is faster and more convenient than the typical TSA process that is required

for the large airlines.

2.      Defendants, the County of Westchester and Airport Manager, April Gasparri, in her official capacity (collectively "County Defendants"), along with AvPorts, LLC ("AvPorts")—a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of HPN—are unlawfully preventing Plaintiffs from operating at the Airport.

3.      Westchester County officials have publicly admitted and recognized that their local government power cannot simply regulate Plaintiffs' *flights* that depart and arrive at HPN. Notably, unlike the airlines operating out of the main passenger terminal ("Terminal") at HPN, as 14 C.F.R. Part 380 ("Part 380") operators authorized to sell tickets to the public by the U.S. Department of Transportation ("DOT"), partnering with 14 C.F.R. Part 135 ("Part 135") operators, direct air carriers certified by the Federal Aviation Administration ("FAA"), Plaintiffs' flights enplane and deplane at Fixed Base Operator spaces ("FBOs") at HPN.  This is a common form of federally licensed and approved operations and business model in the air transportation industry that has been in existence without controversy for decades.  Yet, Defendants attempt to accomplish their goal of regulating what they cannot regulate – for instance the number of Plaintiffs' flights departing from or arriving at HPN FBOs – by adopting and enforcing policies that require certain Part 380 operators (including Plaintiffs) to move their departing and arriving flights from an FBO to the Terminal.  Even if Plaintiffs could continue their operations in the Terminal, Plaintiffs would be subject to further regulations that would unlawfully restrict and eliminate Plaintiffs' flights at HPN.

4.      Specifically, Defendants' attempt to expand their local government control over federally regulated and preempted issues led to Defendants' recent adoption of the Westchester

County Airport Operational Policy No. 1 ("Policy No. 1"), which effectively prohibits Plaintiffs from operating at HPN compliant with their federally regulated and issued licenses and authorities.  At the end of 2021, Defendants began enforcing the Westchester County Municipal Code § 712.462, a local ordinance codifying the County's Terminal Use Procedures ("TUP"), under a novel and erroneous interpretation to require Plaintiffs to operate out of the Terminal and enter into a Terminal Use Agreement ("TUA").  The TUA, in turn, imposed further restrictions, including subjecting users to a lottery system to determine allocation and flight capacity and requiring users to alter flight schedules to adhere to Terminal ramp allocations and passenger limitation restrictions.  Although Part 380 operations at HPN have long occurred at FBOs, Defendants recently adopted Policy No. 1 in January 2022 to specifically require certain Part 380 operators to move their flights to the Terminal.

5.      But the TUP has historically and for good reason been applied only to large airlines, and not to the Plaintiffs which operate under Part 380.  Plaintiffs, because of their federally regulated and authorized procedures, must operate from a non-Security Identification Display Area ("non-SIDA").  Unlike many other airports that are configured to segregate TSA-screened from non-screened passengers such that non-screened passengers can still access non-SIDA boarding, and arrival and baggage claim areas, HPN does not currently offer a non-SIDA area in the Terminal.  Accordingly, Plaintiffs have each historically operated out of FBOs to enplane and deplane passengers outside of the Terminal.

6.      In fact, Plaintiffs' customers cannot, under federal regulations, enter the Terminal Boarding Area in its current configuration.  This is because the Terminal is currently a SIDA-only space, and Plaintiffs' passengers who are screened through a different, but nonetheless TSA-approved screening process, cannot enter SIDA areas.  Stated differently, Plaintiffs operate

a federally approved style of flying that does not require customers to pass through the standard TSA checkpoints found at most large airports.  Indeed, at the core of Plaintiffs' business models is that customers can forego crowded terminals, long lines and TSA security checkpoints in favor of a non-SIDA TSA-approved security protocol.  Entirely consistent with federal law, Plaintiffs' customers can arrive 20 minutes before a flight, pass through Plaintiffs' TSA-compliant and approved security procedures at the FBO, and avoid long lines and large crowds.  Plaintiffs' TSA-approved security protocol also allows Plaintiffs to provide access to additional or smaller airports and underserved cities not regularly serviced by the large airlines, or in underserved airports that do not generate sufficient traffic to justify the resources required of establishing a SIDA TSA checkpoint.  Plaintiffs are able to offer their federally approved services to such locations only through a non-SIDA location.

7.      Defendants know all of this.  However, Defendants have issued various notices in recent months to Plaintiffs demanding that they utilize the Terminal for their operations and notifying them that they are not in compliance with Policy No. 1 if they continue to operate out of their respective FBOs.  They have further refused to provide any reasonable accommodations to Plaintiffs, such as to establish a non-SIDA area in the Terminal, so that Plaintiffs can continue their operations.

8.      As a result, Defendants' Policy No. 1 effectively precludes Plaintiffs from operating at HPN and deprives Plaintiffs of reasonable and non-discriminatory access to the Airport in violation of federal law.

9.      Because of Defendants' conduct, Plaintiffs do not have a solution for reasonable access to HPN, a federally funded and regulated, public use Airport.  Defendants' unlawful conduct prevents Plaintiffs from offering diverse and underserved routes and services that are

fully authorized by federal law.  Defendants' conduct was performed with the specific intent of discriminating against Plaintiffs.

10.     Defendants' conduct is unlawful for at least two reasons: (1) it is preempted by federal law; and (2) it violates Plaintiffs' right to equal protection under the law.  For both reasons, Plaintiffs seek declaratory and permanent injunctive relief to ensure that they will be able to provide air transportation services at the Airport.

## JURISDICTION

11.     This Court has original jurisdiction over the subject matter of this action pursuant to (1) 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States; (2) because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution; and (3) this Court's inherent jurisdiction to grant equitable relief for violations of the United States Constitution and the laws of the United States.

12.     This Court has personal jurisdiction over Defendants because they are domiciled in, reside in, or are a county located in New York and because their denial of Plaintiffs' rights under the United States Constitution and the laws of the United States occurred within New York.  The injuries caused by each Defendant thus occurred in New York.

13.     This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

14.     This Court also has authority to enter injunctive relief for Defendants' violation of federal law and the United States Constitution pursuant to 28 U.S.C. § 1331 under *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002), *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d.

Cir. 2016), *certiorari denied by* 137 S. Ct. 2295 (2017) and equity jurisdiction authorized by *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny.

