### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR; JETSUITEX, INC.; XO GLOBAL, LLC; and, BLADE URBAN AIR MOBILITY, INC.<br><br>                Plaintiffs,<br><br>v.<br><br>COUNTY OF WESTCHESTER, NEW YORK, a charter county; APRIL GASPARRI, in her official capacity as AIRPORT MANAGER; and AVPORTS, LLC<br><br>                Defendants. | CASE NO. 22-cv-01930<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF ITS APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

124222808

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

II.   FACTUAL BACKGROUND ..................................................................................... 2

    A.    Plaintiffs Provide Federally Approved Air Transportation Services. ................................ 2

    B.    HPN Is A Federally Funded Public Use Airport. .............................................................. 4

    C.    The County's Interpretation of the TUP and Adoption of Policy No. 1 Targets Plaintiffs' Services In Violation Of Federal Law. ......................................................................... 5

    D.    Defendants Refused to Make Reasonable Accommodations At HPN, A Federally Funded Public Use Airport, Despite Plaintiffs' Many Proposals. ......................................................... 8

    E.    Plaintiffs Will Be Irreparably Harmed If The County Is Not Enjoined. ............................ 9

III.  LEGAL STANDARD ............................................................................................... 11

IV.   ARGUMENT ............................................................................................................. 11

    A.    Plaintiffs Will Be Irreparably Harmed If Defendants Are Not Enjoined. ....................... 11

    B.    Plaintiffs Are Likely To Succeed On The Merits. ........................................................... 14

        1.    Plaintiffs Are Likely to Succeed on Their Section 1331 Claims For Preemption Because County's Interpretation Of TUP And Adoption Of Policy No. 1 Is Preempted By The ADA And ANCA. ............................................................................................... 14

        2.    Plaintiffs Are Likely To Succeed On Their Section 1983 Claim Because The County's Application Of The TUP And Policy No. 1 Deprives Plaintiffs Of Equal Protection.......... 21

    C.    An Injunctions Is In The Public Interest ........................................................................ 24

    D.    Plaintiffs Should Not Be Required To Post A Bond Pursuant To Rule 65(C) ................ 25

V.    CONCLUSION .......................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*545 Halsey Lane Props., LLC v. Town of Southampton*, 39 F. Supp. 3d 326
(E.D.N.Y. 2014)..................................................................................................21

*Agudath Israel of Am. v. Cuomo*, 983 F.3d 620 (2d Cir. 2020)....................................24

*AIM Int'l Trading, LLC v. Valcucie SpA.*, 188 F. Supp. 2d 384 (S.D.N.Y. 2002) .......................11

*Air Transport Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218 (2d. Cir. 2008)............................15, 16

*Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995) ......................................................15

*Arapahoe Cty. Public Airport Auth. v. F.A.A.*, 242 F.3d 1213 (10th Cir. 2001) ....................16, 18

*Clubside, Inc. v. Valentin*, 468 F.3d 144 (2d Cir. 2006).............................................21

*Delux Pub. Charter LLC v. Cty. of Orange*, No. 8:20-CV-2344-JLS-KES, 2021
WL 5083742 (C.D. Cal. Jan. 3, 2021) ................................................................2, 16

*Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126 (2d Cir. 1997)....................................25

*Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133 (2d.
Cir. 2016), cert. denied by 137 S. Ct. 2295 (2017)................................11, 15, 18, 19

*Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494 (2d Cir. 2001) ...........................21

*Interphoto Corp. v. Minolta Corp.*, 295 F. Supp. 711 (S.D.N.Y.) aff'd, 417 F.2d
621 (2d Cir.1969) (per curiam)...........................................................................12

*K.A. v. City of New York*, 413 F. Supp. 3d 282 (S.D.N.Y. 2019) ...................................21

*Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647 (S.D.N.Y. 2019) .......................11

*Metro. Taxicab Bd. of Trade v. City of New York*, No. 08CIV7837(PAC), 2008
WL 4866021 (S.D.N.Y. Oct. 31, 2008) ...............................................................14

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992)........................................15

*Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457
(S.D.N.Y. 2020).................................................................................................11

*Nat'l Helicopter Corp. of Am. v. City of N.Y.*, 137 F.3d 81 (2d Cir. 1998) ................18

*New York State Telecomms. Ass'n, Inc. v. James*, 544 F. Supp. 3d 269 (E.D.N.Y.
2021) .................................................................................................................25

*Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105 (2d Cir. 2014) ........................11

*Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169 (2d Cir.1995) .................................................12

*Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904 (2d Cir. 1990) ...........................................12

*Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227 (2d Cir. 1999).......................................12

*Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364 (2008) .........................................................15

*RxUSA Wholesale, Inc. v. Dep't of Health & Hum. Servs.*, 467 F. Supp. 2d 285
    (E.D.N.Y. 2006).....................................................................................................24

*Shaw v. Delta Air Lines*, 463 U.S. 85 (1983).................................................................................14

*Snider v. Dylag*, 188 F.3d 51 (2d Cir. 1999)................................................................................21

*Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) .................................................................21

*W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222 (2d. Cir. 1987) .............................14

*Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7 (2008) .................................................11

*Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597 (1991) ..................................................................14

## STATUTES

*28 U.S.C. § 1331* ............................................................................................................14, 15

*42 U.S.C. § 1983* ..............................................................................................................2, 21

*49 U.S.C. § 41713* .................................................................................................................15

*49 U.S.C. § 41716)* ................................................................................................................18

*49 U.S.C. § 47107* ...................................................................................................................4

*49 U.S.C. § 47521* .................................................................................................................18

*49 U.S.C. § 47524* .............................................................................................................19, 20

*Airline Deregulation Act* ........................................................................1, 14, 15, 16, 18

*Airport Noise and Capacity Act* ................................................................................ passim

*Westchester County Municipal Code § 712.462* .......................................1, 5, 6, 7, 25

## OTHER AUTHORITIES

*14 C.F.R. 161* ........................................................................................................................19

124222808

14 C.F.R. Part 119 ……………………………………………………….5

14 C.F.R. Part 135.............................................................................3, 5, 7, 9, 16, 23, 25

14 C.F.R. Part 380............................................................................................. passim

49 C.F.R. § 1544.101 ...............................................................................................7

U.S. Const. amend. XIV .........................................................................................2

Rule 65 ..................................................................................................................10, 25

I.    **INTRODUCTION**

Plaintiffs Delux Public Charter, LLC d/b/a JSX Air ("Delux"), JetSuiteX, Inc.

