1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2
    ----------------------------------------x
3   DELUX PUBLIC CHARTER, LLC d/b/a JSX
    AIR and JETSUITEX, INC., XO GLOBAL,
4   LLC; and BLADE URBAN AIR MOBILITY, INC.,

5                              Plaintiffs,

6                              Case No. 22-cv-01930
        -vs-
7
    COUNTY OF WESTCHESTER, NEW YORK, a
8   charter county; APRIL GASPARRI, in her
    official capacity is AIRPORT MANAGER;
9   and AVPORTS, LLC,

10                             Defendants.
    ----------------------------------------x
11
                               United States Courthouse
12                             White Plains, New York

13                             March 11, 2022

14                ** VIA TELECONFERENCE **

15  B e f o r e:
                               HONORABLE PHILIP M. HALPERN
16                             United States District Judge

17
    A P P E A R A N C E S:
18
    TROUTMAN, PEPPER, HAMILTON, SANDERS, LLP
19      Attorneys for Plaintiffs
    BY:  STEVEN D. ALLISON
20       JOHN N. THOMAS

21
    WESTCHESTER COUNTY ATTORNEY
22  LAW DEPARTMENT
        Attorneys for Defendant, County of Westchester
23  BY:  JOHN NONNA
         DAVID H. CHEN

24

25  *Proceedings recorded via digital recording device*

```
 1  A P P E A R A N C E S:  (CONT.)

 2  THE FOONT LAW FIRM, LLC
          Attorneys for Defendant, AvPorts, LLC and April Gasparri
 3  BY:  BRIAN E. FOONT

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1            THE DEPUTY CLERK:  Delux Public Charter, LLC, et al.
 2 against the County of Westchester, New York, et al.
 3            Would the plaintiffs please note your appearance?
 4            MR. THOMAS:  Yes.  Good morning.  This is Jack Thomas
 5 of Troutman, Pepper for the plaintiffs.  Also on the phone is my
 6 partner, Steven Allison.
 7            MR. ALLISON:  Good morning, Your Honor.  Steven
 8 Allison, Troutman Pepper, for the plaintiffs.
 9            THE COURT:  Good morning, counsel.
10            MR. NONNA:  For Westchester County, Westchester County
11 Attorney John Nonna.
12            MR. CHEN:  And also for Westchester County, Deputy
13 County Attorney David Chen.
14            MR. FOONT:  And AvPorts and April Gasparri, Brian
15 Foont.
16            THE COURT:  All right.  Counsel, good morning.
17            ALL COUNSEL:  Good morning, Your Honor.
18            THE COURT:  I feel like a little bit like the lawyers
19 are pushing a big pile of stuff my way, and I want to start by
20 -- let's try to simplify what's going on here for a moment.
21            First of all, Mr. Foont, are you admitted to the bar
22 in the Southern District?
23            MR. FOONT:  I am, Your Honor.
24            THE COURT:  All right.  So then you know that you got
25 to look at my rules, and you got to make an appropriate motion,
```

1   and your motion under Rule 21 is inappropriate.  So I am just

2   going to deny it without prejudice.

3          However, Mr. Allison, Mr. Thomas, why do we need

4   AvPorts and April Gasparri?  The County is the offender

5   according to your complaint, right?  And April Gasparri, airport

6   manager, and AvPorts, LLC have nothing whatsoever to do with

7   this.  They are employees or agents of the County; am I right?

8          MR. ALLISON:  This is Mr. Allison, Your Honor.

9   Essentially, you are correct.  It was a little unclear to us,

10  Ms. Gasparri is the airport director, and whether she was acting

11  as -- in an official capacity within the purview of a

12  Section 1983 equal protection clause.  So that is why we added

13  her; and AvPorts, who was the one who sent us the letters, our

14  clients the letters informing them of the County's policies

15  initially.  We told Mr. Foont when we were contacted by him this

16  week that we would quickly consider his request and get back to

17  him, but that we had the pressing business of the TRO and

18  certainly would consider that.

19         So we want to look at that carefully and make sure we

20  make the right decision, but I think that Your Honor's

21  suggestion that we may be able to reach a resolution and get

22  them out of the case is -- it may be correct.

23         THE COURT:  All right.  I don't know who wants to

24  speak.  Mr. Nonna, good morning.  Mr. Chen.  What's the

25  situation with these two defendants?

1          MR. CHEN:  Your Honor, this is Dave Chen on behalf

2    Westchester.  What you said is correct.  They are our agents.

3    AvPorts operates the airport for the County.  Ms. Gasparri is

4    the -- is an AvPorts employee, and she has the title of airport

5    manager or director, but for all intents and purposes, she and

6    AvPorts are purely our agents in here.  Her involvement, yes,

7    she signed Policy Number 1, which was promulgated on

8    January 21st, but that's just, again, in her capacity as the

9    airport manager.  She is acting on behalf of the County in that

10   regard.

11          THE COURT:  Okay.  So the first order of business,

12   Mr. Allison, Mr. Foont, and Mr. Chen, you are going to meet and

13   confer, and you are going to let me know -- well, we will fix a

14   date in a moment because you are going to have several topics

15   that you are going to meet and confer about.  But please do this

16   promptly.  I don't want Mr. Foont's law firm engaged here unless

17   it's necessary.  If it's necessary, then of course, Mr. Allison,

18   they remain subject to a proper motion to dismiss; but the

19   instinct that I have is that the individual and the entity are

20   nothing more or less than players without regard to the ability

21   -- without regard to their signing things that they are not

22   necessary parties, and so I am going to ask the three of you to

23   meet and confer.

24          I am also going to instruct that -- Mr. Allison's

25   entitled, Mr. Chen, on some basis, he has clients -- he is

1 entitled to understand their role in some way, shape or form.  I

2 am not looking to create discovery.  I am directing, however,

3 that if there is a piece of paper or pieces of paper, and they

4 may need to be redacted for whatever reason that satisfies

5 Mr. Allison, if he needs it, of their role, then I am directing

6 you to produce them immediately.  Am I clear?

7          MR. CHEN:  Yes, Your Honor.

8          THE COURT:  All right.  Terrific.  So that's one

9 issue.

