UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC.,<br><br>                              Plaintiffs,<br><br>                - vs -<br><br>COUNTY OF WESTCHESTER, NEW YORK, a charter company,<br><br>                              Defendant. | **ANSWER,<br>DEMAND FOR JURY TRIAL,<br>AFFIRMATIVE DEFENSES,<br>AND COUNTERCLAIMS**<br><br>Civil Action No.<br>22-cv-01930-PMH |

Defendant County of Westchester (s/h/a "County of Westchester, New York, a charter company") (alternatively, the "County" or "County Defendant"), by its attorney John M. Nonna, Westchester County Attorney, by Sean T. Carey, Senior Assistant County Attorney, of counsel, as and for its answer ("Answer") to the Complaint ("Complaint") of plaintiffs Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc. ("Delux"); XO Global, LLC ("XO"); and Blade Urban Air Mobility, Inc. ("Blade") (collectively, "Plaintiffs") alleges as follows:

## PRELIMINARY STATEMENT

Paragraph 1

1.    This paragraph is multi-sentence; for the sake of clarity—and on all other multi-sentence paragraphs herein—the County restates each sentence separately and answers sentence-by-sentence the allegations therein:

Paragraph 1, Sentence 1

> Plaintiffs have continuously provided safe, economical, and federally authorized air transportation services to the public at Westchester County Airport ("HPN" or "Airport").

1.1    Admits that Plaintiffs have provided safe air transportation services to the public while operating out of the Westchester County Airport (the "Airport"); denies

knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 1, Sentence 2

> Plaintiffs are federally authorized direct and/or indirect air carriers that comply with all applicable federal laws and regulations.

     1.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully questions of law to the Court.

Paragraph 1, Sentence 3

>            Plaintiffs offer a convenient alternative to the large, well-funded air carriers (colloquially referred to as airlines) by (a) providing access to small airports and underserved cities/markets not regularly serviced by the large airlines, and (b) providing customers with convenient flying services the large airlines cannot offer customers, including—a Transportation Security Administration ("TSA")-approved and compliant security screening process that is faster and more convenient than the typical TSA process that is required for the large airlines.

     1.3    Makes no answer regarding Plaintiffs' allegations that their security screening processes are "Transportation Security Administration ("TSA")-approved and compliant," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully questions of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 2

> 2.      Defendants, the County of Westchester and Airport Manager, April Gasparri, in her official capacity (collectively "County Defendants"), along with AvPorts, LLC ("AvPorts")—a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of HPN—are unlawfully preventing Plaintiffs from operating at the Airport.

2.      Denies the allegations; notes that former defendant April Gasparri, sued in her official capacity as Airport Manager ("Gasparri") and former defendant Avports, LLC ("Avports") (collectively, the "Former Defendants") have been dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.[1]

Paragraph 3

3.      This paragraph is multi-sentence:

Paragraph 3, Sentence 1

> Westchester County officials have publicly admitted and recognized that their local government power cannot simply regulate Plaintiffs' *flights* that depart and arrive at HPN.

3.1      Denies knowledge or information of the specific alleged admissions, recognitions, and officials to which Plaintiffs here refer; deny the implicit allegation that the County is without authority to regulate Plaintiffs' flights in any regard; makes no response to the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the Court.

---

[1] To avoid making this note one hundred times, this Answer interprets all future references to "Defendants" as stating "County Defendant."

Paragraph 3, Sentence 2

> Notably, unlike the airlines operating out of the main passenger terminal ("Terminal") at HPN, as 14 C.F.R. Part 380 ("Part 380") operators authorized to sell tickets to the public by the U.S. Department of Transportation ("DOT"), partnering with 14 C.F.R. Part 135 ("Part 135") operators, direct air carriers certified by the Federal Aviation Administration ("FAA"), Plaintiffs' flights enplane and deplane at Fixed Base Operator spaces ("FBOs") at HPN.

3.2     Denies that Delux is a 14 C.F.R. Part 380 ("Part 380") operator; denies that XO or Blade is a 14 C.F.R. Part 135 ("Part 135") charter operator or a direct air carrier certified by the Federal Aviation Administration ("FAA"); denies that Plaintiffs are authorized to sell tickets to the public without limitation; admits the remaining allegations.

Paragraph 3, Sentence 3

> This is a common form of federally licensed and approved operations and business model in the air transportation industry that has been in existence without controversy for decades.

3.3     Admits that the general practice of Part 380 operators partnering with Part 135 operators is "a common form of federally licensed and approved operations and business model in the air transportation industry that has been in existence without controversy for decades"; denies that Part 380 operators operating out of FBOs at the Westchester County Airport ("HPN") have engaged in the practice of offering individual-seat sales on aircraft containing more than nine (9) seats to the public or a segment of the public (the "Practice") for decades; denies that the Practice is federally licensed or approved.

Paragraph 3, Sentence 3

> Yet, Defendants attempt to accomplish their goal of regulating what they cannot regulate – for instance the number of Plaintiffs' flights departing from or arriving at HPN FBOs – by adopting and enforcing policies that require certain Part 380 operators (including Plaintiffs) to move their departing and arriving flights from an FBO to the Terminal.

3.4     Denies the allegations.

Paragraph 3, Sentence 4

> Even if Plaintiffs could continue their operations in the Terminal, Plaintiffs would be subject to further regulations that would unlawfully restrict and eliminate Plaintiffs' flights at HPN.

3.5     Denies the allegations.

Paragraph 4

4.     This paragraph is multi-sentence:

Paragraph 4, Sentence 1

> Specifically, Defendants' attempt to expand their local government control over federally regulated and preempted issues led to Defendants' recent adoption of the Westchester County Airport Operational Policy No. 1 ("Policy No. 1"), which effectively prohibits Plaintiffs from operating at HPN compliant with their federally regulated and issued licenses and authorities.

4.1    Admits that on January 21, 2022, Avports issued HPN Public Charter Operational Policy #1 ("Policy No. 1"); denies the remaining allegations.

Paragraph 4, Sentence 2

> At the end of 2021, Defendants began enforcing the Westchester County Municipal Code § 712.462, a local ordinance codifying the County's Terminal Use Procedures ("TUP"), under a novel and erroneous interpretation to require Plaintiffs to operate out of the Terminal and enter into a Terminal Use Agreement ("TUA").

4.2    Denies the allegations.

Paragraph 4, Sentence 3

> The TUA, in turn, imposed further restrictions, including subjecting users to a lottery system to determine allocation and flight capacity and requiring users to alter flight schedules to adhere to Terminal ramp allocations and passenger limitation restrictions.

4.3    Denies that the Terminal Use Agreements ("TUAs") impose restrictions; denies knowledge or information sufficient to form a belief as to the allegation that TUAs require users to alter flight schedules; admits the remaining allegations.

Paragraph 4, Sentence 4

> Although Part 380 operations at HPN have long occurred at FBOs, Defendants recently adopted Policy No. 1 in January 2022 to specifically require certain Part 380 operators to move their flights to the Terminal.

4.4     Denies that the Practice has long occurred at HPN FBOs; denies that the definition of "Part 380 operations" can include the Practice simply because Part 380 operators are now engaging or attempting to engage in the Practice; denies that Policy No. 1 was "adopted"; denies that Policy No. 1 represented a change in the relevant law or applicable applications; denies that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; denies that Policy No. 1 or section 712.462 of the Laws of Westchester County (the "TUP") targets or singles out Part 380 operators; admits that "Part 380 operations," not including the Practice, "have long occurred at [HPN] FBOs."

Paragraph 5

5.     This paragraph is multi-sentence:

Paragraph 5, Sentence 1

> But the TUP has historically and for good reason been applied only to large airlines, and not to the Plaintiffs which operate under Part 380.

5.1     Denies the allegations.

Paragraph 5, Sentence 2

> Plaintiffs, because of their federally regulated and authorized procedures, must operate from a non-Security Identification Display Area ("non-SIDA").

5.2     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the Court; to the degree that a response is required, denies the allegations.

Paragraph 5, Sentence 3

> Unlike many other airports that are configured to segregate TSA-screened from non-screened passengers such that non-screened passengers can still access non-SIDA boarding, and arrival and baggage claim areas, HPN does not currently offer a non-SIDA area in the Terminal.

5.3     Admits that HPN does not currently offer a non-Security Identification Display Area ("non-SIDA") area at its main passenger terminal (the "Terminal"); denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 5, Sentence 4

> Accordingly, Plaintiffs have each historically operated out of FBOs to enplane and deplane passengers outside of the Terminal.

5.4     Admits that Plaintiffs have historically operated out of HPN FBOs; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 6

6.     This paragraph is multi-sentence:

Paragraph 6, Sentence 1

> In fact, Plaintiffs' customers cannot, under federal regulations, enter the Terminal Boarding Area in its current configuration.

6.1     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the Court; to the degree that a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 2

> This is because the Terminal is currently a SIDA-only space, and Plaintiffs' passengers who are screened through a different, but nonetheless TSA-approved screening process, cannot enter SIDA areas.

6.2     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the Court; to the degree that a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 3

> Stated differently, Plaintiffs operate a federally approved style of flying that does not require customers to pass through the standard TSA checkpoints found at most large airports.

6.3     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully such questions of law to the

Court; to the degree that a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 4

> Indeed, at the core of Plaintiffs' business models is that customers can forego crowded terminals, long lines and TSA security checkpoints in favor of a non-SIDA TSA-approved security protocol.

6.4     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 5

> Entirely consistent with federal law, Plaintiffs' customers can arrive 20 minutes before a flight, pass through Plaintiffs' TSA-compliant and approved security procedures at the FBO, and avoid long lines and large crowds.

6.5     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 6

> Plaintiffs' TSA-approved security protocol also allows Plaintiffs to provide access to additional or smaller airports and underserved cities not regularly serviced by the large airlines, or in underserved airports that do not generate sufficient traffic to justify the resources required of establishing a SIDA TSA checkpoint.

6.6     Makes no answer regarding the allegation that Plaintiffs' security protocol is "TSA-approved," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully such a question of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 6, Sentence 7

Plaintiffs are able to offer their federally approved services to such locations only through a non-SIDA location.

6.7     Notes that the allegation that non-SIDA services cannot be offered through a SIDA location is tautological; makes no answer regarding the allegation that Plaintiff's services are federally approved, which is a legal conclusion; save to demand strict proof thereof and to refer respectfully such a question of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 7

7.     This paragraph is multi-sentence:

Paragraph 7, Sentence 1

Defendants know all of this.

7.1     Denies the allegation.

Paragraph 7, Sentence 2

> However, Defendants have issued various notices in recent months to Plaintiffs demanding that they utilize the Terminal for their operations and notifying them that they are not in compliance with Policy No. 1 if they continue to operate out of their respective FBOs.

7.2    Admits that County Defendant issued various notices to Plaintiffs demanding that they comply with the TUP; denies the remaining allegations.

Paragraph 7, Sentence 3

> They have further refused to provide any reasonable accommodations to Plaintiffs, such as to establish a non-SIDA area in the Terminal, so that Plaintiffs can continue their operations.

7.3    Denies the allegations.

Paragraph 8

> 8.    As a result, Defendants' Policy No. 1 effectively precludes Plaintiffs from operating at HPN and deprives Plaintiffs of reasonable and non-discriminatory access to the Airport in violation of federal law.

8.    Denies the allegations.

Paragraph 9

9.    This paragraph is multi-sentence:

Paragraph 9, Sentence 1

> Because of Defendants' conduct, Plaintiffs do not have a solution for reasonable access to HPN, a federally funded and regulated, public use Airport.

9.1    Admits that HPN is a "federally funded and regulated, public use Airport"; deny the remaining allegations.

Paragraph 9, Sentence 2

> Defendants' unlawful conduct prevents Plaintiffs from offering diverse and underserved routes and services that are fully authorized by federal law.

9.2    Denies the allegations.

Paragraph 9, Sentence 3

> Defendants' conduct was performed with the specific intent of discriminating against Plaintiffs.

9.3    Denies the allegations.

Paragraph 10

10.    This paragraph is multi-sentence:

Paragraph 10, Sentence 1

> Defendants' conduct is unlawful for at least two reasons: (1) it is preempted by federal law; and (2) it violates Plaintiffs' right to equal protection under the law.

10.1    Makes no answer to the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 10, Sentence 2

> For both reasons, Plaintiffs seek declaratory and permanent injunctive relief to ensure that they will be able to provide air transportation services at the Airport.

10.2    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

## JURISDICTION

Paragraph 11

> 11.    This Court has original jurisdiction over the subject matter of this action pursuant to (1) 28 U.S.C. §§ 1331 and 1343 because the matters in controversy arise under laws of the United States; (2) because this suit seeks redress for the deprivation, under color of state law, for rights secured by the United States Constitution; and (3) this Court's inherent jurisdiction to grant equitable relief for violations of the United States Constitution and the laws of the United States.

11.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 12

12.    This paragraph is multi-sentence:

Paragraph 12, Sentence 1

> This Court has personal jurisdiction over Defendants because they are domiciled in, reside in, or are a county located in New York and because their denial of Plaintiffs' rights under the United States Constitution and the laws of the United States occurred within New York.

12.1    Admits that County Defendant is domiciled in Westchester County, New York; denies that County Defendant denied any of Plaintiffs' rights; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 12, Sentence 2

> The injuries caused by each Defendant thus occurred in New York.

