1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2
   ----------------------------------------x
3  DELUX PUBLIC CHARTER, LLC d/b/a JSX
   AIR and JETSUITEX, INC., XO GLOBAL,
4  LLC; and BLADE URBAN AIR MOBILITY, INC.,

5                              Plaintiffs,

6                              Case No. 22-cv-01930
       -vs-
7
   COUNTY OF WESTCHESTER, NEW YORK, a
8  charter county; APRIL GASPARRI, in her
   official capacity is AIRPORT MANAGER;
9  and AVPORTS, LLC,

10                             Defendants.
   ----------------------------------------x
11
                               United States Courthouse
12                             White Plains, New York

13                             July 21, 2022

14               ** VIA TELECONFERENCE **

15 B e f o r e:
                          HONORABLE PHILIP M. HALPERN
16                        United States District Judge

17
   A P P E A R A N C E S:
18
   TROUTMAN, PEPPER, HAMILTON, SANDERS, LLP
19     Attorneys for Plaintiffs
   BY:  STEVEN D. ALLISON
20     SAMRAH MAHMOUD

21
   WESTCHESTER COUNTY ATTORNEY
22 LAW DEPARTMENT
       Attorneys for Defendant, County of Westchester
23 BY:  JOHN NONNA
       DAVID H. CHEN
24     SEAN T. CAREY

25 *Proceedings recorded via digital recording device*

 1          THE DEPUTY CLERK:  On the matter of Delux Public

 2  Charter, LLC, et al. against the County of Westchester.

 3          Would the plaintiffs please note your appearance?

 4          MR. ALLISON:  Good morning, Your Honor.  Steven

 5  Allison, Troutman, Pepper, Hamilton and Sanders for the

 6  plaintiffs.

 7          THE DEPUTY CLERK:  Defense counsel, please note your

 8  appearance.

 9          MS. MAHMOUD:  Good morning.  Good morning, Your Honor.

10  Samrah Mahmoud from Troutman Pepper for the plaintiffs as well.

11          MR. NONNA:  John Nonna, County Attorney for

12  Westchester County for the defendant.

13          MR. CHEN:  And Dave Chen from the Office of the

14  Westchester County Attorney also for defendants.  Good morning,

15  Your Honor.

16          MR. CAREY:  And Sean Carey from the Westchester County

17  Attorney's Office for defendants.  Good morning, Your Honor.

18          THE COURT:  Counsel, good morning.

19          MR. NONNA:  Good morning, Judge.

20          THE COURT:  Why are you still appearing before me?

21  Why haven't you settled this case?

22          MR. ALLISON:  It's not for lack of trying, Your Honor.

23  This is Mr. Allison.

24          MR. NONNA:  We did try, Your Honor, and this may be

25  headed toward a resolution by Your Honor ultimately, so we have

1  tried.

2           THE COURT:  Well, I am going to resolve it one way or

3  the other.  You don't have -- don't have a doubt in your mind

4  that we will get there, but I just -- it's such a unique fact

5  pattern in that the idiosyncrasies that each side could point

6  out to me, you know, suggest that there's got to be a business

7  resolution here that makes sense short of, you know, a death-to-

8  all, full steam ahead.  I just -- I don't get it, number one.

9           Number two, I guess, and I appreciate that it's not

10 simple, and I appreciate I heard more than one voice say, you

11 know, it's not because we haven't tried, Judge.  And I get that.

12 I get it.

13          The other thing is that these discovery deadlines that

14 you have proposed are outside of the footprint of what I permit,

15 and so before I change them -- because I think I am just going

16 to change them -- I would like to hear from each side as to what

17 makes, frankly, this case so special that it needs all of this

18 discovery.  Frankly, I am kind of surprised that there is very

19 much of anything needed for discovery here because you are

20 seeking equitable relief, right?

21          I mean, so let me hear from, I guess, Mr. Allison or

22 Ms. Mahmoud first, and then I will hear from the County.

23          MR. ALLISON:  Yes, Your Honor.  This is Mr. Allison.

24 Thank you.

25          Let me -- I am going to answer your question in two

1    parts.  I am going to tell you the discovery, but I am also

2    going to describe for you some other scheduling concerns that we

3    had that led us, cooperatively, to come up with the schedule

4    that we propose.

