```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2
     ------------------------------------x
 3   DELUX PUBLIC CHARTER, LLC d/b/a JSX
     AIR and JETSUITEX, INC., XO GLOBAL,
 4   LLC; and BLADE URBAN AIR MOBILITY, INC.,

 5                           Plaintiffs,

 6                                           22 CV 01930
        -vs-
 7                                         DISCOVERY CONFERENCE
     COUNTY OF WESTCHESTER, NEW YORK, a
 8   charter county; APRIL GASPARRI, in her
     official capacity as AIRPORT MANAGER;
 9   and AVPORTS, LLC,

10                           Defendants.
     ------------------------------------x
11
                              United States Courthouse
12                            White Plains, New York
                              March 27, 2023
13
     Before:  HONORABLE PHILIP M. HALPERN,
14            United States District Judge

15
     A P P E A R A N C E S :
16
     TROUTMAN, PEPPER, HAMILTON, SANDERS, LLP
17        Attorneys for Plaintiffs
     BY:  STEVEN D. ALLISON
18        SAMRAH MAHMOUD

19   DORF & NELSON
          Attorneys for Plaintiffs
20   BY:  PAUL NOTO
          JONATHAN B. NELSON
21
     WESTCHESTER COUNTY ATTORNEY
22   LAW DEPARTMENT
          Attorneys for Defendant, County of Westchester
23   BY:  JOHN NONNA
          DAVID H. CHEN
24        SEAN T. CAREY

25
```

1           THE DEPUTY CLERK:  In the matter of Delux Public
2  Charter, LLC, et al. against the County of Westchester.
3           Would the plaintiffs please note your appearance?
4           MR. ALLISON:  Good morning, Your Honor.  Steven
5  Allison, Troutman Pepper, on behalf of the plaintiffs.
6           MS. MAHMOUD:  Good morning, Your Honor.  Samrah
7  Mahmoud, also from Troutman Pepper, on behalf of the plaintiffs.
8           MR. NOTO:  Good morning, Your Honor.  Paul Noto, Dorf
9  & Nelson for the plaintiffs.
10           MR. Nelson:  Good morning, Your Honor.  Jonathan
11  Nelson, Dorf & Nelson, for the plaintiffs.  Nice to see you.
12           THE COURT:  Good to see all of you.
13           THE DEPUTY CLERK:  Defense counsel, please note your
14  appearance.
15           MR. NONNA:  Good morning, Your Honor.  John Nonna,
16  Westchester County.
17           MR. CHEN:  Good morning, Your Honor.  Dave Chen from
18  the County Attorney's Office, also for defendants.
19           MR. CAREY:  Good morning, Your Honor.  Sean Carey,
20  also Westchester County Attorney's Office.
21           THE COURT:  We have the entire Westchester County
22  horsepower bar sitting here in front of me.  Please be seated.
23  I am a little shocked that with all of this horsepower we have
24  discovery issues.  You don't need me to resolve your discovery
25  issues.  Maybe you do.

032723.1                          Proceedings

1          All right.  First of all, I'm glad to see all of you.

2   Nice to see you.  Some of you I haven't seen before in this

3   context.  So it's nice to see you.

4          The first thing is, you know, it's very difficult for

5   me to adjudicate these issues without seeing the documents.  So

6   do we have a copy of the documents with us that you could show

7   me?  You know, this 2/28 email, the memorandum from the aviation

8   counsel, or the 3/15/19 memo from the County attorney to this

9   Mr. Schlactus?  Do we have them here, Mr. Chen, or no?

10         MR. CHEN:  We don't, Your Honor.  We can send them

11   over as soon as we are done.

12         THE COURT:  I mean, it would obviously demystify what

13   was the subject matter of the material because if it were, you

14   know, something unrelated to legal advice, that would be one

15   thing.  If it were related to legal advice, that would be

16   another thing.  So okay.  I am happy to proceed without looking

17   at the documents.

18         So let me hear from the plaintiff first.  Who is going

19   to speak on behalf of the plaintiff?

20         MR. ALLISON:  Ms. Mahmoud will be handling that

21   particular issue, Your Honor.

22         THE COURT:  Okay.  So the first question I have is:

23   Why did you wait four months?

24         MS. MAHMOUD:  Sure, Your Honor.  So I think the issue

25   is, is the documents were produced December of 2022.

1              THE COURT:  The privilege log.

2              MS. MAHMOUD:  2023, with the privilege log and the

3    issue was --

4              THE COURT:  Wait.  Wait.  Wait.  Back up.

5              MS. MAHMOUD:  Sure.

6              THE COURT:  December of 2022 you got a privileged log.

7              MS. MAHMOUD:  2022.  What year are we?

8              THE COURT:  You got the privilege log in December of

9    2023, you are time traveler, and we are going to stop talking

10   and talk about the future.

11             MS. MAHMOUD:  2022.  Yes, Your Honor.  December 22nd,

12   2022.

13             THE COURT:  So you had it in December of 2022.  Why

14   didn't you first week of January come to me and say, Judge, we

15   want these documents?

16             MS. MAHMOUD:  So I think one issue is the two doc ID's

17   that they cite on the privilege log does not mention Mr.

18   Schlactus.  So it was not clear that those memos were

19   necessarily provided to Mr. Schlactus.  That became clear when

20   you read an email he sent where he discusses and quotes from the

21   memos.