**PARTIES**

15.    Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("Delux") is a Delaware limited liability company with its administrative offices located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas.  Delux is a FAA-certificated, on-demand air carrier that operates commercial flights pursuant to Part 135 and holds a Commuter Air Carrier Authorization issued by the DOT.  Delux's operations are safe, legal, quieter than traditional airlines at HPN, and offer the traveling public a unique alternative to those traditional airlines.  Indeed, due to Delux's ability to facilitate a fast, terminal-free, and socially distanced boarding and travel experience, customers are able to travel with confidence even during the pandemic.  Delux has an impeccable safety record.  Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, Delux is fully compliant with all applicable federal, state, and local laws.  Though Delux's operations are fully compliant with federal law, they are structured differently than the large scheduled airlines that operate out of HPN.  Delux's departure times, departure locations, and arrival locations are specifically negotiated with its sole customer, JetSuiteX, Inc.

16.    Plaintiff JetSuiteX, Inc. ("JetSuiteX") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas. JetSuiteX is the parent corporation of Delux.  JetSuiteX is an indirect air carrier that sells tickets for Delux flights pursuant to authority granted by DOT. Under this federally authorized arrangement, JetSuiteX sells tickets to the traveling public, JetSuiteX charters an entire Delux flight, and then Delux operates the flight using the time, location, and destination designated by JetSuiteX.  Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, JetSuiteX is fully compliant with all applicable

federal, state, and local legal obligations.  Collectively, JetSuiteX and Delux will be referred to as "JSX" unless otherwise noted.

17.     Plaintiff XO Global, LLC ("XO Global") is a limited liability company registered under the laws of Delaware with its principal place of business located at 1901 West Cypress Creek Road, Suite 6B in Fort Lauderdale, Florida.  XO Global's parent company is XO Holding Inc., whose parent company is Vista Global Holding Limited.  XO Global is an indirect air carrier that offers on-demand charter, priority access to a private jet fleet, and other programs to meet private aviation needs, as well as products for flyers who have demanding schedules and minimal flexibility around how and when they fly.  XO Global partners with various Part 135 Air Carriers, such as Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

18.     XO Global's flights have an impeccable safety record, as not a single operator XO Global has worked with has had any safety incidents at HPN.  Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, XO Global is also fully compliant with all applicable federal, state, and local laws.

19.     Plaintiff Blade Urban Air Mobility, Inc. ("Blade") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 499 East 34th Street, New York, New York.  Blade is a wholly-owned subsidiary of Blade Air Mobility, Inc., a publicly traded company.  Blade is a technology-powered, global air mobility platform committed to reducing travel friction by enabling cost-effective air transportation alternatives to some of the most congested ground routes in the U.S. and abroad.  Blade arranges on-demand charter and scheduled flights across a diverse accessible fleet of helicopters, jets, turboprops, and

seaplanes.  Blade is an indirect air carrier that furnishes air transportation pursuant to authority granted by DOT.  Blade's flights have an impeccable safety record, and Blade has not experienced any passenger or employee safety incidents at HPN.  Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, Blade is fully compliant with all applicable federal, state, and local legal obligations.  Blade partners with Part 135 operators, such as Contour, to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

20.      Consistent with HPN's badging process, Blade employees are also required to complete a security clearance and undergo a badging process conducted by HPN consistent with procedures in the Terminal.  Blade's employees at HPN are further required to complete a formal safety training with the FBO that it operates out of at HPN, White Plains Aviation Partners LLC d/b/a Million Air ("Million Air").

21.      Defendant County of Westchester, New York ("County"), is a municipal corporation located in the Southern District of New York, with capacity to sue and be sued.  The County is the owner of the Airport.  The Airport, a division of the County, is a commercial and general aviation airport located at 240 Airport Road, White Plains, New York, within the Southern District of New York.  The Airport is the only commercial service airport in the County and the primary provider of general aviation services and facilities in the County.  The acceptance and receipt of federal grant money obligates the airport sponsor, *i.e.*, the County, to comply with statutorily enumerated obligations, known as "Grant Assurances."  Here, the County receives federal grant money to operate and finance investment at the Airport and, as a result, is obligated by the Grant Assurances and federal statutes to operate in a reasonable, non-discriminatory, and financially self-sustaining manner.

22.     The County operates and maintains the Airport as a governmental function for the primary purpose of providing air transportation to the public.  The County's Airport operations are managed by nine current members and two ex-officio members who make up the Westchester County Airport Advisory Board ("Board").  The Board, and each of its individual members, are representatives, agents, and employees of the County and the scope of their duties includes, among other things, adopting Policy No. 1.  The County is a person within the meaning of 42 U.S.C. § 1983.

23.     Defendant April Gasparri ("Ms. Gasparri" or "Airport Manager"), is named in her official capacity as the Airport Manager of HPN.  At all times relevant to this complaint, Ms. Gasparri (or alternatively her predecessor(s)) was and is an agent and employee of the County, responsible for developing airport policies and administering all activities associated with the operation of a medium hub commercial airport.  Ms. Gasparri reports to the County and is responsible for carrying out policies, procedures, and duties regarding the Airport authorized by the Board.  Ms. Gasparri is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this Complaint.  Ms. Gasparri's official residence is at HPN, which is located in Westchester County, New York, within the Southern District of New York.

24.     Defendant AvPorts, LLC, on information and belief, is a Virginia limited liability company with its headquarters at 45025 Aviation Drive, Suite 100, Dulles, VA 20166.  AvPorts is a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of the Airport.  On information and belief, AvPorts is responsible for the promulgation and enforcement of certain policies regarding the Airport, including the policies at issue here.  As an agent for the County, overseeing the management and operation of the Airport, AvPorts is engaged in state action and thus also liable

for the violations at issue.

## ALLEGATIONS

### Plaintiffs' Operations At HPN Are Federally Authorized, Safe, And Quiet

25.     Plaintiffs' operations are fully compliant with federal law, but they are structured differently than the large scheduled airlines that operate at HPN.  Plaintiffs offer a type of service that federal regulations classify as "on-demand" services.  *See* 14 C.F.R. Part 110.2 (defining "on demand" operations).  Under applicable regulations and their respective TSA-approved security plans, Plaintiffs' flights can operate from non-SIDA portions of HPN, such as an FBO (discussed *infra*) and have not experienced any passenger safety incidents since the beginning of their operations at HPN.  Consistent with federal regulations, Plaintiffs do not need to operate from an FBO, but their operations must take place from a non-SIDA portion of the Airport with access to the airfield.