("JetSuiteX"), XO Global, LLC ("XO Global"), and Blade Urban Air Mobility, Inc. ("Blade")

(collectively, "Plaintiffs") provide convenient, federally approved, TSA-compliant flight services

to the traveling public at the Westchester County Airport ("HPN" or the "Airport").  Plaintiffs

seek immediate injunctive relief to prevent Defendants County of Westchester, New York, April

Gasparri, Airport Manager, and AvPorts LLC ("Defendants") from enforcing an unlawful,

discriminatory, and federally preempted local statute and corresponding policy that would

effectively deny Plaintiffs' access to HPN, a federally funded, public use airport, to provide these

services.  Defendants' enforcement of Westchester County Municipal Code § 712.462 and recent

adoption of the Westchester County Airport Operational Policy No. 1 ("Policy No. 1")

improperly regulates Plaintiffs' federally authorized air transportation services and underscores

Defendants' attempt to encroach upon statutory and regulatory authority that is reserved for the

federal government.  Indeed, Defendants' enforcement of Policy No. 1 would force Plaintiffs out

of the fixed base operator facilities, where Plaintiffs have always operated at HPN, and into the

main passenger terminal at HPN ("Terminal") in violation of federal statutes, regulations, and

the U.S. Constitution.  The Court should grant Plaintiffs' request for a temporary restraining

order ("TRO") to avoid irreparable harm from Defendants' unlawful policy.

*First*, Plaintiffs are likely to succeed on the merits of their claims.  Plaintiffs will likely

succeed on their federal question claims for preemption because Policy No. 1, Section 712.462,

and the TUP as applied to Plaintiffs are preempted by the Airline Deregulation Act ("ADA") and

the Airport Noise and Capacity Act ("ANCA").  Specifically, adoption and enforcement of

Policy No. 1, and application of the TUP to Plaintiffs, is preempted by the ADA because they

affect Plaintiffs' routes and services by requiring Plaintiffs to alter their flights, which prevents

Plaintiffs from offering certain routes to underserved airports without a TSA checkpoint in the passenger terminal and destroys Plaintiffs' federally approved procedures and businesses at HPN.  Policy No. 1 and the TUP as applied to Plaintiffs are also preempted by ANCA because they are an arbitrary, unreasonable, and discriminatory restriction on Plaintiffs' operations that does not conform to ANCA's mandatory procedural requirements.  Moreover, Plaintiffs will succeed on their Section 1983 cause of action because Defendants' differential treatment of Plaintiffs' operations, as compared with other operators that continue service from FBOs at HPN, violates the Equal Protection Clause of the Fourteenth Amendment.

*Second*, Plaintiffs will be irreparably harmed if Policy No. 1 and Defendants' application of the TUP to Plaintiffs are not enjoined.  Plaintiffs have made significant investments in their operations at HPN, pay hundreds of thousands of dollars in fees directly or indirectly, and employ staff and engage businesses from the surrounding community.  If Plaintiffs can no longer operate at HPN, Plaintiffs stand to permanently lose these investments in addition to the irreversible damage to their businesses, customer relationships, and reputations.

*Third*, a TRO is in the public interest because Defendants' conduct would foreclose public access to safe and convenient air transportation services.  Plaintiffs' air transportation services also utilize quieter and more environmentally friendly aircraft than most large airlines. No countervailing public interest justifies elimination of Plaintiffs' businesses from HPN.

Thus, the Court should grant Plaintiffs' request for a TRO and preliminary injunction.[1]

## II.    FACTUAL BACKGROUND

### A.    Plaintiffs Provide Federally Approved Air Transportation Services.

---

[1] The Central District of California granted a TRO in favor of JSX against the County of Orange involving similar lawsuit with similar conduct.  *See Delux Pub. Charter LLC v. Cty. of Orange*, No. 8:20-CV-2344-JLS-KES, 2021 WL 5083742 (C.D. Cal. Jan. 3, 2021).  The TRO is still in force and in effect as of the date of this filing.

124222808

Plaintiffs are federally authorized direct air carriers that fly customers for compensation or hire under Federal Aviation Administration's ("FAA") operating rules contained in 14 C.F.R. Part 135 ("Part 135") and/or indirect air carriers authorized by Department of Transportation ("DOT") who partner with Part 135 direct air carriers to market commercial air carrier services under 14 C.F.R. Part 380 ("Part 380").  (Decl. of David Drabinsky ("Drabinsky Decl.") ¶¶ 3-4; Decl. of Karoline Lozier ("Lozier Decl.") ¶ 3); Decl. of Ted Botimer ("Botimer Decl.") ¶ 3.) Delux is a direct air carrier operating flights under Part 135 and holds a Commuter Air Carrier Authority issued by DOT.  (Drabinsky Decl. ¶ 3.)  JetSuiteX, XO Global, and Blade are Part 380 indirect air carriers authorized by DOT to conduct charter operations provided by a direct carrier operating under Part 135.  (Drabinsky Decl. ¶ 4; Lozier Decl. ¶ 3; Botimer Decl. ¶ 3.)

Plaintiffs' operations are structured differently than the large airlines that also operate out of HPN.  (Drabinsky Decl. ¶¶ 4, 11; Lozier Decl. ¶ 9; Botimer Decl. ¶ 10.)  For example, Delux's departure times, departure locations, and arrival locations are specifically negotiated with its sole customer, JetSuiteX, Inc.  (Drabinsky Decl. ¶ 4.)  JetSuiteX is an indirect air carrier that sells tickets for Delux flights pursuant to authority granted by the DOT.[2]  (Id.)  Under this federally authorized arrangement, JetSuiteX sells tickets to the public, JetSuiteX charters an entire Delux flight, and then Delux operates the flight using the time, location, and destination designated by JetSuiteX.  (Id.)  Like JetSuiteX, XO Global and Blade partner with Part 135 direct air carriers, including Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), to sell individual seats to the public for flights operated by such Part 135 direct air carriers.  14 C.F.R. § 380.3; (Lozier Decl. ¶ 3; Botimer Decl. ¶ 3.)

Plaintiffs' federally authorized operations allows Plaintiffs to provide a convenient and

---

[2] Collectively, JetSuiteX and Delux will be referred to as "JSX" unless otherwise noted.

safe alternative to large commercial airline services by (a) connecting flights to smaller airports and underserved cities/markets that are not regularly serviced by the large airlines, and (b) providing customers with services that the large airlines cannot offer—namely, TSA-approved and compliant security processes that are faster and more convenient than the TSA process that is required for airlines at the Terminal.  (Drabinsky Decl. ¶ 15; Lozier Decl. ¶ 17; Botimer Decl. ¶ 11.)  At the core of Plaintiffs' business model is that customers can forego the Terminal's TSA security checkpoints in favor of a non-Security Identification Display Area ("non-SIDA") (but TSA approved) protocol.  (Drabinsky Decl. ¶ 16; Lozier Decl. ¶ 17; Botimer Decl. ¶ 14.)  Consistent with federal law, Plaintiffs' customers can arrive 20-30 minutes before a flight, pass through Plaintiffs' TSA-approved security, and avoid long lines and large crowds.  (Drabinsky Decl. ¶ 16; Lozier Decl. ¶ 10; Botimer Decl. ¶ 11.)  In COVID-19, Plaintiffs' services have been valuable to customers looking to avoid crowded terminals and long security lines where social distancing is not always possible.  (Drabinsky Decl. ¶ 18; Lozier Decl. ¶ 14; Botimer Decl. ¶ 6.)

      **B.**      <u>**HPN Is A Federally Funded Public Use Airport.**</u>

HPN is a federally funded, public use airport, and is thus obligated to comply with certain grant assurances.  (Compl. ¶ 46; *see* https://airport.westchestergov.com/general-information.)  Grant Assurances require the County to provide equal and non-discriminatory access to the HPN.  49 U.S.C. § 47107 (local authorities must make "airports available to all types, kinds, and classes of aeronautical activities on fair and reasonable terms, and without unjust discrimination.")