10          Now, another issue -- and I am glad to see our County

11 Attorney, Mr. Nonna, is on the call.  I have looked at two

12 letters from the County that were uploaded here.  One is

13 Document 21, one is Document 29, and I am trying to be practical

14 here.  As you will see in a minute, I approach these things from

15 a practical point of view.

16          The County has indicated to me that they have not

17 interfered with the plaintiffs' flights, nor will they do so

18 without a valid order, and they have also indicated to me that

19 they will not take, and have not taken, any action to affect

20 their operation, "their" being the plaintiffs' operations at

21 Westchester County.

22          So having said that to each other, what I would like

23 to do is have you stipulate that you will continue to abide that

24 until some other event.

25          Is there a problem with that, Mr. Nonna?

```
 1              MR. NONNA:  No, Your Honor.  That's why we started the
 2    lawsuit.  We weren't going to exercise any self-help enforcing
 3    the policy or the terminal use regulations without getting
 4    approval by the -- by a court without an adjudication that they,
 5    in fact, apply to these specific charter operators.
 6              THE COURT:  All right.  So, Mr. Allison, what I am
 7    proposing is that we stipulate, and that you and Mr. Chen and
 8    Mr. Nonna enter into an order and stipulation that I will sign
 9    that reflects this language.  We are not going to get into the,
10    Mr. Allison, the -- you're temporarily enjoined and restrained;
11    we are not doing that.  What we are going to do is we are going
12    to seize upon the language that the County has offered and enter
13    into an order and stip that the County will not interfere with
14    these flights and will not do so without a valid court order;
15    and that they will not, have not taken any action to affect
16    plaintiffs' operations at the county airport without further
17    court order, I assume, Mr. Nonna.
18              MR. NONNA:  Yes.
19              THE COURT:  Now that eliminates, from my seat, a whole
20    variety of problems that are practical.
21              Mr. Allison, do you have any issue with this?
22              MR. ALLISON:  Your Honor, there is one rather
23    significant issue that I would -- that I would suggest that we
24    need to address by this stip and order procedure that you have
25    outlined.
```

1          The County has, in fact, taken what we would consider

2   to be some level of self-help here.  The County has sent letters

3   to the fixed-base operators or FBOs, which are the facilities at

4   the airport that we operate out of --

5          THE COURT:  Right.  Cease and desist letters.

6          MR. ALLISON:  Right.  And these third parties, which

7   are essential to our business, have been essentially asked to,

8   you know, enforce that policy.  I would suggest that the stip

9   and order needs to include that there is no further action, and,

10  in fact, that these FBOs be informed that those letters are of

11  no force and effect, at least at this point; that they are not

12  being asked to take any action to effectuate the County policy

13  because we are gravely concerned that these third parties might

14  view that they -- that their -- it's in their interest or that

15  they are concerned about whether they need to do something in

16  light of those letters.

17          So I would suggest that we have to add that into this

18  to make sure that there is no sort of, I guess --

19          THE COURT:  I don't think --

20          MR. ALLISON:  -- indirect issue.

21          THE COURT:  I don't think, Mr. Allison, I am going to

22  direct anybody to withdraw their cease and desist orders, but as

23  a practical matter, Mr. Nonna, Mr. Chen, is there any issue with

24  this?  In other words, what I think I am hearing is:  They just

25  want to be sure, the plaintiffs just want to be sure that --

1   these are non-parties, Mr. Allison?  Is that what you are

2   saying?

3           MR. ALLISON:  They are.  They are, Your Honor.  They

4   are not parties to any of the proceedings either in state or

5   federal.

6           THE COURT:  So that the same applies to parties and

7   the recipients of the cease and desist letters; is that it?

8           MR. ALLISON:  Your Honor, that is our concern.

9   Correct.

10          THE COURT:  All right.  Now --

11          (cross-talk)

12          THE COURT:  Mr. Nonna, Mr. Chen, that doesn't seem to

13  be anything unreasonable at all, does it?

14          MR. CHEN:  No.  We will provide the FBOs with the

15  stipulation and order as well.  So they will see the County --

16          THE COURT:  Mr. Allison's point, he is being careful,

17  as he should.  He is saying that this order and stip applies to

18  the parties hereto and the nonparties who have received the

19  County's cease and desist orders.

20          MR. NONNA:  Yes.

21          THE COURT:  Okay.  Terrific.  So we are past the TRO.

22  We are past the problems.  Hopefully Mr. Foont will be in and

23  out of here very quickly.  But now -- and so you are going to

24  get this to me immediately.  I would like it today if it's

25  possible.  If it's not possible today, I would like it on Monday

1  so that I can so order it, and we can move on.

2          Now, the next problem here, practical problem that

3  exists in my mind is, Mr. Allison, your action came subsequent

4  to the County's action, and I get it.  Before I was so

5  privileged and lucky as to be on this side, I was on your side

6  for 40 years, and I perfectly understand lawyers wanting to

7  guide their own issues, number one.

8          Number two, as I understand it, you know, we have had

9  plenty of time back and forth, the County even announced that

10 they were authorized to bring an action somewhere in early

11 February, and so they got ahead of you and whatever it is, I get

12 it.  But now we've got to be practical for each other, and as I

13 understand the situation, the state court action is in front of

14 Judge Lubell, a fine Supreme Court justice, and he has scheduled

15 a preliminary injunction hearing for April 8th, and now you've

16 got me.  We've got an order and stip already in place, so we

17 don't have to worry about injunctions or anything else, but I

18 have a legitimate concern here.  I don't want to do this if

19 Judge Lubell is doing it.  I don't think that's appropriate.  I

20 know everybody, I guess, would like to be in a federal court

21 sometimes for one reason for another, but I don't -- why can't

22 -- why can't you, Mr. Allison, take your preemption issues,

23 which, as we both know is primarily a defense, I realize you

24 have the ability.  You are properly citing case law that says,

25 Judge, I can do this as an affirmative claim.  The Second

 1  Circuit says I can, and so that's good enough for me.  I get it.

 2          But let's be practical with each other for a minute.

 3  You are getting a hearing in front of Judge Lubell.  Preemption

 4  is a perfectly legitimate defense to the claims made, and you

 5  can even make counterclaims; and further, you have a perfect

 6  right to bring your 1983 claims, right, into a state court.  So

 7  why do you need to be here in front of me?