12.2    Admits that the conduct about which Plaintiffs complain occurred in New York; denies the remaining allegations.

Paragraph 13

> 13.    This Court has authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

13.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 14

> 14.    This Court also has authority to enter injunctive relief for Defendants' violation of federal law and the United States Constitution pursuant to 28 U.S.C. § 1331 under *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85 (1983), *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635 (2002), *Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 (2d. Cir. 2016), *certiorari denied by* 137 S. Ct. 2295 (2017) and equity jurisdiction authorized by *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny.

14.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

## PARTIES

Paragraph 15

15.    This paragraph is multi-sentence:

Paragraph 15, Sentence 1

> Plaintiff Delux Public Charter, LLC d/b/a JSX Air ("Delux") is a Delaware limited liability company with its administrative offices located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas.

15.1    Admits the allegations.

Paragraph 15, Sentence 2

> Delux is a FAA-certificated, on-demand air carrier that operates commercial flights pursuant to Part 135 and holds a Commuter Air Carrier Authorization issued by the DOT.

15.2    Denies knowledge or information sufficient to form a belief as to whether Delux holds a Commuter Air Carrier Authorization issued by the DOT; admits the remaining allegations.

Paragraph 15, Sentence 3

> Delux's operations are safe, legal, quieter than traditional airlines at HPN, and offer the traveling public a unique alternative to those traditional airlines.

15.3    Admits that Delux's operations at HPN are safe; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 15, Sentence 4

> Indeed, due to Delux's ability to facilitate a fast, terminal-free, and socially distanced boarding and travel experience, customers are able to travel with confidence even during the pandemic.

15.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 15, Sentence 5

> Delux has an impeccable safety record.

15.5    Denies knowledge or information sufficient to form a belief as to the truth of the allegation.

Paragraph 15, Sentence 6

> Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, Delux is fully compliant with all applicable federal, state, and local laws.

15.6    Denies that the implementation of the TUP or the issuance of Policy No. 1 was illegal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required regarding the remaining allegations, denies knowledge or information sufficient to form a belief as to their truth.

Paragraph 15, Sentence 7

> Though Delux's operations are fully compliant with federal law, they are structured differently than the large scheduled airlines that operate out of HPN.

15.7    Admits that Delux's operations at HPN are "structured differently than the large scheduled airlines that operate out of HPN"; denies knowledge or information sufficient to form a belief as to the truth of the allegation that Delux's non-HPN operations are "structured differently than the large scheduled airlines that operate out of HPN"; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 15, Sentence 8

> Delux's departure times, departure locations, and arrival locations are specifically negotiated with its sole customer, JetSuiteX, Inc.

15.8    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 16

16.    This paragraph is multi-sentence:

Paragraph 16, Sentence 1

> Plaintiff JetSuiteX, Inc. ("JetSuiteX") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1341 Mockingbird Lane, Suite 600E in Dallas, Texas.

16.1    Admits the allegations.

Paragraph 16, Sentence 2

> JetSuiteX is the parent corporation of Delux.

16.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegation.

Paragraph 16, Sentence 3

> JetSuiteX is an indirect air carrier that sells tickets for Delux flights pursuant to authority granted by DOT.

16.3    Admits the allegations.

Paragraph 16, Sentence 4

> Under this federally authorized arrangement, JetSuiteX sells tickets to the traveling public, JetSuiteX charters an entire Delux flight, and then Delux operates the flight using the time, location, and destination designated by JetSuiteX.

16.4    Makes no answer regarding the allegation that the arrangement between Delux and JetSuite X is "federally authorized," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 16, Sentence 5

> Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, JetSuiteX is fully compliant with all applicable federal, state, and local legal obligations.

16.5    Denies that the implementation of the TUP or the issuance of Policy No. 1 is illegal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 16, Sentence 6

> Collectively, JetSuiteX and Delux will be referred to as "JSX" unless otherwise noted.

16.6     Admits the allegation.

Paragraph 17

17.     This paragraph is multi-sentence:

Paragraph 17, Sentence 1

> Plaintiff XO Global, LLC ("XO Global") is a limited liability company registered under the laws of Delaware with its principal place of business located at 1901 West Cypress Creek Road, Suite 6B in Fort Lauderdale, Florida.

17.1     Admits the allegations.

Paragraph 17, Sentence 2

> XO Global's parent company is XO Holding Inc., whose parent company is Vista Global Holding Limited.

17.2     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 17, Sentence 3

> XO Global is an indirect air carrier that offers on-demand charter, priority access to a private jet fleet, and other programs to meet private aviation needs, as well as products for flyers who have demanding schedules and minimal flexibility around how and when they fly.

17.3     Admits that XO is an indirect air carrier; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 17, Sentence 4

> XO Global partners with various Part 135 Air Carriers, such as Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

17.4    Admits that XO partners with Contour; admits that XO sells individual seats to the public for flights; makes no representation regarding the allegation that XO operates "pursuant to its authority from the DOT under Part 380," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 18

18.    This paragraph is multi-sentence:

Paragraph 18, Sentence 1

> XO Global's flights have an impeccable safety record, as not a single operator XO Global has worked with has had any safety incidents at HPN.

18.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 18, Sentence 2

> Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, XO Global is also fully compliant with all applicable federal, state, and local laws.

18.2    Denies that the implementation of the TUP or the issuance of Policy No. 1 was illegal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 19

19.    This paragraph is multi-sentence:

Paragraph 19, Sentence 1

> Plaintiff Blade Urban Air Mobility, Inc. ("Blade") is a corporation organized under the laws of the State of Delaware with its principal place of business located at 499 East 34th Street, New York, New York.

19.1    Admits the allegations.

Paragraph 19, Sentence 2

> Blade is a wholly-owned subsidiary of Blade Air Mobility, Inc., a publicly traded company.

19.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 19, Sentence 3

> Blade is a technology-powered, global air mobility platform committed to reducing travel friction by enabling cost-effective air transportation alternatives to some of the most congested ground routes in the U.S. and abroad.

19.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 19, Sentence 4

> Blade arranges on-demand charter and scheduled flights across a diverse accessible fleet of helicopters, jets, turboprops, and seaplanes.

19.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 19, Sentence 5

> Blade is an indirect air carrier that furnishes air transportation pursuant to authority granted by DOT.

19.5    Admits that Blade is an indirect air carrier; makes no answer regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 19, Sentence 6

> Blade's flights have an impeccable safety record, and Blade has not experienced any passenger or employee safety incidents at HPN.

19.6    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 19, Sentence 7

> Aside from the illegal implementation of the TUP and Policy No. 1 at issue in this litigation, Blade is fully compliant with all applicable federal, state, and local legal obligations.

19.7    Denies that the implementation of the TUP or the issuance of Policy No. 1 was illegal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 19, Sentence 8

> Blade partners with Part 135 operators, such as Contour, to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

19.8    Admits that Blade partners with Contour; admits that Blade sells individual seats to the public for flights; makes no representation regarding the allegation that XO operates "pursuant to its authority from the DOT under Part 380," which is a legal

conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 20

20.     This paragraph is multi-sentence:

Paragraph 20, Sentence 1

> Consistent with HPN's badging process, Blade employees are also required to complete a security clearance and undergo a badging process conducted by HPN consistent with procedures in the Terminal.

20.1    Admit that four Blade employees opted for the Criminal Records History Check ("CHRC") option for one of the two security background checks that are pre-requisites for the Airport's ID application/badging process; deny knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 20, Sentence 2

> Blade's employees at HPN are further required to complete a formal safety training with the FBO that it operates out of at HPN, White Plains Aviation Partners LLC d/b/a Million Air ("Million Air").

20.2    Deny the implicit allegation that the County requires a safety-training course for Blade's employees; deny knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 21

21.    This paragraph is multi-sentence:

Paragraph 21, Sentence 1

> Defendant County of Westchester, New York ("County"), is a municipal corporation located in the Southern District of New York, with capacity to sue and be sued.

21.1    Admits the allegations.

Paragraph 21, Sentence 2

> The County is the owner of the Airport.

21.2    Admits the allegations.

Paragraph 21, Sentence 3

> The Airport, a division of the County, is a commercial and general aviation airport located at 240 Airport Road, White Plains, New York, within the Southern District of New York.

21.3    Denies that the Airport is a division of County Defendant; admits the remaining allegations.

Paragraph 21, Sentence 4

> The Airport is the only commercial service airport in the County and the primary provider of general aviation services and facilities in the County.

21.4    Admits the allegations.

Paragraph 21, Sentence 5

> The acceptance and receipt of federal grant money obligates the airport sponsor, *i.e.*, the County, to comply with statutorily enumerated obligations, known as "Grant Assurances."

21.5    Admits the allegations.

Paragraph 21, Sentence 6

> Here, the County receives federal grant money to operate and finance investment at the Airport and, as a result, is obligated by the Grant Assurances and federal statutes to operate in a reasonable, non-discriminatory, and financially self-sustaining manner.

21.6    Admits the allegations.

Paragraph 22

22.    This paragraph is multi-sentence:

Paragraph 22, Sentence 1

> The County operates and maintains the Airport as a governmental function for the primary purpose of providing air transportation to the public.

22.1    Admits that County Defendant operates and maintains the Airport; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 22, Sentence 2

> The County's Airport operations are managed by nine current members and two ex-officio members who make up the Westchester County Airport Advisory Board ("Board").

22.2    Denies the allegations.

Paragraph 22, Sentence 3

> The Board, and each of its individual members, are representatives, agents, and employees of the County and the scope of their duties includes, among other things, adopting Policy No. 1.

22.3    Denies the allegations.

Paragraph 22, Sentence 4

> The County is a person within the meaning of 42 U.S.C. § 1983.

22.4    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 23

23.    This paragraph is multi-sentence:

Paragraph 23, Sentence 1

> Defendant April Gasparri ("Ms. Gasparri" or "Airport Manager"), is named in her official capacity as the Airport Manager of HPN.

23.1    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 23, Sentence 2

> At all times relevant to this complaint, Ms. Gasparri (or alternatively her predecessor(s)) was and is an agent and employee of the County, responsible for developing airport policies and administering all activities associated with the operation of a medium hub commercial airport.

23.2    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 23, Sentence 3

> Ms. Gasparri reports to the County and is responsible for carrying out policies, procedures, and duties regarding the Airport authorized by the Board.

23.3    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 23, Sentence 4

> Ms. Gasparri is a person within the meaning of 42 U.S.C. § 1983 and acts under color of state law as to the allegations in this Complaint.

23.4     Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 23, Sentence 5

> Ms. Gasparri's official residence is at HPN, which is located in Westchester County, New York, within the Southern District of New York.

23.5     Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 24

24.     This paragraph is multi-sentence:

Paragraph 24, Sentence 1

> Defendant AvPorts, LLC, on information and belief, is a Virginia limited liability company with its headquarters at 45025 Aviation Drive, Suite 100, Dulles, VA 20166.

24.1     Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 24, Sentence 2

> AvPorts is a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of the Airport.

    24.2    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 24, Sentence 3

> On information and belief, AvPorts is responsible for the promulgation and enforcement of certain policies regarding the Airport, including the policies at issue here.

    24.3    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 24, Sentence 4

> As an agent for the County, overseeing the management and operation of the Airport, AvPorts is engaged in state action and thus also liable for the violations at issue.

    24.4    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

## ALLEGATIONS

**Plaintiffs' Operations At HPN Are Federally Authorized, Safe, And Quiet**

Paragraph 25

25.    This paragraph is multi-sentence:

Paragraph 25, Sentence 1

> Plaintiffs' operations are fully compliant with federal law, but they are structured differently than the large scheduled airlines that operate at HPN.

25.1    Admits that Plaintiffs' operations at HPN are "structured differently than the large scheduled airlines that operate out of HPN"; denies knowledge or information sufficient to form a belief as to the truth of the allegation that Delux's non-HPN operations are "structured differently than the large scheduled airlines that operate out of HPN"; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 25, Sentence 2

> Plaintiffs offer a type of service that federal regulations classify as "on-demand" services.  *See* 14 C.F.R. Part 110.2 (defining "on demand" operations).

25.2    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 25, Sentence 3

> Under applicable regulations and their respective TSA-approved security plans, Plaintiffs' flights can operate from non-SIDA portions of HPN, such as an FBO (discussed *infra*) and have not experienced any passenger safety incidents since the beginning of their operations at HPN.

25.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegation that none of the Plaintiff have experienced "any passenger safety incidents since the beginning of their operations at HPN"; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 25, Sentence 4

> Consistent with federal regulations, Plaintiffs do not need to operate from an FBO, but their operations must take place from a non-SIDA portion of the Airport with access to the airfield.

25.4    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, deny the allegation that Plaintiffs' operations with respect to departures must take place from a non-SIDA portion of the Airport.

Paragraph 26

26.    This paragraph is multi-sentence:

Paragraph 26, Sentence 1

> Blade's flights have been operating from FBOs at HPN since 2015, and Blade's flights are currently offered out of Million Air's FBO.

26.1    Admits the allegations.

Paragraph 26, Sentence 2

> Blade is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

26.2    Denies that Blade is authorized to sell tickets to the public without limitation; makes no representation regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 27

27.    This paragraph is multi-sentence:

Paragraph 27, Sentence 1

> Blade is a technology-powered, global air mobility platform committed to reducing travel friction by enabling cost-effective air transportation alternatives to some of the most congested ground routes in the U.S. and abroad.

27.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 27, Sentence 2

> Since 2015, Blade has offered service between HPN and Miami-Opa Locka Executive Airport ("OPF"), and due to increasing popularity, Blade introduced service between HPN and Palm Beach International Airport ("PBI") in 2021.