5             So first, though, to your question.  What discovery is

6    out there that needs to be done?  And I appreciate that on first

7    blush this may seem like the sort of case that you wouldn't need

8    much discovery, but there are a couple issues that have arisen

9    that will need discovery and third-party discovery, which is

10   always more time consuming.

11            So the first, and probably most important, is the

12   County's -- one of the County's defenses, it's a defense to the

13   ANCA preemption issue, is that the County's statute is

14   grandfathered under that, under the ANCA; and the circumstances

15   of the grandfathering, we will call it, and the scope of that is

16   dependent on a somewhat lengthy letter that the FAA wrote in

17   2004 at the submission that the County made to request that

18   ruling.

19            The contours of that ruling, what all was submitted --

20   which I understand was quite substantial, though we don't have

21   it yet -- is a subject of discovery that we are just going to

22   have to understand because, at least from our perspective, the

23   letter itself is not clear on its face what it was purporting to

24   allow to be grandfathered or not.  That may require discovery

25   from the FAA, which would be tricky.  Can be done but -- and

1  probably time consuming.  So that was first, sort of the biggest

2  concern that we had.

3         The second issue would be there is third-party

4  discovery.  You know, as you recall, that Avports, which was a

5  party to the case, which we dismissed, they managed the airport.

6  They actually put out this Policy No. 1, and so we would need to

7  do that; and in addition, with respect to our equal protection

8  claim, we may need to -- and I will emphasize "may," but I think

9  it's likely -- take some limited discovery from the other

10 charter operators at Westchester Airport to support our equal

11 protection claims.  So those are the two sort of biggest issues.

12        The other thing is, Your Honor, there are three

13 plaintiffs here, so that does mean that each discovery request

14 that comes to us is essentially a discovery request to three

15 parties, and that could be time consuming.

16        The last issue with respect to discovery is that there

17 is, at least initially, and we haven't, you know, exchanged

18 documents yet, but an assertion of privilege by the County.  We

19 understand that, but given the role of County counsel, which is

20 sort of a unique role, there may be some issues with respect to

21 that.  I am not suggesting there absolutely will be, but there

22 might be something that we need to go to the magistrate there.

23        So those are the -- sort of the scope of the discovery

24 issues that led us to believe that this might be a -- require a

25 little more time, and that let me emphasize, Your Honor, we

1  tried not to tack on too much more time, but a little more time

2  than in the normal course of your default timing.

3          The other thing, Your Honor, though, that I will say

4  is when we laid those dates down on the timing that we have now,

5  it did sort of -- it did have quite a number of the discovery

6  deadlines that fell right around the holidays, and rather than

7  coming to Your Honor and asking for relief from those, we tried

8  to sort of anticipate that we might need a little more time

9  about that because of the holidays

10          And then lastly, Your Honor, I have a trial on

11  December the 5th.  It's a case that's been pending for over five

12  years, and so I suspect that it will, in fact, go on December

13  the 5th out here in California, and I needed to leave some time

14  for that and not have a deadline fall right in the middle -- not

15  have a key deadline fall right in the middle of that, right in

16  the middle of that trial.

17          So we put all of those things into the balance.

18  Mr. Nonna, Mr. Chen, Ms. Mahmoud and I met and conferred in what

19  I would call a very cooperative meet-and-confer process, and we

20  came up with the schedule that's in front of you.

21          MR. NONNA:  This is John Nonna.

22          THE COURT:  All right.  Mr. Nonna, Mr. Chen, do you

23  have anything to add?

24          MR. CHEN:  Yes.

25          MR. NONNA:  David, let me just start, and you can

1   weigh in because I think we did try to work together to

2   accommodate some of the issues Mr. Allison raised, particularly

3   his trial, and the fact that some of the dates fell around

4   holiday periods.

5           Just on the specific issues he raised with respect to

6   the FAA, we will produce whatever was submitted to the FAA that

7   led to the FAA to send a letter to the County in 2004

8   essentially saying that the County was exempt from the

9   requirements of ANCA and Part 161 of ANCA based upon what was

10  submitted, so we will submit that.

11          I think that the letter and the documents essentially

12  speak for themselves.  I don't know that anybody at the FAA,

13  from what a letter they sent 18 years ago, is going to be able

14  to come in and shed any more light other than what the letter

15  says, but, you know, if you think it's necessary, Mr. Allison --

16          THE COURT:  Does it say, Mr. Nonna, that the County's

17  exempt?