22             I think the second thing, Your Honor, is --

23             THE COURT:  Wait.

24             MS. MAHMOUD:  Sure.

25             THE COURT:  That email that he quotes from, when did

1  you get that piece of paper?

2          MS. MAHMOUD:  That was in -- also in December of 2022.

3          THE COURT:  So you had a piece of paper in December of

4  2022 that referenced memos that you say, you know, are highly

5  relevant to defenses or the County's knowledge or something, and

6  it's now January -- I mean, March.  What is today, the 27th?

7          MS. MAHMOUD:  Yes.

8          THE COURT:  Okay.  It's not a very good answer.  Tell

9  me about the email now.

10         MS. MAHMOUD:  And then just to clarify, too, Your

11 Honor, there were also depos scheduled throughout January and

12 February, and so the point of that was we wanted to speak to the

13 County 30(b)(6) and to the current Airport Advisory Board

14 chairman to hear -- and if you looked at the depo transcripts

15 you will see that we did --

16         THE COURT:  Hold on one second.  Mr. Cangelosi, I see

17 we have visitors on the phone.  Do you want to have them

18 identify themselves or are they your clients or do you know?

19         MS. MAHMOUD:  I believe that should be our client

20 representatives dialing in to listen.

21         MS. KAPLAN:  This is Jenna Kaplan, XO Global LLC.

22         MR. STONE:  Hi.  Sam Stone from Blade Urban Air

23 Mobility, Inc.

24         MR. MOSS:  Ray Moss, general counsel, as the general

25 counsel to JSX.

1            THE COURT:  Okay.  Thank you.  All right.

2            Tell me about this email.

3            MS. MAHMOUD:  Sure, Your Honor.  So the email at issue

4   that disclosed that there were memos in the first place was an

5   email from Mr. Schlactus to some County, I think, employees, and

6   he is referencing -- he says the County has been responsive to

7   my concerns.  Thank you.  And then he starts to quote from the

8   memo that he was provided, and he says, I disagree with the

9   County's conclusions -- and I am paraphrasing, I'll tell you

10  when I am quoting.  He says he disagrees with the conclusion,

11  and then he quotes and says that the TUPs do not apply to

12  JetSmarter or Federal Aviation Regulation Part 135, air carrier

13  operations.  So that's the issue here, and it's contrary to

14  County's position.

15            And then he goes on and says, "The fact" -- this is a

16  quote -- "the fact that 'JetSmarter arranged flights utilizing

17  Part 135 air carriers are not conducted at the terminal or

18  terminal ramp is not' a justification for sidestepping the

19  terminal use procedures."

20            And so he is again then concluding what we believe to

21  be that the 2004 law issue was limited to activities happening

22  at the terminal and/or terminal ramp.

23            And our contention in this action is that because

24  under the 2004 law, it simply doesn't apply to our clients'

25  operations for multiple reasons, and we believe that this memo

032723.1                      Proceedings

1  agrees with our position and shows that, but the County --

2          THE COURT:  But it's legal advice to a chairman of a

3  board unrelated to Westchester County, and the law is crystal

4  clear that that relationship is attorney-client privileged.  I

5  know you don't agree with that, but I am -- you know, I am not

6  going to waste time on that.  If the County attorney is writing

7  or an outside counsel is writing to the chairman of the -- what

8  is it -- the ABB?

9          MR. CHEN:  Airport Advisory Board, Your Honor.

10         THE COURT:  There is a relationship there.  That's

11 what the law says.  I am not going to reinvent the law here.

12         MS. MAHMOUD:  Yes, and I think there is an issue, Your

13 Honor, as to what capacity was provided to Mr. Schlactus.

14         THE COURT:  I don't buy the GMail.  Everybody uses

15 their email interchangeably.  I am not buying the GMail, either.

16         What else you got?

17         MS. MAHMOUD:  That's okay.  So Mr. Schlactus was the

18 co-chair and co-leader of the Coalition to Prevent Airport

19 Expansion at Westchester County.

20         THE COURT:  That's not getting in my way, either.  He

21 is entitled to have multiple hats, and when he is wearing his

22 county hat he is getting -- if it's legal advice, it's legal

23 advice, period.  Full stop.

24         MS. MAHMOUD:  And I think what you said there is

25 important; that if he was providing it in his County position,

1  but I don't think that is clear from the correspondence or the

2  opinions, and in fact, later when he went on a podcast later

3  that month, he talked about and he said, I'm talking in my

4  position as the coalition leader.

5          THE COURT:  Did you ask him in his deposition about

6  this email?

7          MS. MAHMOUD:  We did not depose Mr. Schlactus.  We

8  deposed Mr. Hartman, who is the current Airport Advisory Board

9  chairman, and as you recall, we did agree about who was being

10 deposed before some of this came up, and also we have limits on

11 the depos.  So we did pursue questioning about this memo, but

12 unfortunately, no one was able to answer questions about it.

13         And I think -- so I think it's important, Your Honor,

14 that, as you suggested, to review *in camera* and see in what

15 capacity it was provided.  I also think there is a question

16 of -- I mean, just establishing the attorney-client relationship

17 does not answer the question because then --

18         THE COURT:  No, it doesn't, but it puts it on the ball

19 field of attorney-client privilege.