26.     Blade's flights have been operating from FBOs at HPN since 2015, and Blade's flights are currently offered out of Million Air's FBO.  Blade is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

27.     Blade is a technology-powered, global air mobility platform committed to reducing travel friction by enabling cost-effective air transportation alternatives to some of the most congested ground routes in the U.S. and abroad.  Since 2015, Blade has offered service between HPN and Miami-Opa Locka Executive Airport ("OPF"), and due to increasing popularity, Blade introduced service between HPN and Palm Beach International Airport ("PBI") in 2021.  Blade has never had any passenger or employee safety incidents or accidents at HPN.

28.     Blade's operations at HPN directly employ more than 11 individuals who live in or near the County.  Blade's operations at HPN also indirectly support numerous other local jobs,

including its Part 135 operating partners and local catering, shuttle, and car service businesses. In addition to significant marketing investments regarding its services at HPN, Blade has invested over $200,000 in improvements at Million Air and pays approximately $60,000 per year to rent a dedicated lounge at Million Air to service its passengers.  Blade and/or its Part 135 operating partners also pay the Airport various fees associated with the operation of Blade flights, including landing, facility, parking, RON, shuttle, charter, hanger, after hours and valet parking fees.  Blade expects to fly approximately 165 Part 380 flights between HPN and OPF or PBI during the November 2021 through April 2022 season.

29.     XO Global, and its related company, JetSmarter, Inc., has been offering flights out of various FBOs at HPN since 2015.  In the last twelve months, XO Global organized more than one thousand flights and transported more than 12,000 passengers to and from HPN.  XO Global is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.  Since it began operations at HPN, XO Global has been partnering with various Part 135 operators and operating from various FBOs.

30.     XO Global has offered flights from HPN to Van Nuys, Oakland, and various locations in South Florida.  XO Global's flights have an impeccable safety record as not a single operator XO Global worked with had any safety incidents at HPN.

31.      XO has likewise spent time and money in building its operations at HPN and contributing to the local economy.

32.     JSX began operating 30-seat aircraft from an FBO at HPN in June of 2020 with flights to Pinehurst, NC.  In November 2021, it began HPN's only service to Miami International

Airport (MIA) with 5 flights a week, from an FBO.[1]  Delux is an FAA-certificated air carrier that is authorized by federal law to fly customers for compensation or hire under the FAA's operating rules contained in Part 135.  Delux holds a commuter air carrier authorization issued by the DOT, and JetSuiteX is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.  Since it began operations at HPN, JSX has been operating from an FBO.

33.     JSX currently offers flights from HPN to Miami.  In addition to the route currently offered, JSX also intended to offer many more routes in 2022.  JSX has never had a safety incident or accident at HPN or elsewhere in its over five-year operating history.  JSX enjoys a perfect safety record, the highest customer satisfaction of any air carrier in the United States, was named #1 air carrier in North America by APEX (the Airline Passenger Experience Association), and it is the only Five-Star Rated Regional Air Carrier in the World named by APEX for the last four consecutive years.

34.     Additionally, JSX's operations at HPN directly employ 5 individuals who live in or near the County.  Numerous additional jobs are supported indirectly.  JSX spent significant resources investing in the HPN market, estimating at least $2 million, and JSX has paid significant amounts in fees.

35.     Unlike traditional airlines, Plaintiffs' flights follow a TSA-approved "Twelve-Five" Security Plan,[2] which is a regulatory protocol that permits its passengers to bypass TSA

---

[1] From November 15 to December 31, 2021, JSX reduced its operations from 30 passengers to 9 passengers per flight under a reservation of rights in response to demands from HPN until a more permanent solution could be reached.

[2] The "Twelve-Five" Security Plan refers to a category of TSA-approved security plan applicable to the operation of certain aircraft with a maximum certificated takeoff weight of 12,500 pounds or more.  *See* 49 C.F.R. § 1550.7.

security checkpoints in the Terminal.  Plaintiffs maintain a rigorous TSA-approved and monitored security plan, but passengers flying with Plaintiffs are not processed through the main terminal's TSA checkpoints.  Instead, the "Twelve-Five" Security Plan is uniquely available for Part 135 operators and allows Plaintiffs' flights to enplane and deplane passengers at non-SIDA locations, and as a result, Plaintiffs' customers do not have to enter the terminal of an airport to do so.  Under the "Twelve-Five" federally authorized regulatory protocol, Plaintiffs' passengers are able to bypass large crowds, long lines, typical time spent waiting for an airplane to board and depart.  The result is a faster, safer, and crowd-free airport experience that is fully compliant with federal safety regulations.

36.     By contrast, customers of large airlines who board from terminal buildings are required to pass through a TSA security checkpoint in order to enter the Terminal (which is exclusively a SIDA location) at HPN.  The TSA security checkpoints—and the crowds, frustration, and delays associated with them—are ubiquitous for the average airport user, and in HPN they are particularly crowded and congested and provide no opportunity for social distancing protocols or a quick experience from car to airplane.

37.     Plaintiffs provide a level of safety, convenience, and a socially distanced flying experience that is not otherwise available to customers of large traditional airline customers in any class of service.  Plaintiffs' services are safe, federally authorized, and especially well-suited for individuals who want to maintain social distancing and avoid large crowds while traveling during the COVID-19 pandemic.  Plaintiffs' aircraft operations are also quieter than large airlines.

38.     Plaintiffs are, however, prohibited from allowing their customers to enter SIDA areas of HPN because non-SIDA and SIDA customers cannot commingle under federal

regulations.  A SIDA location is differentiated and cordoned off from non-SIDA locations at HPN—but both types of security procedures are TSA-approved and meet federal regulations.  As a result, Plaintiffs' customers are federally prohibited from entering the Terminal at HPN because HPN does not have a non-SIDA area in the Terminal.  The only option for Plaintiffs is therefore to maintain their operations at an FBO.

39.     Until recently, Plaintiffs have been permitted to operate at an FBO at HPN.  An FBO is an aeronautical service provider located at an airport that, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators.  Use of FBOs' non-Terminal facilities is currently the only way Plaintiffs' flights are able to enplane and deplane customers at HPN at a non-SIDA location.

40.     Moreover, even if Plaintiffs could require their customers to pass through a SIDA-compliant security checkpoint at HPN in the main terminal, they would be unable to do so under federal law because several of the airports that Plaintiffs serve with routes that link to HPN either do not have a TSA-checkpoint or Plaintiffs operate from those airports at non-SIDA locations that lack TSA facilities.  If Plaintiffs were forced to conduct all flight operations from a sterile area of the Terminal, passengers who did not undergo TSA screening at their departure airport would not be able to deplane into the Terminal at HPN.  This, in turn, would effectively evict Plaintiffs from HPN because Plaintiffs, consistent with federal regulations, do not have passengers undergo such screening at any of the many other airports that Plaintiffs serve.  Even if only departing flights were required to be conducted from a sterile area, such a requirement would fundamentally alter and interfere with Plaintiffs' federally authorized procedures.