Plaintiffs have been operating out of HPN through Fixed Base Operator spaces ("FBOs").  (Drabinsky Decl. ¶ 23; Lozier Decl. ¶ 18; Botimer Decl. ¶ 7.)  Although Plaintiffs do not need to operate from an FBO, their operations must take place from a non-SIDA portion of the Airport with access to the airfield.  (Drabinsky Decl. ¶ 12; Lozier Decl. ¶ 18; Botimer Decl. ¶ 17.)  The Terminal is configured without any non-SIDA boarding areas.  (Drabinsky Decl. ¶ 24; Lozier

124222808

Decl. ¶ 17; Botimer Decl. ¶ 14.)  A non-SIDA boarding area is essential for Plaintiffs' operations because Plaintiffs' security procedures (or procedures used by Plaintiffs' Part 135 operators) requires that their customers board from a non-SIDA location, because SIDA and non-SIDA passengers must be separated under federal regulations.  (Drabinsky Decl. ¶ 24; Lozier Decl. ¶ 17; Botimer Decl. ¶ 14.)  Thus, the Terminal is not viable for Plaintiffs' operations because it does not offer non-SIDA boarding.  (Drabinsky Decl. ¶ 24; Lozier Decl. ¶ 17; Botimer Decl. ¶ 14.)

Instead, Plaintiffs have been operating from an FBO, similar to other Part 135 and Part 380 operators.  (Drabinsky Decl. ¶ 23; Lozier Decl. ¶ 18; Botimer Decl. ¶ 7.)  An FBO is an aeronautical service provider located at an airport who, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators.  (Drabinsky Decl. ¶ 23; Lozier Decl. ¶ 21; Botimer Decl. ¶ 7.)  FBOs are the only way Plaintiffs are able to enplane and deplane customers at a non-SIDA location at HPN.  (Drabinsky Decl. ¶ 24; Lozier Decl. ¶ 17; Botimer Decl. ¶ 14.)  The County has historically permitted charter flight operations from FBOs rather than the Terminal.  (Drabinsky Decl. ¶ 27, Ex. C; Lozier Decl. ¶ 17Botimer Decl. ¶ 15.)

C.   **The County's Interpretation of the TUP and Adoption of Policy No. 1 Targets Plaintiffs' Services In Violation Of Federal Law.**

The County's recent enactment of Policy No. 1 is an improper attempt to regulate Plaintiffs' flights in violation of federal law.  In 2004, the County passed Westchester County Municipal Code § 712.462, which codified the Airport's "Terminal Use Procedures" or "TUP." Westchester Cty. Municipal Code ("Municipal Code") § 712.462.  The TUP applies to "Airlines" operating pursuant to 14 C.F.R. Parts 119, 121, and 135 providing "Passenger Services," and requires them to operate from the Terminal pursuant to the Terminal Use Agreement ("TUA"), which imposes further restrictions and requirements on air carriers.  Municipal Code §§

712.462(1), 712.462(2)(o).  For example, the TUA subjects users to a lottery system to determine allocation and flight capacity and requires users to alter flight schedules to adhere to Terminal ramp allocations and passenger limitation restrictions.  Municipal Code §§ 712.462(3)-(5).

The TUP does not apply to Part 380 operations, which typically operate from an FBO.  Municipal Code § 712.462(1).  Section 712.462(2)(j) defines "Passenger Service" as "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."  Municipal Code § 712.462(2)(j).  Defendants maintain any service that involves aircraft of more than nine seats and individual seat sales to the public must operate from the Terminal under a TUA.  (Drabinsky Decl. ¶ 26, Ex. B; Lozier Decl. ¶ 23, Ex I; Botimer Decl. ¶ 17, Ex. L.)

Plaintiffs do not offer traditional "Passenger Service" as defined in Section 712.462(2)(j), but instead JetSuiteX, Blade, and XO Global are engaged in public charter operations under Part 380 with federal approval from DOT.  (*See* Drabinsky Decl., Ex. C).  Part 380 operations were never before considered "Passenger Service" by the County and are not referenced anywhere in the TUP's definitions of "Airline," "Passenger Service," or anywhere else in the TUP.  (*Id.*)  In fact, Part 380 operations at HPN have long occurred at FBOs, and public charter operations under Part 380 go back many decades.  (Drabinsky Decl. ¶ 25; Lozier Decl. ¶ 19; Botimer Decl. ¶ 16.)  Numerous operators have operated at HPN flights with more than nine aircraft seats from FBOs, including under Part 380.  (Drabinsky Decl. ¶ 25; Lozier Decl. ¶ 19.)

On November 5 and 9, 2021, former HPN Airport Manager, Peter Scherrer, demanded Plaintiffs use the Terminal for their operations and claimed Plaintiffs' operations violated § 712.462, which codified the Airport's TUP.  (Drabinsky Decl. ¶ 26, Ex. B; Lozier Decl. ¶ 23, Ex.

-6-

I; Botimer Decl. ¶ 17, Ex. L.)  On November 9, 2021, the former Airport Manager sent notices to the FBOs at HPN and requested the FBOs help HPN enforce Section 712.462 and the TUP.  (*See* Lozier Decl. ¶ 24.)

In a December 2, 2021 letter, the County again asserted Plaintiffs' operations fell within the definition of "Passenger Service" and is regulated by the TUP because their aircraft have more than nine seats and involve sales of single seats to the public.  (Drabinsky Decl. ¶ 29, Ex. D.)  This is the same definition that applies to the large, regularly scheduled airlines, which are federally required to be subjected to SIDA TSA screening procedures and accordingly operate from the Terminal's SIDA portions.  *See* 49 C.F.R. § 1544.101.  Defendants noted however the nine-seat limitation does not apply to other Part 135 air charter operations at the FBOs where a single entity or individual charters the entire aircraft, and individual seats are not made available to the public.  (*Id.*)  Defendants also noted the same limitation did not apply to other FBO operators including Part 91 corporate flight department operations at FBOs, which have also been conducted at the FBOs for decades.  (*Id.*)

The County adopted Policy No. 1 on January 21, 2022, defining Plaintiffs' services as "Single Seat Charter Operations" or "SSCO" and mandating Plaintiffs' services be conducted at the Terminal pursuant to a TUA.  (Drabinsky Decl., Ex. F.)  Policy No. 1 defines SSCOs as DOT Part 380 "public charter" operators, offering single-seat sales to the general public, or any segment thereof, on an aircraft with more than nine seats.  (Drabinsky Decl., Ex. F.)  It further impermissibly limits Plaintiffs' access to HPN because it requires Plaintiffs to route their passengers through the Terminal for departing flights and mandates the use of the Terminal's TSA screening procedures.  (*Id.*; Drabinsky Decl. Ex. C.)  Notably, the TUP itself does not require operators to route passengers through the SIDA TSA screening procedures that is

required at the Terminal.  (Drabinsky Decl., Ex. G.)  However, Defendants included this requirement in Policy No. 1, knowing it would effectively eliminate Plaintiffs' access to HPN. (Drabinsky Decl. ¶¶ 3, 34-35; Lozier Decl. ¶ 27; Botimer Decl. ¶ 20.)