 8          MR. ALLISON:  Well, Your Honor, I think there is a

 9  couple answers to that question, and I will try to be brief.

10          First, and let me say this very clearly on the record,

11  nothing of what I am about to say is meant with any level of

12  disrespect to Judge Lubell.  I agree with you, a fine jurist.

13  But these actions, both of them, unquestionably raise issues of

14  federal law.  There's no issues of state law, and as a matter of

15  fact, if you read the complaint that was filed in state court,

16  the plaintiffs -- the County concedes that the issues are

17  federal law.  And the Second Circuit has said in *Yule* (ph) and

18  many other cases that resolving novel issues, questions of

19  federal law are quintessentially the obligation of federal

20  courts.  That's why the abstention doctrines that we went

21  through are pretty clearly inapplicable when federal law

22  supplies the rule of decision, and that's where we are here.  So

23  that is why we want to be in a federal court.

24          Again, I don't disagree with you, Your Honor, that you

25  can raise preemption as a defense in state court.  That, of

1  course, is true.  But the reason that we want to be here is

2  because we are raising federal law issues.  Just the same way

3  that if it was a state law claim, that the *Wilton* abstention

4  doctrine that the County raises would be applicable, and state

5  court would be more likely to be the appropriate place for that

6  case when you have two courts that have taken jurisdiction.

7          So that's the -- that is the fundamental reason that

8  we want to be in front of Your Honor.

9          THE COURT:  Well, I mean, let's talk about this for a

10  minute because it may be from your seat that abstention is

11  inapplicable here, but I am not -- I am not saying it is or

12  isn't, but it's certainly on my mind, and it's certainly

13  something you are going to both brief for me; but let me just --

14  you know, let's step away from this for a second.

15          The regulation -- you will forgive me, I am saying

16  regulation -- but 712.462, that showed up in the -- on the

17  planet in 2004, and it's pretty clear, pretty straightforward.

18  And then, as I get this scenario, the -- I don't know what you

19  would call this, I guess Policy Number 1 is what we will call

20  it, came out on January 21, 2022; and then the County decided

21  that it needed to, according to the resolution, commence an

22  action at the end of January 2022, and they then went and

23  commenced an action; and now it's March 11th, and you have

24  decided, Mr. Allison, for whatever reason to commence your

25  action.  And I am saying, well, I don't know.  I don't feel any

 1  urgency, and why on the 10th of March is this now all of a

 2  sudden some kind of preempted conduct?  The -- I just don't -- I

 3  don't get it.  I mean, it would have been preempted back in 2004

 4  when the reg was issued.  It would have been preempted in --

 5  according to you -- on January 21 when the policy was issued,

 6  but what all of a sudden makes it an urgent March 10th issue for

 7  me?

 8          MR. ALLISON:  Sure.  And, Your Honor, let me address

 9  that because I understand from your perspective, Your Honor, how

10  it may look that way, but hopefully I can give you the timeline,

11  and it will make it more clear.

12          THE COURT:  Yes.

13          MR. ALLISON:  In 2004 when the policy -- the TUP or

14  the terminal use procedures were adopted, the municipal code you

15  reference, our client's business model didn't exist.  We weren't

16  operating.  So the three of us were not operating then.

17          But more importantly, from 2004 until late in 2021,

18  November, the County and the airport never enforced or

19  interpreted that policy the way they started to in November.  In

20  fact, in the declarations that we filed, two of our clients,

21  Blade and XO, had been providing these services at the airport

22  since 2015 and without a peep this was a problem or violated the

23  terminal use procedures that were in 2004.  So it wasn't until

24  November, late October, early November that we started getting

25  indications from the County that they were going to start to try

1    to interpret the TUPs or the 2004 statute in that fashion.

2              Our clients appropriately have been negotiating with

3    the County, meeting and conferring with them, trying to find out

4    a way to resolve this issue.  Then in January was the first time

5    that the County put an official policy in place, this Policy

6    Number 1, that says these terminal use procedures, the way they

7    now interpret them, apply to single-seat charter operators, a

8    new category that they invented to encompass just our clients,

9    not other type of charter operators operating --

10             THE COURT:  That's the nine-seaters, right?  It's the

11   nine-seaters and more, and the problem that they are having -- I

12   don't mean to interrupt, but I guess I need to for a second.

13             MR. ALLISON:  Sure.

14             THE COURT:  -- is that the business models have

15   changed:  Covid and/or there are more people able to fly or less

16   people, more people desirous of staying out of the crowds,

17   whatever it is.  I don't know what it is.  Maybe we have more

18   rich people who can afford these services or the services

19   pricing has come down.  Look, I don't really care what got us

20   here.  But I think, in fairness, I don't think the County is,

21   you know, taking potshots at its customers because ultimately

22   you're customers of the County as I get it.  I don't think they

23   are doing that.  I think what they are doing is they are

24   reacting to an economic model change.

25             Now let me interrupt, as long as I have, Mr. Allison.

1           Mr. Chen, am I -- is that correct or incorrect?

2           MR. CHEN:  I think that's absolutely correct, Your

3    Honor.  This is Mr. Chen.

4           THE COURT:  So -- and the other feature about this

5    that is of concern to me is you're -- you two, both sides of you

6    are drawing lines with each other a little bit in a customer

7    relationship umbrella.  Am I wrong, Mr. Allison, that really on

8    some level you are a customer of the County or am I looking at

9    it inappropriately?

10          MR. ALLISON:  I don't know that that's the right

11   phraseology.  We are operating a federally approved -- and this

12   is a really important point.  You know, aviation is a federal

13   concern.  It is very clear under the ADA and ANCA that this is a

14   federal concern, and there is very broad and significant

15   preemption provisions.  So this is not something -- so our --

16          THE COURT:  I read your brief.  I read your brief.

17          MR. ALLISON:  Our services are federally approved.  So

18   we are approved to do so first and foremost through the federal

19   government, and then that allows us, gives us access to the

20   airports, not just this airport but for a whole variety of

21   airports around the country.  And so -- and so we are not a

22   customer of theirs in that sense.  We are permitted to have

23   access to it as part of a federal aviation policy, and we have

24   complied with that, and therefore, we are allowed access.