27.2   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 27, Sentence 3

> Blade has never had any passenger or employee safety incidents or accidents at HPN.

27.3   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 28

28.    This paragraph is multi-sentence:

Paragraph 28, Sentence 1

> Blade's operations at HPN directly employ more than 11 individuals who live in or near the County.

28.1   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 28, Sentence 2

> Blade's operations at HPN also indirectly support numerous other local jobs, including its Part 135 operating partners and local catering, shuttle, and car service businesses.

28.2     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 28, Sentence 3

> In addition to significant marketing investments regarding its services at HPN, Blade has invested over $200,000 in improvements at Million Air and pays approximately $60,000 per year to rent a dedicated lounge at Million Air to service its passengers.

28.3     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 28, Sentence 4

> Blade and/or its Part 135 operating partners also pay the Airport various fees associated with the operation of Blade flights, including landing, facility, parking, RON, shuttle, charter, hanger, after hours and valet parking fees.

28.4     Denies the allegations.

Paragraph 28, Sentence 5

> Blade expects to fly approximately 165 Part 380 flights between HPN and OPF or PBI during the November 2021 through April 2022 season.

28.5    Denies knowledge or information sufficient to form a belief as to the truth

of the allegations.

Paragraph 29

29.    This paragraph is multi-sentence:

Paragraph 29, Sentence 1

> XO Global, and its related company, JetSmarter, Inc., has been offering flights out of various FBOs at HPN since 2015.

29.1    Admits the allegations.

Paragraph 29, Sentence 2

> In the last twelve months, XO Global organized more than one thousand flights and transported more than 12,000 passengers to and from HPN.

29.2    Denies knowledge or information sufficient to form a belief as to the truth

of the allegations.

Paragraph 29, Sentence 3

> XO Global is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

29.3    Denies that XO is authorized to sell tickets to the public without limitation;

makes no representation regarding the remaining allegation, which is a legal conclusion,

save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 29, Sentence 4

> Since it began operations at HPN, XO Global has been partnering with various Part 135 operators and operating from various FBOs.

29.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 30

30.    This paragraph is multi-sentence:

Paragraph 30, Sentence 1

> XO Global has offered flights from HPN to Van Nuys, Oakland, and various locations in South Florida.

30.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 30, Sentence 2

> XO Global's flights have an impeccable safety record as not a single operator XO Global worked with had any safety incidents at HPN.

30.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 31

> 31.     XO has likewise spent time and money in building its operations at HPN and contributing to the local economy.

31.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 32

32.     This paragraph is multi-sentence:

Paragraph 32, Sentence 1

> JSX began operating 30-seat aircraft from an FBO at HPN in June of 2020 with flights to Pinehurst, NC.

32.1     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 32, Sentence 2

> In November 2021, it began HPN's only service to Miami International Airport (MIA) with 5 flights a week, from an FBO.[1]

32.2     Admits the allegations.

Paragraph 32, Sentence 3

> [1] From November 15 to December 31, 2021, JSX reduced its operations from 30 passengers to 9 passengers per flight under a reservation of rights in response to demands from HPN until a more permanent solution could be reached.

32.3    Admits the allegations.

Paragraph 32, Sentence 4

> Delux is an FAA-certificated air carrier that is authorized by federal law to fly customers for compensation or hire under the FAA's operating rules contained in Part 135.

32.4    Admits that Delux is an FAA-certified air carrier; makes no answer regarding the remaining allegations, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 32, Sentence 5

> Delux holds a commuter air carrier authorization issued by the DOT, and JetSuiteX is authorized to sell individual seats to the public for flights pursuant to its authority from the DOT under Part 380.

32.5    Admits that Delux holds a DOT-issued commuter air carrier authorization; makes no answer regarding the remaining allegations, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 32, Sentence 6

> Since it began operations at HPN, JSX has been operating from an FBO.

32.6    Admits the allegations.

Paragraph 33

33.     This paragraph is multi-sentence:

Paragraph 33, Sentence 1

> JSX currently offers flights from HPN to Miami.

33.1     Admits the allegations.

Paragraph 33, Sentence 2

> In addition to the route currently offered, JSX also intended to offer many more routes in 2022.

33.2     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 33, Sentence 3

> JSX has never had a safety incident or accident at HPN or elsewhere in its over five-year operating history.

33.3     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 33, Sentence 4

> JSX enjoys a perfect safety record, the highest customer satisfaction of any air carrier in the United States, was named #1 air carrier in North America by APEX (the Airline Passenger Experience Association), and it is the only Five-Star Rated Regional Air Carrier in the World named by APEX for the last four consecutive years.

33.4   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 34

34.   This paragraph is multi-sentence:

Paragraph 34, Sentence 1

> Additionally, JSX's operations at HPN directly employ 5 individuals who live in or near the County.

34.1   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 34, Sentence 2

> Numerous additional jobs are supported indirectly.

34.2   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 34, Sentence 3

> JSX spent significant resources investing in the HPN market, estimating at least $2 million, and JSX has paid significant amounts in fees.

34.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 35

35.    This paragraph is multi-sentence:

Paragraph 35, Sentence 1

> Unlike traditional airlines, Plaintiffs' flights follow a TSA-approved "Twelve-Five" Security Plan,[2] which is a regulatory protocol that permits its passengers to bypass TSA security checkpoints in the Terminal.

35.1    Denies knowledge or information sufficient to form a belief as to the allegation traditional airlines do not follow a TSA-approved "Twelve-Five" Security Plan; denies knowledge or information sufficient to form a belief as to the allegation that Plaintiffs' flights follow a TSA-approved "Twelve-Five" Security Plan; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 35, Sentence 2

> [2] The "Twelve-Five" Security Plan refers to a category of TSA-approved security plan applicable to the operation of certain aircraft with a maximum certificated takeoff weight of 12,500 pounds or more. *See* 49 C.F.R. § 1550.7.

35.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 35, Sentence 3

> Plaintiffs maintain a rigorous TSA-approved and monitored security plan, but passengers flying with Plaintiffs are not processed through the main terminal's TSA checkpoints.

35.3    Admits that Plaintiffs' passengers are not processed through the Terminal's TSA checkpoints; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 35, Sentence 4

> Instead, the "Twelve-Five" Security Plan is uniquely available for Part 135 operators and allows Plaintiffs' flights to enplane and deplane passengers at non-SIDA locations, and as a result, Plaintiffs' customers do not have to enter the terminal of an airport to do so.

35.4    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 35, Sentence 5

> Under the "Twelve-Five" federally authorized regulatory protocol, Plaintiffs' passengers are able to bypass large crowds, long lines, typical time spent waiting for an airplane to board and depart.

35.5    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 35, Sentence 6

> The result is a faster, safer, and crowd-free airport experience that is fully compliant with federal safety regulations.

35.6    Denies knowledge or information sufficient to form a belief as to truth of the allegations.

Paragraph 36

36.    This paragraph is multi-sentence:

Paragraph 36, Sentence 1

> By contrast, customers of large airlines who board from terminal buildings are required to pass through a TSA security checkpoint in order to enter the Terminal (which is exclusively a SIDA location) at HPN.

36.1    Admits that the Terminal is a SIDA location; admits that Terminal passengers pass through a TSA security checkpoint before entering the Terminal; denies knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 36, Sentence 2

> The TSA security checkpoints—and the crowds, frustration, and delays associated with them—are ubiquitous for the average airport user, and in HPN they are particularly crowded and congested and provide no opportunity for social distancing protocols or a quick experience from car to airplane.

36.2    Denies that the TSA security checkpoints at HPN are particularly crowded and congested; denies that the TSA security checkpoints at HPN provide no opportunity for social distancing protocols; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 37

37.    This paragraph is multi-sentence:

Paragraph 37, Sentence 1

> Plaintiffs provide a level of safety, convenience, and a socially distanced flying experience that is not otherwise available to customers of large traditional airline customers in any class of service.

37.1    Denies that Plaintiffs provide a level of safety that is not otherwise available to customers of large traditional airline customers in any class of service; denies knowledge or information sufficient to form a belief as to the truth of the remaining allegations.

Paragraph 37, Sentence 2

> Plaintiffs' services are safe, federally authorized, and especially well-suited for individuals who want to maintain social distancing and avoid large crowds while traveling during the COVID-19 pandemic.

37.2    Admits that Plaintiffs' services at HPN are safe; makes no representation regarding the allegation that Plaintiffs' services are federally authorized, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 37, Sentence 3

> Plaintiffs' aircraft operations are also quieter than large airlines.

37.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 38

38.    This paragraph is multi-sentence:

Paragraph 38, Sentence 1

> Plaintiffs are, however, prohibited from allowing their customers to enter SIDA areas of HPN because non-SIDA and SIDA customers cannot commingle under federal regulations.

38.1    Denies that Plaintiffs are prohibited form allowing their customers to enter SIDA areas of HPN; makes no representation regarding the remaining allegations, which

are legal conclusions, save to demand strict proof thereof and refer respectfully all questions of law to the Court.

Paragraph 38, Sentence 2

> A SIDA location is differentiated and cordoned off from non-SIDA locations at HPN—but both types of security procedures are TSA-approved and meet federal regulations.

38.2    Admits that, at HPN, SIDA locations are differentiated and cordoned off from non-SIDA locations; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 38, Sentence 3

> As a result, Plaintiffs' customers are federally prohibited from entering the Terminal at HPN because HPN does not have a non-SIDA area in the Terminal.

38.3    Denies that Plaintiffs' customers are prohibited from entering the Terminal; makes no representation regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and refer respectfully all questions of law to the Court.

Paragraph 38, Sentence 4

> The only option for Plaintiffs is therefore to maintain their operations at an FBO.

38.4    Denies the allegations.

Paragraph 39

39.    This paragraph is multi-sentence:

Paragraph 39, Sentence 1

> Until recently, Plaintiffs have been permitted to operate at an FBO at HPN.

39.1    Admits that Plaintiff have been permitted to operate at HPN FBOs; denies that Plaintiffs are no longer permitted to do so.

Paragraph 39, Sentence 2

> An FBO is an aeronautical service provider located at an airport that, among other things, offers fueling, maintenance, and other ground-based services to aircraft operators.

39.2    Admits the allegations.

Paragraph 39, Sentence 3

> Use of FBOs' non-Terminal facilities is currently the only way Plaintiffs' flights are able to enplane and deplane customers at HPN at a non-SIDA location.

39.3    Denies the allegations.

Paragraph 40

40.    This paragraph is multi-sentence:

Paragraph 40, Sentence 1

> Moreover, even if Plaintiffs could require their customers to pass through a SIDA-compliant security checkpoint at HPN in the main terminal, they would be unable to do so under federal law because several of the airports that Plaintiffs serve with routes that link to HPN either do not have a TSA-checkpoint or Plaintiffs operate from those airports at non-SIDA locations that lack TSA facilities.

40.1    Denies the allegations.

Paragraph 40, Sentence 2

> If Plaintiffs were forced to conduct all flight operations from a sterile area of the Terminal, passengers who did not undergo TSA screening at their departure airport would not be able to deplane into the Terminal at HPN.

40.2    Denies that County Defendant is forcing Plaintiffs to perform their flight operations from a sterile area; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 40, Sentence 3

> This, in turn, would effectively evict Plaintiffs from HPN because Plaintiffs, consistent with federal regulations, do not have passengers undergo such screening at any of the many other airports that Plaintiffs serve.

40.3    Denies that compliance with the TUP would "effectively evict Plaintiffs from HPN"; makes no answer regarding the remaining allegations, which are legal

conclusions, save to demand strict proof thereof and to refer all questions of law to the Court.

Paragraph 40, Sentence 4

> Even if only departing flights were required to be conducted from a sterile area, such a requirement would fundamentally alter and interfere with Plaintiffs' federally authorized procedures.

40.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 41

41.    This paragraph is multi-sentence:

Paragraph 41, Sentence 1

> Plaintiffs currently offer routes between HPN and FBOs in Van Nuys, Oakland, Fort Lauderdale, Palm Beach, and Miami, and do not utilize TSA-checkpoints at these airports.

41.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 41, Sentence 2

> While Plaintiffs' customers would not be subject to clear through TSA SIDA checkpoints at these airports (and in some cases such SIDA checkpoints may not even exist), if they were forced to undergo TSA screening at HPN, they would not be able to fly between HPN and any of those airports.

41.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 41, Sentence 3

> This is because TSA requires passengers who clear through SIDA checkpoints to do so at both their origin and destination airport.

41.3    Makes no answer to these allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 41, Sentence 4

> If customers cannot avoid traditional TSA SIDA checkpoints when flying with Plaintiffs, then they will no longer choose to fly with Plaintiffs and Plaintiffs are thus unable to continue existing services.

41.4    Denies knowledge or information sufficient to form a belief as to truth of the allegations.

Paragraph 42

42.    This paragraph is multi-sentence:

Paragraph 42, Sentence 1

> Plaintiffs' flight offerings have the added benefit of minimizing airport impact by aggregating passengers into smaller and/or quieter aircraft as an alternative to passengers each chartering their own aircraft, which would create further noise and environmental impact and/or airport congestion.

42.1    Denies the allegations.

Paragraph 42, Sentence 2

> For example, instead of ten passengers each chartering their own aircraft individually to the same destination, Plaintiffs' flight offerings aggregate those ten passengers in one aircraft, thus minimizing the impact by comparison.