18          MR. NONNA:  Yes.  I believe the exact language from

19  page 8 in the letter:  "If the County's actions are not found to

20  reduce or limit aircraft operations, or affect aircraft safety,

21  then the County is exempt from the requirements of ANCA and Part

22  61.  As noted above, we find that the County is so exempt."

23          And we will produce whatever was sent to the FAA that

24  led to that conclusion.  That's not a problem.  We have been

25  able to look for it and actually dig it up, so we do have it.  I

1  don't think that will be a big issue.

2          As to the third-party discovery with respect to

3  Avports, we will make them available.  They are our agents.

4  They are not defendants in the case, but they will be made

5  available without the need, I don't think, to issue separate

6  subpoenas.

7          THE COURT:  Depositions.  I don't see --

8          MR. NONNA:  That's not a big problem.

9          The equal protection claim we are still trying to

10  figure out.  We are treating all charter operators equally to

11  the extent we are aware that they are conducting operations that

12  violate the terminal use regulations, ie., they are operating,

13  they are selling seats to the public or a segment of the public

14  in aircraft with more than nine seats.  We will produce what we

15  know about what other charter operators are doing.  That's a

16  legitimate area of discovery, but I think, as Mr. Allison said,

17  I don't think it's that extensive.

18          But we want to work within the dates that -- you know,

19  that meet with some of the concerns Mr. Allison raised about his

20  schedule.  So that's why we agreed on these dates.

21          David, is there anything that you need to add?

22          MR. CHEN:  Just very briefly on the privilege issue,

23  Your Honor.  I mean, the issue, such as it is, that Mr. Allison

24  raised is mainly around the fact that, obviously, you know, we,

25  as the County Attorney's Office, was very involved in a lot of

1  the decisions that got made, you know, earlier this year and the

2  end of 2021.  So, you know, we flagged that.  I don't think that

3  comes as any surprise that our names are all over a lot of the

4  correspondence back and forth, you know, inside the County and

5  with our agent.

6          So, you know, we don't see that as, frankly, any

7  different than, you know, the role of the general counsel at the

8  -- in the various plaintiffs' offices.  I think they probably

9  have the same role.

10          THE COURT:  I get it.  I get it.

11          First, let me correct the notion, Mr. Allison, that

12  you are going to go to the magistrate judge.  You are not.  You

13  are going to be with me.

14          MR. ALLISON:  Very well.

15          THE COURT:  I don't really refer a lot of cases to the

16  magistrate judges for pretrial.  I think I can do it faster and

17  easier, and less burdensome on them.  They have plenty to do.

18          Mr. Chen, on privilege, you know as well as I do, that

19  because your names are all over it doesn't make it privileged.

20  It makes it certainly something that you need to look at and

21  determine whether there is privileged material contained in the

22  letters that you refer to.  Certainly, I get that.  But the

23  privilege is the privilege, and I am not -- nobody is going to

24  get past the attorney-client privilege, assuming there is one,

25  on my watch.

1         So when you're teeing up your discovery meet-and-

2  confer, just be really clear with each other that that rule

3  about the privilege that we can pull off the shelf and look at

4  and read together, that would be the rule I am going to apply.

5  So that if you apply it to yourselves, you won't need to have me

6  tell you what the rule is.  So, you know, I mean, you are both

7  very sophisticated.  Don't fight over things that you certainly

8  don't need to fight over.

9         On the other hand, if you have something that's

10 legitimate, that's what I am here to do, and I will do it

11 promptly.  We will do it together, actually, in my courtroom.

12        Mr. Allison, the good news is I am hands-on.  I rule

13 on discovery disputes immediately, but I do it in person.  So

14 try to bear that in mind as you are picking fights, and Mr. Chen

15 and Mr. Nonna will not take advantage of that kind of thinking

16 strategically.  So I don't expect you should have very many

17 privilege fights in connection with this case.

18        With respect to equal protection, Mr. Allison, tell me

19 just at a thousand feet or 30,000 feet, what is the claim here?

20 What is the claim?  The plaintiffs are being treated differently

21 than whom and why?  How is it that they are being treated

22 differently?

23        MR. ALLISON:  So, Your Honor, there are similar, if

24 not identical, aircraft that are operating from Fixed Base

25 Operators.  They are flying planes that have similar noise,

1 similar routes, similar number of passengers, except maybe on

2 the side of the nine line you might be eight versus ten, right?