20         MS. MAHMOUD:  I think if it's provided to him in his

21 County position, in his Airport Advisory position, not County

22 position, but Airport Advisory Board position, there is at least

23 a question then, and I think first you have to review the memos

24 to see if it was provided in that capacity.

25         THE COURT:  And the County says this -- one of these

032723.1                          Proceedings

1   memos -- I may be mixing up memos -- but one of them was not

2   even turned over to Mr. Schlactus, right?  Don't they say that

3   in the letter to me?  I believe they do.

4            MS. MAHMOUD:  I believe they said -- they suggested

5   that they had summarized it for him.  So then the summary was

6   provided to him, he is quoting from, which is relevant.

7            THE COURT:  Mr. Chen, is that correct, the memo

8   itself --

9            MR. CHEN:  That's correct, Your Honor.

10           THE COURT:  And that's the memo -- it's not the

11  March 15th memo.  It's the earlier memo associated with the

12  2/28/19 email?

13           MR. CHEN:  That's correct, Your Honor.

14           THE COURT:  Okay.

15           MS. MAHMOUD:  So there was a summary provided to him.

16           THE COURT:  Okay.  You are asking for a memo that you

17  didn't get.

18           MS. MAHMOUD:  And again, I think our understanding was

19  it never was provided to him, but they represented in their

20  papers that it was a summary.  So then the summary is, I think,

21  what would be relevant.  That was also not provided, nor was

22  it --

23           THE COURT:  What about the March 15th memo?

24           MS. MAHMOUD:  That, I think was provided to him.

25           THE COURT:  From the county attorney to him as

1  chairman.

2         MS. MAHMOUD:  Again, I think the capacity in which it

3  was provided to him is questionable, and if you look at his

4  email from 2/28, he thanks them for keeping him in the loop and

5  responding to his concerns.  And again, if you listen to that,

6  and if you read that in connection with his March podcast, he

7  talks about how he is representing the coalition in that

8  podcast.  He discusses a lot of the advice in that memo from

9  what we can tell, and then he says -- he says, "We have been

10 urging the County to take a look at some of these issues."

11        THE COURT:  I am a little bothered by this.  It's kind

12 of -- feels like an afterthought from my seat.  It's a

13 last-minute -- last-minute effort.  You didn't want to depose

14 him.  You know you can raise a discovery dispute with me during

15 the discovery period by simply writing a letter.  You could have

16 asked me, Judge, we want to depose this fellow because A, B, C

17 and D.  All of the things you are saying to me now we could have

18 cleaned this up a little bit factually.  It's bothersome to me.

19        All right.  Let me hear from the County on the email

20 and the two memos.  Mr. Chen, good morning.

21        MR. CHEN:  Good morning, Your Honor.

22        So two things:  First of all, as you noted, Mr.

23 Schlactus has worn different hats, and we've -- when deciding

24 whether there was a privilege over his document or not, we did

25 our best to discern the capacity in which he was operating, and

1  there are documents that we produced, which is why plaintiffs

2  even know about him, which he clearly was not operating in a

3  County capacity, and those are produced.  We feel here that he

4  was, but we are more than happy to provide all the documents for

5  your *in camera* inspection.

6          But to us, there is a deeper question, Your Honor,

7  which is why these are even relevant.  I think Your Honor hit on

8  it a little bit.  They didn't even seek to depose Mr. Schlactus,

9  and you will recall they sought to go above and beyond the ten

10 depositions to which they were allowed, but even there they

11 didn't seek to depose him.  So it is a little bit of an

12 afterthought.  We produced Mr. Hartman, who is the current chair

13 of the AAB, but Mr. Schlactus never even came up.

14         But beyond that, Judge, the issue here that they say

15 this is relevant to is whether the TUPs apply to them or not,

16 and certainly that's at the heart of the case.  That's a legal

17 question, Your Honor.  So frankly, Mr. Schlactus's opinion on

18 that is not relevant.  The only person whose opinion on that

19 that matters is your own.  So we question whether these are even

20 relevant to begin with before we even get to the question of

21 whether privilege was properly asserted.

22         But as we mentioned, we will certainly provide those

23 for your *in camera* inspection, Your Honor, if you want to see

24 them.

25         THE COURT:  Just so I am clear, the February 28th

1  email was or was not turned over?  That's the Document 971068.

2           MR. CHEN:  That one I believe was, Your Honor.  We

3  will double-check with our privilege log, but I believe -- no?

4  Okay.  I could be --

5           THE COURT:  It was not turned over.

6           MR. CHEN:  We will provide -- if Your Honor decides,

7  we will provide both the documents and privilege log backing up

8  the assertions of privilege.

9           THE COURT:  No, I don't need a privilege log.  I

10  just -- there were three pieces of paper that are at issue in

11  your request, right?  I mean, in your opposition.  None of them

12  have been turned over.

13           I think, I kind of agree with you, Mr. Chen.  I

14  don't -- I think this is an afterthought.  It may not be

15  relevant, but I think in fairness, now that it's teed up the way

16  it is, I should look at the documents.  So I would ask you to

17  produce them today *in camera* because I don't want to waste time

18  on this request one way or the other.  You either turn it over

19  or you won't.  All right?

20           MR. CHEN:  Yes, Your Honor.

21           THE COURT:  Thank you.

22           All right.  Now let's talk about these RFPs from 2016.

23  Mr. Noto?

24           MR. NOTO:  Good morning, Your Honor.  Yes.  In 2016,

25  the County had put out a request for proposals to privatize the

1  airport, and we had learned of this as we went through

2  discovery, and we did depose a number of County witnesses and,

3  you know, particularly two prior and present airport managers.