41.     Plaintiffs currently offer routes between HPN and FBOs in Van Nuys, Oakland, Fort Lauderdale, Palm Beach, and Miami, and do not utilize TSA-checkpoints at these airports.

While Plaintiffs' customers would not be subject to clear through TSA SIDA checkpoints at these airports (and in some cases such SIDA checkpoints may not even exist), if they were forced to undergo TSA screening at HPN, they would not be able to fly between HPN and any of those airports. This is because TSA requires passengers who clear through SIDA checkpoints to do so at both their origin and destination airport. If customers cannot avoid traditional TSA SIDA checkpoints when flying with Plaintiffs, then they will no longer choose to fly with Plaintiffs and Plaintiffs are thus unable to continue existing services.

42. Plaintiffs' flight offerings have the added benefit of minimizing airport impact by aggregating passengers into smaller and/or quieter aircraft as an alternative to passengers each chartering their own aircraft, which would create further noise and environmental impact and/or airport congestion. For example, instead of ten passengers each chartering their own aircraft individually to the same destination, Plaintiffs' flight offerings aggregate those ten passengers in one aircraft, thus minimizing the impact by comparison. Further, Defendants have maintained that the TUP and Policy No. 1 would not apply to certain other operators operating out of FBOs, including a Part 91 operator, and thus they would not be subjected to the TUA's restrictions.

43. Moreover, Plaintiffs offer other valuable services to their customers when they operate from an FBO that cannot be offered at the Terminal. These services include valet parking and shuttle services, concierge services, specialized health and safety protocols, private lounge access, and speedier check-in, boarding and baggage handling processes. As a further example, Blade also administers its industry-leading COVID-19 health and safety protocol, including on-site COVID-19 testing by registered nurses, temperature and blood oxygen level testing and proof of vaccination enforcement, from Million Air's FBO. Blade would not be able to offer these services or enforce these protocols at the Terminal, and many of Blade's customers

and the increasing popularity of Blade's services out of HPN are attributable to these services and protocols.

44.     Hence, any effort by the County to eliminate Plaintiffs from operating from the FBOs at HPN, without authorizing a non-SIDA area, effectively eliminates those routes and services.

45.     In fact, until recently, Defendants have not enforced the TUP against any of the Part 135 operators Blade and XO Global have worked with since 2015, nor have Defendants required Blade or XO Global to move their flights from their respective FBOs to the Terminal. Moreover, Defendants never required Blade or XO Global to sign the TUA, nor are Plaintiffs aware of any instances where HPN applied the TUP to Part 380 operators selling more than 9 seats until recently.

**HPN Is A Not A Private Commercial Space, But A Federally Funded Public Use Airport Subject To Federal Law And Regulations**

46.     HPN is a "public use" airport that is funded, in part, by grants obtained under one or more federal programs, including the Airport Improvement Program.  The receipt of federal grant money obligates the airport sponsor, i.e., the County, to comply with Grant Assurances.

47.     The FAA has made clear that these Grant Assurances require "Federally obligated airport sponsors . . . to operate airports for the use and benefit of aeronautical users and to make those airports available to all types, kinds, and classes of aeronautical activities on fair and reasonable terms, and without unjust discrimination."[3]  In other words, Defendants have a duty to provide Plaintiffs with reasonable access at HPN.

48.     In order to comply with their obligation to provide Plaintiffs with "reasonable

---

[3] https://www.faa.gov/airports/airport_compliance/media/airportSponsor AndUserRightsBrochure.pdf

access," Defendants must provide Plaintiffs access to the Airport on reasonable and non-discriminatory terms.  At bottom, Defendants must ensure that Plaintiffs have reasonable and non-discriminatory access to the public use Airport in a way that is consistent with Plaintiffs' federally authorized business plan.

49.     Pertinent here, the Grant Assurances, as set forth in a federal statute (49 U.S.C. § 47107), require the County to provide access to all aviation users in a reasonable and non-discriminatory manner.  At a minimum, this means that the County cannot arbitrarily seek to exclude an airport user (e.g., an air carrier) from accessing the Airport.

**The County Is Improperly Enforcing Policy No. 1 And The TUP Against Plaintiffs**

50.     County officials have publicly recognized during public hearings, including in November 2021, that their local government power cannot simply regulate Plaintiffs' flights that depart from and arrive at HPN.  Yet, Defendants' adoption of Policy No. 1 and enforcement of the TUP require certain Part 135 and 380 operators (such as Plaintiffs) to move their departing and arriving flights from an FBO to the Terminal.  Defendants' attempt to expand their local government control to regulate Plaintiffs' flights encroaches upon federally preempted issues and violates federal law.

51.     In 2004, the County passed Westchester County Municipal Code § 712.462, which codified the TUP.  The TUP sets forth the County's policy concerning access to the Airport by airlines, establishes the Airport's terminal capacity to accommodate airlines, and adopts a mechanism for allocating capacity among airlines seeking access.  The TUP requires airlines seeking to conduct passenger services from the Terminal to enter into a TUA with the County.  The TUP governs air carriers' operations out of HPN's Terminal but does not apply to air carriers operating from FBOs.

52.     The TUP governs the use of the Terminal and the Terminal Ramp at the Airport, which is for the "exclusive use of Airlines providing Passenger Service."  Westchester Cty. Municipal Code § 712.462(1).  Specifically, the TUP applies only to Airlines offering Passenger Service under 14 C.F.R. Parts 119, 121, or 135.  The TUP defines "Passenger Service" as "any air service to or from the Airport for which seat are individually offered or sold to the public or a segment of the public."  Defendants maintain that any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to the TUP.

53.     The TUP forces operators under Parts 119, 121, and 135 offering Passenger Services in an aircraft with more than nine seats to enter into the TUA, under which operators are to agree to abide by additional "Technical Specifications and Procedural Requirements" and prohibits operators from challenging the Technical Specifications and Procedural Requirements, or the TUP, in a court of law or administrative proceeding.  The TUP and TUA have the further effect of limiting Plaintiffs' services by causing Plaintiffs to alter flight schedules based on their allocation to the Terminal Ramp through the lottery system and the overall Terminal Capacity passenger limitation for all airlines operating at the Terminal.