As explained above, however, Plaintiffs' federally authorized Twelve-Five security procedures are separate and exempt from the Terminal's TSA screening procedures, and indeed, subjecting Plaintiffs' customers to the Terminal would not only eliminate Plaintiffs' routes and services but would effectively destroy their businesses at HPN.  (Drabinsky Decl. ¶ 35; Lozier Decl. ¶ 27; Botimer Decl. ¶ 20.)

### D.    Defendants Refused to Make Reasonable Accommodations At HPN, A Federally Funded Public Use Airport, Despite Plaintiffs' Many Proposals.

Despite Plaintiffs numerous efforts to reach a solution in light of the County's new interpretation of the local statute, the County has refused to consider any other option. (Drabinsky Decl. ¶ 39; Lozier Decl. ¶ 25; Botimer Decl. ¶ 19.)

For example, JSX proposed two alternatives that were summarily rejected.  (Drabinsky Decl. ¶ 39, Ex. G.)  These proposals involved checking in passengers at the Terminal and the use of vacant office space on the first floor of the Terminal to hold passengers prior to boarding. (*Id.*)  Under the first proposal, when boarding commences, passengers would be escorted through the Ross Aviation East FBO and down a non-SIDA ramp.  (*Id.*)  Under the second proposal, passengers would be escorted through an access gate just north of the Terminal and then down an Airport terminal ramp.  (*Id.*)  Inexplicably, these proposals were rejected by the Airport, without any meaningful consideration or analysis.[3]  (*Id.*)

Similarly, XO objected and proposed alternatives such as completing passenger check in

---

[3] As a sign of goodwill, JSX offered to limit HPN flights to nine passengers for the remainder of 2021 by physically removing seats from its aircraft, which in and of itself negatively impacted JSX's revenue.  (Drabinsky Decl. ¶ 39, Ex. G [Feb 15, 2022 Letter from A. Wilcox].)

at the Ross Aviation East FBO and transporting the passengers to the aircraft that parked at the terminal to be boarded planeside.  (Botimer Decl. ¶ 19.)  This proposal was also summarily denied without explanation.  *Id.*

Blade likewise objected to the County's position with respect to its services at an FBO. (Lozier Decl. ¶ 25, Ex. J.)  In a November 29, 2021 letter, Blade reminded the County that Blade had been operating at the FBO for the last six years, that the County had approved its leasehold with the FBO, and that the County was involved in the planning and construction activities related to Blade's facilities at the FBO.  (*Id.*)

However, Defendants did not entertain any of Plaintiffs' proposed alternatives.

### E.       Plaintiffs Will Be Irreparably Harmed If The County Is Not Enjoined.

Enforcement of the County's new Policy No. 1 and the TUP to Plaintiffs will irreparably harm Plaintiffs by entirely halting their services at HPN, including routes offered to underserved cities, safe and efficient services to the traveling public, and employment for several employees in the area surrounding HPN.  (Drabinsky Decl. ¶¶ 15; Lozier Decl. ¶ 11; Botimer Decl. ¶ 11.) Plaintiffs will suffer a significant loss of revenue and customer goodwill if they are forced to stop operations at HPN.  (Drabinsky Decl. ¶ 43; Lozier Decl. ¶ 30; Botimer Decl. ¶ 26.)

Policy No. 1 will also cause Plaintiffs to lose significant investments they have already made to operate from HPN, such as lease agreements with FBOs, commercial arrangements with other vendors, and improvements made to their facilities.  For example, Blade has invested over $200,000 in improvements for its facility at Million Air's FBO and pays approximately $60,000 a year to rent space at HPN, and Blade and/or its Part 135 operating partners also pay various fees for landing, facility, parking, RON, shuttle, charter, hanger, after hours and valet parking fees.  (Lozier Decl. ¶ 22.)  Blade has established a New York-based staff and partnered with various local business to offer valet, shuttle, and catering services for its customers.  (Lozier

Decl. ¶¶ 29-30.)  JSX has invested approximately $2 million to operate at HPN.  (Drabinsky Decl. ¶ 40.)  Similarly, XO Global has spent significant time and money in building its operations at HPN to support more than one thousand flights and transport more than 12,000 passengers to and from HPN.  (Botimer Decl. ¶¶ 24-26.)

Additionally, Plaintiffs stand to lose significant profits from the suspension of operations at HPN.  Blade is currently scheduled to fly approximately 165 flights during the November 2021 through April 2022 season and Blade's inability to operate out of HPN would force Blade to cancel flights that have already been booked and could result in losses in the millions for the remainder of the November 2021 through April 2022 season.  (Lozier Decl. ¶ 30.)  JSX expected to offer over 600 flights during the period of March 2022 through October 2022, with an estimated value of $500,000 in revenue.  (Drabinsky Decl. ¶ 40.)  JSX lost hundreds of thousands of dollars when it limited the number of passengers on its flights from HPN for the remainder of 2021.  (Drabinsky Decl. ¶ 41.)  XO Global has already sold 530 seats on 150 flights that are currently published, available for sale, and scheduled to be performed through April 30, 2022 alone, with the revenue of over $1 million.  (Botimer Decl. ¶ 24.)  The loss of these and other future flights not only damages Plaintiffs financially, but harms Plaintiffs' goodwill and reputation in an incalculable amount.

Further, Plaintiffs face unwarranted litigation from the County seeking to enforce the preempted statute and policy.  As of February 7, 2022, the County adopted an act to authorize the County attorney to initiate litigation against Plaintiffs, indicating that the County's attempt to exclude Plaintiffs' operations are imminent.  (Thomas Decl. ¶ 2, Ex. M.)  Then, on March 7, 2022, the same day Plaintiffs filed this action, the County filed an action in New York state court seeking a preliminary injunction set for hearing on April 8, 2022.

III.   **LEGAL STANDARD**

A TRO pursuant to Rule 65(b) of the Federal Rules of Civil Procedure is designed to preserve the status quo.  *AIM Int'l Trading, LLC v. Valcucie SpA.*, 188 F. Supp. 2d 384, 387 (S.D.N.Y. 2002).  The Second Circuit's standard for granting a TRO and a preliminary injunction are identical.  *Id.* at 387; *see also Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 469 (S.D.N.Y. 2020).

To obtain either relief, the moving party must show "(1) irreparable harm absent injunctive relief; (2) a likelihood of success on the merits; and (3) that the public's interest weighs in favor of granting injunction."  *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d. Cir. 2016), *cert. denied by* 137 S. Ct. 2295 (2017).  Moreover, plaintiff must show the "balance of the equities tips in [its] favor and an injunction is in the public interest."  *Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105, 112 n.4 (2d Cir. 2014) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)).  The balance of equities and public interest factors merge when the Government opposes.  *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019).

IV.   **ARGUMENT**

Plaintiffs are entitled to a temporary and preliminary injunction against Defendants' improper enforcement of the TUP and adoption of Policy No. 1.  Defendants attempts to curtail Plaintiffs' routes and services at HPN directly contravenes federal law and regulations regarding access to airports, will cause irreparable harm to Plaintiffs' business and goodwill, and harms the interest of citizens utilizing Plaintiffs' services to travel to and from HPN.