25          In some sense we are a customer of the fixed-base

1  operators because that's where we have to operate out of, but

2  that is -- those are not County entities.  That's truly who we

3  are -- if you want to think of it as a customer, that's who we

4  are a customer of.  We are not a customer of the airport in that

5  sense.

6            THE COURT:  And are the FBOs customers of the County?

7  Who is the customer?  The --

8            MR. ALLISON:  I am sorry.  I am sorry.  I didn't mean

9  to interrupt.  I think the FBOs have typically -- and I haven't

10 studied their contracts in this particular instance yet -- but

11 typically, they have some sort of a lease arrangement or -- with

12 the --

13           THE COURT:  I get it.

14           MR. ALLISON:  -- with the -- but again, the airport

15 takes federal funds and has to allow us to have access to the

16 airport.

17           THE COURT:  No, no.  I get it.

18           (Cross-talk)

19           MR. ALLISON:  -- those funds.

20           THE COURT:  I don't want to talk about whether this is

21 preempted, this policy is or regulation is preempted or not.  I

22 don't want to talk about that right now.

23           MR. ALLISON:  I got it.

24           THE COURT:  What I want to talk about is the business

25 relationship that is extant, and in the wide variety of

1  materials that you forwarded to me there was one letter that

2  sort of got my attention from The Wicks Group that was sent to

3  Jet Law, and the gravamen was, look-it, we want to talk and try

4  to solve this problem with you and with your advice and consent

5  if possible.

6           Tell me, Mr. Chen, how far along has that process

7  gone?

8           MR. CHEN:  Well, Your Honor, so The Wicks Group is our

9  aviation counsel.  Obviously, anything involving the airport,

10  you know, involves a lot of aviation regs, and there's a lot of

11  (inaudible), so we hired them and have hired them to represent

12  our interest in that matter.  And that was -- a lot of the

13  communications, as you noted, that have taken place over the

14  last six or so months have been between our aviation counsel and

15  their aviation counsel.  There have also been some between

16  AvPorts and the plaintiffs directly.

17           And I think, you know, what started to become clear is

18  that, you know, we just had a disagreement specifically over

19  whether our local law was -- could be applied to them and/or,

20  you know, for their position whether it would be preempted by

21  these federal regulations.

22           So we -- I think we kind of took it as far as we could

23  go, and unfortunately, this litigation was -- was the result,

24  but I mean, I think it's worth mentioning two things:  You know,

25  one, as I think you have seen, you know, we are not -- certainly

1  not trying to take the law into our own hands.  We have been

2  trying to do this the right way.  You know, we've been very

3  clear in our intentions all along and, you know, initiated an

4  action in state court, which we felt was the appropriate issue

5  to resolve a question of really local law.

6           And two, I think the other thing that bears mentioning

7  is that, you know, this idea that we have sort of singled out

8  the plaintiffs, or the defendants in our case, is really not

9  true.  I mean, one of the reasons we promulgated the policy on

10  January 21st was to make very clear that no one was being

11  singled out; that this was the policy, and it was being -- and

12  this was published to everyone.  And it's worth mentioning there

13  are other Part 30 -- 380 operators, you know, similarly situated

14  to plaintiffs who are not -- who are in compliance with our

15  local law and therefore were not named as defendants.  So, I

16  mean, they are only being singled out in that sense in that they

17  are the ones that have refused to comply.

18           THE COURT:  Take me through a minute, if you don't

19  mind, Mr. Chen, explain to me, if you don't mind, in brief

20  terms:  What's the point here?  What's the problem?  And what is

21  the Policy Number 1's solution to the problem?

22           MR. CHEN:  Sure, Your Honor.  So I guess in the

23  30-second version is that --

24           THE COURT:  You can have a minute.

25           MR. CHEN:  I will take the full minute.  There is

1  obviously the big-time airlines you would think of that most

2  people fly commercially:  American, Delta, et cetera.  You know,

3  those fly out of -- those are publicly available, and as such,

4  they are required under local law, and they do, fly out of the

5  terminal pursuant to a terminal use agreement.

6          Private charter planes have always been exempted from

7  that.  So if a basketball team wants to charter a plane, usually

8  a smaller one, or a business wants to charter it, they are

9  not -- they are not bound by the same requirement.  They can

10 charter a private plane, and they can fly it out of an FBO with

11 no issue.

12         And then so as the paper sort of sets forth, this new

13 business model started to emerge a few years ago and really sort

14 of came to a head in just the last couple of years, probably

15 accelerated by Covid, where companies like the plaintiffs have

16 sort of, you know, done a little bit of a hybrid.  They

17 essentially charter planes privately, but then they sell

18 individual seats on those planes to the public; and our opinion

19 is that that brings them under the rubric of our local terminal

20 use procedures, and they disagree, and that's really the dispute

21 here.  It's fundamentally, we think, a question of

22 interpretation of local law, and that's why we brought it in

23 state court.  It didn't seem like something to bother the

24 federal courts with.

25         Now, we get it.  Obviously --

1               (Cross-talk)

2               THE COURT:  Just let me interrupt.  What's the

3   business of the nine seats?  What is that about?

4               MR. CHEN:  That -- I am not frankly sure where that

5   original number came from, but that's been there since the 2004

6   law was passed.  It's just a way to distinguish, as far as I

7   understand, smaller planes which are the kind that are typically

8   operating from the FBOs from the larger ones.

9               THE COURT:  If you're selling seats on a plane that

10  has nine or less seats, you are exempt?

11              MR. CHEN:  Correct.

12              THE COURT:  And if you are selling seats on a plane

13  that has nine or more, you are not exempt?

14              MR. CHEN:  Correct.  Selling them publicly, Your

15  Honor.  That's --

16              THE COURT:  Yes, selling seats publicly.  Okay.  All

17  right.  I get it.