    42.2    Denies the allegations.

Paragraph 42, Sentence 3

> Further, Defendants have maintained that the TUP and Policy No. 1 would not apply to certain other operators operating out of FBOs, including a Part 91 operator, and thus they would not be subjected to the TUA's restrictions.

    42.3    Denies the allegations.

Paragraph 43

    43.    This paragraph is multi-sentence:

Paragraph 43, Sentence 1

> Moreover, Plaintiffs offer other valuable services to their customers when they operate from an FBO that cannot be offered at the Terminal.

    43.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 43, Sentence 2

> These services include valet parking and shuttle services, concierge services, specialized health and safety protocols, private lounge access, and speedier check-in, boarding and baggage handling processes.

43.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 43, Sentence 3

> As a further example, Blade also administers its industry-leading COVID-19 health and safety protocol, including on-site COVID-19 testing by registered nurses, temperature and blood oxygen level testing and proof of vaccination enforcement, from Million Air's FBO.

43.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 43, Sentence 4

> Blade would not be able to offer these services or enforce these protocols at the Terminal, and many of Blade's customers and the increasing popularity of Blade's services out of HPN are attributable to these services and protocols.

43.4    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 44

> 44.     Hence, any effort by the County to eliminate Plaintiffs from operating from the FBOs at HPN, without authorizing a non-SIDA area, effectively eliminates those routes and services.

44.     Denies the allegations.

Paragraph 45

45.     This paragraph is multi-sentence:

Paragraph 45, Sentence 1

> In fact, until recently, Defendants have not enforced the TUP against any of the Part 135 operators Blade and XO Global have worked with since 2015, nor have Defendants required Blade or XO Global to move their flights from their respective FBOs to the Terminal.

45.1     Admits that—pursuant to a stipulation and order (*see* CM/ECF Doc No 45)—County Defendant has not required Blade or XO to move any flights to the Terminal and will not do so absent a further court order; denies the remaining allegations.

Paragraph 45, Sentence 2

> Moreover, Defendants never required Blade or XO Global to sign the TUA, nor are Plaintiffs aware of any instances where HPN applied the TUP to Part 380 operators selling more than 9 seats until recently.

45.2     Denies that neither Blade nor XO is required to sign a TUA; denies knowledge or information necessary to form a belief as to the allegation regarding Plaintiffs' awareness of any such instances.

**HPN Is A Not A Private Commercial Space, But A Federally Funded Public Use Airport Subject To Federal Law And Regulations**

Paragraph 46

46.     This paragraph is multi-sentence:

Paragraph 46, Sentence 1

> HPN is a "public use" airport that is funded, in part, by grants obtained under one or more federal programs, including the Airport Improvement Program.

46.1     Admits the allegations.

Paragraph 46, Sentence 2

> The receipt of federal grant money obligates the airport sponsor, i.e., the County, to comply with Grant Assurances.

46.2     Admits the allegations.

Paragraph 47

47.     This paragraph is multi-sentence:

Paragraph 47, Sentence 1

> The FAA has made clear that these Grant Assurances require "Federally obligated airport sponsors . . . to operate airports for the use and benefit of aeronautical users and to make those airports available to all types, kinds, and classes of aeronautical activities on fair and reasonable terms, and without unjust discrimination."[3]

47.1     Refers respectfully the Court to the cited Grant Assurances as the best evidence of their content and import.

Paragraph 47, Sentence 2

> [3] https://www.faa.gov/airports/airport_compliance/media/airportSponsor
> AndUserRightsBrochure.pdf

47.2    Refers respectfully the Court to the cited document as the best evidence of its content and import.

Paragraph 47, Sentence 3

> In other words, Defendants have a duty to provide Plaintiffs with reasonable access at HPN.

47.3    Makes no regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 48

48.    This paragraph is multi-sentence:

Paragraph 48, Sentence 1

> In order to comply with their obligation to provide Plaintiffs with "reasonable access," Defendants must provide Plaintiffs access to the Airport on reasonable and non-discriminatory terms.

48.1    Makes no answer regarding the allegations, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 48, Sentence 2

> At bottom, Defendants must ensure that Plaintiffs have reasonable and non-discriminatory access to the public use Airport in a way that is consistent with Plaintiffs' federally authorized business plan.

48.2    Makes no answer regarding the allegations, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 49

49.    This paragraph is multi-sentence:

Paragraph 49, Sentence 1

> Pertinent here, the Grant Assurances, as set forth in a federal statute (49 U.S.C. § 47107), require the County to provide access to all aviation users in a reasonable and non-discriminatory manner.

49.1    Makes no regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 49, Sentence 2

> At a minimum, this means that the County cannot arbitrarily seek to exclude an airport user (e.g., an air carrier) from accessing the Airport.

49.2    Makes no regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

**The County Is Improperly Enforcing Policy No. 1 And The TUP Against Plaintiffs**

Paragraph 50

      50.     This paragraph is multi-sentence:

Paragraph 50, Sentence 1

> County officials have publicly recognized during public hearings, including in November 2021, that their local government power cannot simply regulate Plaintiffs' flights that depart from and arrive at HPN.

      50.1    Admits the allegations; denies the implicit allegation that County Defendant is prohibited from regulating Plaintiff's flights at HPN in any respect.

Paragraph 50, Sentence 2

> Yet, Defendants' adoption of Policy No. 1 and enforcement of the TUP require certain Part 135 and 380 operators (such as Plaintiffs) to move their departing and arriving flights from an FBO to the Terminal.

      50.2    Denies the allegations.

Paragraph 50, Sentence 3

> Defendants' attempt to expand their local government control to regulate Plaintiffs' flights encroaches upon federally preempted issues and violates federal law.

      50.3    Denies the allegations.

Paragraph 51

      51.     This paragraph is multi-sentence:

Paragraph 51, Sentence 1

> In 2004, the County passed Westchester County Municipal Code § 712.462, which codified the TUP.

51.1    Admits the allegations.

Paragraph 51, Sentence 2

> The TUP sets forth the County's policy concerning access to the Airport by airlines, establishes the Airport's terminal capacity to accommodate airlines, and adopts a mechanism for allocating capacity among airlines seeking access.

51.2    Denies that the TUP is "policy," as opposed to a law; admits the remaining allegations.

Paragraph 51, Sentence 3

> The TUP requires airlines seeking to conduct passenger services from the Terminal to enter into a TUA with the County.

51.3    Admits that the TUP requires "Airlines" seeking to conduct "Passenger Service," as those terms are defined within the TUP (*see* LWC § 712.462(2)) from the Terminal to enter a TUA with the County; denies the remaining allegations.

Paragraph 51, Sentence 4

> The TUP governs air carriers' operations out of HPN's Terminal but does not apply to air carriers operating from FBOs.

51.4    Denies the allegations.

Paragraph 52

52.    This paragraph is multi-sentence:

Paragraph 52, Sentence 1

> The TUP governs the use of the Terminal and the Terminal Ramp at the Airport, which is for the "exclusive use of Airlines providing Passenger Service."  Westchester Cty. Municipal Code § 712.462(1).

52.1    Refers respectfully the Court to the cited law as the best evidence of its content and import; to the degree a response is required, admits the allegations.

Paragraph 52, Sentence 2

> Specifically, the TUP applies only to Airlines offering Passenger Service under 14 C.F.R. Parts 119, 121, or 135.

52.2    Admits that the TUP applies to "Airlines" seeking to conduct "Passenger Service," as those terms are defined within the TUP (*see* LWC § 712.462(2)); denies the remaining allegations.

Paragraph 52, Sentence 3

> The TUP defines "Passenger Service" as "any air service to or from the Airport for which seat are individually offered or sold to the public or a segment of the public."

52.3    Refers respectfully the Court to the cited law as the best evidence of its content and import; to the degree a response is required, denies the allegation to the degree it omits part of the legal definition.

Paragraph 52, Sentence 4

> Defendants maintain that any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to the TUP.

52.4    Admits the allegations.

Paragraph 53

53.    This paragraph is multi-sentence:

Paragraph 53, Sentence 1

> The TUP forces operators under Parts 119, 121, and 135 offering Passenger Services in an aircraft with more than nine seats to enter into the TUA, under which operators are to agree to abide by additional "Technical Specifications and Procedural Requirements" and prohibits operators from challenging the Technical Specifications and Procedural Requirements, or the TUP, in a court of law or administrative proceeding.

53.1    Refers respectfully the Court to the TUP as the best evidence of its content and import; to the degree that a response is required, denies the allegations, which makes no mention of the "individual-seat sales" requirement.

<u>Paragraph 53, Sentence 2</u>

> The TUP and TUA have the further effect of limiting Plaintiffs' services by causing Plaintiffs to alter flight schedules based on their allocation to the Terminal Ramp through the lottery system and the overall Terminal Capacity passenger limitation for all airlines operating at the Terminal.

53.2    Denies knowledge or information sufficient to for a belief as to the truth of the allegations.

<u>Paragraph 54</u>

54.    This paragraph is multi-sentence:

<u>Paragraph 54, Sentence 1</u>

> But as explained above, JSX, Blade, and XO Global are engaged in public charter operations under Part 380 with federal approval from the DOT.

54.1    Admits that an earlier section of the complaint alleges that Plaintiffs are engaged in public charter operations under Part 380; denies knowledge or information sufficient to form a belief as to whether Plaintiffs are operating with[,] or within[,] federal approval.

<u>Paragraph 54, Sentence 2</u>

> Indeed, the County itself has repeatedly acknowledged that Plaintiffs are among a group of operators offering single-seat sales under DOT Part 380 "public charter" rules.

54.2    Admits that "Plaintiffs are among a group of operators offering single-seat sales under DOT Part 380 'public charter' rules"; denies knowledge of the specific "repeated[] acknowledge[ments]" to which Plaintiffs here refer.

Paragraph 54, Sentence 3

> Notably, the County had never before applied the TUP to Part 380 operations, and indeed, the TUP itself does not reference Part 380 operators at all.

54.3    Denies the allegation that "the County had never before applied the TUP to Part 380 operations"; refer respectfully the Court to the TUP as the best evidence of its content and import.

Paragraph 54, Sentence 4

> In fact, Part 380 operations at HPN have long occurred at FBOs, and public charter operations under Part 380 have existed without controversy for many decades.

54.4    Denies the implicit implication that Part 380 operations are synonymous with or inherently include the Practice; admits the remaining allegations.

Paragraph 54, Sentence 5

> Similarly, Part 380 operators have never been required to enter into a TUA or any similar agreement when operating from an FBO.

54.5    Denies the allegations.

Paragraph 54, Sentence 6

> Numerous operators have operated, and continue to operate, flights at HPN with more than nine aircraft seats from FBOs, including under Part 380.

54.6    Denies the implicit obligation that the Practice is limited to operating "flights at HPN with more than nine aircraft seats," as such statement omits the additional element of selling such seats on an individual basis to the public; admits the remaining allegations.

Paragraph 54, Sentence 7

> These operations have accounted for thousands of flights.

54.7    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 55

55.    This paragraph is multi-sentence:

Paragraph 55, Sentence 1

> Beginning in October and November 2021, the County, through AvPorts, began demanding that Plaintiffs utilize the Terminal for their Part 380 operations and enter into a TUA in order to continue operating at HPN.

55.1    Admits the allegations with respect to Plaintiffs' operations that included the Practice; denies the remaining the allegations.

Paragraph 55, Sentence 2

> The County claimed that Plaintiffs' operations violated Westchester County Municipal Code § 712.462.

55.2    Admits the allegations with respect to Plaintiffs' engagement in the Practice; denies the remaining the allegations.

Paragraph 56

56.    This paragraph is multi-sentence:

Paragraph 56, Sentence 1

> On November 5, 2021 and November 9, 2021, AvPorts, acting on behalf of the County, sent a letter to each Plaintiff demanding that they conduct their services out of the Terminal pursuant to a Terminal Use Agreement.

56.1    Refers respectfully the Court to such letters as the best evidence of their content and import; to the degree a response is required, admits the allegations with respect to Plaintiffs' engagement in the Practice; denies the remaining allegations.

Paragraph 56, Sentence 2

> The County asserted that Plaintiffs were engaged in "Passenger Service" and were not permitted to operate from an FBO.

56.2    Refers respectfully the Court to such letters as the best evidence of their content and import; to the degree a response is required, admits the allegations with respect to Plaintiffs' engagement in the Practice; denies the remaining allegations.

Paragraph 57

57.     This paragraph is multi-sentence:

Paragraph 57, Sentence 1

> In a December 2, 2021 letter to JSX, the County asserted that Plaintiffs' operations fell within the definition of "Passenger Service" that is otherwise regulated by the TUP because their aircraft have more than nine seats and involve sales of single seats to the public.

57.1     Refers respectfully the Court to such letter as the best evidence of its content and import; to the degree a response is required, admits the allegations with respect to Plaintiffs' engagement in the Practice; denies the remaining allegations.

Paragraph 57, Sentence 2

> This is the same category that applies to the large, regularly scheduled airlines.

57.2     Refers respectfully the Court to the TUP as the best evidence of its content and import; to the degree a response is required, admits the allegation.

Paragraph 57, Sentence 3

> However, those large airlines are federally required to be subjected to full TSA security and accordingly operate from the SIDA portions of the Terminal, while Plaintiffs are not.

57.3     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 57, Sentence 4

> Thus, the County's interpretation impermissibly extends the definition of Passenger Services to Plaintiffs in a manner that destroys Plaintiffs' federally approved procedures and business models.

57.4    Denies that the TUP is impermissible; denies that the County's interpretation of the TUP is impermissible, improper, or an "exten[sion]" of the TUP's plain meaning; denies knowledge and information sufficient to form a belief as to the remaining allegations.