3 But even so, some of them have exactly the same number of

4 passengers; they are just not clicked into this category of

5 selling seats to the public, but they are operating a plane that

6 may be full of 30 individuals.

7          And their security screening is also taking place in a

8 similar fashion to ours, in other words, outside of the what we

9 all who travel through typical airports think of as the normal

10 TSA screening.  So all those aircraft are leaving and landing at

11 HPN every day, and the only differentiation that the code

12 appears to make is this nine-seat differentiation, which we

13 think has no rational basis.  It doesn't rationally

14 differentiate any of these, and so that we are being treated,

15 without any rational basis, differently than similarly situated,

16 but not identically situated, aircraft at the field, and that

17 this Policy No. 1 specifically targets us, and specifically

18 targets, particularly the case of XO and Blade operators that

19 have been operating in this fashion at HPN since 2015 without

20 any incident --

21          (Cross-talk)

22          THE COURT:  -- since 2004?

23          MR. ALLISON:  Yes.  It was -- it came in place in

24 2004.

25          And let me just -- and, again, I don't want to turn

1  this necessarily to the merit's conversation, but I do want to

2  address the comment Mr. Nonna made about the FAA letter.  It's

3  really important.  He read a very -- he read several sentences

4  of a quite long letter.

5          The FAA allowed grandfathering under ANCA, which has a

6  particular date, 1990.  As I said, if the restriction was in

7  place before 1990, it may be grandfathered.  With respect to

8  three specific restrictions that had been in place at the field

9  or HPN -- excuse me -- since 1985.  Those three specific

10  restrictions that are mentioned in the letter have nothing to do

11  with single-seat charters, nine-seat limitations or address our

12  particular circumstance.  So among the arguments that you are

13  going to hear, Your Honor, about that letter is that it has a

14  limited scope that is addressing very specific restrictions

15  under the specific wording of the statute that allows

16  grandfathering for very -- under very precise terms.

17          So, again, we will have lots of time to talk about

18  that, and Your Honor will probably get tired of hearing us talk

19  about that letter, but that's going to be a key -- a key for us.

20          THE COURT:  I find this all very interesting.  The

21  letter says what the letter says.  It means what it means.  And,

22  you know, I mean, the part of this that -- part of this that is

23  equal protection, you know, I mean, I don't know how they

24  arrived at nine seats, but it's nine or more seats that offer

25  passenger service, right?  And passenger service is where seats

1  are individually offered, individually offered.  And I guess you

2  could argue that's ambiguous, too, a little bit, in that if it's

3  offered to a group of 30, is it individually offered?  I think

4  the tenor and the intent is more like -- what appears just

5  facially is, you know, that you can go online and buy a seat.  I

6  could go online and buy a seat on one of these planes today, and

7  that's the target of this provision.  So I -- you know, I look

8  forward to understanding more about your equal protection

9  argument, and it isn't really meant for today, and I am sure the

10 County has its own view less limiting than Mr. Allison's view.

11 I accept that.

12         All right.  So here is what I am going to do:

13 Ordinarily, what I would do is say, yeah, I am going to throttle

14 back your dates, and you are not getting your dates because I

15 want to be in touch with you, and it will require you to deal

16 with me sooner.  What I will do, though, is I will let you have

17 your dates, but I am going to say, we will add to your order,

18 unless you have really good cause -- and it's going to have to

19 be really, really good cause -- you know, I am not going to

20 extend any of these dates.

21         You have indicated that, you know, maybe you will go

22 to a private mediator at the close of discovery.  We are going

23 to be really clear with each other.  This case is coming and

24 going.  It has a beginning.  We are entering the middle.  And we

25 are going to get to the end, and it's going to be timely.  So

```
 1  because I think it's an important issue.  There are injunction
 2  issues here, so that gets my attention.  And so I will give you
 3  your dates, but be really clear with me, Mr. Allison, Mr. Chen,
 4  Mr. Carey -- I am leaving Mr. Nonna out because he won't write
 5  to me for an adjournment -- don't call me.  I will call you.  Am
 6  I clear about that?
 7            MR. CAREY:  Yes, Your Honor.
 8            MR. CHEN:  Yes, Your Honor.
 9            MR. ALLISON:  Very clear, Your Honor.
10            THE COURT:  All right.  Let's be really clear.
11            Now, having said that, I rush in to say if any of the
12  lawyers have personal issues or Covid issues, of course I will
13  react favorably; but honestly, this is -- I don't think you need
14  all of the time, Mr. Allison.  You need to get a letter and get
15  the application from the County, take a deposition, and go find
16  out who is selling to the public but is being treated
17  differently than you within the footprint of this statute, but I
18  will go along with it, okay, in deference to holidays, your
19  trial, et cetera, but I am going to move this along.
20            Also, I think because I am going to -- at some point
21  we are either going to have a 56.1 Statement and probably a
22  hearing, or we are going to go to trial on the issue, and we
23  will talk about that when we get further along.  These pleadings
24  are ridiculously -- let me say that again -- ridiculously overly
25  complicated, and so we are going to streamline those at a more
```