4          The reason they are important to us is because in

5  those RFPs they would have had to describe all of the activity,

6  all of the operations at the airport, including those that the

7  FBOs, who are our clients, operate out of; and in order to do

8  that, they also would have had to describe the applicability of

9  the TUPs to those operations, and this is, you know, tied

10 somewhat to our equal protection claim.

11         So the County's knowledge is relevant here because we

12 keep going back and forth when they say, well, we didn't know

13 you were operating.  We have proof we were operating since 2015,

14 so we think these documents are relevant.  And more importantly,

15 Judge, these documents are readily available to the County.

16 This is not like they have to go into the archives and dig

17 something out.  They are not privileged.  I mean, somebody could

18 properly FOIL them, but it would take too long to get them, but

19 I think the County's reluctance to provide them, they are just

20 saying, look, you know, it's late, and we don't want to do it.

21 They could get these documents, you know, instantaneously

22 because this is only from 2016.  So they are not going to be

23 hard to find or locate as -- in fairness, some documents they

24 have had to go back, you know, a long way to dig out and provide

25 to us, which they did.  But in this case these are from 2016,

1  and they are right there in the County office building.  So

2  there is really no reason for them not to provide us these

3  documents.

4            THE COURT:  Okay.  What are they relevant to,

5  actually?

6            MR. NOTO:  Well, they are relevant to two issues:  One

7  is the County's knowledge of what we were doing at the time

8  because they say we weren't operating in 2015 when we were; and

9  secondly, they are relevant to how they would have described the

10  operations and the applicability of the TUPs to those

11  operations, which is a critical issue here, and probably the

12  critical issue in the case, which is:  Do the TUPs apply to our

13  operations or not?  Obviously, they say they do.  We say they

14  don't.  The Court will decide.

15            THE COURT:  What if they said, in effect, no, they

16  don't apply, right?  But I determine that they do.  Who cares

17  what the County thinks of that?  Isn't that an issue for me to

18  decide?  Do we really need --

19            MR. NOTO:  Well, I think it's an issue to the extent

20  of how -- A, their credibility, and B, why did they change their

21  position if in 2016 they were saying, these were okay, and then

22  suddenly they are not okay.  We would like to know why, which is

23  why it's important.

24            We believe that the County -- and that's why we have

25  argued about these memos -- is that the County had previously

1  taken a position that the TUPs do not apply to our operations,

2  and we believe they don't.  They changed their position in 2020,

3  we believe, because of political pressure from outside groups

4  that are anti-airport and anti-airport operations and have a,

5  you know, a different agenda.  And so the County has suddenly,

6  you know, evidently had an epiphany and said, oh, now they

7  apply.  I think that's very relevant, and I think it's also

8  relevant to our equal protection claim.

9           THE COURT:  Let me hear from Mr. Chen.  Are you going

10 to address this for me, please?

11          MR. CHEN:  Yes, Your Honor.  So a few things:  First

12 of all, this is, again, I think best characterized as an

13 afterthought.  The original request for documents that was made

14 to us didn't say anything about these documents.  So this was

15 not something that was requested in the beginning.  The two

16 requests for documents that were made were extra -- that

17 plaintiffs argue cover these documents were extraordinarily

18 broad, and we objected to them on that basis, and plaintiffs

19 didn't dispute that until just now.  So we think this, again,

20 falls under the category of an afterthought.

21          THE COURT:  When did you respond to the document

22 demand?

23          MR. CHEN:  I am sorry, Your Honor?

24          THE COURT:  When did you respond to the document

25 demand?

1          MR. CHEN:  It was within 30 -- September 1st of 2022,

2   Your Honor.  So they have had our position on this since back --

3   since back then.

4          As far as the documents themselves, I mean, as counsel

5   noted, these are from 2016.  So it's a little hard to see how

6   they might be relevant to this issue, which arose in early 2021,

7   I think.  But setting that aside, as Your Honor again noted,

8   first of all, there is no reason to think that any of our

9   positions regarding the TUPs were set forth back then.  This is

10  an emergent issue across the nation, and as -- again, as Your

11  Honor sort of noted, even if -- even if they reflect that our

12  position changed at some point, frankly, so what?  Lots of

13  people's positions changed.  It's a question of law.  Things

14  can -- the facts on the ground.

15         THE COURT:  Well, I guess they want to poke at you a

16  little bit and say, if, in fact -- and I mean, I assume these

17  documents are readily available.  They are not -- it's not over-

18  burdensome for you to have to produce these documents, is it?

19         MR. CHEN:  It's -- I actually don't know if they are

20  -- how readily available they are.  We send out an RFP, Your

21  Honor, they generate a ton of responses.  So I don't necessarily

22  think this is something we have to retrieve from archives,

23  but in terms of volume, we are talking about a substantial

24  amount of documents here if we have to respond to the RFPs.

25         There was also just -- I don't want to get too down

1  the road into what the RFP addressed, but it was about

2  privatization of the airport, so it really -- there is really no

3  reason to think that this very specific legal issue comes up in

4  the course of that request.  There is no basis to think that.