54.     But as explained above, JSX, Blade, and XO Global are engaged in public charter operations under Part 380 with federal approval from the DOT.  Indeed, the County itself has repeatedly acknowledged that Plaintiffs are among a group of operators offering single-seat sales under DOT Part 380 "public charter" rules.  Notably, the County had never before applied the TUP to Part 380 operations, and indeed, the TUP itself does not reference Part 380 operators at all.  In fact, Part 380 operations at HPN have long occurred at FBOs, and public charter operations under Part 380 have existed without controversy for many decades.  Similarly, Part

380 operators have never been required to enter into a TUA or any similar agreement when operating from an FBO. Numerous operators have operated, and continue to operate, flights at HPN with more than nine aircraft seats from FBOs, including under Part 380. These operations have accounted for thousands of flights.

55.     Beginning in October and November 2021, the County, through AvPorts, began demanding that Plaintiffs utilize the Terminal for their Part 380 operations and enter into a TUA in order to continue operating at HPN. The County claimed that Plaintiffs' operations violated Westchester County Municipal Code § 712.462.

56.     On November 5, 2021 and November 9, 2021, AvPorts, acting on behalf of the County, sent a letter to each Plaintiff demanding that they conduct their services out of the Terminal pursuant to a Terminal Use Agreement. The County asserted that Plaintiffs were engaged in "Passenger Service" and were not permitted to operate from an FBO.

57.     In a December 2, 2021 letter to JSX, the County asserted that Plaintiffs' operations fell within the definition of "Passenger Service" that is otherwise regulated by the TUP because their aircraft have more than nine seats and involve sales of single seats to the public. This is the same category that applies to the large, regularly scheduled airlines. However, those large airlines are federally required to be subjected to full TSA security and accordingly operate from the SIDA portions of the Terminal, while Plaintiffs are not. Thus, the County's interpretation impermissibly extends the definition of Passenger Services to Plaintiffs in a manner that destroys Plaintiffs' federally approved procedures and business models.

58.     In the same letter, Defendants further noted that the nine-seat limitation does not apply to other Part 135 air charter operations at the FBOs where a single-entity or individual charters the entire aircraft, and individual seats are not made available to the public. Defendants

also noted that the same limitation did not apply to other operations at FBOs, including Part 91 corporate aircraft operations at FBOs, which have also been conducted for decades.

59.     Despite contending that it was not making a change to its laws, Defendants nonetheless adopted Policy No. 1 on January 21, 2022, which directly targeted Plaintiffs' operations and mandated that they utilize the Terminal.  As the name suggests, the policy was the first of its kind for HPN and constitutes a new interpretation of the TUP.  The Airport Noise and Capacity Act ("ANCA") bars local noise and access restrictions that are enacted after 1990 unless they comply with the statute's mandatory procedural requirements.  49 U.S.C. 47524(d); *see also Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 ( 2d. Cir. 2016).  On information and belief, Defendants have not complied with ANCA's strict procedural requirements, and thus, the recent enactment of Policy No. 1 is unlawful.

60.     In fact, within Policy No. 1, Defendants reclassified Plaintiffs' Part 380 operations as "Single-Seat-Charter-Operations" or "SSCOs," a novel term for a decades-old business model, implicitly acknowledging that such operations were not previously addressed by the TUP.  Policy No. 1 credited Plaintiffs' business as innovative, while simultaneously destroying their businesses by requiring Plaintiffs to utilize the Airport's TSA checkpoints, in violation of federal regulations that require Plaintiffs to operate from non-SIDA areas.  Notably, none of the FAA, DOT, TSA, TUP nor the TUA mandate use of the Airport's TSA checkpoints, or otherwise prevent operators from utilizing separate TSA-approved screening.

61.     During this time, Plaintiffs actively sought to reach a good-faith resolution that would address Defendants' concerns; however, Defendants summarily rejected any proposed alternatives without any meaningful consideration or analysis.

62.     For example, in response to AvPorts' initial letter, JSX attended a meeting with

former Airport Manager, Peter Scherrer, on November 10, 2021, and spoke with him again on November 12, 2021. In its November 15, 2021 letter, JSX stated that as a sign of goodwill, it would begin limiting all HPN flights to a maximum of nine seats for sale until the end of the year and block passenger seats from service to limit the aircraft to nine passenger seats, which in and of itself caused a significant adverse impact on JSX's revenue. JSX agreed to maintain these restrictions for the rest of the year in order to afford time to reach a mutually acceptable resolution. Although Defendants had many weeks to work with JSX on a potential resolution, Defendants only ignored or rejected JSX's proposals.

63. JSX in fact proposed multiple TSA-compliant alternatives for the Airport's consideration. These included proposals whereby passengers would check in at the Terminal, and JSX would use vacant office space on the first floor of the Terminal to hold passengers prior to boarding. Under the first proposal, when boarding commences, passengers would be escorted through the Ross Aviation East FBO and down a non-SIDA ramp. Under the second proposal, passengers would be escorted through an access gate just north of the Terminal and then down an Airport terminal ramp. Unfortunately, and inexplicably, these proposals were summarily rejected by the Airport, without any meaningful consideration or analysis, even though these proposals represented common-sense solutions that would have enabled compliance with TSA security requirements. These proposals also would have enabled the Airport to comply with its obligations under federal law.

64. XO Global similarly objected and proposed alternatives such as completing passenger check in at the Ross Aviation East FBO and transporting the passengers to the aircraft that parked at the Terminal to be boarded planeside.

65. Blade likewise objected to the County's position with respect to its services at an

FBO.  In a November 29, 2021 letter, Blade reminded the County that Blade's existing Part 380 service had been operating at the FBO for the last five years, that the County had approved its leasehold with Million Air, and that the County was involved in the planning, construction and leasehold improvement activities related to Blade's facilities at Million Air.

66.     However, the County refused to entertain any proposed accommodations for Plaintiffs and is accordingly denying Plaintiffs reasonable access to the Airport, a federally regulated and public space.

67.     The County's policy targets only Plaintiffs by defining them as SSCOs, and not similarly situated on-demand carriers who operate at FBOs.  Moreover, the County declined to offer any non-SIDA access to the Terminal so that Plaintiffs could reasonably access the Terminal in accordance with the TUP that the County wishes to enforce.

**The County Is Prohibited From Imposing Barriers To Access Under Federal Aviation Law**

68.     Federal law also prohibits the Airport from creating rules or policies that have the effect of unjust discrimination against a type, kind or class of aviation service and unreasonably restricting an airport user's access to the Airport.  Defendants' refusal to make any reasonable accommodation for Plaintiffs' operations restricts Plaintiffs' access to HPN in violation of federal law.