A.   **Plaintiffs Will Be Irreparably Harmed If Defendants Are Not Enjoined.**

Plaintiffs will be irreparably harmed if Defendants are not enjoined from enforcing Policy No. 1 and the TUP on Plaintiffs.  To meet the irreparable harm requirement, Plaintiffs must

demonstrate that absent a preliminary injunction they will suffer an "injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied by an award of monetary damages." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999). "Major disruption of a business can be as harmful as its termination and thereby constitute irreparable injury." *Petereit v. S.B. Thomas, Inc.*, 63 F.3d 1169, 1186 (2d Cir.1995) (remanding with instructions plaintiffs "may show that the lost profits ... are of such magnitude as to threaten the viability of their businesses"). Additionally, irreparable and immediate injury occurs when a business will suffer a loss of goodwill as a result of being unable to provide its services. *See Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 908 (2d Cir. 1990) (district court abused discretion by failing to consider injury from termination of services to customers); *Interphoto Corp. v. Minolta Corp.*, 295 F. Supp. 711, 723–24 (S.D.N.Y.) aff'd, 417 F.2d 621 (2d Cir.1969) (per curiam) (irreparable injury would occur if plaintiff could no longer offer its products).

Here, irreparable harm is actual and imminent because Defendants' new Policy No. 1 and the TUP will prevent Plaintiffs from operating at HPN, force them to cancel flights to and from HPN, and terminate any future operations planned at HPN. Policy No. 1 forces Plaintiffs to operate out of the Terminal, which subjects Plaintiffs' customers to SIDA TSA screening despite Plaintiffs' TSA-approved non-SIDA screening processes. Indeed, Plaintiffs' TSA-approved non-SIDA screening protocols that allow for speedier check-in, boarding and baggage handling is one of the primary reasons customers choose to use Plaintiffs' services. Without this key differentiator, Plaintiffs will lose customers and they will not be able to compete with the large commercial airlines, effectively eliminating their services and destroying their businesses.

Furthermore, subjecting Plaintiffs' customers to the Terminal's SIDA TSA screening will also impact Plaintiffs' route offerings. While the County is temporarily willing to allow

Plaintiffs arriving flights to land at FBOs in order to comply with federal regulations regarding

SIDA, this solution only solves half the problem (and only temporarily).  While Plaintiffs

customers arriving at HPN will not be subject to the Terminal's TSA screening procedure,

customers departing from HPN will be.  This would cause significant confusion and

inconvenience for passengers traveling in and out of HPN, particularly when they do not face

such an inconsistent screening process when flying with Plaintiffs from other airports.[4]  Thus,

implementation of Policy No. 1 will be damaging to Plaintiffs' goodwill with customers.

      The loss of operations at HPN would be significant for Plaintiffs.  As detailed above and

in the supporting declarations, Plaintiffs have each invested significant sums in their operations at

HPN, directly and indirectly employ many, and stand to lose significant revenue and profits if

unable to operate at HPN.  (Drabinsky Decl. ¶¶ 40-42; Lozier Decl ¶¶ 22, 29-30; Botimer Decl. ¶¶

24-26.)  Policy No. 1 and application of the TUP to Plaintiffs, if not enjoined, will cause irreparable

harm to Plaintiffs' reputation, its employees, and to the public as Plaintiffs will be forced to cease

operations at HPN.  (Drabinsky Decl. ¶¶ 40-42; Lozier Decl. ¶ 30; Botimer Decl. ¶¶ 25-26.)

      Furthermore, the harm to Plaintiffs is imminent as the County has sent multiple letters to

Plaintiffs claiming Plaintiffs' non-compliance with Policy No. 1, and Defendants have repeatedly

indicated their immediate intent to enforce Policy No. 1 against Plaintiffs by bringing suit.

(Drabinsky Decl. ¶ 44; Lozier Decl. ¶ 31; Botimer Decl. ¶ 27.)  As recently as February 7, 2022,

Defendants sent Plaintiffs a demand to immediately cease operations.  (Drabinsky Decl. ¶ 32, Ex.

F).  On the same day, Defendants adopted Act 7-2022, formally authorizing the commencement

---

[4] This convoluted procedure is the equivalent of flying two one-way flights on different airlines that depart and arrive from different terminals at the same airport.  Customers to purchase round-trip tickets on the same airline in the same terminal, and therefore will not purchase only a one-way ticket from Plaintiffs.

of legal action, including litigation.  (Thomas Decl. ¶ 2, Ex. M.)  Then, on March 7, 2022, the same day Plaintiffs filed this action, the County filed an action in New York state court seeking a preliminary injunction set for hearing on April 8, 2022.

By contrast, the County will not be prejudiced by maintenance of the status quo, i.e., Plaintiffs continuing to operate from FBOs, as they or their predecessors have since 2015, until a reasonable accommodation can be made or this case is otherwise resolved.  Since Plaintiffs' current operations are safe and efficient, quieter than commercial airlines flying out of HPN, and provide desired service to the public, the County will hardly suffer during any TRO or preliminary injunction.

### B.   Plaintiffs Are Likely To Succeed On The Merits.

1.   **Plaintiffs Are Likely to Succeed on Their Section 1331 Claims For Preemption Because County's Interpretation Of TUP And Adoption Of Policy No. 1 Is Preempted By The ADA And ANCA.**

Plaintiffs are likely to succeed on the merits of their claims for preemption under the ADA and ANCA.  The Court has federal question jurisdiction under Section 1331 over challenges to preempted state statutes and regulations.  It is well-established a "plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute" thus "presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve."  *Shaw v. Delta Air Lines*, 463 U.S. 85, 96 n. 14 (1983); *see also Wis. Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 (1991) ("state laws that interfere with, or are contrary to the laws of congress, made in pursuance of the constitution are invalid" under Supremacy Clause); *Metro. Taxicab Bd. of Trade v. City of New York*, No. 08CIV7837(PAC), 2008 WL 4866021, at *4 (S.D.N.Y. Oct. 31, 2008) (citing *Shaw* to permit injunctive relief cause of action from allegedly preempted state action).

Indeed, the Second Circuit has repeatedly held a plaintiff can assert a defensive

preemption claim for declaratory and injunctive relief under ADA and ANCA.  *See W. Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 225 (2d. Cir. 1987) (plaintiff stated claim based on ADA preemption despite absence of private right of action); *Air Transport Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 221-22 (2d. Cir. 2008) (plaintiff could maintain preemption under Supremacy Clause); *Friends of the E. Hampton*, 841 F.3d at 144-45 (recognizing plaintiff's right to seek injunction of local or municipal conduct under defensive preemption by ANCA).

Defendants' adoption of Policy No. 1 and application of the TUP to Plaintiffs violates the ADA and ANCA.  Plaintiffs' Section 1331 claims for preemption are therefore likely to prevail.

    a.    The ADA Preempts County's Application Of TUP And Policy No. 1 As Unlawful Restriction On Routes And Services.