18              Mr. Allison, why can't this problem be solved?  Why

19  can't you guys come up with a solution?  You're smart.  You're

20  capable.  Why can't we -- why can't we get everybody we need to

21  get in a room and figure this out?  I mean, I get it.  You don't

22  want to go to the terminal, and you don't like -- your clients

23  don't like having to deal with the terminal, the lack of privity

24  or privacy, the TSA, public checkpoints.  I get it.  I get it.

25              But there's got to be a way here for the County and

1 your clients, I assume, I guess, along with the FBOs, to come up

2 with a solution.  Isn't there -- why do we have to draw lines in

3 the sand with each other so that you've got two judges right now

4 looking at the same problem.  Why do we have to do it that way?

5 Why can't we direct that we try to come up with a business

6 solution where nobody wins 100 percent, everybody loses a little

7 bit in the hopes of solving a problem?

8          This appears, according to Mr. Chen, to be a new issue

9 that has arisen, and maybe it's not a new issue.  Maybe your

10 answer would be:  No, no, no, we have been doing the same thing,

11 but it's now more frequent.  It's more pronounced.  There are a

12 lot more people flying, buying tickets over the Internet and

13 flying out.  Why can't we figure this out?

14          MR. ALLISON:  Your Honor, let me address that in two

15 parts, and I am going to get to your practical question second

16 because there is a reason why, to answer your question, you keep

17 saying why and then what about the practical?

18          And the "why" is it that, frankly, listening carefully

19 to what Mr. Chen just said, he described this as an issue of

20 local law.  That is definitively not true under the Airline

21 Deregulation Act and the Airport Noise and Capacity Act.  It

22 just is not a local legal issue.  It is a national federal

23 issue.  Congress has decided this repeatedly.  So that I think

24 is where we are at a little bit of loggerheads as what decides

25 because our method of doing business, new or not, is federally

1  approved, and is in many other airports throughout the country.

2          So this is not -- this is not as novel or a new a

3  thing as it sounds, but even if it is new, that's irrelevant

4  because, again, it was federally approved; and part of the

5  reason for the Airline Deregulation Act -- it says it right in

6  the purposes of it -- is to allow -- the market to allow new and

7  innovative forms of transportation, air transportation to exist.

8  That was why under President Reagan the deregulation happened

9  those many years ago.  So while that may seem like ancient

10  history, it's important because that's why these statutes exist

11  to avoid local regulation, local laws trying to tell national

12  air carriers you can't do this.  That's exactly the point.

13          THE COURT:  Mr. Allison, you're right or you're wrong.

14  I don't know.

15          MR. ALLISON:  Right.

16          THE COURT:  But the County is pointing to the local

17  regulation 712.462, and it's saying to me, this is a local

18  issue; and you are saying to me, much like your complaint does,

19  Your Honor, this is preempted by federal law.  I got that.

20  That's what got you here.

21          MR. ALLISON:  Okay.

22          THE COURT:  I get it, and you're adamant and they're

23  adamant.  I am good with that.  I like adamant lawyers, and I

24  love my job, and I am delighted to be here, and if I keep this

25  case, I will have to figure this out.  So I get all of that.

 1  Let's put all of that to the side now.  You've got --

 2          MR. ALLISON:  Okay.

 3          THE COURT:  -- an airline business that apparently is

 4  booming, and the County's running an airport through its agents,

 5  and they are saying, no, no, no.  You can't do this.  It's a

 6  business proposition before it's a legal proposition.  The

 7  legal --

 8          MR. ALLISON:  Absolutely.

 9          THE COURT:  -- proposition is on the table.  I got it.

10  I am going backwards.  I'm saying, I got it.  You know, I am not

11  an airline -- an air deregulation specialist.  I hope you all

12  realize that, and I hope you also realize by my questions I am

13  eager to understand, and I am a pretty good study of things, so

14  I will get it, but I do need to be educated on this.  I get all

15  of that.  But this is a business that your clients are running

16  and that the airport is running, and I am raising my hand and

17  saying, can we get to the business solution possibility here

18  before we get to the preemption possibility?

19          MR. ALLISON:  Yes, Your Honor.

20          THE COURT:  That's what I want to talk about.

21          MR. ALLISON:  And that was going to be my second

22  point, Your Honor.  We have --

23          THE COURT:  I get it.

24          MR. ALLISON:  We have absolutely attempted to do that.

25  The CEOs or presidents or general counsels of all three of my

1  clients have actively been involved in attempting to reach

2  resolutions that allow -- so this is very important -- that

3  allow their federally-approved business to continue to operate

4  in the way in which the federal government has said it can

5  operate, yet try to find creative solutions.

6         To date, the creative solutions that have been

7  proposed have been rejected almost without comment.  I won't go

8  through the details of them unless Your Honor wants me to

9  because I think that probably gets into the weeds a little bit

10 and maybe turns it into a frog.

11        THE COURT:  I don't need that.  I don't need that.

12        MR. ALLISON:  But let me tell you, we have done that,

13 and that is the reason why in part we had not filed our lawsuit

14 as of now because they were trying to find business solutions,

15 and, you know, as much as I believe they like talking to me,

16 they would rather not hire me, and so --

17        THE COURT:  All right.  Mr. Nonna, Mr. Chen -- and I

18 don't -- I don't want you to, you know, on an adversarial

19 call -- not with me, of course, but with the adversaries -- I

20 don't want you to say anything inappropriately, but my question

21 is:  Wouldn't it be better, wouldn't it be more appropriate at

22 this juncture now that you've both lawyered up and lawsuited up,

23 and you are all ready to go, and you are all teed up, wouldn't

24 it be better to pause this scenario for a minute or a brief

25 period and try to see is there any opportunity to resolve this

1  amicably now?

2          MR. NONNA:  Your Honor, this is John --

3          MR. CHEN:  I am sorry.  Go ahead.

4          MR. NONNA:  You go first.  Go ahead.

5          MR. CHEN:  I was just going to say -- and look, I

6  wasn't directly involved in most of the negotiations, but we --

7  you know, we made what I think was a pretty significant

8  concession, which was that, look, as per your incoming flights

9  that follow this model, if you want to bring those into the

10  FBOs, that's fine.  So, you know, it's only the outgoing flights

11  that we really felt like we had to draw a line on, and we felt

12  like that was a pretty significant concession, and it was

13  rejected.