Paragraph 58

58.    This paragraph is multi-sentence:

Paragraph 58, Sentence 1

> In the same letter, Defendants further noted that the nine-seat limitation does not apply to other Part 135 air charter operations at the FBOs where a single-entity or individual charters the entire aircraft, and individual seats are not made available to the public.

58.1    Refers respectfully the Court to such letter as the best evidence of its content and import; to the degree a response is required, admits the allegations.

Paragraph 58, Sentence 2

> Defendants also noted that the same limitation did not apply to other operations at FBOs, including Part 91 corporate aircraft operations at FBOs, which have also been conducted for decades.

58.2    Admits the allegations.

Paragraph 59

59.     This paragraph is multi-sentence:

Paragraph 59, Sentence 1

> Despite contending that it was not making a change to its laws, Defendants nonetheless adopted Policy No. 1 on January 21, 2022, which directly targeted Plaintiffs' operations and mandated that they utilize the Terminal.

59.1    Admits that Policy No. 1 is not a law, did not change County law, and was rather a determination of the applicability of the TUP to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refer respectfully the Court to Policy No. 1 as the best evidence of its content and import; admits that County Defendant has contended and continues to contend same; denies the remaining allegations.

Paragraph 59, Sentence 2

> As the name suggests, the policy was the first of its kind for HPN and constitutes a new interpretation of the TUP.

59.2    Denies the allegations.

Paragraph 59, Sentence 3

> The Airport Noise and
> Capacity Act ("ANCA") bars local noise and access restrictions that are enacted after 1990
> unless they comply with the statute's mandatory procedural requirements.  49 U.S.C. 47524(d);
> *see also Friends of E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 143 ( 2d.
> Cir. 2016).

59.3    Makes no answer to the above allegations, which are legal conclusions, save
to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 59, Sentence 4

> On information and belief, Defendants have not complied with ANCA's strict
> procedural requirements, and thus, the recent enactment of Policy No. 1 is unlawful.

59.4    Denies the allegations.

Paragraph 60

60.    This paragraph is multi-sentence:

Paragraph 60, Sentence 1

> In fact, within Policy No. 1, Defendants reclassified Plaintiffs' Part 380
> operations as "Single-Seat-Charter-Operations" or "SSCOs," a novel term for a decades-old
> business model, implicitly acknowledging that such operations were not previously addressed by
> the TUP.

60.1    Denies the allegations.

Paragraph 60, Sentence 2

> Policy No. 1 credited Plaintiffs' business as innovative, while simultaneously destroying their businesses by requiring Plaintiffs to utilize the Airport's TSA checkpoints, in violation of federal regulations that require Plaintiffs to operate from non-SIDA areas.

60.2   Refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; to the degree a response is required, denies the allegations.

Paragraph 60, Sentence 3

> Notably, none of the FAA, DOT, TSA, TUP nor the TUA mandate use of the Airport's TSA checkpoints, or otherwise prevent operators from utilizing separate TSA-approved screening.

60.3   Refers respectfully the Court to the TUP and existing TUAs as the best evidence of their content and import; denies knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 61

> 61.   During this time, Plaintiffs actively sought to reach a good-faith resolution that would address Defendants' concerns; however, Defendants summarily rejected any proposed alternatives without any meaningful consideration or analysis.

61.   Admits that the parties together sought to reach a good-faith resolution that would address all parties' concerns; denies the remaining allegations.

Paragraph 62

62.   This paragraph is multi-sentence:

Paragraph 62, Sentence 1

> For example, in response to AvPorts' initial letter, JSX attended a meeting with former Airport Manager, Peter Scherrer, on November 10, 2021, and spoke with him again on November 12, 2021.

62.1    Admits the allegations.

Paragraph 62, Sentence 2

> In its November 15, 2021 letter, JSX stated that as a sign of goodwill, it would begin limiting all HPN flights to a maximum of nine seats for sale until the end of the year and block passenger seats from service to limit the aircraft to nine passenger seats, which in and of itself caused a significant adverse impact on JSX's revenue.

62.2    Refers respectfully the Court to the letter as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the truth of the allegation that JSX's actions "in and of itself caused a significant adverse impact on JSX's revenue."

Paragraph 62, Sentence 3

> JSX agreed to maintain these restrictions for the rest of the year in order to afford time to reach a mutually acceptable resolution.

62.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 62, Sentence 4

> Although Defendants had many weeks to work with JSX on a potential resolution, Defendants only ignored or rejected JSX's proposals.

62.4    Denies the allegations.

Paragraph 63

63.    This paragraph is multi-sentence:

Paragraph 63, Sentence 1

> JSX in fact proposed multiple TSA-compliant alternatives for the Airport's consideration.

63.1    Admits that JSX has proposed multiple alternatives; makes no answer regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 63, Sentence 2

> These included proposals whereby passengers would check in at the Terminal, and JSX would use vacant office space on the first floor of the Terminal to hold passengers prior to boarding.

63.2    Admits the allegations.

Paragraph 63, Sentence 3

> Under the first proposal, when boarding commences, passengers would be escorted through the Ross Aviation East FBO and down a non-SIDA ramp.

63.3    Admits the allegations.

Paragraph 63, Sentence 4

> Under the second proposal, passengers would be escorted through an access gate just north of the Terminal and then down an Airport terminal ramp.

63.4    Admits the allegations.

Paragraph 63, Sentence 5

> Unfortunately, and inexplicably, these proposals were summarily rejected by the Airport, without any meaningful consideration or analysis, even though these proposals represented common-sense solutions that would have enabled compliance with TSA security requirements.

63.5    Makes no answer to the allegation that JSX's proposal "would have enabled compliance with TSA security requirements," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully to the Court all questions of law; denies the remaining allegations.

Paragraph 63, Sentence 6

> These proposals also would have enabled the Airport to comply with its obligations under federal law.

63.6    Makes no answer to the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully to the Court all questions of law

Paragraph 64

> 64.    XO Global similarly objected and proposed alternatives such as completing passenger check in at the Ross Aviation East FBO and transporting the passengers to the aircraft that parked at the Terminal to be boarded planeside.

64.    Admits the allegations.

Paragraph 65

65.    This paragraph is multi-sentence:

Paragraph 65, Sentence 1

> Blade likewise objected to the County's position with respect to its services at an FBO.

65.1    Admits the allegations.

Paragraph 65, Sentence 2

> In a November 29, 2021 letter, Blade reminded the County that Blade's existing Part 380 service had been operating at the FBO for the last five years, that the County had approved its leasehold with Million Air, and that the County was involved in the planning, construction and leasehold improvement activities related to Blade's facilities at Million Air.

65.2    Refers respectfully the Court to the cited letter as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the truth of the allegation that Blade had engaged in the Practice between November 29, 2016, and November 29, 2021.

Paragraph 66

> 66.    However, the County refused to entertain any proposed accommodations for Plaintiffs and is accordingly denying Plaintiffs reasonable access to the Airport, a federally regulated and public space.

66.    Admits that the Airport is federally regulated; makes no representation to the allegation that the Airport is a "public space," which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; denies the remaining allegations, including and specifically the allegation that the County has denied or is denying Plaintiffs access to the airport and/or reasonable accommodations.

Paragraph 67

67.    This paragraph is multi-sentence:

Paragraph 67, Sentence 1

> The County's policy targets only Plaintiffs by defining them as SSCOs, and not similarly situated on-demand carriers who operate at FBOs.

67.1    Denies the allegations.

Paragraph 67, Sentence 2

> Moreover, the County declined to offer any non-SIDA access to the Terminal so that Plaintiffs could reasonably access the Terminal in accordance with the TUP that the County wishes to enforce.

67.2    Denies the allegations.

**The County Is Prohibited From Imposing Barriers To Access Under Federal Aviation Law**

Paragraph 68

68.    This paragraph is multi-sentence:

Paragraph 68, Sentence 1

> Federal law also prohibits the Airport from creating rules or policies that have the effect of unjust discrimination against a type, kind or class of aviation service and unreasonably restricting an airport user's access to the Airport.

68.1    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 68, Sentence 2

> Defendants' refusal to make any reasonable accommodation for Plaintiffs' operations restricts Plaintiffs' access to HPN in violation of federal law.

68.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations, —including and specifically the allegation that the County has denied or is denying Plaintiffs access to the airport and/or reasonable accommodations.

Paragraph 69

69.    This paragraph is multi-sentence:

78

Paragraph 69, Sentence 1

> Congress has preempted the field of aviation and air carrier regulation.

69.1    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the implicit allegation that Congress completely preempted the field of aviation and air carrier regulation.

Paragraph 69, Sentence 2

> This means that, *inter alia*, counties and cities are not permitted to self-regulate the air transportation industry.

69.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 69, Sentence 3

> Any effort to do so is invalid under the Supremacy Clause of the United States Constitution and the preemption provisions of the various federal aviation statutes.

69.3    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 70

> 70.     Congress determined that preemption was necessary to achieve the objectives of the Airline Deregulation Act ("ADA"), which include, among other things: encouraging entry into the air transportation market by new carriers; strengthening small air carriers to ensure a more effective and competitive airline industry; ensuring the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination; and preventing unfair, deceptive, predatory, or anticompetitive practices in air transportation. *See* 49 U.S.C. § 40101.

70.     Refers respectfully the Court to the ADA as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 71

71.     This paragraph is multi-sentence:

Paragraph 71, Sentence 1

> The FAA regulates aviation safety and has done so by implementing federal regulations pertaining to every aspect of airport and aircraft operations.

71.1     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies that the FAA has implemented federal regulations pertaining to "every" aspect of airport and aircraft operations.

Paragraph 71, Sentence 2

> The DOT regulates the economic aspects of the air carrier industry.

71.2    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, admits the allegation.

Paragraph 71, Sentence 3

> Together, the DOT and FAA have full authority to regulate air carriers.

71.3    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the implicit allegation that the DOT and the FAA together possess the exclusive authority to regulate air carriers.

## Preemption Under the Airline Deregulation Act ("ADA")

Paragraph 72

> 72.    Congress has expressly preempted state and local governments from enacting or enforcing "a law, regulation, or other provision having the force and effect of law *related to* a price, route, or service of an air carrier . . ." 49 U.S.C. § 41713(b)(1) (emphasis added).

72.    Refers respectfully the Court to the cited statute as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree

a response is required, denies the allegation to the degree the citation omits a material, codified limitation.

Paragraph 73

73.    This paragraph is multi-sentence:

Paragraph 73, Sentence 1

In so doing, Congress expressly wanted to avoid a patchwork of state and local regulations from unduly burdening interstate air transportation and undermining the objectives of the ADA.

73.1    Admits the allegation.

Paragraph 73, Sentence 2

As a result, all state and local laws, regulations, and other provisions having the force and effect of law that relate to carriers' prices, routes and services are preempted and invalid.

73.2    Denies the allegations.

Paragraph 74

74.    This paragraph is multi-sentence:

Paragraph 74, Sentence 1

Local governments are expressly prohibited from unilaterally imposing regulations in this area absent FAA approval.

74.1    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegation.

<u>Paragraph 74, Sentence 2</u>

> Local restrictions or access plans that violate federal law or federal policy are *per se* unreasonable and thus do not fit within the narrow "proprietary right" exception (discussed below).

74.2    Makes no answer regarding the allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, notes that the allegation is tautological.

<u>Paragraph 75</u>

> 75.    Under the ADA, 49 U.S.C. § 41713(b)(1), "a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier."

75.    Refers respectfully the Court to the cited statute as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

<u>Paragraph 76</u>

76.    This paragraph is multi-sentence:

Paragraph 76, Sentence 1

---

A state or local law is "related to" a price, route or service if it has "[1] a connection with, or [2] reference to" a price, route, or service. *American Airlines v. Wolen*, 513 U.S. 219, 223 (1995); *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008).

---

76.1    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 76, Sentence 2

---

The "relating to" phrase in § 41713(b)(1) "express[es] a broad pre-emptive purpose." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).

---

76.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 77

77.    This paragraph is multi-sentence:

Paragraph 77, Sentence 1

---

Congress allowed for an extremely narrow exception to the otherwise wholesale preemption for local governments "carrying out [their] proprietary powers and rights" as airport sponsors.  49 U.S.C. § 41713(b)(3).

---

77.1     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 77, Sentence 2

> This is known as the "proprietary right exception," and it is very narrowly interpreted.

77.2     Admits that the cited statutory provision is known as the "proprietary right exception"; makes no answer regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegation.

Paragraph 78

> 78.     Under this narrow exception, a local government's exercise of its proprietary powers must be reasonable, nondiscriminatory, nonburdensome to interstate commerce, and designed not to conflict with the ADA and its policies.

78.     Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 79

79.     This paragraph is multi-sentence:

Paragraph 79, Sentence 1

> The validity of any local regulation therefore depends on (1) whether the regulation "is related to a price, route, or service of an air carrier"; (2) if so, whether regulation amounts to an exercise of a State or local government's propriety powers; and (3) if it is an exercise of proprietary powers, whether such exercise is reasonable, non-arbitrary and non-discriminatory and not in conflict with the ADA, ANCA, or other federal law.

79.1    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 79, Sentence 2

> Only if all these showings are met is a local regulation exempted from preemption by 49 U.S.C. § 41713(b)(3).

79.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 79, Sentence 3

> In determining whether a local regulation restricting access to a public airport meets the narrow exception, the FAA has stated that such regulations must balance both local and federal interests.