1  appropriate date, but I just find that there's hundreds of

2  paragraphs here that are unnecessary.  So we will talk about

3  streamlining at another point in time.

4          All right.  Mr. Cangelosi, I need a conference date

5  after March 13th, 2023, shortly thereafter.

6          3/27 at 10:00 a.m., counsel?

7          MR. CHEN:  That's fine, Your Honor.  Thank you.

8          THE COURT:  Now let me just -- March 27 --

9          MR. ALLISON:  Your Honor, was that March?

10          THE COURT:  Yes.

11          MR. ALLISON:  I believe that's okay.  Just give me

12  three seconds, please, Your Honor.  March 27th looks -- that's

13  fine.  Thank you, Your Honor.

14          THE COURT:  Okay.  Don't call me for adjournments

15  unless you really need to.  I am not inclined to give you one

16  more day.  You've got plenty of time.  This is an important

17  matter.  It's an injunction case.  That goes to the head of the

18  class as quickly as I can get to it as my schedule permits, and

19  I don't really think this is overly complicated either factually

20  or legally.  I really don't.  You know, if it's exempt, it's

21  exempt.  If it's not exempt, it's not exempt.  It's not -- it's

22  not that tough to figure out.

23          The thing that intrigues me about this, just so you

24  know, because I will ask about it I am sure later on, is you

25  know, with the law being in place, and I guess the County not

1  enforcing it, you know, I guess from the County's point of view,

2  the answer to my question is, what impact does that have?

3  Nothing, Judge.  We can enforce it or not enforce it.

4           And, Mr. Allison, I assume you will latch onto that at

5  some point, and you will have to explain to me why that should

6  be of any import, unless I am way off on that.

7           Mr. Nonna?

8           MR. NONNA:  Well, I think from the County's point of

9  view -- and again, we'd need to make sure we can confirm this

10  with our airport manager -- this business model of selling seat

11  -- individual seats to the public on charter flights under Part

12  380 is relatively new.  I mean, Mr. Allison said they have been

13  operating -- these, some of these plaintiffs since 2015.  Yes,

14  they might have been operating normal charter flights where they

15  are chartering a whole plane for like a sports team or a group,

16  but that's different than selling seats online to the public

17  like any other commercial airline.

18           My question is, the commercial airlines like United,

19  Delta, they may have a claim:  These guys are doing the same

20  thing we are doing and you are treating them differently by not

21  requiring them to leave from the terminal and abiding by the

22  terminal use regulations, but that's -- these are arguments for

23  down the road.  I am sorry.

24           THE COURT:  I don't think any of those airlines are

25  going to make that argument.  Oh, Mr. Nonna, please enforce the

1  rule to make the terminal less accessible and more crowded.  I

2  don't think they are going to do that, honestly, to be honest,

3  but the answer to the question I asked is:  Judge, they weren't

4  doing this.  They weren't -- the business model changed, and

5  therefore, we didn't -- it's not that we didn't enforce it; we

6  had to reason to enforce it.

7           Mr. Allison, I will give you 30 seconds on that.

8           MR. ALLISON:  Your Honor, there is two quick points:

9  One, we weren't -- we were, in fact, operating in a similar

10 manner, and we will prove that; but two, you said sort of what's

11 the impact of this?  We relied on this.

12          One of my clients, Blade -- and again, known to the

13 airport -- invested hundreds and hundreds of thousands of

14 dollars in expanding and building a lounge at one of these Fixed

15 Base Operators to allow them to continue to operate in this

16 fashion.  They invested at the airport in reliance on the fact

17 that they would be permitted --

18          (Cross-talk)

19          THE COURT:  The County's fault?

20          MR. ALLISON:  -- to operate.

21          MR. NONNA:  Wait a second.  Let me address that,

22 Mr. Allison.  You may not know --

23          THE COURT:  Hold on.

24          MR. NONNA:  Your client who got -- I am sorry.  I

25 apologize.