5  We certainly have no reason to think that.  Public charters may

6  certainly be mentioned in the documents, but this very specific

7  and narrow issue of whether the TUPs terms apply to them, we

8  have no reason to think that it is.

9          So, you know, this -- it's very broad, and this is why

10 we objected in the first place.  There is no reason to think

11 this is going to actually produce any kind of relevant

12 information, and we think it's unnecessary.

13         THE COURT:  Mr. Noto, anything else you want to tell

14 me?

15         MR. NOTO:  No, Your Honor, other than, you know, we

16 obviously think it's relevant because it's operational, and the

17 operations are critical to this whole issue.  We operate out of

18 FBOs.  They are trying to force us into the terminal, which

19 would essentially destroy our businesses.  So in terms of what

20 they were proposing as the privatization goes, it's important,

21 and it is relevant, and I disagree with Mr. Chen, oh, if their

22 position changed.  The law didn't change.  Their position may

23 change, but the law never changed.  So for them to say, oh, who

24 cares?  Well, we do care because either they were complying with

25 the law then, or they are complying with the law now, but the

1  point is if they took the position that they were within the law

2  the way they were operating in 2016, then that's pretty

3  powerful, and that's pretty compelling right now as the -- in

4  terms of this case.

5           THE COURT:  We are guessing.  We don't know.

6           MR. NOTO:  We are guessing.  That's correct.  But we

7  won't know unless we see the RFPs.

8           THE COURT:  Right.  Are there other individuals out

9  there that have their responses to these RFPs that are -- you

10 know, why do you have to go to the County?  Can't you get them

11 from third parties?

12          MR. NOTO:  We don't know.  We have no idea who

13 responded.  We wouldn't know.

14          THE COURT:  I see.  All right.  All right.  I am going

15 to reserve decision on that.  I will get you a decision

16 immediately, but I want to see these documents first.

17          Just so you know so there's no surprises coming, my

18 inclination is, as I am hearing both of you, not to permit a

19 search into the RFPs, but in fairness, I will think about what

20 you've said to me, and I will read these documents, and I will

21 get you a decision right away.

22          All right.  Where are we going now?  Are we going to a

23 jury trial this summer or are we going to summary judgment or --

24 let me hear from Mr. Chen first.

25          MR. NONNA:  I will address that issue, Your Honor.

```
 1            THE COURT:  Mr. Nonna.  Good morning.  How are you?
 2            MR. NONNA:  So on Thursday we followed Your Honor's
 3  rules.  We served the plaintiffs with our proposed 56.1
 4  Statement for them to respond.  They have some time under your
 5  rules to respond to add or object to what we said are undisputed
 6  facts, and then we -- our plan would be to send the Court a
 7  pre-motion letter asking for permission to make a motion for
 8  summary judgment because we believe that there aren't any
 9  factual issues here.  There are purely legal issues.  Even the
10  equal protection claim could be decided on a summary judgment
11  motion.  I can address that in more detail if you'd like, but we
12  believe the issue of whether this preemption under ANCA, ADA,
13  the Airline Deregulation Act, or whether we violated grant
14  assurances, those issues which they have raised, as well as the
15  equal protection claim, could be decided on a summary judgment
16  motion.  So that's why following your rules, we started our 56.1
17  while we are waiting for their response, and then we will file
18  our pre-motion letter.
19            THE COURT:  Great.  Yes?
20            MR. ALLISON:  Good morning, Your Honor.
21            THE COURT:  Good morning.
22            MR. ALLISON:  It's a little more complicated than
23  that, so I will try to break it down.  We have three causes of
24  action, two of which are for the Court.  They are bench trial
25  causes of action.  They are declaratory relief, preemption under
```

1   ANCA, preemption under the ADA.  The third cause of action,

2   equal protection, does have a jury trial right.

3           We suggested to the County last week that we would be

4   willing to consider -- or made a proposal -- we said, why don't

5   we waive our jury trial right on the equal protection, and you

6   agree you won't bring a summary judgment motion because your

7   rules make it fairly clear that in a bench trial that's not

8   preferred?

9           THE COURT:  It's not out of the rule, but it --

10          MR. ALLISON:  I understand.

11          THE COURT:  -- but it would have to be for a really

12  good reason.

13          MR. ALLISON:  Exactly.  But we said, look, let's cut

14  to the chase.  Let's have a bench trial in front of Your Honor

15  on those three causes of action, and they have a counterclaim,

16  but it's declaratory relief as well, and let's get to the issue.

17          They rejected that proposal and suggested instead they

18  wanted to bring the 56.1, which we are taking a look at.