69.     Congress has preempted the field of aviation and air carrier regulation.  This means that, *inter alia*, counties and cities are not permitted to self-regulate the air transportation industry.  Any effort to do so is invalid under the Supremacy Clause of the United States Constitution and the preemption provisions of the various federal aviation statutes.

70.     Congress determined that preemption was necessary to achieve the objectives of the Airline Deregulation Act ("ADA"), which include, among other things: encouraging entry

into the air transportation market by new carriers; strengthening small air carriers to ensure a more effective and competitive airline industry; ensuring the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination; and preventing unfair, deceptive, predatory, or anticompetitive practices in air transportation. *See* 49 U.S.C. § 40101.

71.     The FAA regulates aviation safety and has done so by implementing federal regulations pertaining to every aspect of airport and aircraft operations. The DOT regulates the economic aspects of the air carrier industry. Together, the DOT and FAA have full authority to regulate air carriers.

**Preemption Under the Airline Deregulation Act ("ADA")**

72.     Congress has expressly preempted state and local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law *related to* a price, route, or service of an air carrier . . ." 49 U.S.C. § 41713(b)(1) (emphasis added).

73.     In so doing, Congress expressly wanted to avoid a patchwork of state and local regulations from unduly burdening interstate air transportation and undermining the objectives of the ADA. As a result, all state and local laws, regulations, and other provisions having the force and effect of law that relate to carriers' prices, routes and services are preempted and invalid.

74.     Local governments are expressly prohibited from unilaterally imposing regulations in this area absent FAA approval. Local restrictions or access plans that violate federal law or federal policy are *per se* unreasonable and thus do not fit within the narrow "proprietary right" exception (discussed below).

75.     Under the ADA, 49 U.S.C. § 41713(b)(1), "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or

other provision having the force and effect of law related to a price, route, or service of an air carrier."

76.     A state or local law is "related to" a price, route or service if it has "[1] a connection with, or [2] reference to" a price, route, or service. *American Airlines v. Wolen*, 513 U.S. 219, 223 (1995); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008). The "relating to" phrase in § 41713(b)(1) "express[es] a broad pre-emptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).

77.     Congress allowed for an extremely narrow exception to the otherwise wholesale preemption for local governments "carrying out [their] proprietary powers and rights" as airport sponsors. 49 U.S.C. § 41713(b)(3). This is known as the "proprietary right exception," and it is very narrowly interpreted.

78.     Under this narrow exception, a local government's exercise of its proprietary powers must be reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed not to conflict with the ADA and its policies.

79.     The validity of any local regulation therefore depends on (1) whether the regulation "is related to a price, route, or service of an air carrier"; (2) if so, whether regulation amounts to an exercise of a State or local government's propriety powers; and (3) if it is an exercise of proprietary powers, whether such exercise is reasonable, non-arbitrary and non-discriminatory and not in conflict with the ADA, ANCA, or other federal law. Only if all these showings are met is a local regulation exempted from preemption by 49 U.S.C. § 41713(b)(3). In determining whether a local regulation restricting access to a public airport meets the narrow exception, the FAA has stated that such regulations must balance both local and federal interests.

80.     Here, Defendants' conduct: (1) effectively prohibits Plaintiffs from providing

certain routes (*e.g.*, routes that originate at an airport where customers enplane from a non-SIDA location, despite them being permissible under federal law) and certain services (e.g., Plaintiffs' convenient options offered to HPN travelers); (2) is a flawed attempt to exercise proprietary powers (as any other explanation would not even arguably justify them); and (3) is unreasonable, arbitrary and discriminatory (they target and single out certain safe operators, Plaintiffs, for no legitimate reason), irreparably harming Plaintiffs, Plaintiffs' employees based at HPN, *and* the traveling public who prefer Plaintiffs' services and businesses and socially distanced travel experiences.

**Preemption Under the Airport Noise and Capacity Act ("ANCA")**

81.     Congress's most authoritative expression of specific intent regarding the extent of federal preemption in the area of access at public airports is the Airport Noise and Capacity Act ("ANCA"), 49 U.S.C. § 47521, *et seq*.  ANCA was enacted after Congress determined that previous federal statutes and regulations were insufficient to ensure a uniform federal aviation policy regarding noise and airport access restrictions.  Through ANCA, Congress explicitly sought to address the "uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system[.]"  49 U.S.C. § 47521(2).  Because Congress recognized that local airport sponsors may seek to impermissibly control or regulate access to airports within their jurisdictions, Congress expressly found that access restrictions to public airports "must be carried out at the national level."  *Id*. § 47521(3)-(4).  This is express preemption in the field of access to public airports and aircraft noise.

82.     ANCA, and FAA's regulatory scheme generally, classify aircraft into four "Stages" based on noise emission levels.  Stage 1 aircraft emit the most noise, and Stage 4 aircraft emit the least, with Stage 2 and Stage 3 aircraft in between.  Plaintiffs' services utilize

Stage 3 aircraft.

83.     ANCA prohibits airport sponsors from imposing regulations that restrict a Stage 3 aircraft's ability to access a public airport unless the sponsor complies with 14 C.F.R. Part 161 ("Part 161") and the FAA grants permission.

84.     The FAA has promulgated extensive regulations, published at Part 161, which create a uniform process for airport sponsors to seek permission to introduce access restrictions at airports.  To date (more than 30 years after ANCA became federal law), no airport has successfully obtained permission from the FAA to impose an access restriction on Stage 3 aircraft via the Part 161 process or otherwise.

85.     Indeed, ANCA's requirements for enacting access restrictions for Stage 3 aircraft are remarkably stringent.  Federal courts and the FAA have both interpreted 49 U.S.C. § 47524 as a requirement that all public airports comply with Part 161 before any access restriction affecting a Stage 3 aircraft can be enforced.  *See* 14 C.F.R. §§ 161.101, 161.301(c).  Under Part 161, proprietors must obtain, *inter alia*, (i) FAA approval for the restriction or (ii) the unanimous consent of *all* aircraft operators affected by the restriction.  49 U.S.C. § 47524(c)(1).

86.     On information and belief, Defendants have neither sought nor obtained FAA approval for the access restriction imposed on Plaintiffs (whether based on the illegal Policy No. 1, the TUP, or otherwise).

87.     Alternatively, Defendants have also failed to obtain unanimous consent of all operators (as evidenced by this lawsuit).