Policy No. 1 and the TUP as applied to Plaintiffs runs afoul of the ADA's broad preemptive effect on local regulations related to routes and services.  The ADA prohibits local or municipal authorities from "enact[ing] or enforce[ing] a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart."  49 U.S.C. § 41713(b).  Thus, Congress expressly preempted any state or local regulation related to price, routes, and services.  *See Air Transp. Ass'n of Am.*, 520 F.3d at 222 (relying on *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 380–81 (1992); *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 225–26 (1995)); *see also Friends of the E. Hampton*, 841 F.3d at 144-45.

In construing the ADA, the Supreme Court concluded that state enforcement actions related to "rates, routes, or services," are preempted, even if the law's effect "is only indirect," and regardless of whether the law is inconsistent with federal regulation.  *See Air Transp. Ass'n of Am.*, 520 F.3d at 222 (quoting *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008)).  As the Second Circuit has observed, Congress's "overarching goal" with regard to the ADA is to

assure that transportation rates, routes, and services reflect maximum reliance on competitive market forces, thereby stimulating not only efficiency, innovation, and low prices, but also variety and quality in transportation services.  *Air Transp. Ass'n of Am.*, 520 F.3d at 222–23.

In *Air Transport Ass'n*, the Second Circuit similarly construed the state's passage of a "Passenger Bill of Rights" to be a preempted restriction on services because it impacted matters such as boarding procedures, baggage handling, and food and drink, even if it was incidental to and distinct from the actual transportation of passengers.  *Air Transport Ass'n*, 520 F.3d at 222-23.  Similarly, the Tenth Circuit enjoined a ban on an operator's "scheduled passenger service," as an unlawful regulation of routes and services that was preempted by the ADA.  *See Arapahoe Cty. Public Airport Auth. v. F.A.A.*, 242 F.3d 1213, 1222-24 (10th Cir. 2001) (finding Authority "affirmatively curtailed an air carrier's business decision to offer a particular service in a particular market," "impact[ed] scope of services available to public citizens" traveling through the airport and prevented carrier from "conduct[ing] regular operations over any route involving the banned airport").  A District Court in the Central District of California recently enjoined the County of Orange and the airport there from enforcing a similar restriction against JSX that purported to curtail Part 135 and Part 380 operations from FBOs.  *See Delux Pub. Charter LLC v. Cty. of Orange*, No. 8:20-CV-2344-JLS-KES, 2021 WL 5083742 (C.D. Cal. Jan. 3, 2021) (finding Plaintiffs were "likely to succeed in showing that the County failed to comply with ANCA and ADA" because restriction effectively foreclosed Plaintiffs' access to airport).

Likewise, here, Policy No. 1 directly impacts Plaintiffs' services.  Under the Policy, Plaintiffs would have to operate from the Terminal, which does not offer non-SIDA boarding.  (Drabinsky Decl. ¶ 33; Lozier Decl. ¶ 27; Botimer Decl. ¶ 21.)  Plaintiffs' customers would be required to undergo SIDA TSA screening at the Terminal instead of Plaintiffs' current TSA-

approved screening processes, which fundamentally alters Plaintiffs' services.  (Drabinsky Decl. ¶ 34; Lozier Decl. ¶¶ 28-29; Botimer Decl. ¶ 22.)  Plaintiffs would no longer be able to provide the very service they are advertising to customers and for which they received federal approval – a fast, convenient, travel experience.  (Drabinsky Decl. ¶¶ 33-34; Lozier Decl. ¶¶ 28-29; Botimer Decl. ¶ 20.)  This service is not merely "incidental" but is a core element of Plaintiffs' business model.  (Drabinsky Decl. ¶ 34; Lozier Decl. ¶¶ 28-29; Botimer Decl. ¶ 22.)  Moreover, Plaintiffs offer other valuable services that cannot be offered at the Terminal, such as valet and shuttle services, concierge services, private lounge access, specialized health and safety protocols, and speedier check-in and boarding.  (Drabinsky Decl. ¶ 36; Lozier Decl. ¶¶ 13-14, 28-29; Botimer Decl. ¶ 12, 23.)  Defendants' application of the TUP and Policy No. 1 puts Plaintiffs in the impossible position of violating local regulations or ceasing operations altogether.

Additionally, Policy No. 1 will prevent Plaintiffs from operating underserved routes from HPN.  (Drabinsky Decl. ¶ 35; Lozier Decl. ¶ 11; Botimer Decl. ¶ 11.)  Plaintiffs offer routes from HPN to cities such as Miami, Fort Lauderdale, Palm Beach, Van Nuys, and Oakland, some of which are not currently offered by any of the large airline carriers operating from the Terminal.  (Drabinsky Decl. ¶ 21; Lozier Decl. ¶ 7; Botimer Decl. ¶ 8.)  However, Plaintiffs' ability to service these routes depends on its ability to operate from a non-SIDA location. (Drabinsky Decl. ¶ 24; Lozier Decl. ¶ 17; Botimer Decl. ¶ 14.)  This allows Plaintiffs to provide routes to other small airports that either do not have TSA screening for SIDA locations or where Plaintiffs currently operate only from non-SIDA locations at those airports.  (Drabinsky Decl. ¶ 21; Lozier Decl. ¶ 11; Botimer Decl. ¶ 11.)  By forcing Plaintiffs to move their operations to the Terminal, Defendants are effectively preventing Plaintiffs from operating these underserved routes.

Defendants' application of the TUP and Policy No. 1 against Plaintiffs' operations do not fall within the sole exception to the ADA's broad preemptive effect, the "proprietary right exception," which is narrowly interpreted.  49 U.S.C. § 41716(b)(3); *see also Friends of E. Hampton*, 841 F.3d at 139 (requiring local regulation be consistent with federal policy for exception to apply).  The proprietor is vested "only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs."  *Id.* (citations omitted).

Courts applying the proprietor exception have upheld restrictions only when they are targeted at advancing a specific local interest.  *See, e.g.*, *Nat'l Helicopter Corp. of Am. v. City of N.Y.*, 137 F.3d 81, 88 (2d. Cir. 1998) (tempering environmental concerns); *cf. Arapahoe Cty.*, 242 F.3d at 1223 (expressing skepticism that safety and civil aviation needs fell within proprietor exception and finding asserted safety concerns unsupported).  But the County has not cited any permissible local interest addressed through Policy No. 1.  Indeed, Plaintiffs were operating from FBOs for years without concern from the County.  (Lozier Decl. ¶ 7; Botimer Decl. ¶ 7.)  The County cannot now credibly claim to have a local concern about Plaintiffs' operations that can be remedied only by moving Plaintiffs operations from one part of the Airport to another.

> b. ANCA Preempts The County's Adoption of Policy No. 1 Against Plaintiffs' Access To The Airport.