14          So, I mean, we certainly did try, and really we kind

15  of just kind of kept running up to the same issue, which is that

16  ultimately the plaintiffs feel that, you know, our law can't be

17  applied to them.

18          The only other point I wanted to make, and then I will

19  turn it over to the county attorney, is you know, this specter

20  of violating federal law keeps getting raised.  Our 2004 law was

21  vetted by the FAA.  This is part of our state court complaint,

22  and they said that we were grandfathered in.  So this is not an

23  issue, actually, that you will see around the country.  We're --

24  Westchester is in a bit of a unique position here because we

25  have this local law that was grandfathered in and approved by

1  the FAA.  So, you know, this idea that we're somehow in

2  violation of federal laws is really a bit much.

3          But look, as we noted in our own complaint, they

4  obviously have a defense that there is some preemption here, and

5  we are fully prepared to address that in the state court action.

6          THE COURT:  Yeah.

7          MR. NONNA:  So let me just add that the discussions

8  have kind of came to a halt because there was no response to

9  several of the final letters.  There was a final letter from

10 JSX, I believe, that basically rejected the County's approach

11 completely, but I think Mr. Chen made a good point.  We kind of

12 gave halfway by saying you could bring your flights into the

13 FBOs.  The issue is really getting a ramp allocation for

14 departing flights, which was an important and probably the most

15 important part of the TUR is to control by ramp allocation

16 departing flights for larger planes that seat more than nine

17 people.

18          So maybe there could be further discussions about

19 that.  I know one of the things -- and I don't want to get into

20 the weeds -- but I tell you there was efforts to try to resolve

21 that part, too.  I think one of the charter operators wanted to

22 bring a bus in from the FBOs to board the flight at the ramp

23 allocation.  I think we determined -- the County determined with

24 AvPorts's input that that created some safety problems with

25 buses traveling back and forth between FBO and the terminal.  So

1  efforts have been made.  I don't think it's a fair to say the

2  County turned a blind eye to try and accommodate -- accommodate

3  the charter operators.

4          THE COURT:  From what I am hearing, Mr. Nonna, is that

5  with respect to incoming flights, you were willing to let the

6  business remain as it is.  With respect to outgoing flights,

7  that's where the issue became an issue, and moving people by bus

8  didn't work.

9          Is there other options, Mr. Allison?  I mean, this

10  feels to me like -- listen, lawyers are a wonderful breed of

11  human being.  Lawyers -- I am a lawyer before I was a judge, and

12  I truly get it and, you know, drawing lines in the sand and

13  preemption is preemption.  I just -- and then of course the

14  County will in its papers let me know that, you know, this is

15  not preemption.  It doesn't apply.  The rules don't apply to

16  this, et cetera.  I will get you a ruling as quickly as I can.

17  I don't know whether I need an evidentiary hearing on your

18  injunction or not, and frankly, I don't even know whether I am

19  going to take this case because of the abstention issues.  I'm

20  not saying I am.  I'm not saying I am not.  I am saying I need

21  to be educated on that.

22          So while you are doing all of that work, is it just

23  that this is a matter of principle now; that there is no way for

24  business people to fix this problem of getting people on a

25  charter airplane in a comfortable way that makes both the

1  clients, the customers happy and the County?  I mean, I struggle

2  with it.

3          MR. ALLISON:  Your Honor, let me -- and I think we

4  have talked around it a little bit, but the fundamental issue is

5  the insistence by the County that we use the TSA security, you

6  know, the typical TSA security clearing system, and that our

7  passengers move through that.  It's what's called a SITA versus

8  a non-SITA -- not to turn you into an aviation lawyer today --

9  but that distinction is absolutely critical to our business

10 model that was federally approved, and by the way, and the TSA

11 has approved it.

12         Now, to be clear, we have a TSA screening process.  I

13 want to make that very, very clear.  It's called the Twelve-Five

14 protocols approved by the TSA.  The TSA is very happy with the

15 way we do that.  We are audited by them.  They make sure we do

16 it right.  So but that -- the County has insisted, and has not

17 moved off that insistence, that our passengers move through the

18 TSA security system, and that would effectively turn us into

19 American or Delta or Southwest or whichever one you want to

20 pick, and that is not our business model, and the federal

21 government has not said we have to do that.  And that is -- it's

22 not the only issue, but it is certainly the crux of the issue;

23 and that is where I believe -- and again, I wasn't involved in

24 all of the back-and-forth early on -- but I believe that is the

25 rocks on which we have -- you know, the ship has, you know, gone

1  aground.

2          THE COURT:  I understand.

3          MR. ALLISON:  And so that, you know, just to let Your

4  Honor know that's the issue, I think the biggest issue.

5          MR. CHEN:  Just a very brief point (inaudible).  It's

6  Mr. Chen.  You know, speaking of American and Delta and JetBlue

7  and those other airlines, I think that it's really important to

8  remember, it's not that the County is standing on principle

9  here.  It's really that we take our obligations, our FAA

10  obligations, you know, to treat everyone equally very seriously,

11  and if we didn't attempt to enforce our law as to the

12  plaintiffs, then we would open ourselves up to the other

13  commercial airlines like American, like Delta, like JetBlue

14  saying, hey, why don't we do the same thing?  We will charter an

15  entire plane, but sell the individual tickets publicly and

16  operate it out of the FBOs instead of out of the terminal?

17          You know, it's not so much I think us standing on

18  principle or just being stubborn or drawing a line in the sand.

19  This is our attempt to comply with our federal requirements to

20  treat everyone the same.

21          THE COURT:  Can't we solve the TSA problem, though,

22  with these folks, Mr. Chen?

23          MR. ALLISON:  Your Honor -- I am sorry.  I will let

24  Mr. Chen speak.

25          MR. CHEN:  That I am not -- I am not -- this is a

1  little bit more technical, I think, than I am prepared to brief,

2  Your Honor.  I mean, my understanding -- and Mr. Nonna may

3  correct me -- is our issue, it's not about TSA checkpoints.