79.3    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 80

80.     Here, Defendants' conduct: (1) effectively prohibits Plaintiffs from providing certain routes (*e.g.*, routes that originate at an airport where customers enplane from a non-SIDA location, despite them being permissible under federal law) and certain services (e.g., Plaintiffs' convenient options offered to HPN travelers); (2) is a flawed attempt to exercise proprietary powers (as any other explanation would not even arguably justify them); and (3) is unreasonable, arbitrary and discriminatory (they target and single out certain safe operators, Plaintiffs, for no legitimate reason), irreparably harming Plaintiffs, Plaintiffs' employees based at HPN, *and* the traveling public who prefer Plaintiffs' services and businesses and socially distanced travel experiences.

80.     Denies the allegations

**Preemption Under the Airport Noise and Capacity Act ("ANCA")**

Paragraph 81

81.     This paragraph is multi-sentence:

Paragraph 81, Sentence 1

Congress's most authoritative expression of specific intent regarding the extent of federal preemption in the area of access at public airports is the Airport Noise and Capacity Act ("ANCA"), 49 U.S.C. § 47521, *et seq.*

81.1    Refers respectfully the Court to the Airport Noise and Capacity Act ("ANCA") as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 81, Sentence 2

> ANCA was enacted after Congress determined that previous federal statutes and regulations were insufficient to ensure a uniform federal aviation policy regarding noise and airport access restrictions.

    81.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 81, Sentence 3

> Through ANCA, Congress explicitly sought to address the "uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system[.]"  49 U.S.C. § 47521(2).

    81.3    Refers respectfully the Court to the cited statute as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 81, Sentence 4

> Because Congress recognized that local airport sponsors may seek to impermissibly control or regulate access to airports within their jurisdictions, Congress expressly found that access restrictions to public airports "must be carried out at the national level."  *Id.* § 47521(3)-(4).

    81.4    Refers respectfully the Court to the cited statute as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 81, Sentence 5

> This is express preemption in the field of access to public airports and aircraft noise.

81.5   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 82

82.   This paragraph is multi-sentence:

Paragraph 82, Sentence 1

> ANCA, and FAA's regulatory scheme generally, classify aircraft into four "Stages" based on noise emission levels.

82.1   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 82, Sentence 2

> Stage 1 aircraft emit the most noise, and Stage 4 aircraft emit the least, with Stage 2 and Stage 3 aircraft in between.

82.2   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 82, Sentence 3

> Plaintiffs' services utilize Stage 3 aircraft.

82.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 83

> 83.    ANCA prohibits airport sponsors from imposing regulations that restrict a Stage 3 aircraft's ability to access a public airport unless the sponsor complies with 14 C.F.R. Part 161 ("Part 161") and the FAA grants permission.

83.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 84

84.    This paragraph is multi-sentence:

Paragraph 84, Sentence 1

> The FAA has promulgated extensive regulations, published at Part 161, which create a uniform process for airport sponsors to seek permission to introduce access restrictions at airports.

84.1    Refers respectfully the cited regulations as the best evidence of their content and import; makes no answer regarding the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 84, Sentence 2

> To date (more than 30 years after ANCA became federal law), no airport has successfully obtained permission from the FAA to impose an access restriction on Stage 3 aircraft via the Part 161 process or otherwise.

84.2    Denies knowledge and information sufficient to form a belief as to the truth of the allegations.

Paragraph 85

85.    This paragraph is multi-sentence:

Paragraph 85, Sentence 1

> Indeed, ANCA's requirements for enacting access restrictions for Stage 3 aircraft are remarkably stringent.

85.1    Refers respectfully the Court to the cited requirements as the best evidence of their content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 85, Sentence 2

> Federal courts and the FAA have both interpreted 49 U.S.C. § 47524 as a requirement that all public airports comply with Part 161 before any access restriction affecting a Stage 3 aircraft can be enforced. *See* 14 C.F.R. §§ 161.101, 161.301(c).

85.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the

Court; to the degree a response is required, denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 85, Sentence 3

> Under Part 161, proprietors must obtain, *inter alia*, (i) FAA approval for the restriction or (ii) the unanimous consent of *all* aircraft operators affected by the restriction.  49 U.S.C. § 47524(c)(1).

      85.3    Refers respectfully the Court to the cited statute and the cited regulations as the best evidence of their content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 86

>     86.    On information and belief, Defendants have neither sought nor obtained FAA approval for the access restriction imposed on Plaintiffs (whether based on the illegal Policy No. 1, the TUP, or otherwise).

    86.    Denies the allegations.

Paragraph 87

>     87.    Alternatively, Defendants have also failed to obtain unanimous consent of all operators (as evidenced by this lawsuit).

    87.    Denies the allegations.

Paragraph 88

> 88.     Moreover, even assuming that Defendants attempted to meet Part 161's strictures, they would have had to demonstrate to the FAA, among other things, that the access restriction imposed on Plaintiffs: (i) is reasonable, non-arbitrary and non-discriminatory; (ii) does not create an unreasonable burden on interstate or foreign commerce; (iii) is consistent with maintaining the safe and efficient use of navigable airspace; (iv) does not conflict with a law or regulation of the United States; (v) has received adequate opportunity for public comment; and (vi) does not create an unreasonable burden on the national aviation system.  49 U.S.C. § 47524(c)(2).

88.     Refers respectfully the Court to the cited statute and the cited regulations as the best evidence of their content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 89

> 89.     Each of the showings required to gain FAA approval are absent from the Defendants' decision to unilaterally impose an access restriction and to otherwise act to effectively remove Plaintiffs from the Airport.

89.     Denies the allegations.

Paragraph 90

90.     This paragraph is multi-sentence:

Paragraph 90, Sentence 1

> On information and belief, Defendants have not initiated, much less successfully completed, the Part 161 process.

90.1    Denies the allegations.

Paragraph 90, Sentence 2

> The Defendants cannot circumvent ANCA's requirements or the FAA's processes to impose access restrictions on Stage 3 aircraft.

90.2    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 90, Sentence 3

> FAA procedures are mandatory and comprehensive, and local attempts to regulate access that are not enacted in compliance with Part 161 are federally preempted.[4]

90.3    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 90, Sentence 4

> [4] Given that Policy No. 1 is a new policy enacted in 2022, it is not subject to being grandfathered in.

90.4    Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import.

Paragraph 91

91.    Defendants' conduct is further unreasonable because it interferes with Congress's stated goals in enacting ANCA, in particular preventing localities from creating a patchwork of regulations limiting airport access.

91.    Denies the allegations.

Paragraph 92

92.    In sum, Defendants violated ANCA (and its implementing regulations) by imposing Policy No. 1, preventing FBOs from working with Plaintiffs, and refusing to consider non-SIDA portions of the Terminal, all of which preclude Plaintiffs from operating at HPN.

92.    Denies the allegations.

Paragraph 93

93.    This paragraph is multi-sentence:

Paragraph 93, Sentence 1

Furthermore, Defendants' unlawful and unconstitutional conduct was and is intentional.

93.1    Denies that the County's conduct was either unlawful or unconstitutional; admits that the County acted with intent.

Paragraph 93, Sentence 2

> Defendants were and are fully aware that any access restriction imposed by Policy No. 1 or TUP is subject to ANCA's processes and thus subject to preemption.

93.2    Denies that Policy No. 1 is an access restriction; makes no answer to the remaining allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies that the TUP is subject to preemption.

**Plaintiffs Will Be Irreparably Harmed If The County Is Not Enjoined From Enforcing Policy**

Paragraph 94

94.    This paragraph is multi-sentence:

Paragraph 94, Sentence 1

> The County's Policy No. 1 prohibits Plaintiffs from operating as they always have at FBOs at HPN.

94.1    Denies the allegations.

Paragraph 94, Sentence 2

> Yet the County has refused Plaintiffs' proposals to operate from alternative non-SIDA locations or create a non-SIDA location at the Terminal.

94.2    Denies the implicit allegation that the County has refused to consider Plaintiffs' proposals; admits the remaining allegations.

Paragraph 94, Sentence 3

> Accordingly, Defendants' actions foreclose Plaintiffs' access to the Airport on reasonable and non-discriminatory terms, as required by federal law.

94.3    Denies the allegations.

Paragraph 95

> 95.    Enforcement of the County's new Policy No. 1 will irreparably harm Plaintiffs by entirely halting Plaintiffs' services at HPN, including routes offered to underserved cities, safe and efficient services to the traveling public, and employment for over employees in the area surrounding HPN, and causing other impact on the local economy.

96.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 96

> 96.    Plaintiffs will also suffer a significant loss of revenue and customer goodwill if they are forced to stop operations at HPN.

96.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 97

> 97.    For example, in the next twelve months, XO is expected to operate more than 1,000 flights to and from HPN with expected revenue in tens of millions annually.

97.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 98

> 98.     Similarly, JSX stands to lose significant resources it spent investing in the HPN market at an estimated value of over $2 million and significant investments already made to operate out of HPN if Policy No. 1 is to be enforced.

98.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 99

99.     This paragraph is multi-sentence:

Paragraph 99, Sentence 1

> Additionally, as mentioned above, the popularity of Blade's services out of HPN continues to grow and Blade is expected to operate approximately 165 Part 380 flights between HPN and OPF or PBI during the November 2021 through April 2022 season alone.

99.1    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 99, Sentence 2

> Blade stands to lose the significant investments it has made towards its operations at HPN and Million Air.

99.2    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 99, Sentence 3

> Moreover, Blade's increasing customer based would be forced to cancel flights that have already been booked, which will in turn damage Blade's reputation and goodwill.

99.3    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 99, Sentence 4

> If Policy No. 1 is enforced, Blade's inability to operate out of FBOs at HPN could result in losses in the millions for the remainder of the November 2021 through April 2022 season (and in the tens of millions for the November 2022 through April 2023 season, which does not take into account any potential expanded schedules or additional routes), as well as Blade's inability to honor contractual commitments to its Part 135 operating partners.

99.4    Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; denies knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 99, Sentence 5

> Additionally, Blade partners with Part 135 operators and local catering, shuttle, and car service businesses, and employs eleven individuals for its operations at HPN, all of whom would be significantly impacted if Blade could no longer operate from HPN.

99.5    Denies knowledge or information sufficient to form a belief as to the remaining allegations.

Paragraph 100

> 100.    Plaintiffs estimate that the local economic impact of their combined flight operations is well over $50 million annually.

100.    Denies knowledge or information sufficient to form a belief as to the remaining allegations.

### FIRST CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

**Defendants' Conduct Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ANCA (28 U.S.C. § 1331 and 49 U.S.C. §§ 47521-47534) (Against all Defendants)**

Paragraph 101

> 101.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

101.    Repeats and reincorporates the allegations in the preceding responses as if more fully set forth at length herein.

Paragraph 102

> 102.    The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding."  U.S. Const., art. VI.

102.    Refers respectfully the Court to the cited clause as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 103

> 103.    Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

103.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 104

104.    This paragraph is multi-sentence:

Paragraph 104, Sentence 1

> There is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

104.1   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 104, Sentence 2

> AvPorts is a private company that provides airport facilities management, operations, airline services, administration, accounting, and noise abatement on behalf of the Airport.

104.2   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 104, Sentence 3

> As an agent for the County, AvPorts has sent notices to Plaintiffs on the County's behalf, seeking to exclude their operations at FBOs and improperly enforce Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP against Plaintiffs.

104.3   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 104, Sentence 4

> AvPorts, with the County Defendants' approval, has promulgated Policy No. 1.

104.4   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 104, Sentence 5

As a result, AvPort's conduct is related to its agreement to adopt directives from the County Defendants aimed at unreasonably excluding Plaintiffs from HPN, including their adoption of Policy No. 1 and Defendants' enforcement of the TUP, is contrary to and interferes with federal law, including but not limited to ANCA.

104.5   Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 105

105.   Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is unreasonable, arbitrary, discriminatory, and violates federal law.

105.   Denies the allegations.

Paragraph 106

106.   Defendants' conduct, including their adoption of Policy No. 1 and reliance on the TUP, constituted and constitutes an access restriction for Plaintiffs' Stage 3 aircraft.

106.   Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and

a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; denies the remaining allegations.

Paragraph 107

> 107.    Defendants did not comply with Part 161.

107.    Makes no response to the allegation, which is a legal conclusion, save to demand strict proof thereof and refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegation.

Paragraph 108

> 108.    All air carriers present at HPN did not unanimously consent to Policy No. 1 or the TUP.

108.    Admits that Plaintiffs have not consented to Policy No. 1 or the TUP; denies the remaining allegations.

Paragraph 109

> 109.    The above-described conduct is not an action which falls within the narrow proprietary right exception because, among other reasons, Defendants purposefully acted in violation of federal law by intentionally discriminating against Plaintiffs.

109.    Denies the allegations.

Paragraph 110

> 110.    The above-described conduct is unreasonable, arbitrary, and discriminatory.

110.     Denies the allegations.

Paragraph 111

111.     This paragraph is multi-sentence:

Paragraph 111, Sentence 1

> Such conduct is *per se* unreasonable and unlawful as Defendants took this action in violation of federal law.

111.1   Denies the allegations.

Paragraph 111, Sentence 2

> As such, it is preempted by federal law and violates the Supremacy Clause of the U.S. Constitution.

111.2   Denies the allegations.

Paragraph 112

> 112.     The above-described conduct violates ANCA, and thus HPN's Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP must be amended or eliminated as a result of this ANCA violation.