1            THE COURT:  Hold on a second.  That's the County's

2   fault, not the reg's lawyers' fault?

3            MR. ALLISON:  Well, Your Honor, they had no reason to

4   believe that there was -- that there was any problem with how

5   they were operating.

6            MR. NONNA:  May I address this, Your Honor, quickly?

7            THE COURT:  Hold on.  Not yet, Mr. Nonna.  Let

8   Mr. Allison finish.

9            MR. ALLISON:  And they worked with the County

10  officials to allow this expansion to occur.  As I say "County

11  officials," I should say airport officials, to allow to

12  expansion to occur.  So this was -- again, this was an open --

13           THE COURT:  I mean, the footprint of the building is a

14  different issue than who is paying for airline seats, right?  I

15  mean, seats on airplanes, I guess, but yeah, I understand your

16  point.  Your point is, well, the airport permitted us to expand,

17  and we relied on it.  I don't know.  You are going to have to

18  convince me of that, but assuming you are right, maybe they --

19  either lawyering is what's at issue for Blade as opposed to the

20  County.  I don't know.  But I get your point.  I get it.  I get

21  it.  They knew about it.  They let us do it.  We built.  We are

22  here.  We are doing, and now all of a sudden we are being told

23  we have to go across the runway.

24           (Cross-talk)

25           MR. NONNA:  Your Honor, would you mind if I address

 1  that?

 2          THE COURT:  Yes, sure, Mr. Nonna.

 3          MR. NONNA:  I am sorry.  So quickly, so just to be

 4  clear, we saw the allegation in the complaint that Blade had

 5  created this lounge within the Fixed Base Operator Million Air.

 6  We weren't aware of that at all.  So we wrote to Million Air,

 7  and we got a copy of the sublease that Million Air entered into,

 8  which the County did not know about.  That sublease was entered

 9  into dated December 21, 2021, after this issue of the violation

10  of the terminal use regulations was raised with Blade.  So at

11  least this lounge -- by the way, which they are apparently

12  paying $60,000 a year in rent to -- just went into effect, just

13  went into effect, and we didn't even know about it.

14          THE COURT:  I understand that, but they are talking

15  about building the building, I assume, Mr. Allison, right?

16          MR. ALLISON:  Yeah.  Of course, Your Honor.

17          MR. NONNA:  The building is owned by Million Air.

18  It's not Million Air's building.  It's -- Million Air built this

19  building in 2016 and 2017.  This is their terminal, Million

20  Air's terminal, and the allegation of Blade is, well, we are

21  leasing part of this terminal, a lounge within this terminal.

22  That sublease from Million Air did not go into effect until

23  after --

24          THE COURT:  I get it.

25          MR. NONNA:  -- the issue of the terminal use was

```
 1  raised.

 2            THE COURT:  I get it.  I get it.  All right.  So let's

 3  not be -- and I would encourage after we hang up with each

 4  other, there is no reason to be contentious here.  This is,

 5  frankly, a pretty straightforward proposition.  What we are

 6  going to need to do is nail down the facts, and then we are

 7  going to have to figure out what's the most efficient way to

 8  adjudicate this because we are going to adjudicate this if you

 9  can't resolve it.

10            I still say, and I hope you will hear me loud and

11  clear, this case needs to be settled by the entirely competent

12  lawyers who are on either side of the problem here.  You can

13  figure this out.  You can solve this problem because if you give

14  it to me, I promise you I will solve it.  I don't know who is

15  going to be unhappy with me, but I promise you, usually one or

16  the other is unhappy with me.  You should be unhappy with each

17  other.  You don't have to be unhappy with me.

18            MR. ALLISON:  Right.

19            THE COURT:  All right.  Counsel, take care of

20  yourselves.  I look forward to working with all of you, and I

21  look forward to addressing these issues.  They are very

22  interesting issues to me.

23            MR. NONNA:  Right.

24            MR. ALLISON:  Thank you, Your Honor, we appreciate

25  your time today.
```

1          THE COURT:  Okay.  Take care.

2          MS. MAHMOUD:  Thank you, Your Honor.

3                         -o0o-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25