19          Your Honor, I think it -- and again, I -- we have not

20  done it comprehensively, but they have 119 facts in there.  I'm

21  quite certain there is going to be some factual disputes, and

22  why are there factual disputes?  I want to give you just a

23  preview, Your Honor.  It's not meant to be comprehensive because

24  you have a procedure.  The Airline Deregulation Act, the

25  standard there is:  Does the County law relate to our prices,

032723.1                          Proceedings

 1  routes or services?  There is a factual dispute, a very clear
 2  factual dispute about whether what they are doing relates to my
 3  client's prices, routes or services.  That has facts absolutely
 4  embedded in it, and Your Honor is going to have to understand
 5  what we do, how that differs from the other airlines that are
 6  out there.  The position they have taken, their witnesses are,
 7  oh, it's all the same.  It's no big deal.  You just move over
 8  here.  It's exactly the same.  Your services won't be affected.
 9  It will be fine.  That's sort of the quintessential factual
10  dispute that I think, again, if we all agree that we are in a
11  bench trial, Your Honor would have to decide.  So that's just
12  one -- that's one small example.
13          The other example is this grandfathering issue under
14  ANCA.  Now that may sound like a legal issue, and there
15  certainly are legal issues in it, but this case has a very
16  interesting sort of twist, which is that --
17          THE COURT:  Every case has so far an interesting
18  twist.
19          MR. ALLISON:  And whether this one is interesting or
20  not is some debate, right?
21          THE COURT:  I am fascinated.
22          MR. ALLISON:  It's interesting to us, at least.
23          THE COURT:  I'm fascinated by this.
24          MR. ALLISON:  2004 they passed a law that they said
25  the FAA blessed and said was grandfathered, but that law we

1    think -- and I am not sure there is a whole lot of dispute -- on

2    its face doesn't apply to us.  They amended it in 2005.  That

3    law never got a given blessing by the FAA, but they say it's

4    just a mere clarification.  And if 2005 is just a mere

5    clarification, there's a lot of facts about what happened 2004,

6    2005, why it happened, why it didn't happen.  Because if, in

7    fact, that is merely a continuation as they argue, then they are

8    going to say, well, it's grandfathered because it's just part of

9    the whole same thing.  By the way -- don't want concede -- we

10   don't concede that the FAA actually gave it the holy water that

11   they say they did, but that's a separate issue.  There is again

12   another factual dispute.

13         And then the equal protection clause, I mean, whether

14   the law is reasonable or nondiscriminatory, I mean, the word

15   "reasonable," again, I know it's not impossible to get summary

16   judgment when reasonable is the standard, but it's very, very

17   difficult.

18         And we would suggest, Your Honor, that the appropriate

19   course here is to look towards a bench trial.  Let's focus on

20   that.  Let's get the appropriate witnesses here in an efficient

21   trial.  We read your rules.  We understand you are not going to

22   have an inefficient bench trial, and that that's the way we will

23   do it.  But if we need to, Your Honor, of course we will follow

24   the procedures and go through the 56.1 and we'll do it that way.

25         THE COURT:  Well, I appreciate your disagreement with

1  the notion that I can adjudicate this at summary judgment.  You

2  know, that's standard fare --

3          MR. ALLISON:  Of course.

4          THE COURT:  -- for every summary judgment motion I

5  get.

6          I would encourage one thing.  My Rule 56.1 rule is

7  most precise, and it's very direct, and so what I'm interested

8  in in your response is not anything other than what the rule

9  requires, which is you admit the truth or you deny the truth of

10 the allegation, period.  If you deny it, which is your

11 entitlement, you need to cite to evidence.  You don't need to

12 give me until the motion is filed the evidence, and the purpose

13 is really clear.  56.1 Statements, when I sat on that side of

14 the bench, you know, were very expensive documents to prepare

15 for clients and had utility in trying to get the judge to

16 understand.  On this side of the bench, they can become nooses

17 around a judge's neck when people stray from and move away from

18 the fundamental purpose.  The purpose for me in a 56.1 Statement

19 is precisely what it is you are referring to, which is:  Judge,

20 are there issues of fact here, yes or no?  And it becomes pretty

21 clear when this is done properly that there are or are not

22 issues of fact, and it may turn out that there are issues of

23 fact, and it may turn out there are not, but the tool by which

24 someone like me now can adjudicate that issue is the 56.1.

25          So I lean very heavily on my rule, and I reject 56.1

1  statements that are not in strict conformity with both the page

2  limitations and the admit-or-deny portion of it because that

3  is -- that becomes a tool as opposed to a noose around the

4  judge's neck, and I very much -- I have lots of summary judgment

5  motions, as you can imagine.  I can do them more efficiently and

6  deal with them more quickly and readily than with the 56.1 as I

7  have asked for it to be served up to me than without it.  So I

8  get that.

9         I have no intention of trying to broker a non-jury

10 trial deal.  The County has indicated very clearly to me that --

11 in their statements that they think summary judgment is

12 appropriate.  So I'm going to be respectful of that notion and,

13 you know, those of you that know me know we well enough to know

14 that if you make me do things twice, I will hold it against you

15 somewhere along the line.  So, you know, I take the County at

16 its word.  I have lots of summary judgment motions involving the

17 County, and they are always well done, and I agree with most of

18 them or I disagree with most of them.  It doesn't matter.  So I

19 am going to -- I am going to let them pursue the possibility.

20        I still wonder, just from my seat, why this isn't

21 something that can be resolved.  I wonder if it's so much of a

22 line-in-the-sand issue that bright minds -- I am looking at

23 seven bright minds, and I am saying, why does this have to come

24 to a judge to adjudicate, and possibly a jury if Mr. Nonna is

25 wrong in his conclusion?  Why can't this be resolved as a

1  business issue, a business dispute, and why can't we get

2  somewhere?

3          I know plaintiffs always want to resolve.  Of course

4  you want to resolve.  But have you exhausted yourselves trying

5  this.

6          MR. ALLISON:  Your Honor -- and Mr. Noto can speak to

7  this, too -- we have both been involved in this at various

8  phases.  We really have tried.  I have to tell you, and you may

9  have forgotten this, I mean, we flew our CEOs out for an

10 in-person meeting at HPN with County executives.  This was taken

11 very seriously.  There was a followup Zoom meeting after that.