88.     Moreover, even assuming that Defendants attempted to meet Part 161's strictures, they would have had to demonstrate to the FAA, among other things, that the access restriction imposed on Plaintiffs: (i) is reasonable, non-arbitrary and non-discriminatory; (ii) does not create

an unreasonable burden on interstate or foreign commerce; (iii) is consistent with maintaining the safe and efficient use of navigable airspace; (iv) does not conflict with a law or regulation of the United States; (v) has received adequate opportunity for public comment; and (vi) does not create an unreasonable burden on the national aviation system.  49 U.S.C. § 47524(c)(2).

89.     Each of the showings required to gain FAA approval are absent from the Defendants' decision to unilaterally impose an access restriction and to otherwise act to effectively remove Plaintiffs from the Airport.

90.     On information and belief, Defendants have not initiated, much less successfully completed, the Part 161 process.  The Defendants cannot circumvent ANCA's requirements or the FAA's processes to impose access restrictions on Stage 3 aircraft.  FAA procedures are mandatory and comprehensive, and local attempts to regulate access that are not enacted in compliance with Part 161 are federally preempted.[4]

91.     Defendants' conduct is further unreasonable because it interferes with Congress's stated goals in enacting ANCA, in particular preventing localities from creating a patchwork of regulations limiting airport access.

92.     In sum, Defendants violated ANCA (and its implementing regulations) by imposing Policy No. 1, preventing FBOs from working with Plaintiffs, and refusing to consider non-SIDA portions of the Terminal, all of which preclude Plaintiffs from operating at HPN.

93.      Furthermore, Defendants' unlawful and unconstitutional conduct was and is intentional.  Defendants were and are fully aware that any access restriction imposed by Policy No. 1 or TUP is subject to ANCA's processes and thus subject to preemption.

**Plaintiffs Will Be Irreparably Harmed If The County Is Not Enjoined From Enforcing Policy**

---

[4] Given that Policy No. 1 is a new policy enacted in 2022, it is not subject to being grandfathered in.

**No. 1**

94.     The County's Policy No. 1 prohibits Plaintiffs from operating as they always have at FBOs at HPN.  Yet the County has refused Plaintiffs' proposals to operate from alternative non-SIDA locations or create a non-SIDA location at the Terminal.  Accordingly, Defendants' actions foreclose Plaintiffs' access to the Airport on reasonable and non-discriminatory terms, as required by federal law.

95.     Enforcement of the County's new Policy No. 1 will irreparably harm Plaintiffs by entirely halting Plaintiffs' services at HPN, including routes offered to underserved cities, safe and efficient services to the traveling public, and employment for over employees in the area surrounding HPN, and causing other impact on the local economy.

96.     Plaintiffs will also suffer a significant loss of revenue and customer goodwill if they are forced to stop operations at HPN.

97.     For example, in the next twelve months, XO is expected to operate more than 1,000 flights to and from HPN with expected revenue in tens of millions annually.

98.     Similarly, JSX stands to lose significant resources it spent investing in the HPN market at an estimated value of over $2 million and significant investments already made to operate out of HPN if Policy No. 1 is to be enforced.

99.     Additionally, as mentioned above, the popularity of Blade's services out of HPN continues to grow and Blade is expected to operate approximately 165 Part 380 flights between HPN and OPF or PBI during the November 2021 through April 2022 season alone.  Blade stands to lose the significant investments it has made towards its operations at HPN and Million Air.  Moreover, Blade's increasing customer based would be forced to cancel flights that have already been booked, which will in turn damage Blade's reputation and goodwill.  If Policy No. 1 is

enforced, Blade's inability to operate out of FBOs at HPN could result in losses in the millions for the remainder of the November 2021 through April 2022 season (and in the tens of millions for the November 2022 through April 2023 season, which does not take into account any potential expanded schedules or additional routes), as well as Blade's inability to honor contractual commitments to its Part 135 operating partners.  Additionally, Blade partners with Part 135 operators and local catering, shuttle, and car service businesses, and employs eleven individuals for its operations at HPN, all of whom would be significantly impacted if Blade could no longer operate from HPN.

100.    Plaintiffs estimate that the local economic impact of their combined flight operations is well over $50 million annually.

## FIRST CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

### Defendants' Conduct Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ANCA (28 U.S.C. § 1331 and 49 U.S.C. §§ 47521-47534) (Against all Defendants)

101.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

102.    The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const., art. VI.

103.    Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

104.    There is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.  AvPorts is a private company that provides airport facilities management, operations, airline services,

administration, accounting, and noise abatement on behalf of the Airport.  As an agent for the County, AvPorts has sent notices to Plaintiffs on the County's behalf, seeking to exclude their operations at FBOs and improperly enforce Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP against Plaintiffs.  AvPorts, with the County Defendants' approval, has promulgated Policy No. 1.  As a result, AvPort's conduct is related to its agreement to adopt directives from the County Defendants aimed at unreasonably excluding Plaintiffs from HPN, including their adoption of Policy No. 1 and Defendants' enforcement of the TUP, is contrary to and interferes with federal law, including but not limited to ANCA.

105.    Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is unreasonable, arbitrary, discriminatory, and violates federal law.

106.    Defendants' conduct, including their adoption of Policy No. 1 and reliance on the TUP, constituted and constitutes an access restriction for Plaintiffs' Stage 3 aircraft.

107.    Defendants did not comply with Part 161.

108.    All air carriers present at HPN did not unanimously consent to Policy No. 1 or the TUP.

109.    The above-described conduct is not an action which falls within the narrow proprietary right exception because, among other reasons, Defendants purposefully acted in violation of federal law by intentionally discriminating against Plaintiffs.

110.    The above-described conduct is unreasonable, arbitrary, and discriminatory.

111.    Such conduct is *per se* unreasonable and unlawful as Defendants took this action in violation of federal law.  As such, it is preempted by federal law and violates the Supremacy Clause of the U.S. Constitution.

112.    The above-described conduct violates ANCA, and thus HPN's Policy No. 1,

Section 712.462 of the Westchester County Municipal Code, and the TUP must be amended or eliminated as a result of this ANCA violation.

113.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise excluding Plaintiffs from operating at HPN as of January 21, 2022.

114.    Plaintiffs also seek declaratory relief that makes clear that Defendants cannot prohibit Plaintiffs' operations through local law, regulation, or other provision having the force of law.

115.    Plaintiffs specifically seek an injunction preventing Defendants from enforcing the Policy No. 1, Section 712.462 of the Westchester County Municipal Code, or the TUP, and a declaration that these regulations are invalid under the ANCA.