Even if the County could successfully avoid ADA preemption, Policy No. 1 would nonetheless be preempted by the County's failure to abide by ANCA.  *See Friends of E. Hampton*, 841 F.3d at 155 (local laws were preempted by ANCA even if they otherwise fell within proprietor exception).  Congress expressly preempted the area of access to public airports when it adopted ANCA.  49 U.S.C. § 47521(2)-(3) (local restrictions "impeded the national air transportation system" and "a noise policy must be carried out at the national level").  An

"airport noise or access restriction on the operation of stage 3 aircraft not in effect on October 1, 1990, may become effective ***only if*** the restriction has been agreed to by the airport proprietor and all aircraft operators or has been submitted to and approved by the Secretary of Transportation after an airport or aircraft operator's request for approval as provided by the program established under this section."  49 U.S.C. § 47524(c) (emphasis added); *see also Friends of E. Hampton*, 841 F.3d at 138.  Pursuant to ANCA, the DOT promulgated a national program through 14 C.F.R. 161.  Section 47524 has been interpreted to require all public airports comply with Part 161 before any access restriction affecting a Stage 3 aircraft can be enforced. *See* 14 C.F.R. §§ 161.101, 161.301(c); *see also* 49 U.S.C. § 47524(c)(2) (setting forth requirements for approval of access restriction).

The Second Circuit has already addressed a closely analogous situation where various airport users and operators sought injunctive relief to stop a local airport sponsor from enforcing local laws restricting operators' access to public use airport.  *See Friends of the E. Hampton*, 841 F.3d at 152.  There, the Second Circuit found the plaintiffs were likely to succeed on their ANCA preemption claim and enjoined enforcement of three local laws that limited the number of weekly flights and imposed curfews against certain aircraft.  *Id.* at 141.  The Second Circuit found the local laws were preempted by ANCA and the proprietor exception did not apply because the town failed to abide by ANCA's procedural requirements.  *See id.* at 147, 154-55.

In its holding, the Second Circuit emphasized that ANCA's procedural requirements— Part 161 or unanimous consent—were mandatory.  *Id.* at 151-52 ("[T]he plain statutory text is fairly read to mandate the identified procedural requirements for local noise and access restrictions on Stage 2 and 3 aircraft at any public airport.").  The regulations delineate six mandatory conditions before a proposed restriction is approved by the FAA, including that the

124222808

restriction is "reasonable, nonarbitrary, and nondiscriminatory."  14 C.F.R. § 161.305(e)(2)(i)

None of the ANCA requirements are met here.  The County has not obtained agreement from all aircraft operators to enact such a restriction (hence the present lawsuit).  Nor have they received approval from the appropriate federal authorities.  (Compl. ¶ 86.)

Further, Defendants cannot show that the restriction is reasonable, nonarbitrary, and nondiscriminatory.  The Airport has not, and cannot, reasonably contend that Plaintiffs' operations pose noise and capacity risks that would be remedied by simply moving Plaintiffs from FBOs to the already crowded Terminal.  Indeed, Blade and XO Global in conjunction with its related company, JetSmarter, Inc., have operated from an FBO since 2015 without noise or capacity complaints.  (Lozier Decl. ¶ 7; Botimer Decl. ¶ 7.)  Plaintiffs' flight offerings also minimize airport impact by aggregating passengers into smaller and/or quieter aircraft when passengers may instead charter their own aircraft, which would create further noise, impact, or airport congestion.  (Drabinsky Decl. ¶ 19; Lozier Decl. ¶ 15; Botimer Decl. ¶ 13.)  Moreover, air carriers utilizing aircraft of similar sizes and noise levels continue to offer flights out of the FBOs.  (Drabinsky Decl. ¶ 23; Lozier Decl. ¶ 19; Botimer Decl. ¶ 16.)

Finally, the TUP and Policy No. 1 are not "grandfathered" restrictions.  Federal law permits noise and access restriction in effect prior to the enactment of ANCA to be "grandfathered" in unless they reduce or limit aircraft operations.  49 U.S.C. § 47524(d).  But the TUP was codified in 2004, well after ANCA's enactment.  Moreover, Policy No. 1 is an amendment of the ordinance.  Defendants adopted Policy No. 1 to name Part 380 operators that offer more than nine seats for sale to the public to bring them within the purview of the TUP, which is silent as to Part 380 operators (and was never before applied to them).  Given that Policy No. 1 addresses an issue the TUP does not contemplate, as the County acknowledged, and

124222808

effectively eliminates Plaintiffs' ability to operate at HPN, it is subject to ANCA.  (*See -* Drabinsky Decl. Ex. F.)

Accordingly, the County has not complied with, let alone pursued, approval of the policy as mandated by ANCA and thus Defendants' attempt to enact a new policy or law to regulate Plaintiffs' access to HPN is preempted by ANCA.

> **2.      Plaintiffs Are Likely To Succeed On Their Section 1983 Claim Because The County's Application Of The TUP And Policy No. 1 Deprives Plaintiffs Of Equal Protection.**

Plaintiffs are also likely to prevail on the merits of their 42 U.S.C. § 1983 claim for Equal Protection because Defendants intentionally adopted Policy No. 1 to eliminate Plaintiffs' operations from HPN.  To state a Section 1983 claim, a plaintiff need only allege (1) a violation of a right secured by the Constitution and laws of the United States; and (2) that the deprivation was committed by a person action under color of law.  *See K.A. v. City of New York*, 413 F. Supp. 3d 282, 294 (S.D.N.Y. 2019) (citing *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999)).

The Second Circuit has long recognized equal protection extends to individuals "who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials."  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).  A plaintiff may bring such a "class of one" claim under the Equal Protection Clause where they have been treated differently from others similarly situated and there is no rational basis for the differential treatment.  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (number in a class immaterial for equal protection and recognizing "class of one theory").

Under this theory, Plaintiffs must show (1) no rational person could regard plaintiff's circumstances to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy, and (2) the similarity in circumstances and difference in treatment are sufficient to rule out that defendants made a mistake.  *Clubside,*

124222808

*Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006); s*ee also 545 Halsey Lane Props., LLC v.*

*Town of Southampton*, 39 F. Supp. 3d 326, 344 (E.D.N.Y. 2014) (considering if persons in

similar circumstances "received more favorable treatment than the plaintiff is offered" without

"any reasonable nexus to legitimate governmental policy").  Here, Plaintiffs meet both parts.

As to the first prong of the test, Plaintiffs will be able to establish that they were treated

differently from similarly situated operators.  For example, Plaintiffs are similarly situated to

other operators that operate from FBOs.  Plaintiffs' flights involve similar (if not identical)

aircraft to those who are permitted to continue operating at FBOs.  (Drabinsky Decl. ¶ 23; Lozier

Decl. ¶ 19; Botimer Decl. ¶ 16.)  The aircraft have a similar noise profile, fly similar routes, and

in many cases carry a similar number of passengers.  (See id.)  These aircraft also apply a TSA-

approved screening process outside of a SIDA area.  (*See* Drabinsky Decl. ¶¶ 23-25; Lozier

Decl. ¶ 18; Botimer Decl. ¶ 15.)  Further, that Plaintiffs sell seats on aircraft with more than nine

seats to the public does not change that Plaintiffs use the same types of aircraft that have been

operating from the FBOs for decades.  (Drabinsky Decl. ¶¶ 25-27, Ex. C; Lozier Decl. ¶ 19;

Botimer Decl. ¶ 16.)  Likewise, that Plaintiffs' flights utilize aircraft capable of carrying more

than nine passengers does not make them different from other operators that are permitted to

remain at the FBOs.  Thus, Plaintiffs are similarly situated to other FBO operators at HPN.