4  It's about the use of the terminal.  Now, obviously, the TSA

5  checkpoints are in the terminal, so there is some overlap, but I

6  -- I think that's -- that's the real hang-up there, but I don't

7  want to speak out of turn.  This is -- that is not my area of

8  expertise.

9          (Cross-talk)

10          MR. NONNA:  We have -- I am sorry, go ahead,

11  Mr. Allison.

12          MR. ALLISON:  No, go ahead, Mr. Nonna.  I certainly

13  wasn't trying to interrupt anybody.

14          MR. NONNA:  Your Honor, I am not -- I am not going to

15  add to what Mr. Chen said.  I can't answer that question,

16  either.

17          THE COURT:  Okay.  All right.  Look, I am pushing a

18  little bit, as you have noticed.  We have accomplished a couple

19  of things for each other, which is, we are going to do an order

20  and stip.  You are going to get back to me no later than

21  5:00 p.m. on Monday.  Stick with the language of the letters.

22  It includes the individuals or entities that received cease and

23  desist letters so that they are comfortable.  You will meet and

24  confer about AvPorts, LLC and Ms. Gasparri.

25          I am not going to address the TRO because I don't need

1   to, and I'm happy to give you a briefing schedule.  I need you

2   to oppose.  I will sign the order to show cause.  By the time

3   the County gets its time, and you get your reply time, you know,

4   we are going to be past April 8th.  So I am trying to be

5   practical to save the both of you --

6         MR. ALLISON:  Your Honor, this is Mr. Allison.  I

7   didn't mean to interrupt, but I did want to say something that I

8   hadn't mentioned before.  We are intending to, and will do so

9   next week, move to stay the state court action in deference to

10  this action.  So I didn't want anybody to be surprised by that,

11  and I apologize, Your Honor, that I didn't mention it earlier.

12        THE COURT:  Yeah, I mean --

13        MR. ALLISON:  We do intend to do it.

14        THE COURT:  You do whatever you need to do.  I am not

15  going to be rushed or not, and very honestly, you are going to

16  have to brief this issue quickly for me on abstention.  I am not

17  at all convinced that given the nature of the claims here, and

18  the nature of the action pending, and your rights under the

19  C.P.L.R. and the state court to address all of the issues here.

20  I, frankly, don't know yet how I feel, but I am struck by the

21  notion that this unconstitutional provision that's been around

22  since 2004, that the County says it's going to prove by the FAA

23  and everything else, and it may not be such an urgent necessary

24  federal question that I need to address it.

25        So I don't know how I feel about it, and please don't

1  infer one way or the other that I am committing to my thinking,

2  but I am raising my hand and saying very sincerely, you know,

3  you do whatever you need to do, Mr. Allison, but I don't really

4  care about what procedural steps you decide to take.  When I am

5  ready, I will let you know whether I am going to keep this case

6  or not, and so do whatever you think you've got to do.

7          But my point now is, you have an order to show cause

8  for preliminary injunction.  You know, you're looking for

9  ultimate relief, by the way, Mr. Allison, and so let's be really

10  clear.  I am a burden-of-proof person, and when you are looking

11  for ultimate relief in a preliminary injunction, the standard of

12  review by the district court judge is significantly higher than

13  otherwise, and so just be guided accordingly.

14          So I am going to need -- and I don't know whether you

15  want to take a first crack at supplemental briefing on the issue

16  of abstention or you think you can handle it.  We are not going

17  over the page limit, so that's not going to happen.  You can do

18  it in reply.  I assume the County is going to oppose and ask me

19  to abstain and dismiss this action.

20          Am I right about that, Mr. Chen?

21          MR. CHEN:  That's correct, Your Honor.  And I am just

22  I am wondering if it would make cleaner if we can just limit

23  further briefing to this issue of abstention?  I mean,

24  obviously, it's up to you, but I am just wondering.  It seems

25  like --

1          THE COURT:  I am not going to let -- the plaintiff has

2  made an application for a preliminary injunction.  I, frankly,

3  was hoping I would hear -- but I haven't yet heard -- that that

4  motion is going to be withdrawn given the order and stip that we

5  have entered into.  I actually think the order and stip would be

6  better than the preliminary injunction exercise, but maybe

7  Mr. Allison will reflect on that and decide he doesn't need this

8  application for a preliminary injunction anymore.  And but he

9  hasn't said that, so I don't know.  Maybe I should put him on

10 the spot.

11          Mr. Allison, what do you think?

12          MR. ALLISON:  I think, Your Honor, that I would like

13 to discuss that issue with my clients and certainly will do so

14 quickly, and if we decide to withdraw, we would let everybody

15 know immediately, but I --

16          THE COURT:  By Monday at 5:00 would be the time I

17 would insist that you tell me.

18          MR. ALLISON:  That's fine, Your Honor.

19          THE COURT:  That would then leave a nice clean, neat

20 abstention issue for us to consider, and I think that that's the

21 main event here for the moment, and I think you both want an

22 answer from me as quickly as time permits, which, you know, I

23 will give you as quickly as I can.

24          But I think in the interim what I am going to do,

25 Mr. Chen, is we are going to -- Mr. Allison is not prepared --

1  and I don't blame him -- to withdraw.  I pushed everybody I

2  think as far as I can push everybody for this conversation, and

3  I will leave some more pushing thoughts for another conversation

4  that we will have soon; but for the moment, you will let me know

5  by 5:00 p.m. on Monday.  The order to show cause is going to be

6  withdrawn or not by 5:00 p.m. on Monday.  If it is, so be it.

7          If it is not, Mr. Chen, what kind of time would you

8  need to oppose the order to show cause, and how would you like

9  to handle the abstention issue?  I think what I would insist is

10 you do an opposition brief and whatever documents, and then we

11 will give plaintiff reply, and then I will permit each of you --

12 and you will raise the issue of abstention in your opposition.

13 I will give you a -- how much time do you need to do that?

14          MR. NONNA:  Your Honor, this is John Nonna again.  Is

15 this to respond to the order to show cause for the injunction

16 and address abstention in response to that as well?