112.     Denies the allegations.

Paragraph 113

113.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise excluding Plaintiffs from operating at HPN as of January 21, 2022.

113.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 114

114.    Plaintiffs also seek declaratory relief that makes clear that Defendants cannot prohibit Plaintiffs' operations through local law, regulation, or other provision having the force of law.

114.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court

Paragraph 115

115.    Plaintiffs specifically seek an injunction preventing Defendants from enforcing the Policy No. 1, Section 712.462 of the Westchester County Municipal Code, or the TUP, and a declaration that these regulations are invalid under the ANCA.

115.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court

## SECOND CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

### Defendants' Conduct Is Preempted by Federal Law and Violates the Supremacy Clause of the U.S. Constitution – ADA (28 U.S.C. § 1331 and 49 U.S.C. §§ 41713 et seq.) (Against all Defendants)

Paragraph 116

> 116.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

116.    Repeats and reincorporates the allegations in the preceding responses as if more fully set forth at length herein

Paragraph 117

> 117.    The Supremacy Clause of the U.S. Constitution provides that the "Constitution, and the laws of the United States which shall be made in pursuance thereof . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding." f U.S. Const., art. VI.

117.    Refers respectfully the Court to the cited clause as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 118

> 118.    Under the Supremacy Clause, local regulations which run contrary to federal law are preempted, and thus invalid and unenforceable.

118.    Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 119

> 119.    As alleged above, there is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

119.    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 120

> 120.    Defendants' conduct aimed at unreasonably excluding Plaintiffs from HPN, including adoption of Policy No. 1 and Defendants' enforcement of the TUP is contrary to and interferes with federal law, including but not limited to the ADA.

120.    Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully

the Court to Policy No. 1 as the best evidence of its content and import; denies the remaining allegations.

Paragraph 121

> 121.    Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

121.    Denies the allegations.

Paragraph 122

> 122.    Defendants' conduct, including the adoption of Policy No. 1 and enforcement of the TUP constitutes a regulation affecting the "rates, routes, and services" of Plaintiffs.

122.    Denies the implicit allegation that Policy No. 1 worked a change in the relevant law; denies the implicit allegation that Policy No. 1 represented anything other than a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis; refers respectfully the Court to Policy No. 1 as the best evidence of its content and import; makes no answer regarding the remaining allegation, which is a legal conclusion, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 123

> 123.    Defendants' above-described conduct prevents Plaintiffs from flying certain routes (*i.e.*, it forecloses Plaintiffs from operating flights to HPN from non-SIDA airport locations).

123.    Denies the allegations.

Paragraph 124

> 124.    Defendants' above-described conduct also prevents HPN from offering aeronautical services (e.g., it prohibits any customer services at HPN).

124.    Denies the allegations.

Paragraph 125

> 125.    Defendants' above-described conduct is not an action which falls within the narrow proprietary right exception, as the adoption of Policy No. 1 was unreasonable, arbitrary, and discriminatory.

125.    Denies the allegations.

Paragraph 126

> 126.    Plaintiffs' flights have operated safely at HPN for years.

126.    Admits the allegations.

Paragraph 127

> 127.    Plaintiffs' flights at HPN are serviced by quieter aircraft than most large airline flights at HPN.

127.    Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 128

> 128.    Plaintiffs were singled out by Defendants.

128.    Denies the allegations.

Paragraph 129

| |
|---|
| 129.    Defendants' decision to target Plaintiffs is arbitrary and unconstitutional. |

129.    Denies the allegations.

Paragraph 130

130.    This paragraph is multi-sentence:

Paragraph 130, Sentence 1

| |
|---|
| Defendants' above-described conduct is *per se* unreasonable and unlawful as Defendants took this action in violation of federal law. |

130.1   Denies the allegations.

Paragraph 130, Sentence 2

| |
|---|
| As such, it is preempted by federal law and the Supremacy Clause of the U.S. Constitution. |

130.2   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegations.

Paragraph 131

| |
|---|
| 131.    Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, Plaintiffs irreparably by causing a substantial loss of business, damaging Plaintiffs' business reputation and goodwill, and putting Plaintiffs at a significant competitive disadvantage to other carriers operating at HPN. |

131.    Denies the allegations.

Paragraph 132

> 132.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise excluding Plaintiffs from operating at HPN in violation of the ADA as of January 21, 2022.

132.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 133

> 133.    Plaintiffs also seek declaratory relief that makes clear that Defendants cannot prohibit Plaintiffs' operations through local law, regulation, or other provision having the force of law.

133.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 134

> 134.    Plaintiffs specifically seek an injunction preventing Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, or the TUP, and a declaration that such regulations invalid under the ADA.

134.     Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

### THIRD CAUSE OF ACTION FOR DECLARATORY AND INJUNCTIVE RELIEF

### Deprivation of Equal Protection –
### U.S. Const. Amend. XIV and 42 U.S.C. § 1983
### (Against all Defendants)

Paragraph 135

> 135.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

135.     Repeats and reincorporates the allegations in the preceding responses as if more fully set forth at length herein.

Paragraph 136

> 136.     The Equal Protection Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

136.     Refers respectfully the Court to the cited clause as the best evidence of its content and import; makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 137

> 137.     Defendant Ms. Gasparri is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.

137.    Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 138

138.    This paragraph is multi-sentence:

Paragraph 138, Sentence 1

> Defendant County is a "person" within the meaning of 42 U.S.C. § 1983 and acting under color of state law as to the allegations in this Complaint, including the following deprivation of Plaintiffs' equal protection rights.

138.1   Makes no answer regarding the allegations, which are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court; to the degree a response is required, denies the allegation that the County in any way deprived Plaintiffs of their equal protection rights.

Paragraph 138, Sentence 2

> The County has mandated and officially adopted a policy, ordinance, regulation and/or decision that violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

138.2   Denies the allegations.

Paragraph 139

> 139.    As alleged above, there is a sufficiently close nexus between the County Defendants and AvPorts that AvPorts engaged in state action and is thus also liable for such violations.

139.     Makes no reply to these allegations, which concern a defendant who was dismissed from the instant action by stipulation so-ordered on March 16, 2022. *See* CM/ECF Doc. No. 51.

Paragraph 140

140.     This paragraph is multi-sentence:

Paragraph 140, Sentence 1

> Defendants' adoption of Policy No. 1 and reliance on the TUP is for the sole purpose of singling out Plaintiffs for discriminatory treatment in violation of the Equal Protection Clause.

140.1   Denies the allegations.

Paragraph 140, Sentence 2

> Defendants do not prohibit the operations of other similarly situated carriers.

140.2   Denies the allegations.

Paragraph 141

141.     This paragraph is multi-sentence:

Paragraph 141, Sentence 1

> Defendants targeted Plaintiffs and treated Plaintiffs differently from other operators operating out of FBOs at HPN.

141.1   Denies the allegations.

Paragraph 141, Sentence 2

> Plaintiffs' operations involve similar (if not identical) aircraft to those who are permitted to continue operating at FBOs.

141.2   Denies the implicit allegation that the County allows other operators to engage in the Practice insofar as other operators do not sell individual seats to the public; admits that other operators based out of FBOs use similar aircraft to Plaintiffs'.

Paragraph 141, Sentence 3

> These aircraft also apply a TSA-approved security procedure, have a similar noise profile, fly similar routes, and in many cases carry a similar number of passengers.

141.3   Denies knowledge or information sufficient to form a belief as to the truth of the allegations.

Paragraph 142

> 142.   Defendants have no legitimate justification or rational basis for instituting Policy No. 1 or relying on the TUP other than to discriminate against Plaintiffs and prohibit them from operating at HPN.

142.   Denies the allegations.

Paragraph 143

> 143.   Defendants' unwillingness to consider other non-SIDA accommodations at the Airport is arbitrary, discriminatory, and violates federal law.

143.   Denies the allegations.

Paragraph 144

> 144.    Defendants intentionally treated Plaintiffs differently than any other air carriers or operators at the Airport.

144.    Denies the allegations.

Paragraph 145

145.    This paragraph is multi-sentence:

Paragraph 145, Sentence 1

> Defendants' above-described conduct is not rationally related to any legitimate state interest.

145.1   Denies the allegations.

Paragraph 145, Sentence 2

> Rather, Defendants acted irrationally and arbitrarily with the sole intent of discriminating against Plaintiffs and preventing them from operating at HPN.

145.2   Denies the allegations.

Paragraph 146

> 146.    Defendants' unconstitutional and discriminatory conduct has harmed, and will continue to harm, Plaintiffs irreparably by causing a substantial loss of business, damaging Plaintiff's' business reputation and goodwill, and putting Plaintiffs at a significant competitive disadvantage to other carriers operating at HPN.

146.    Denies the allegations.

Paragraph 147

> 147.    Plaintiffs were irreparably harmed by Defendants' unconstitutional and discriminatory conduct because their constitutional rights have been infringed.

147.    Denies the allegations.

Paragraph 148

> 148.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek a declaratory judgment declaring that Defendants' Policy No. 1 is unconstitutional, and that Defendants are not permitted to prohibit Plaintiffs from operating at HPN.

148.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 149

> 149.    As a result of Defendants' unconstitutional conduct, Plaintiffs seek both preliminary and permanent injunctive relief prohibiting Defendants from enforcing Policy No. 1, Section 712.462 of the Westchester County Municipal Code, and the TUP, or otherwise banning Plaintiffs from operating at the Airport as of January 21, 2022.

149.    Makes no answer regarding the allegations, which characterize the nature of this lawsuit and as such are legal conclusions, save to demand strict proof thereof and to refer respectfully all questions of law to the Court.

Paragraph 150

> 150.    Plaintiffs also seek attorneys' fees as permitted by 42 U.S.C. § 1988.

150.    Makes no answer regarding the allegation, which involves a demand for relief that has been dismissed from this action by stipulation. *See* CM/ECF Doc. No. 59.

## DEMAND FOR JURY TRIAL

151.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the County hereby demands a trial by jury in this action.

## AS AND FOR THE FIRST AFFIRMATIVE DEFENSE

152.    Plaintiffs have failed to state a claim upon which relief can be granted.

## AS AND FOR THE SECOND AFFIRMATIVE DEFENSE

153.    The County is entitled to qualified immunity, because at all relevant times it acted in good faith and in accordance with all laws, rules, and regulations and pursuant to statutory authority and obligations.

## AS AND FOR THE THIRD AFFIRMATIVE DEFENSE

154.    The County acted reasonably and its conduct was justified under the circumstances and did not violate Plaintiffs' constitutional or statutory rights.

## AS AND FOR THE FOURTH AFFIRMATIVE DEFENSE

155.    At all times relevant hereto, the County acted in good faith and for good cause including but not limited to, legitimate, rational, and appropriate governmental interests in accordance with all applicable statutes, laws, and regulations.

## AS AND FOR THE FIFTH AFFIRMATIVE DEFENSE

156.    Plaintiffs have failed to join Corporate Flight Management, Inc. d/b/a Contour Aviation ("Contour"), a necessary and indispensable party.

## AS AND FOR THE SIXTH AFFIRMATIVE DEFENSE

157.    Plaintiffs claims should be dismissed for failure to exhaust their administrative remedies under 14 C.F.R. Part 16.

## COUNTERSTATEMENT OF FACTS

**INTRODUCTION**

158.    The County hereby seeks a declaratory judgment that Plaintiffs are required to comply with County law.

159.    The County also seeks injunctive relief in the form of a court order prohibiting the Plaintiffs from further violations of County law.

160.    The County is authorized to pass local laws pursuant to Article IX of the New York State Constitution and Section 1 of New York's Municipal Home Rule Law.

161.    Part V of the Laws of Westchester County[2] sets forth "General Ordinances Relating to County Property and Facilities."   Chapter 712 therein sets forth "Use of County-Owned Properties;" Article IV therein sets forth ordinances regarding "Aviation: Inside County Airport;" and Section 712.462 therein sets forth the "Westchester County Airport Terminal Use Procedures" (hereafter the "TUPs").  All of these laws were duly enacted by the Westchester County Board of Legislators.

---

[2] *Available at* https://library.municode.com/ny/westchester_county/codes/code_of_ordinances.

162.    Subsection 1 of the TUPs states, in relevant part, that the TUPs "shall apply to all use of the passenger terminal" by "Airlines" providing "Passenger Service," and that "[a]ll Passenger Service provided at the Airport shall be provided at the Terminal."

163.    Subsection 2 of the TUPs states, in relevant part, that Airlines must have "a valid Terminal Use Agreement with the County in effect."  Subsection 2 also sets forth the following definitions:

"Airline" is defined as "any person providing Passenger Service in aircraft designed for more than (9) passenger seats, including but not limited to, any air carrier or other operator certificated to provide Passenger Service under Parts 119, 121 or 135 of the Federal Aviation Regulations, Title 14, Code of Federal Regulations."

"Person" is defined as "any individual, firm, company, association, society, corporation, partnership, co-partnership, joint-stock company, trust, estate, governmental entity or any other legal entity or legal representatives, agents or assigns thereof."

"Passenger Service" is defined as "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."

"Ramp Allocation" is defined as "the authorization to schedule an Airline aircraft operation on the Terminal Ramp during a designated half hour each day….  An operation shall consist of an arrival or a departure."

"Terminal Ramp" is defined as "that portion of the apron at the Airport that is immediately adjacent to the Terminal building and which is available for scheduled Airline operations."

164.     Subsection 3 of the TUPs states, in relevant part, that "[a]n Airline must hold a Ramp Allocation for each aircraft operation scheduled to use the Terminal Ramp."