12 We brought Mr. Noto in with his experience as an elected

13 official, and he's been our emissary with the County, and I

14 think the one thing we may agree on is that there's been

15 significant efforts by both sides, and this may be that, you

16 know, rare case where we just can't get there.

17         And again, we don't want to reveal settlement

18 communications so we have to be careful about that, but I would

19 say that, you know, when you're dealing with a political body,

20 there are considerations that are sometimes not the same as when

21 you are dealing with just two businesses in a strict business-

22 to-business dispute, and we have to respect those.

23         So that has, I think, been some of the -- some of the

24 concerns, and, you know, our clients feel strongly, justifiably

25 we think, that we have a federally approved business model and

1 that we are doing things extremely appropriately.

2          THE COURT:  Notwithstanding this memorandum, right?

3 Notwithstanding this -- what do you call it -- TUP?

4          MR. ALLISON:  Notwithstanding the local law?

5          THE COURT:  Yes.

6          MR. ALLISON:  Well, I mean, that's what preemption is.

7 I mean, people try to have local laws, and Congress has said in

8 these two statutes quite clearly that aviation is a federal

9 concern for very significant reasons and, you know, we're

10 certainly not the first litigant to assert the preemptive power

11 of those statutes.

12          THE COURT:  No, no.  I get it.

13          MR. ALLISON:  But I think that there have been -- to

14 your point, Your Honor, we have made significant efforts.  We

15 remain willing to talk.  We are always willing to talk.

16          THE COURT:  Okay.

17          MR. ALLISON:  So --

18          THE COURT:  Mr. Chen?  Mr. Nonna?  Mr. Nonna, do you

19 want to add anything?  I don't need to get in the weeds here.  I

20 just, as a practical matter, I understand generally what's going

21 on here, but I just -- it feels like there could be some kind of

22 a win-win resolution here.

23          MR. NONNA:  We made a proposal.  Unfortunately, it

24 wasn't accepted.  We thought it would work where they

25 could arrive -- they could leave from the terminal.  The

1  passengers could be on a separate floor and escorted through TSA

2  very quickly, and they can arrive at the FBO.  They didn't

3  accept that.  I don't -- that's their decision.  That's the

4  farthest we think we could go.

5          This is -- this is -- as far as the specific issues

6  Mr. Allison has raised with respect to preemption, we are going

7  to save responding to those in our pre-motion letter --

8          THE COURT:  Of course.

9          MR. NONNA:  -- rather than now.

10          Let me just as an aside -- and they may be aware of

11  this, the plaintiff's counsel may be aware of this -- there was

12  a program a few weeks ago that the American Bar Association

13  sponsored on air and aviation law.  One of the issues that was

14  discussed was how airports all over the country have questions

15  about their business model selling seats to the public.  It was

16  discussed.  There was no resolution, obviously, but it's a major

17  issue, and unfortunately, Your Honor may be the one to be the

18  first one to decide this issue under our terminal use

19  regulation, but it is a major issue, and it's difficult to

20  overcome some of these issues.

21          THE COURT:  What is the -- Mr. Nonna, if you don't

22  mind, just give me a word or two on what the essence of this

23  issue is.  Is it a safety concern?  Is it a -- what is it that

24  drives this?

25          MR. NONNA:  It's the ability to some controls as

1  an proprietor -- under the County's proprietary rights as a

2  sponsor over the use of the airport as a -- for commercial

3  passenger service, which we believe this is, and he is going to

4  dispute that probably and say it's really not passenger service.

5  That's going to be a legal issue for Your Honor to decide.

6              THE COURT:  So but take me a little further down that

7  path if you don't mind.  I get it.  The County wants to run its

8  airport as it deems appropriate, but this is about moving

9  passengers into a terminal, right?  Isn't that what the gravamen

10 here is?

11             MR. NONNA:  Yes.

12             THE COURT:  And the reason that the County wants to

13 move passengers into the terminal is generally, generically a

14 safety concern?  Are you just flexing your business muscles and

15 saying, no, this is how we want to do business?

16             MR. NONNA:  It's the capacity of the airport to handle

17 passengers and passenger service.

18             THE COURT:  I missed the beginning.

19             MR. NONNA:  The capacity of the airport to handle

20 passenger service, which dates back to the 1980s when this went

21 into effect, and that's why the TUR incorporates this rule of

22 240 passengers per half an hour for operations like the

23 plaintiffs' now; they are operating like a commercial airline.

24             THE COURT:  So I get it.  This is to slow down the

25 traffic?  This is to stay within the model of how many

 1  passengers per hour can pass through the airport?

 2          MR. NONNA:  Yes.

 3          THE COURT:  I will give you a chance in a second.  I

 4  know.  I get it.

 5          What's wrong with that?

 6          MR. ALLISON:  Your Honor --

 7          THE COURT:  I know it's preemptive.

 8          MR. ALLISON:  What's wrong with that is it conflates

 9  and mixes a very important thing.  What he said was it's a

10  concern about the number of people passing through the terminal.

11  So their solution is to move more people, to move us into the

12  terminal.  What it's really about and --

13          THE COURT:  That would slow down -- that would slow

14  down the number of people, wouldn't it?  If it's more crowded,

15  it takes longer and spreads out over the hours.