## SECOND CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

**Defendants' Conduct Is Preempted by Federal Law and Violates the
Supremacy Clause of the U.S. Constitution – ADA
(28 U.S.C. § 1331 and 49 U.S.C. §§ 41713 *et seq.*)
(Against all Defendants)**

116.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

117.    The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." f U.S. Const., art. VI.

118.    Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

119.    As alleged above, there is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

120.    Defendants' conduct aimed at unreasonably excluding Plaintiffs from HPN, including adoption of Policy No. 1 and Defendants' enforcement of the TUP is contrary to and interferes with federal law, including but not limited to the ADA.

121.    Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

122.    Defendants' conduct, including the adoption of Policy No. 1 and enforcement of the TUP constitutes a regulation affecting the "rates, routes, and services" of Plaintiffs.

123.    Defendants' above-described conduct prevents Plaintiffs from flying certain routes (*i.e.*, it forecloses Plaintiffs from operating flights to HPN from non-SIDA airport locations).

124.    Defendants' above-described conduct also prevents HPN from offering aeronautical services (e.g., it prohibits any customer services at HPN).

125.    Defendants' above-described conduct is not an action which falls within the narrow proprietary right exception, as the adoption of Policy No. 1 was unreasonable, arbitrary, and discriminatory.

126.    Plaintiffs' flights have operated safely at HPN for years.

127.    Plaintiffs' flights at HPN are serviced by quieter aircraft than most large airline flights at HPN.

128.    Plaintiffs were singled out by Defendants.

129.    Defendants' decision to target Plaintiffs is arbitrary and unconstitutional.

130.     Defendants' above-described conduct is *per se* unreasonable and unlawful as Defendants took this action in violation of federal law.  As such, it is preempted by federal law and the Supremacy Clause of the U.S. Constitution.

131.     Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, Plaintiffs irreparably by causing a substantial loss of business, damaging Plaintiffs' business reputation and goodwill, and putting Plaintiffs at a significant competitive disadvantage to other carriers operating at HPN.

132.     As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise excluding Plaintiffs from operating at HPN in violation of the ADA as of January 21, 2022.

133.     Plaintiffs also seek declaratory relief that makes clear that Defendants cannot prohibit Plaintiffs' operations through local law, regulation, or other provision having the force of law.

134.     Plaintiffs specifically seek an injunction preventing Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, or the TUP, and a declaration that such regulations invalid under the ADA.

## THIRD CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

**Deprivation of Equal Protection –
U.S. Const. Amend. XIV and 42 U.S.C. § 1983
(Against all Defendants)**

135.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

136.     The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the

equal protection of the laws."  U.S. Const. amend. XIV, § 1.

137.    Defendant Ms. Gasparri is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.

138.    Defendant County is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.  The County has mandated and officially adopted a policy, ordinance, regulation and/or decision that violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

139.    As alleged above, there is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

140.    Defendants' adoption of Policy No. 1 and reliance on the TUP is for the sole purpose of singling out Plaintiffs for discriminatory treatment in violation of the Equal Protection Clause.  Defendants do not prohibit the operations of other similarly situated carriers.

141.    Defendants targeted Plaintiffs and treated Plaintiffs differently from other operators operating out of FBOs at HPN.  Plaintiffs' operations involve similar (if not identical) aircraft to those who are permitted to continue operating at FBOs.  These aircraft also apply a TSA-approved security procedure, have a similar noise profile, fly similar routes, and in many cases carry a similar number of passengers.

142.    Defendants have no legitimate justification or rational basis for instituting Policy No. 1 or relying on the TUP other than to discriminate against Plaintiffs and prohibit them from operating at HPN.

143.    Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

144.    Defendants intentionally treated Plaintiffs differently than any other air carriers or operators at the Airport.

145.    Defendants' above-described conduct is not rationally related to any legitimate state interest.  Rather, Defendants acted irrationally and arbitrarily with the sole intent of discriminating against Plaintiffs and preventing them from operating at HPN.

146.    Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, Plaintiffs irreparably by causing a substantial loss of business, damaging Plaintiff's' business reputation and goodwill, and putting Plaintiffs at a significant competitive disadvantage to other carriers operating at HPN.

147.    Plaintiffs were irreparably harmed by Defendants' unconstitutional and discriminatory conduct because their constitutional rights have been infringed.

148.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek a declaratory judgment declaring that Defendants' Policy No. 1 is unconstitutional, and that Defendants are not permitted to prohibit Plaintiffs from operating at HPN.

149.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise banning Plaintiffs from operating at the Airport as of January 21, 2022.

150.    Plaintiffs also seek attorneys' fees as permitted by 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment:

1.      Declaring that the Defendants must provide an accommodation to Plaintiffs that grants them access to the Airport on reasonable and nondiscriminatory terms in a manner that does not negatively impact Plaintiffs' rates, routes, or services;

2.      Enjoining Defendants and any party in privity of contract with Defendants from imposing or enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, the TUP, or otherwise imposing or enforcing any law, regulation, policy, or other provision having the force and effect of law which restricts Plaintiffs' access to HPN, or affects Plaintiffs' ability to offer federally authorized rates, routes, and services at HPN;

3.      Enjoining Defendants and any party in privity of contract with Defendants from ceasing doing business with Plaintiffs as a result of Defendants' actions or conduct;

4.      Waiving the requirement for the posting of a bond as security for entry of temporary or preliminary injunctive relief;

5.      Damages, including nominal damages, for the completed and on-going violations of law and tortious interference claims;

6.      Awarding Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

7.      Granting such other and further relief as the Court deems just and proper.

**<u>JURY DEMAND</u>**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand a trial by jury of all issues triable by jury.

Dated:    March 7, 2022            TROUTMAN PEPPER HAMILTON
                                          SANDERS LLP

By: */s/ John N. Thomas*
    John N. Thomas (JT7317)
    Jenna C. Hutchinson (FILL IN)
    TROUTMAN PEPPER HAMILTON SANDERS
    LLP

    875 Third Avenue
    New York, NY 10022
    Telephone: 212-704-6000
    Facsimile: 212-704-6288
    Jack.thomas@troutman.com
    Jenna.hutchison@troutman.com

    Steven D. Allison (PHV Forthcoming)
    Samrah R. Mahmoud (PHV Forthcoming)
    Sheila Z. Chen (PHV Forthcoming)

    *Attorneys for Plaintiffs*
    *Delux Public Charter, LLC d/b/a JSX Air*
    *and JetSuiteX, Inc.; XO Global, LLC; Blade*
    *Urban Air Mobility, Inc.*

124179796