Plaintiffs were treated differently from these similarly situated operators because

Defendants' newly established policy expressly singles out Plaintiffs for application of the TUP.

Defendants have labeled Plaintiffs' federally authorized operations as "Single Seat Charter

Operations," to justify applying the TUP and requiring Plaintiffs to move to the Terminal.

(Drabinsky Decl. ¶ 38, Ex. F.)  Notably, Plaintiffs' operations involve aircraft of the same size,

similar flight patterns, and similar routes as other operators that are permitted to remain at the

FBOs.[5]  (*See* Drabinsky Decl. ¶¶ 25-27; Lozier Decl. ¶¶ 18-19; Botimer Decl. ¶¶ 15-16.)

Moreover, there is no rational basis for the differential treatment.  Plaintiffs' flights do not impact the Airport more than other Part 135 and Part 380 operators, and in fact, minimize noise and capacity concerns by aggregating passengers into smaller or quieter aircraft when passengers may instead charter their own aircraft which would increase flights, noise, and congestion.  (Drabinsky Decl. ¶ 19; Lozier Decl. ¶ 15; Botimer Decl. ¶ 13.)  For example, instead of ten passengers each chartering their own aircraft to the same destination, Plaintiffs' flight offerings aggregate those ten passengers in one aircraft, thus minimizing the comparative impact.  (*Id.*)  Enforcement of Policy No. 1 against Plaintiffs would exacerbate noise and capacity at HPN by encouraging HPN travelers to rely on individual charters flights.  (*Id.*)

As to the second prong, the evidence demonstrates Defendants' application of the TUP and Policy No. 1 specifically targeted Plaintiffs' business model.  At the core of these models is that customers can forego Terminal's TSA security in favor of a different TSA-approved security protocol, which must occur at a non-SIDA location.  (Drabinsky Decl. ¶ 24; Lozier Decl. ¶ 17; Botimer Decl. ¶ 14.)  Defendants know all of this.  (*Id.*)  Yet, they adopted a policy that would force Plaintiffs to move their operations to the SIDA-only Terminal and force Plaintiffs to obtain a type of TSA operator security program they are not required to hold under federal regulations.  (Drabinsky Decl. ¶¶ 34-35; Lozier Decl. ¶¶ 27-29; Botimer Decl. ¶¶ 20-22.)  Defendants further refused to provide any reasonable accommodations to Plaintiffs, such as to establish a non-SIDA area in the Terminal, so that Plaintiffs can continue operating.  (Drabinsky Decl. ¶ 39; Lozier Decl. ¶ 26; Botimer Decl. ¶ 19.)

---

[5] For example, Defendants maintain the TUP and Policy No. 1 would not apply to a Part 91 Gulfstream IV owner for example who could also charter flights without being subjected to the same restrictions.  (*See* Drabinsky Decl. Ex.D.)

While the TUP does not mention Part 380 operators (nor was it previously applied to them), Defendants adopted Policy No. 1 to expressly name Part 380 operators that offer more than nine seats for sale to the public.  (Drabinsky Decl. Ex. F.)  Policy No. 1 even specifically mandated use of the Terminal's TSA screening process, which the TUP does not require.  (Drabinsky Decl. Ex. G.)  Policy No. 1 is not related to any legitimate interest.  Instead, it seeks to impose on Plaintiffs' operations even more stringent requirements than the TUP requires (or is permissible under federal law) to eliminate Plaintiffs' operations from HPN altogether.

### C.      An Injunctions Is In The Public Interest

A preliminary injunction is in the public interest because it will prevent the County from foreclosing Plaintiffs' services to the public.  A court should balance public interests when deciding if a plaintiff's irreparable injury and probability of success on the merits warrants injunctive relief.  *RxUSA Wholesale, Inc. v. Dep't of Health & Hum. Servs.*, 467 F. Supp. 2d 285, 291–92 (E.D.N.Y. 2006) (preliminary injunction benefits public interest by keeping status quo with potentially unconstitutional FDA rule).  The public interest is not served by maintaining an unconstitutional policy when constitutional alternatives exist.  *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020) (reversing denial of preliminary injunction where executive order likely violated First Amendment rights).

Here, an injunction is in the public interest because Plaintiffs can continue services they were already providing to their customers (and in some cases are paid already) and will ensure public access to Plaintiffs' routes and services.  Again, Plaintiffs offer routes from HPN that large commercial airlines do not offer at the Terminal.  (Drabinsky Decl. ¶ ¶15-17; Lozier Decl. ¶ 11; Botimer Decl. ¶ 11.)  Moreover, Plaintiffs consistently rank high on customer satisfaction surveys and demand has grown for their services.  (Drabinsky Decl. ¶ 20; Lozier Decl. ¶ 14; Botimer Decl. ¶ 8.)  The County cannot show it is in the public interest to enforce Policy No. 1.

**D.      Plaintiffs Should Not Be Required To Post A Bond Pursuant To Rule 65(c)**

The Court should not require Plaintiffs to post a bond.  Rule 65 "gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement where there has been no proof of likelihood of harm . . . ."  *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997). Here, there is no likelihood of harm given Plaintiffs are asking this Court to maintain the years-long status quo so Plaintiffs can continue operating from FBOs.  *See New York State Telecomms. Ass'n, Inc. v. James*, 544 F. Supp. 3d 269, 289 (E.D.N.Y. 2021).

**V.      CONCLUSION**

Thus, the Court should grant Plaintiffs' request for TRO and preliminary injunction and enjoin Defendants from (1) enforcing Westchester County Airport Operational Policy No. 1 ("Policy No. 1"); (2) enforcing the Westchester County Municipal Code § 712.462, the Terminal Use Procedures ("TUP"), as applied to the Plaintiffs and any Part 135 operators utilized by Plaintiffs at Westchester County Airport ("HPN"); (3) preventing or interfering with Plaintiffs continuing operations out of the Fixed Base Operators ("FBO") at HPN; and (4) indirectly violating any of the orders contained therein.

124222808

Dated:      March _8, 2022                    TROUTMAN PEPPER HAMILTON
                                              SANDERS LLP


                                              By: */s/ John N. Thomas*
                                              _____
                                                  John N. Thomas
                                                  Jenna C. Hutchinson
                                                  TROUTMAN PEPPER HAMILTON
                                                  SANDERS LLP
                                                  875 Third Avenue
                                                  New York, NY 10022
                                                  Telephone: 212.704.6000
                                                  Facsimile: 212.704.6288
                                                  jack.thomas@troutman.com
                                                  jenna.hutchinson@troutman.com

                                                  Steven D. Allison (PHV Forthcoming)
                                                  Samrah R. Mahmoud (PHV Forthcoming)
                                                  Sheila Z. Chen (PHV Forthcoming)

                                                  Attorneys for Plaintiffs
                                                   Delux Public Charter, LLC d/b/a JSX Air;
                                                  JetSuiteX, Inc.; XO Global, LLC; Blade
                                                  Urban Air Mobility, Inc.

124222808