17          THE COURT:  Yup.

18          MR. NONNA:  Okay.  Got it.  David -- (inaudible)

19          MR. CHEN:  Judge, I am deciding how much of my March

20 gets destroyed.  I mean, if it would work for Your Honor, I

21 mean, I think maybe two weeks, two to three weeks to draft an

22 opposition if it was --

23          THE COURT:  No.  I am not -- I am not going to -- I am

24 not going to get in the way of this.  I will give you until

25 Friday, April 1st to oppose, and your opposition will include

1  preliminary injunction, and you want to raise the abstention

2  issue with me in those papers, I will accept that and permit

3  that so that we are working on an expedient basis.

4           And then, Mr. Allison, on the issue of your reply,

5  they are going to oppose, raise abstention.  You are going to

6  reply to the preliminary injunction and abstention by what date?

7           MR. ALLISON:  We are -- given that we are the ones

8  seeking quick relief, I think we would be hard pressed to argue

9  for more than a week.  So I think we could do it within a week

10 or ten days.

11          THE COURT:  Okay.  I am happy to give you -- how is

12 April 11th?

13          MR. ALLISON:  That's fine, Your Honor.

14          MR. NONNA:  Just to come back to one thing, Your

15 Honor, if I may?  In the event we are fortunate enough that

16 plaintiffs decide to withdraw their order to show cause by

17 5:00 p.m. on Monday, then we will only address the abstention in

18 our briefs?

19          THE COURT:  Yes.

20          MR. NONNA:  Yes.  Okay.  Thanks.

21          THE COURT:  Yes.  That's the plan.  And if they were

22 to withdraw their preliminary injunction, then I would encourage

23 that we could maybe advance the ball a little bit on abstention.

24          Is that feasible, Mr. Chen, or not given the

25 County's --

```
 1              MR. CHEN:  No.  That makes perfect sense, Your Honor.

 2              THE COURT:  Okay.  So if there is no preliminary

 3    injunction motion, could you get me your abstention brief, no

 4    more than ten pages, by the 25th?

 5              MR. CHEN:  Yes, Your Honor.  We can do that.

 6              THE COURT:  And could you, Mr. Allison, get me your

 7    opposition abstention brief, no more than ten pages, and I mean

 8    it, by April the 1st?

 9              MR. ALLISON:  Yes, Your Honor.

10              THE COURT:  Okay.  And so then I will be able to read

11    those briefs.  I may call you in.  I may -- I don't know what I

12    am going to do, but I am going to, assuming in this scenario the

13    preliminary injunction order to show cause is withdrawn, I am

14    going to accept the two briefs as to the County's request that I

15    abstain and dismiss.  Is that what you want, Mr. Chen?

16              MR. CHEN:  Yes, Your Honor.

17              THE COURT:  Okay.  I don't think this is a bad plan.

18    I think this is a good plan.

19              Mr. Allison, I would encourage you to consider, I know

20    we have a lot, and a careful lawyer always has to think.  I am

21    going to sign your order to show cause.  I am going to make it

22    returnable on submission on the 11th of April, and we will give

23    opposition due on the -- let's see, on the 1st.  You will reply,

24    it will be on submission on the 11th.  I am striking the TRO,

25    and we will go from here.
```

1           Short of that, we will deal with the abstention issue

2    by way of two briefs.  I am trying to streamline this for both

3    of you.  You're anxious.  You've got a lot going.  I will try to

4    get a decision to you very quickly on your abstention if I can.

5    I will fit you in as best I can.

6           Business is booming, by the way, in the Southern

7    District.  Our courtrooms are open.  We are picking juries.

8    Lawyers are coming in.  It's really -- we are moving along here.

9    So I will get to you as quick as I can.

10          In the interim, don't feel like you can't talk to each

11   other.  I am going to insist at some point -- I am going to

12   insist, just so you know, every case I participate in I require

13   the lawyers to meet and confer.  You can do it with a mediator.

14   We can do it with a magistrate judge.  You can do it on your

15   own, but you are not off the hook on meeting and conferring

16   about how you are going to solve this problem together because

17   that's what ordinarily happens.  Problems gets solved by smart

18   lawyers.  Once they beat their chests, draw their lines in the

19   sand, write their pleadings; now you are in a litigation process

20   where statistically most people resolve their problems, and I am

21   hopeful that you will take that to heart at some juncture here

22   and consider how to resolve this.  I mean, this can be solved in

23   many, many ways.

24          All right.  Mr. Allison, is there anything else I need

25   to do?  Of course, I assume we have no service issues here,

1  gentlemen.  Everybody's got their papers.  We don't need to --

2  we don't need to get ticky-tacky with each other about service;

3  am I right?

4          MR. NONNA:  This is John Nonna.  Yes, Your Honor.  You

5  are right.

6          THE COURT:  Mr. Allison?

7          MR. ALLISON:  Yes, Your Honor.  I am not aware of any

8  issues.

9          THE COURT:  All right.  Terrific.  So we will get this

10  under way, and to the extent if there is things that come up,

11  you know, or you, God forbid, decide you want to start talking

12  resolution, and I can steer you in a direction.  I assume you

13  don't want me in the middle, but it might be a magistrate judge

14  or someone.  All you need to do is write me.  All right.

15          I look forward to working with you, assuming I am

16  going to keep this case.  I look forward to it.  I think

17  everybody on the phone has made it crystal clear to me that you

18  know a hell of a lot more about this area of the law than I do,

19  and so I am very interested in learning it and understanding it.

20  So thank you for that.

21          All right.  Anything else, Mr. Allison?

22          MR. CHEN:  Thank you, Your Honor.

23          MR. ALLISON:  No, Your Honor.  Nothing from the

24  plaintiffs.  Thank you, Your Honor, for your time this morning.

25          THE COURT:  All right.  Mr. Chen?  Mr. Nonna?  You are

```
1  good?

2          MR. NONNA:  We are good.  Thank you very much, Your

3  Honor, for your time.

4          THE COURT:  Mr. Foont, you are good?

5          MR. FOONT:  Yes, Your Honor.  Thank you.

6          THE COURT:  Okay.  Take care, counsel.

7                          -o0o-

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```