165.     The TUPs have been in effect since 2004.  That same year, the TUPs were reviewed by the Federal Aviation Administration (FAA), whose Office of the Chief Counsel represented to the County that the TUPs comply with federal aviation law.

166.     The TUPs have been amended twice since 2004, once in 2005 (by Local Law No. 21-2005) and once in 2010 (by Local Law No. 25-2010).

167.     Neither amendment worked a material change to the TUPs.

## FACTUAL ALLEGATIONS

### Background

168.     The Airport is located approximately five miles northeast of White Plains, New York.  It has been a public-use airport since 1945, and offers a mixture of commercial, business and private aviation services.

169.     The County owns the Airport, which is managed and operated on the County's behalf by Avports.

170.     Aircraft traffic to and from the Airport (FAA code "HPN") includes flights by well-known commercial operators such as American Airlines, Delta, and jetBlue.  Pursuant to the TUPs, each of these commercial operators has a Terminal Use Agreement ("TUA") with County Defendant, which governs their use of the Airport's passenger terminal.  Each commercial operator also has a Ramp Allocation from County Defendant.

171.     Some aircraft traffic to and from the Airport consists of non-public, chartered flights, often chartered by business entities or professional sports teams.  Because such "whole-aircraft" charter flights do not involve the sale of individual seats, they are not considered

"Passenger Service," and they are not required by the TUPs to use a Ramp Allocation at the Airport terminal.  Instead, such flights operate out of other Airport facilities run by various Fixed Based Operators ("FBOs").

### The Business Model in Dispute

172.    In late 2019, a new business model began to emerge, catering in part to passengers who wish to avoid flying with the general public out of the Airport terminal on a typical commercial flight.

173.    Under this model, air charter brokers will charter flights, operating out of various Airport FBOs, and then sell tickets for individual seats on those flights to the general public, typically via publicly-accessible websites.  So long as those flights are on aircraft with nine seats or fewer, the TUPs do not apply because the definition of "Airline" is not met.

174.    In or about 2020 or 2021, however, Blade, JSX, and XO began selling individual tickets, to the general public, on chartered aircraft with more than nine seats.

175.    For example, per a DOT "Statement of Charter Operator and Direct Air Carrier" filed by Blade and Contour on 4/21/21 (attached hereto as Exhibit 'A'), the aircraft Blade and Contour are using is a 2002 Bombardier CRJ-200, with sixteen seats.

176.    Per a similar DOT "Statement of Charter Operator and Direct Air Carrier" filed by JSX and Delux on 10/7/21 (attached hereto as Exhibit 'B'), the aircraft JSX and Delux are using is an Embraer EMB-135/145, with thirty seats.

177.    Upon information and belief, XO has also sold individual tickets, and continues to sell individual tickets, to "the public or a segment of the public," on chartered aircraft with more than nine seats operated by Contour, from an FBO at the Airport.

178.     Blade, JSX and XO do not directly operate these flights; the flights are operated by either Delux (for JSX) or Contour (for Blade and XO).  Regardless, per the TUPs, the definition of "Passenger Service" applies "regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."  LWC § 712.462(2).

**Communications with the Defendants**

179.     In mid-2021, the County and Avports determined that flights such as those described above violate the TUPs, to the extent they involve individual-seat sales, are offered to "the public or a segment of the public," and are flown on aircraft containing more than nine (9) seats from an FBO as opposed to from the Airport terminal by an operator with a Terminal Use Agreement and Ramp Allocation.

180.     Nevertheless, in an effort to avoid litigation, the County and Avports have, beginning in the Fall of 2021 and continuing through February 2022, engaged in communications with Plaintiffs (and other air charter brokers and operators), including letters, telephone calls, and video conferences.

181.     In the course of these communications, the County has made clear that its intent is to bring all air charter brokers and operators into compliance with County law, not just Plaintiffs. Plaintiffs are simply those air charter brokers and operators who have refused to comply with County law.

182.     The County has also made clear that Avports would work with any and all operators to arrange for the necessary TUAs and Ramp Allocations.

183.     Notwithstanding this spirit of cooperation, the County has also repeatedly and consistently asserted its rights.  For example, on November 3, 2021, the County informed XO that

because a flight service XO had proposed is "Passenger Service" under the TUPS, "it could, by law, only be provided at the HPN Terminal" as opposed to an FBO.

184.    On November 5, 2021, the County wrote to JSX, noting that "JSX's passenger service at the Westchester County Airport is being operated out of a Fixed Base Operation, namely Signature Flight Support, as opposed to the Terminal," and stating that JSX must "immediately conform its operations at the Westchester County Airport with local law."

185.    On November 9, 2021, the County wrote to Blade, stating that "any service that involves aircraft of more than nine seats and individual seat sales to any segment of the public must operate from the Terminal pursuant to a Terminal Use Agreement."  That same day, the County sent similar letters to a number of FBOs at the Airport, including Signature Flight Support, Ross Aviation, and White Plains Aviation Partners, LLC.

186.    On November 22, 2021, the County wrote to XO stating, in part, that XO "must immediately cease and desist the practice of selling more than nine (9) seats on any aircraft flight operated from an FBO at HPN, as this practice violates County law."

187.    On December 1, 2021, the County informed JSX that the County and Avports are "currently in the process of identifying any and all operations of this nature and notifying them of the requirement to operate at the Terminal[.]"

188.    On December 17, 2021, the County wrote to XO, noting that "XO and another operator, Contour Aviation, are continuing to offer flights from an FBO at HPN (for example to Florida) that do not comply with this requirement," *i.e.*, to operate public flights with more than nine seats from the Terminal, and stating that "[t]hese current operations must be brought into immediate compliance."

189.    On January 7, 2022, the County wrote to JSX noting, *inter alia*, that "[w]hile the County remains willing to provide flexibility for your arriving flights to deplane passengers at a FBO, all other activities must be in compliance with the TUP, which requires, *inter alia,* the staging of aircraft at the Terminal ramp."

190.    On January 21, 2022, Avports published, on behalf of the County, a "Public Charter Operational Policy," attached hereto as Exhibit 'C.'   This publicly-available policy states, in relevant part:

> Single Seat Charter Operations (SSCO) represent an innovative, recent and distinct type of operation at HPN. In order to determine how to accommodate this new business model at the Airport in compliance with County law, the County has engaged over the last several months in detailed consultations with the SSCOs that have expressed an interest in serving HPN. The County intends to treat all of the SSCO operations in the same fashion, and has developed this policy accordingly.
> …
> SSCOs refer to DOT Part 380 "public charter" operators, offering single-seat sales to the general public, or any segment thereof, on aircraft with more than nine (9) seats.
> …
> For aircraft operations designed for more than nine (9) seats, the Operating Plan shall include passengers and their baggage originating and using the Airport's passenger terminal, at a minimum, for departure. Optional to the Operating Plan is utilizing the passenger terminal for arriving flights.

191.    As evidenced by the document itself, Public Charter Operational Policy represented both a determination of the applicability of a long-standing law to a newly emerging business model and a proposed accommodation to that business model on a going-forward basis.

192.    On February 7, 2022, the County sent letters to Contour and Delux.  These letters stated, in relevant part, that the County had informed the air charter brokers:

> that these services are in violation of the TUP and must cease. It has been our understanding that they have been sharing this information with you, as the actual AOC operator of the flights in question. However, we are now sending this letter to you directly as the air carrier (along with all other similarly-situated air carriers operating non-compliant SSCO services at HPN) so as to be certain that you are fully aware that these operations are not in compliance. You are hereby so

informed, and directed to immediately cease these non-conforming operations and come into immediate compliance. The attached [Public Charter Operational Policy] sets forth the acceptable means of compliance.

193.    To date, neither Delux nor Contour has directly responded to these letters.

194.    However, on February 15, 2022, JSX responded on behalf of Delux and refused to comply with the TUPs.

195.    For the avoidance of doubt, there are two separate and equally-acceptable ways in which Plaintiffs may come into compliance with County law.  First, the air charter brokers (Blade, JSX, and XO) can permanently cease their practice of selling tickets for individual seats on flights with more than nine seats to "the public or a segment of the public."  Second, the operators (Contour and Delux) can enter into TUAs, obtain Ramp Allocations, and operate the flights in question from the Airport terminal.

## COUNT ONE

### (For Declaratory Relief)

196.    The County repeats each and every allegation set forth above as if fully set forth herein.

197.    Pursuant to CPLR § 3001, this Court "may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed."

198.    A "justiciable controversy" exists between the County and Plaintiffs as to whether the TUPs, as codified in County law, apply to Plaintiffs with respect to the aforementioned actions at the Airport.

199.    Plaintiffs have taken the position that the TUPs conflict with federal aviation law. They do not.  The primary means by which operators of U.S. public-use airports ("airport sponsors") such as the County are regulated is through certain "Grant Assurances" entered into

between the sponsor and the FAA in connection with receiving Federal assistance for such airport. Grant Assurance 22, "Economic Nondiscrimination," requires the sponsor to make the airport available as an airport for public use on reasonable terms and without "unjust discrimination."[3] This requirement does not require an airport sponsor to accommodate all operators at its FBOs simply because that is their business preference. The essence of Grant Assurance 22 is that the sponsor must not "unjustly" discriminate, but sponsors may and do treat differently distinct categories of users, to wit: the new category of "Single Seat Charter Operations" (*see* Ex.C) vs. the whole-aircraft, Part 135 On-Demand charter operations that have long been served at Airport FBOs.

200.    As set forth in its recently-published policy (*see* Ex. C), all of the former are accommodated at the Airport; Plaintiffs have been treated no differently than any other Single Seat Charter Operator.  The point of dispute is simply whether they will comply with the County's law requiring that such operations must be conducted at the Terminal.

201.    Notably, if Plaintiffs were permitted to conduct this type of operation at the FBOs, despite County law to the contrary, the County could in fact be accused of unjustly discriminating against other airlines that offer single-seat sales to "the public or a segment of the public" on aircraft with more than nine seats, such as United, Delta, and jetBlue, all of whom operate from the Airport terminal pursuant to a TUA.

202.    The County's TUPs do not conflict with 49 U.S.C. § 41713(b)(1), either.  This federal statute prohibits any State (or a "political subdivision" of a State, such as a county) from enacting or enforcing a law or regulation "related to a price, route, or service of an air carrier."

---

[3] *See* https://www.faa.gov/airports/aip/grant_assurances/media/airport-sponsor-assurances-aip-2020.pdf.

The TUPs do not regulate prices, routes or services of an air carrier; they are simply the long-standing mechanism by which the County "carr[ies] out its proprietary powers and rights," as permitted under 49 U.S.C. § 41713(b)(3), such as its power to regulate traffic at the Airport terminal.

203.    Nor do the TUPs conflict with the Airport Noise and Capacity Act of 1990 ("ANCA"), which limits the ability of airport sponsors to impose new noise or access restrictions. As noted, the County is not imposing any new access restriction; it is merely requiring Single Seat Charter Operations (including, but not limited, to Plaintiffs) to operate from the Airport terminal, just as every other air carrier selling individual seats on aircraft with more than nine seats to a "segment of the general public" has been required to do since 2004.

204.    Plaintiffs have also taken the position that the County's TUPs are out of step with local laws at other airports around the United States.  The TUPs are, in fact, relatively unique in that they predate the applicable FAA regulations.  The FAA has opined, however, that the TUPs are effectively "grandfathered," and may still be applied by the County so long as they are applied in a non-discriminatory manner.  In publishing and disseminating the Westchester County Airport Public Charter Operational Policy (Ex. C), Avports has demonstrated that the TUPs are in fact being applied to all air charter brokers and operators equally.

205.    The aforementioned disputes are purely disputes of law, which this Court may adjudicate.

206.    Accordingly, the County is entitled to an order declaring that the TUPs, as codified in County law, apply to all of Plaintiffs with respect to the aforementioned actions at the Airport.

**COUNT TWO**

**(For Permanent Injunction)**

207.    The County repeats each and every allegation as set forth above as if fully set forth herein.

208.    As set forth above, Plaintiffs have acted in violation of the County's rights with respect to the TUPs, which are duly enacted local laws.

209.    Indeed, each Plaintiff has continued to act, and in fact is currently acting, in violation of the County's rights with respect to the TUPs.

210.    Notably, Plaintiffs continue to do so despite receiving numerous communications from the County and its counsel explaining how their actions violate local law.

211.    Given these repeated and ongoing violations, and the suggestion by Plaintiffs that the local laws in question simply do not apply to them, a declaratory judgment alone would likely be rendered ineffectual.

212.    Accordingly, the County is entitled to an order permanently enjoining the Plaintiffs from violating the TUPs.

*[Remainder of Page Intentionally Left Blank]*

**WHEREFORE**, the County demands judgment:

a.      Dismissing Plaintiffs' Complaint

b.      Granting the County's Counterclaims for Declaratory Relief and Permanent

        Injunction; and

c.      Granting such other and further relief that the court deems just and proper.


DATED:   White Plains, New York        **JOHN M. NONNA**
         June 19, 2022                 Westchester County Attorney
                                       *Attorney for County Defendant*

                                       By: _____
                                           Sean T. Carey (SC8804)
                                           Sr. Assistant County Attorney, of Counsel
                                           Michaelian Office Building
                                           148 Martine Avenue, Room 600
                                           White Plains, New York 10601
                                           T: (914) 995-2243
                                           F: (914) 995-3132
                                           stca@westchestergov.com


To:     All Parties (*via CM/ECF*)