16          MR. ALLISON:  What this is about is moving us into

17  their allocation system, and the allocation system requires you

18  to have slots at the airport.  There's two massive problems with

19  that.  So what it really does is it cuts down our flights.  This

20  is actually about -- it's not actually about capacity at the

21  terminal.  If they were concerned about that, they wouldn't want

22  us in the terminal.  They wouldn't want more people in the

23  terminal.  They would want less people in the terminal.

24          THE COURT:  This reduces the number of flights?  Is

25  that --

1          MR. ALLISON:  Exactly.  And that's exactly the

2  problem.  It's this not only would reduce the number of flights,

3  I mean, we will present evidence that it would essentially cut

4  our business off.  What we are doing wouldn't exist, but -- the

5  way they want it.  But that is exactly what ANCA and ADA says

6  you cannot do by local law.  That's why we are here.  That is

7  the gravamen of it.

8          I looked back at the very first hearing we had in

9  front of Your Honor, and Mr. Nonna said it exactly.  He said,

10 this is about the capacity at the terminal and getting us into

11 the allocation system.  We also will present evidence that there

12 is almost no slots in the allocation system.  So even if our

13 business model worked at the terminal, which it doesn't, there

14 is huge practical problems with us actually doing it.  It's sort

15 of an illusory offer that they made in the policy, number one.

16          But again, what this does is, it regulates routes and

17 services, which ANCA and ADA say you cannot do locally.  That's

18 why we have an FAA.  That's -- that's -- this is what you are

19 going to decide, Your Honor.

20          MR. NONNA:  Can I add something?

21          THE COURT:  Of course.

22          MR. NONNA:  They are constantly referring to the

23 price, services and routes.  In that law, the ADA, there is an

24 exception to that exemption, that preemption requirement; that

25 the exception is the airport sponsor can exercise its

1  proprietary rights, and that's the legal issue, are we

2  exercising our proprietary rights.  So, you know, we can discuss

3  this all day.

4          THE COURT:  Yeah, no.  I asked for a feel.  I got a

5  feel.

6          MR. NONNA:  The FBOs, the fixed-base operators, can't

7  start operating like the commercial airlines and have a

8  commercial service, passenger service out of their FBO.

9          THE COURT:  This is the notion that, in effect,

10 whether it was Covid-related or however it arose, these

11 purveyors are selling seats on their planes.  Is that, in

12 essence, it, Mr. Nonna?  That they have gone from, oh, this is

13 just a private group getting on a plane to:  They are offering

14 seats to the public for money?

15         MR. NONNA:  Selling seats to the public.  For

16 instance, you can book a flight on one of these operators,

17 Blade, I believe, by doing it through JetBlue.  You could go to

18 JetBlue's website and book a flight leaving from the FBO through

19 JetBlue.  So it's operating -- they're operating like a regular

20 commercial airline, which should operate out of the terminal.

21         THE COURT:  All right, Mr. Allison.  Go ahead.

22         MR. ALLISON:  Yeah, these Part 3 ADA operations have

23 been around for decades.  It's been in the federal regulation

24 for quite a long time, and it's been at HPN since at least 2015.

25 So while it became more popular during Covid for some obvious

1  reasons, which was folks liked the notion of not being in a

2  crowded terminal and having more distance and space, it

3  certainly isn't a complete recent invention.  I think its

4  popularity has increased.  So I would -- that characterization

5  is not exactly accurate, or at least we certainly dispute it.

6             THE COURT:  Yeah.  I get it.  All right.

7             I did -- I did ask for a thumbnail sketch, and I got

8  one.  So I look forward to discussing this at summary judgment.

9             The one thing I would encourage is the more you can

10  agree to without taking your adversarial armor and throwing it

11  away, the more likely it is, of course, that there is a

12  resolution by me.  I may -- this may be something I want to deal

13  with at an oral argument.  We'll see.  We will see what the

14  papers are.  Give me the essence.  Don't tell me you need more

15  pages.  There is a very limited strict burden of proof here.  I

16  am a burden-of-proof person.  I don't know how to be plainer.

17  Because you get 25 pages with me doesn't mean you need to give

18  me 25 pages.  You need to give me that which I need to

19  adjudicate the issue before me and not more.  So you don't need

20  to make speeches with me.  You need to point me, direct me with

21  case law -- in the Second Circuit, hopefully, in the Southern

22  District -- to this issue.  That's how I am going to adjudicate

23  this.  I don't know how to be plainer.  You don't need anything

24  else.  Get me to the burden of proof and establish what the

25  elements are and tell me what the proof is for or against it,

1   and I will tell you what I think.  Okay?  So please don't make

2   this -- while this may be an issue of first impression, which,

3   okay, that's okay with me, it may be that you can fashion an

4   argument well within the confines of the burden of proof here.

5              All right?  Anything else?  Anybody?

6              MR. CHEN:  Just a technical question, Your Honor, how

7   would you like us to provide that documents for *in camera*?

8   Should we --

9              THE COURT:  Just send them to chambers' email.

10              MR. CHEN:  Thank you.

11              THE COURT:  All right?  And obviously, they will just

12   come ex parte to me, and I will read them, and I will get you a

13   ruling immediately.  All right?  Okay.

14              THE DEPUTY CLERK:  All rise.  Court is in recess.

15                                -o0o-

16

17

18

19

20

21

22

23

24

25