UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC.,<br><br>         Plaintiffs,<br><br>    -against -<br>COUNTY OF WESTCHESTER,<br><br>         Defendant. | **JOINT LOCAL<br>RULE 56.1 STATEMENT**<br><br>22-cv-01930 (PMH) |

## I.  FACTS APPLICABLE TO ALL CLAIMS FOR RELIEF

1.  The sole commercial terminal (the "Terminal") at the Westchester County Airport ("HPN") is operated pursuant to the County's local use restrictions, codified in the Laws of Westchester County ("LWC") as "Terminal Use Procedures" ("TUP"). (LWC § 712.462.)

**Resp. 1:** Disputed. The Terminal is operated pursuant to federal law and only where specifically allowed, certain local use restrictions. (49 USC § 47524; USC § 41713(b).)

2.  Since 2005, the TUP has explicitly required that "any air service to or from [HPN] for which seats are individually offered or sold to the public or a segment of the public" on "aircraft designed for more than (9) passenger seats, including but not limited to any carrier or other operator certified . . . under Parts 119, 121 or 135 of the Federal Aviation Regulations, Title 14, Code of Federal Regulations" must operate out of the Terminal. (LWC § 712.462(1), (2)(a), (j); Carey Decl., Ex. C [hereinafter, "Local Law No. 17-2005"] at C899–901[1].)

**Resp. 2:** Statement of law. Undisputed, but also states "shall apply to all use of the passenger terminal and the terminal ramp at [HPN] by Airlines providing Passenger Service, as the term is defined herein." LWC § 712.462(1).

3.  Plaintiffs Blade Urban Air Mobility, Inc. ("Blade"), XO Global, LLC ("XO"), and JetsuiteX, Inc. ("JSX") (collectively, "Plaintiffs") sell seats to the public on aircraft designed for

---

[1] *N.b.*, the County's bates prefix of "COW-" has been shortened to "C."

more than (9) passenger seats at HPN and <u>do</u> <u>not</u> operate out of the Terminal. (Dkt. No. 1 [hereinafter, "Compl."] ¶¶ 5, 15; Lozada Tr. 83:4–88:7; 94:19–23; Tomkiel Tr. 62:19–66:14; 88:13–15; Drabinsky Tr. 65:2–13, 71:23–72:1, 159:8–12.)

**Resp. 3:** Undisputed.

4.      Instead, Plaintiffs provide air service out of one of HPN's privately run Fixed-Base Operators ("FBOs"), pursuant to agreements with those FBOs.  The County is not a party to those agreements. (Compl. ¶¶ 5, 26, 29, 38; Gasparri Tr. 60:4–8, 60:19–61:24.)

**Resp. 4**: Undisputed.

5.      There is no allegation that during the ten years following the 2005 Amendment's enactment, "any air service to or from [HPN] for which seats are individually offered or sold to the public or a segment of the public" on "aircraft designed for more than (9) passenger seats" occurred outside of the Terminal— *i.e.*, at one of HPN's three FBOs.

**Resp. 5:** Disputed. (Scherrer Ex. 7 (Sept. 2015 email); Scherrer Tr. 102:9-107:21.)

6.      There is no allegation that between 2015 and November 2018, the County was aware that Blade or Jetsmarter was selling seats to the public on aircraft with more than 9 passenger seats for flights operating out of the FBOs, in violation of the TUP.

**Resp. 6:** Disputed. (Scherrer Exs. 7, 11; Scherrer Tr. 102:9-107:21, 139:8-142:15.)

7.      In November 2018 and January 2019, the County received reports that Jetsmarter, Inc. ("Jetsmarter")—a non-party to the instant litigation that is "related to" XO—was operating in violation of the TUP. (Carey Decl., Ex. N (Email of Nov. 6, 2018) at C1158, Ex. O (Email of Jan. 23, 2019); *see also* Compl. ¶ 29 (identifying Jetsmarter).)

**Resp. 7**:  Disputed. November 2018 was not the first discussion. (*See* Resp. Nos. 5-6).

8.      Avports' employees investigated these allegations by attempting to purchase tickets

on Jetsmarter flights. They were unable to. (Scherrer Tr. 134:2–14; Rumbarger Tr. 185:8–12.)

**Resp. 8:** Disputed. (C1422 (noting can pay fee to book); Rumbarger Tr. 183:21-184:24.)

9.      The County concluded, as a result of Avports' investigations, that tickets for the Jetsmarter flights in question were only being sold to membership groups—not to the general public. (Scherrer Tr. 132:6–136:5; Carey Decl., Ex. P (Email of Dec. 20, 2018) at BLD-13121, Ex. Q (Email of Mar. 10, 2018) at BLD-12546; *see also* XO Letter of Oct. 7, 2022 at C1331; *cf.* LWC § 712.462; 14 C.F.R. § 212.5 (setting forth the procedures for affinity charters).)

**Resp. 9:** Disputed. Cited evidence does not show JetSmarter flights were sold only to members. (*See* XO_8227; Lozada Tr. 149:3-151:3; Tomkiel Tr. 38:5-9, 63:23-66:1.)

10.      In March 2020, the world was beset by the COVID-19 pandemic. (*See* 9 N.Y.C.R.R. § 8.202.4 (declaring a state of emergency).)

**Resp. 10**: Undisputed.

11.      As a result of the pandemic, XO's and Blade's public sale of air service to and from HPN on aircraft designed for more than 9 passenger seats "spiked." (Tomkiel Tr. 75:16–21; Lozada Tr. 80:21–81:10.)

**Resp. 11:** Partially disputed. Pandemic caused increase in private aviation in general; cited testimony does not discuss 9 seats. (Tomkiel Tr. 75:19-21; Lozada Tr. 80:21-81:1.)

12.      Plaintiffs' broad public advertisement of their HPN operations caught local community leaders' attention. (*See* Carey Decl., Ex. R (Email of Mar. 25, 2021) at C1252; Ex. S (Email of Apr. 28, 2021) at C6083; Scherrer Tr. 277:18–23.)

**Resp. 12:** Partially disputed, as 2021 was not the first time local leaders raised Plaintiffs' HPN operations. (Scherrer Ex. 8 at 3 & Ex. 11 at 9, 29; Scherrer Tr. 108:3-110:9, 139:8-142:15.)

13.      In late March/early April of 2021, those local community leaders began voicing

concerns about Plaintiffs to the County administration. (McDonald Tr. 5:16–6:9).)

**Resp. 13:** Partially disputed. In 2017 (and ongoing), community organizations notified the County JetSmarter, XO, and others were operating from FBOs. (*See* Resp. 12.)

14.    In Fall 2021, the County again investigated whether any operators—including Plaintiffs—were operating at HPN in violation of the TUP. (McDonald Tr. 77:14–20; Carey Decl., Ex. T (Email of Sept. 24, 2021) at C1265, Ex. S (Email of Sept. 24, 2021) at C1267.)

**Resp. 14**: Undisputed.

15.    After the issuance of Policy No. 1, Plaintiffs continued to offer air service at HPN to the general public on aircraft designed for more than nine (9) passenger seats out of HPN's FBOs, and not the Terminal. (*See* Drabinsky Decl. ¶ 40; Dkt. No. 17 (Lozier Decl.) ¶ 30; Dkt. No. 18 (Botimer Decl.) ¶ 24.)

**Resp. 15**: Undisputed.

16.    Six weeks after Policy No. 1's issuance, Plaintiffs commenced the instant action. (Compl. at 1.)   A so-ordered stipulation has allowed Plaintiffs to continue their operations, in violation of the TUP, pending resolution of this action. (Dkt. No. 45 (Stipulation) at 3.)

**Resp. 16**: Disputed in part. Plaintiffs are not violating the TUPs, which are preempted.

17.    On March 8, 2022, Avports General Manager April Gasparri notified FAA's Eastern Region's District Office Manager Evelyn Martinez that the County "filed a legal claim against [Plaintiffs] for conducting Single Seat public sales and operations on aircraft with greater than nine seats and while operating out of FBOs." (Carey Decl., Ex. W (Email of Mar. 8, 2022) at C2432; Gasparri Tr. 252:11–255:12.)

**Resp. 17**: Undisputed.

18.    There is no evidence in the record that FAA has had any issue with the County's

TUP, the 2005 Amendment, Policy No. 1, or the County's instant attempt to enforce its local use restrictions. (*Cf.* Carey Decl., Ex. X (Letter from FAA to John Wayne Airport) at C6908–09.)

**Resp. 18:** Disputed. Defendant cites no evidence the FAA was provided with the current TUP, the 2005 Amendment, or Policy No. 1. (Gasparri Tr. 80:10-14; *see also* Cnty's Fact 63.)

## II.   FACTS RELEVANT TO SPECIFIC CLAIMS FOR RELIEF

### A.   Airport Noise and Capacity Act ("ANCA") Claim

#### i.   *HPN's Pre-ANCA Use Restrictions*

19.     HPN's first formal, local use restrictions came as a result of a court order in *Midway Airlines, Inc. v. County of Westchester*, No. 84-CV-2229 (EW) (S.D.N.Y.), entered on April 19, 1984 (the "*Midway* Order"). (Carey Decl., Ex. A [hereinafter, "Briefing Materials"] at C5775; Carey Decl., Ex. D [hereinafter, "Resolution No. 95-1984"] at C787–93.)  This order directed the County to "promulgate rational and nondiscriminatory rules governing the allocation of ground facilities and flight slots" within 50 days. (*Midway Airlines, Inc. v. County of Westchester*, 584 F. Supp. 436, 441–42 (S.D.N.Y. 1984).

**Resp. 19:** Undisputed *Midway* Order was entered on that date with cited language; but the Order directed the County to adopt rules only for Part 121 carriers and neither the County's 1984 restrictions nor the Order addressed Part 135/Part 380 carriers. (*Midway*, 584 F. Supp. at 441–42.)

20.     On June 7, 1984, the County promulgated its first formal set of local use restrictions. (*See* Resolution No. 95-1984.)

**Resp. 20:** Undisputed.

21.     From that date forward, HPN has had local use restrictions in effect continuously. (Briefing Materials at C5803; Resolution No. 95-1984 at C787–88; *see also* LWC § 712.462.)

**Resp. 21:** Disputed that restrictions same since 1984 or are enforceable. (*See* Res. Nos. 58-

1985, 59-1985; L.L. 21-2005 at C5565; §712.462).

22.     On March 4, 1985, the County "implemented the access limits, allocation terms, and technical specifications . . . set forth in the Stipulation." (Briefing Materials at C5778; *see also* Carey Decl., Ex. E (Resolution No. 58-1985) at C811, Ex. F (Resolution No. 59-1985) at C823–28.)

**Resp. 22:** Disputed the limits, allocations, and specifications in *Midway* Stipulation apply beyond Part 121 carriers. (*Midway*, 584 F. Supp. at 441–42; C812.)

23.     On April 5, 1988, "the County and the carriers entered into the . . . Terminal Capacity Agreement . . . , the purpose of which was to continue the terms set forth in [the] Stipulation and to continue to apply those same constraints to the new Terminal." (Briefing Materials at C5784.)

**Resp. 23**: Undisputed Materials state quote, but Materials were drafted in 2004 and contain multiple hearsay. Disputed that referenced carriers were Part 135s/Part 380s. (C812; Resp. 22.)

        ii.     *Passage of the Airport Noise and Capacity Act of 1990 ("ANCA")*

24.     On November 5, 1990, Congress enacted the Airport Noise and Capacity Act of 1990 ("ANCA"). (Pub. L. No. 101-508 §§ 9301–09, 104 Stat. 1388, 378–84.)

**Resp. 24**: Undisputed.

25.     Following ANCA's passage, <u>new</u> local airport-use restrictions became subject to strict "notice, review, and approval requirements" established by the FAA. (49 U.S.C. § 47524.)

**Resp. 25**: Undisputed but is statement of law, not fact.

26.     Local airport-use restrictions that <u>predate</u> ANCA, however, are explicitly excluded from the "notice, review, and approval requirements" (*i.e.*, "grandfathered"). (49 U.S.C. § 47524(b), (c)(1), (d); 14 C.F.R. § 161.3(a), (b).)

**Resp. 26**: Disputed, statement of law. ANCA excludes only certain restrictions before November 5, 1990. 42 U.S.C. § 47524(d)(2).

27.     Furthermore, amendments to grandfathered local airport-use restrictions are themselves grandfathered, provided that such amendments do not reduce aircraft operations, limit aircraft operations, or affect aircraft safety. (49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.3(b).)

**Resp. 27**: Undisputed but is statement of law, not fact.

   *iii.* *Codification of the TUP*

28.     In mid-2003, the County carried out an in-depth review of HPN's existing use restrictions. (Briefing Materials at C5887; *see also* Carey Decl., Ex B. [hereinafter, "Local Law No. 12-2004"] at C851.)

**Resp. 28**: Disputed in part. Unsupported the County "carried out an in-depth review . . . ."

29.     This review was prompted by, *inter alia*, the impending expiration of the reaffirmed 1996 Terminal Capacity Agreement between the County and various air carriers, which was scheduled to expire on December 31, 2004. (Briefing Materials at C5785, C5829, C5833, C5887.)

**Resp. 29**: Undisputed Materials stated this as to 1994 Terminal Agreement.

30.     As a result of its review, the County resolved "to codify and clarify [the] existing legal restrictions – which appear[ed] in a complex and confusing series of Board of Legislators actions, policy statements and regulations – into a single set of use restrictions." (*Id.* at C5805 (emphasis omitted); *see also id.* at C5829, C5887.)

**Resp. 30:** Undisputed County stated this was what it believed it was doing.

31.     The process of codification and clarification included, among other things, soliciting input from the various air carriers operating out of HPN. (*Id.* at C5829, C5887–97.)

**Resp. 31:** Disputed in part. County did not get input from Part 135s/Part 380s. (C5895-97)

32.     On or about February 27, 2004, the process resulted in a draft law that, if adopted by the Westchester County Board of Legislators (the "BOL"), would codify "the Procedures applicable to all Airlines providing passenger service at [HPN]." (*Id.* at C5839–56.)

**Resp. 32:**   Undisputed document states quote. Full quote provides: "This Section shall apply to all use of the Passenger Terminal ("Terminal") and the Terminal Ramp at Westchester County Airport ("Airport") by Airlines providing scheduled passenger service. The Terminal Ramp shall be for the exclusive use of Airlines providing scheduled passenger service. This section does not apply to any activities by Airport users not providing passenger service or not using the Terminal Ramp." (C5839–56.)

33.     Pursuant to ANCA's grandfather clause, the draft law—which restated, clarified, and in some instances narrowed HPN's pre-ANCA use restrictions—was exempt from ANCA's "notice, review, and approval requirements." (*Id.* at C5832.)

**Resp. 33:** Disputed the law only "restated, clarified and . . . narrowed" pre-ANCA restrictions; the rest is a legal conclusion. The County cites its 2004 FAA briefing, which does not support Fact 33. The County stated the law stemmed from *Midway* and carrier agreements (which were with Part 121 airlines) and that it codified only three existing restrictions: (1) a 240 passengers per half-hour limit at the Terminal; (2) the four-gate limit; and (3) a takeoff weight limit. These were never before applied to Part 135/Part 380 carriers. (*See* C824; C5769-70; C5773-74.)

34.     Nevertheless, the County elected to submit the draft law to the FAA's Office of the Chief Counsel for review and approval. (*See* Local Law No. 12-2004 at C851; *see generally* Briefing Materials; Carey Decl., Ex. I [hereinafter, "FAA Letter"] at C9471.)

**Resp. 34:** Disputed in part. Undisputed County submitted draft law to FAA. But letter does not state County sought approval for law or that FAA provided blanket approval. (*See* C9471.)

35.     On June 9, 2004, the FAA wrote to the County, finding that the proposed local law "[is] exempt from the Airport Noise and Capacity Act of 1990 (ANCA) since the action[] relate[s] to airport noise or access restrictions that were in effect on November 5, 1990 and would not 'reduce or limit aircraft operations or affect aircraft safety.'" (FAA Letter at C9472 (quoting 49 U.S.C. § 47524(d)(4)).)

**Resp. 35**:  Disputed. FAA did not state local law was exempt but that "the proposed County actions are exempt from . . . []ANCA[] since the actions . . . were [pre-ANCA] and would not 'reduce or limit aircraft operations or affect aircraft safety.'" (*See* C9472 (emphasis added).) These actions were "(1) codify and clarify existing legal restrictions; (2) extend and renew the existing Airport terminal use agreement with air carriers who use the commercial passenger terminal by entering into a new terminal use agreement; and (3) codify and modify existing technical specifications and procedures for allocation of Airport capacity. According to the County, all changes will make the limitations less restrictive than those in effect today." (*See* C9471-72.)

36.     In so finding, the FAA explicitly found that the draft law, if enacted, would be "'grandfathered' under ANCA and is therefore not subject to its requirements." (*Id.* at C9478 (citing 49 U.S.C. §§ 47524(b), 47524(c)(1), and 14 C.F.R. § 161.3(a)).)

**Resp. 36**:  Disputed. The FAA remarked on only 3 specific restrictions. (*See* Resp. 35.)

37.     The FAA also observed that the draft law constituted a permissible amendment of a grandfathered local use regulation—as both contemplated by and permissible under ANCA. (*Id.* at C9478 (citing 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.7(b)(4)).)

**Resp. 37**:  Disputed. The FAA concluded only that County's proposal to codify, revise, or modify its three use restrictions were a pre-ANCA amendment. (*See* C9478; Resp. 35.)

38.     On September 14, 2004, the County codified HPN's local use restrictions at LWC

§ 712.462 (the "TUP"). (Local Law No. 12-2004 at C849, C859–73.)

**Resp. 38**:  Undisputed.

39.     As set forth in its accompanying committee report, the TUP's "principal purpose .

. . [was] to ensure that the procedures and regulations governing commercial use of [HPN] are

well-defined and consistently applied to all commercial users." (*Id.* at C851.)

**Resp. 39:**  Disputed. Report states TUP's purpose was "to codify all [] critical use

restrictions . . . to ensure that the procedures and regulations governing use of the <u>Airport terminal</u>

are well-defined and consistently applied to all commercial users." (*See* C851 (emphasis added).)

   *iv.*  <u>*2005 Amendment of the TUP*</u>

40.     As originally codified, the TUP required all "Airlines providing scheduled

passenger service" to use HPN's Terminal. (Local Law No. 12-2004 at C859.)

**Resp. 40:**  Disputed. TUP applied only "to all use of the Passenger Terminal ("Terminal")

and the Terminal Ramp at the Westchester County Airport ("Airport") by Airlines providing

scheduled passenger service. . . . This Section does not apply to any activities by Airport users not

providing passenger service or not using the Terminal building or Terminal Ramp."  (C859.)

41.     This requirement thus imposed on all Airlines: (i) an aircraft capacity limit, (ii) a

passenger capacity limit, and (iii) a lottery system for use of the Terminal's four gates during 30-

minute increments. (*Id.* at C852–53, C859–73; Briefing Materials at C5816–17, C5821–28; FAA

Letter at C9472.)

**Resp. 41:** Disputed in part. The original TUP defined "Airline" as "any person providing

scheduled passenger air service, including but not limited to, any air carrier or other operator

certificated to provide scheduled passenger service under Parts 119, 121 or 135 . . . ." (C859.)  It

did not mention or apply to Part 380 carriers or those not providing scheduled passenger service

and did not apply to those not using the Terminal/Terminal ramp. (*Id*. at C859-873.)

42.     At the same time, the TUP retained HPN's historic practice of permitting small aircraft to operate outside the Terminal—*i.e.*, out of HPN's three FBOs. (*See* Briefing Materials at C5780; Local Law No. 12-2004 at C854.)

**Resp. 42:**  Disputed, unsupported by cited evidence. Many non-"small aircraft" have operated outside the Terminal. (*See e.g.,* Tomkiel Tr. 146:1–149:11; Lozada Tr. 118:12–130:12, 136:16–139:11; Drabinsky Tr. 100:19–102:19.)

43.     The 2004 law did not define the phrase "scheduled passenger service." (Local Law No. 12-2004 at C859–73.)

**Resp. 43**:  Undisputed.

44.     To maintain the "careful balance between competing interests at the Airport" that the TUP sought to achieve, the County amended the TUP on November 15, 2005 (the "2005 Amendment"). (Local Law No. 17-2005 at C893–94, C896, C899–914.)

**Resp. 44:**  Undisputed Report contains quoted language, but disputed it says that was the reason for the amendment as the quote is out of context.

45.     As relevant to the matter at bar, the 2005 Amendment included three key aspects. (*Id.* at C899–914.)

**Resp. 45:**  Disputed. The law does not state there were only three "key aspects."

46.     <u>First</u>, it defined the term "Passenger Service" to include "any air service to or from [HPN] for which seats are individually offered or sold to the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity." (*Id.* at C899.)

**Resp. 46:**  Disputed. "Passenger Services" is "any air service to or from the <u>Airport</u> for

which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity." (L.L. 17-2005 at C901 (emphasis added).) "Airport" is the "passenger terminal and the terminal ramp at the Westchester County Airport." (*Id*. at C899.)

47.   Second, it modified the term "Airline" by (i) replacing the phrase "scheduled passenger air service" with the defined term "Passenger Service"; and (ii) harmonizing it with applicable federal regulations by limiting it to "aircraft designed for more than (9) passenger seats." (*Id.*; *see e.g.*, 14 C.F.R. § 135.411(a)(1), (a)(2); 43 Fed. Reg. 46,783, 46,811 (Oct. 10, 1978); *see also* 43 Fed. Reg. 46,742, 46,752 (Oct. 10, 1978).)

**Resp. 47:**   Disputed. Cited authorities do not support the change to "Airline" was to "harmoniz[e] it with applicable federal regulations." Cited regulations have nothing to do with operating at the HPN Terminal and mostly deal with aircraft maintenance and alterations. 2005 Amendment materially changed "Airline" definition and materially added "Passenger Service."

48.   Third, it modified the "Applicability" section by replacing the phrase "scheduled passenger air service" with the term "Passenger Service." (Local Law No. 17-2005 at C899.)

**Resp. 48**:   Disputed. Original TUP "[did] not apply to any activities by Airport users not providing passenger service or not using the Terminal building or Terminal Ramp." (C874, § 1.) 2005 Amendment and new "Passenger Service" expands TUP's scope beyond Terminal. (C899.)

49.   Together, these three amendments resolved any unintended ambiguity by clarifying that the TUP "include[s] all commercial passenger operations, including those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations." (*Id.* at C894.)

**Resp. 49**:   Disputed. Cited evidence does not state there was any ambiguity in the original

TUP. Nor does the evidence suggest the modifications were mere clarifications or "resolved any unintended ambiguity." (C899; Latimer Tr. 170:25-172:14 (unknown why statute was amended)).

50.     Like the original 2004 law, the 2005 TUP amendment was subject to the County's public notice and hearing requirements, and was codified in the official Code of Westchester County. (*Id.* at C892; *see also* N.Y. Mun. Home Rule §§ 10(1)(i), 20, 33(1), (4)(d).)

**Resp. 50**:  Undisputed but immaterial.

51.     To date, no federal agency, including the FAA, has ever indicated that the TUP violates any federal law or regulation.

**Resp. 51**: Disputed, unsupported by evidence. Witnesses unaware if 2005 TUP or Policy No. 1 were sent to FAA. (McDonald Tr. 45:14-46:25, 149:24-150:11; Gasparri Tr. 78:19-80:14.)

            *v.     Policy No. 1*

52.     On January 21, 2022, the County published Policy No. 1. (Carey Decl., Ex. J [hereinafter, "Policy No. 1"] at C966.)

**Resp. 52:** Undisputed.

53.     Policy No. 1 is not a legislative enactment. (*See* Policy No. 1 at C966–67.)

**Resp. 53**:  Undisputed but immaterial.

54.     Policy No. 1 did not add or modify any local use restriction. (*See id*.; LWC § 712.462(1), (2)(a), (j).)

**Resp. 54**:  Disputed. Policy No. 1 added for the first time "Single-Seat-Charter-Operators" defined as "DOT Part 380 'public charter' operators, offering single-seat sales to the general public, or any segment thereof, on aircraft with more than nine (9) seats."  *(See* C966.)  Part 380 carriers were never before mentioned in the relevant laws. (C874; LWC § 712.462; Gasparri Tr. 76:13-77:10; Rumbarger Tr. 57:23-58:3; Scherrer Tr. 80:5-11.)

55.     Rather, Policy No. 1 is a clarification that the TUP's requirement that "any air service to or from [HPN] for which seats are individually offered or sold to the public or a segment of the public," on "aircraft designed for more than (9) passenger seats," must operate out of the Terminal, applies to all air carriers, irrespective of the regulatory part under which they operate—including Part 380 public charter operators. (Policy No. 1 at C966 & n.1.)

**Resp. 55**: Disputed in part. Undisputed quoted language is in Policy No. 1. But Policy No. 1 is not a mere clarification and does not state TUP's requirements. (*See* C966; Resp. 49, 54.)

56.     Policy No. 1 also offered potential solutions for those public charter operators displeased by the County's enforcement of the TUP. (*Id.* at C967.)

**Resp. 56**:  Disputed. County's proposals all required Plaintiffs to process passengers through the Terminal and Terminal TSA, a protocol different than their TSA-approved program. (C967; Rumbarger Tr. 102:14-103:25, 110:15-25; Drabinsky Tr. 218:20-219:8; JSX-157.) It also subjected them to the Terminal slot lottery. (*Id.*) These unlawful "alternatives" would interfere with Plaintiffs' routes, prices, services, and access. (*See* Counterst. of Facts ("COF") 13-17.)

57.     Specifically, it permitted public charter operators' incoming flights to arrive at HPN via FBOs, rather than at the Terminal. (*Id.*)

**Resp. 57**:  Undisputed the County offered to allow Plaintiffs to arrive at HPN via FBOs but required they enplane at Terminal. (Rumbarger Tr. 102:14-103:25.) This was not a solution as Plaintiffs would not be able to continue their service.  (*See* Resp. 56 and COF 13-17.)

58.     And while Policy No. 1 made clear that public charter operations on aircraft with more than 9 passenger seats had to <u>depart</u> from the Terminal, it proposed that the passengers on such flights could be segregated from regular commercial passengers in a designated, non-SIDA area of the Terminal prior to departure. (*Id.*)

**Resp. 58**: Undisputed County proposed to segregate Plaintiffs' passengers *after* they went through Terminal TSA. (Rumbarger Tr. 102:14-103:25.) Disputed this proposal was legally valid as Plaintiffs could not use their authorized TSA 12-5 security plan, would be subject to the Terminal lottery, and their services would be destroyed. (*See* Resps. 56-57; COF 13-17.)

59.     This proposal was presented to Robert Duffy, the United States Department of Homeland Security's Federal Security Director for HPN, who informed the County and Avports that it would comply with all applicable TSA regulations. (Gasparri Tr. 196:20–207:21.)

**Resp. 59:** Disputed, and Duffy's statements are inadmissible hearsay. Gasparri did not testify Duffy stated the above. Instead, about her call she stated: "I remember it being fairly quickly, because this Policy Number 1 that they read, they didn't have any objections or edits or comments." (Gasparri Tr. 210:19 – 211:4.) Neither Duffy nor TSA opined whether Plaintiffs had to proceed through the Terminal or if TUPs violated ADA or ANCA. (Gasparri Tr. 211:7–212:22.) Duffy said Plaintiffs complied with current TSA regulations. (Rumbarger Tr. 300:11-301:4.)

60.     Plaintiffs rejected the County's proposed accommodation as "incompatible" with their preferred business models, which avoid commercial airline terminals entirely. (Drabinsky Tr. 176:7–178:10, 202:21–24; Tomkiel Tr. 88:13–15, 103:23–114:24; Lozada Tr. 113:5–116:11.)

**Resp. 60:** Undisputed Plaintiffs rejected County's purported "accommodation" as against federal law. Disputed operating from an FBO is simply Plaintiffs' preferred business model.

**B.     Airline Deregulation Act ("ADA") Claim**

61.     In 1994, the FAA reviewed the reaffirmed Terminal Capacity Agreement—*i.e.*, one of the various documents undergirding the TUPs (*see* § II(A)(i), (ii), *supra*)—and consented to the agreement "with the understanding that [it] allows access to the airport on fair and reasonable terms, without unjust discrimination and provides access on reasonable terms to new entrants."

(Briefing Materials at C5819 (internal quotation marks and citation omitted).)

**Resp. 61**:  Disputed, unsupported by cited evidence. Statement is immaterial as it predates the TUPs/Policy No. 1. Grant Assurance compliance is distinct from the ADA. *See* 49 U.S.C. § 41713.  FAA "consent[ed] to [the] extension of the 1985 Stipulation since it has been voluntarily entered into by the County and the airlines since it merely extends a previously negotiated settlement." (C5819.)  "Airlines" are Part 121 operators, not Part 135s/Part 380s. (C5790-92.)

62.     In its letter of June 9, 2004, the FAA affirmatively found that the proposed TUP would not violate the County's obligation under the federal grant assurances "to provide access by air carriers on reasonable and not unjustly discriminatory terms." (FAA Letter at C9479).

**Resp. 62**:  Disputed and immaterial. *See* Resp. 61 (ADA compliance distinct). The FAA found "nothing in the proposed actions by the County—codifying and clarifying existing legal restrictions, extending and renewing the existing Airport terminal use agreements with the air carriers, and codifying and modifying existing technical specification and procedures for allocation of terminal space and gates—that is inconsistent at this time with its grant assurances." (*See* C9479.) These existing restrictions did not apply to Part 380 operators.

63.     The County did not submit the 2005 TUP amendment to the FAA for review, because it was not required to do so. (49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.3(b).)

**Resp. 63**:  Undisputed County did not submit the 2005 Amendment to FAA. Remainder is a legal conclusion and is disputed. *See* Resp. Nos. 40-51.

64.     Neither the 2004 TUP nor the 2005 amendment purports to regulate any air carriers' prices, routes or services.

**Resp. 64**:  Undisputed the TUPs do not explicitly state they regulate "rates, routes or services," but disputed whether they in fact do so. *See* Plfs' Facts 5, 13-18.

### C.     Equal Protection Claim

65.     None of the Plaintiffs is a member of a protected class. (*See* Compl. ¶¶ 135–50; *see generally* Compl. (omitting reference to any protected class).)

**Resp. 65**: Undisputed.

66.     In their Complaint, the entities to whom Plaintiffs compare themselves (*i.e.*, the entities who Plaintiffs allege are similarly situated to themselves and who Plaintiffs allege are being treated differently for no rational basis) at HPN (hereinafter, the "Comparators") are "[the] other operators operating out of FBOs at HPN." (Compl. ¶ 141.)

**Resp. 66:** Undisputed.

67.     During their 30(b)(6) depositions, Plaintiffs identified their Comparators as including (i) Part 135 operators operating "scheduled service," including Cape Air, Tradewind, Wheels Up, and Hard Rock Air; (ii) Part 135 operators "running a political campaign or . . . flying a sports team"; (iii) corporate jets owned by companies like Pepsi, Discovery, and IBM; (iv) "community groups," such as the Albany Club, the Bakers Bay Club, the Discovery Land Club, the Nexus Club, the Yellowstone Club; (v) individuals who come together and decide to charter a plane together; (vi) operators operating pursuant to 14 C.F.R. Part 91 ("Part 91"); and (vii) operators with fractional ownership interests, such as FlexJet, NetJets, and Sentient. (Tomkiel Tr. 146:1–12, 146:18–148:7, 148:11–15, 148:20–24; 169:8–22; Lozada Tr. 118:12–130:12, 136:16–139:11; Drabinsky Tr. 100:19–102:19.)

**Resp. 67:** Undisputed.

68.     <u>With respect to the first subgroup</u>: The Part 135 operators operating "scheduled service" to which Blade compares itself <u>either</u> operate aircraft with nine seats or fewer (*i.e.*, Cape Air, Tradewind, and Wheels Up) <u>or</u> complied with the TUP by moving their air service to the

Terminal (*i.e.*, Hard Rock). (Tomkiel Tr. 159:9–16; Lozada Tr. 128:11–14, 130:4–8; Scherrer Tr. 228:13–15; Drabinsky Tr. 101:10–11 (mentioning "Hard Rock"); Carey Decl., Ex. K (Email of Feb. 14, 2022) at C2170 (confirming Hard Rock moved its air services to the Terminal).)

**Resp. 68:** Disputed, immaterial. The nine-seat limitation is discriminatory and without rational basis. Tradewind is a Part 135 operating a Pilatus PC-12, which is designed for ten passengers, from an FBO. (C8056; C8071; Tomkiel Tr. 154:23-156:23). Bakers and Yellowstone operate under Part 135 from an FBO and sell more than 9 seats to the public. (Tomkiel Tr. 148:10-153:3, 159:17-160:3). Hard Rock stopped operating at HPN. (Rumbarger Tr. 219:11-220:21).

69.     With respect to the second subgroup:  Plaintiffs have not identified any political campaigns, sports teams, or other common-purpose groups chartering aircraft that are selling seats to the public for HPN flights on aircraft with more than 9 passenger seats. (*See* Tomkiel Tr. 150:7–16.)

**Resp. 69:** Disputed. (Drabinsky Tr. 100:19-101:19; Tomkiel Tr. 59:3-23, 146:1-169:15; Lozada Tr. 120:9-130:20) (identifying Yellowstone, Bakers, Discovery, Albany, and Nexus.)

70.     With respect to the third subgroup:  Plaintiffs have not identified any air carriers selling seats to the public for HPN flights on corporate jets with more than 9 passenger seats.

**Resp. 70:** Disputed in part. Corporate jets can operate from the FBOs and fly more than nine passengers. (Rumbarger Tr. 22:4-23:8, 90:24-91:10). The remainder is undisputed.

71.     With respect to the fourth subgroup:  Plaintiffs have not identified any "community groups"—including the community groups Yellowstone Mountain Club, Nexus Club, Albany Club, and Bakers Bay Club—selling seats to the general public for HPN flights on aircraft with more than 9 passenger seats. (Tomkiel Tr. 150:23–151:24, 152:17–19; Lozada Tr. 123:20–124:17; Drabinsky Tr. 101:12–16; *see also* 14 C.F.R. § 212.5 (setting forth the procedures for "affinity

(pro rata) charter[s]," which includes that "[n]o solicitation, sales or participation may take place beyond the <u>bona fide members</u> of an eligible chartering organization" (emphasis added).)

**Resp. 71:** Disputed. Yellowstone, Baker's Bay, Discovery, Albany, and Nexus operate from FBOs selling seats to a "segment of the public" on aircraft designed for more than nine seats. (Tomkiel Tr. 148:10-153:7, 159:17-160:3; Lozada Tr. 123:10-22; Drabinsky Tr. 101:12–16).

72.   <u>With respect to the fifth subgroup</u>:  The "individuals who come together and decide to charter a plane together" do not, according to the definitions set forth in federal regulations, sell seats to the public. (Tomkiel Tr. 153:17–154:14; Lozada Tr. 121:19–122:3, 123:5–9; *see also* 14 C.F.R. § 1.1.)

**Resp. 72:** Disputed, statement of law. Neither witness cited testified to the above. "Commercial operator" under § 1.1 is irrelevant and does not define "selling seats to the public." Wheels Up also offers shared seat models and there are other flight aggregating websites where the public can buy seats on aircraft designed for nine or more. (Lozada Tr. 120:4-121:1.)

73.   <u>With respect to the sixth subgroup</u>:  Plaintiffs have not identified any Part 91 operators that sell seats to the public for HPN flights on aircraft with more than 9 passenger seats. (*See* 14 C.F.R. §§ 91.147 91.501(b); Tomkiel Tr. 146:10–11, 149:17–21 ("They can't sell seats, but they can use the plane for whatever they want.").)

**Resp. 73:** Undisputed.

74.   <u>With respect to the seventh subgroup</u>: Plaintiffs have not identified any operators with fractional ownership interests—including Flex Jet, NetJets, and Sentient—selling seats to the public for HPN flights on aircraft with more than 9 passenger seats. (Lozada Tr. 124:18-126:7, 136:16–139:12; *see also* 14 C.F.R. Subpart K ("Fractional Ownership Operations").)

**Resp. 74:** Disputed. The public can book seats on Flex Jet, NetJets, and Wheels Up so long

as they pay the applicable fees. These entities offer shared seat flights on aircraft designed for more than 9 passenger seats.  (Lozada Tr. 120:4-121:1, 146:1-147:6; Mahmoud Decl. Ex. C.)

75.     Aside from those entities included in the aforementioned subgroups, Plaintiffs have not identified any other Comparators. (*See generally* Compl.)

**Resp. 75**: Undisputed.

76.     None of the identified Comparators are *prima facie* identical to Plaintiffs. (*See* Tomkiel Tr. 146:1–12, 146:18–148:7, 148:11–15, 148:20–24; 169:8–22; Lozada Tr. 118:12–130:12, 136:16–139:11; Drabinsky Tr. 100:19–102:19.)

**Resp. 76:** Disputed, also statement of law. (Tomkiel Tr. 146:1-149:11, 150:16-152:23, 154:23-155:24; Lozada Tr. 120:9-127:18; Lozier Decl. ¶¶ 18-19; Drabinsky Tr. 100:19-101:19).

77.     As Plaintiffs themselves assert, they offer a unique and innovative service at HPN. (*See* Compl. ¶¶ 15; Tomkiel Tr. 115:5–7; Dkt. No. 16 [hereinafter, "Drabinsky Decl."] ¶¶ 6, 15; Carey Decl., Ex. L (JSX Letter of Nov. 15, 2021) at C8053, Ex. M. (hereinafter, "XO Letter of Oct. 7, 2022") at C1331; *see also* Policy No. 1 at C966.)

**Resp. 77:** Disputed. Plaintiffs state they offer an alternative to large commercial airlines. (Compl. ¶¶ 15, 35; Drabinsky Decl. ¶¶ 6, 15; Lozier Decl. ¶ 17; Botimer Decl. ¶ 11.).

78.     Pursuant to a process known as "code sharing," JetBlue—a well-known Part 121 commercial operator—sells seats on JSX's HPN flights. (Drabinsky Tr. 56:13–57:10, 57:17–20, 58:2–20; *see also* 14 C.F.R. § 257.3 (defining "code-sharing arrangements").)

**Resp. 78**: Undisputed, but immaterial. JetBlue's website states such flights are sold by JSX per Delux's Part 135/JetSuiteX's Part 380 certifications. (Drabinsky Tr. 60:8-19, *Id.*, Ex. 33.)

79.     Such flights provide "frequent flier" miles for JetBlue's customers. (Drabinsky Tr. 55:19–56:6.)

**Resp. 79:** Undisputed, but immaterial. Wheels Up, which County allows to operate from an FBO, partners with Delta and customers earn Delta miles. (Mahmoud Decl. Ex. D)

80.     These flights operate out of one of HPN's FBOs, while JetBlue's regular flights operate out of the Terminal. (Compl. ¶ 32; Drabinsky Tr. 53:4–22, 57:5–9, 78:15–21, 89:15–20.)

**Resp. 80:** Undisputed JSX's flights operate out of the Atlantic Aviation FBO.

81.     The County codified the TUP to formalize "a careful balance between competing interests at the Airport." (Local Law No. 12-2004 at C853.)

**Resp. 81:** Undisputed TUPs state this. In context, TUPs also state they provide for "the continuing maintenance and operation of the <u>terminal complex</u> . . . ." (C893 (emphasis added).)

82.     In passing the 2005 Amendment, the County confirmed that the TUP "was clearly intended to include all commercial passenger operations, including those that provide infrequent or special purpose services" at the Terminal, with a carve out for "very small passenger aircraft – those with (9) seats or less – [which could] continue to use the general aviation facilities at the Airport, as they always have done." (Local Law 17-2005 at C895.)

**Resp. 82:** Undisputed Amendment states this. But County cites no evidence of subjective rationale, nor did witnesses know. (Gasparri Tr. 77:11-79:3; Rumbarger Tr. 56:15-22.)

83.     The FAA's regulatory scheme recognizes both a distinction between commercial and noncommercial operators <u>and</u> a regulatory break point at nine-to-ten passenger seats. (*See, e.g.*, 14 C.F.R. §§ 91.147, 91.501(b), 135.411(a)(1), (a)(2); 139.1(a)(1); *see also* 43 Fed. Reg. 46,742, 46,756.)

**Resp. 83:** Disputed, statement of law, and immaterial. The nine-seat limitation is discriminatory and without rational basis; County witnesses could not provide rationale. (Gasparri Tr. 75:20-76:12; McDonald Tr. 101:13-103:23, 163:21-165:7; Latimer Tr. 155:18-157:19).

III.    **FACTS RELEVANT TO SPECIFIC DEFENSES**

    A.    **Plaintiffs' Equitable Defenses of Waiver, Estoppel, and Laches**

    84.    Plaintiffs have not alleged that the County defrauded them. (*See generally* Compl.)

**Resp. 84:** Undisputed but immaterial legal conclusion.

    B.    **Plaintiffs' Failure to Exhaust Their Administrative Remedies**

    85.    Plaintiffs have not filed a complaint with the FAA against the County as airport sponsor. (*See* 14 C.F.R. Part 16.)

**Resp. 85:** Undisputed but immaterial as Plaintiffs have no obligation to do so.

## PLAINTIFFS' COUNTERSTATEMENT OF FACTS ("COF")

I.    **Facts Applicable to All Claims For Relief**

    1. Part 135 and Part 380 carriers have existed for decades, as the County's agents are aware. (*See* 14 C.F.R. § 135; 14 C.F.R. § 380.; *see also* Scherrer Tr. 259:6-9; Gasparri Tr. 169:12-16.)

**COF Resp. 1:**  Undisputed, but immaterial.

    2. Plaintiffs provide a convenient and safe alternative to large commercial airlines under 14 C.F.R. §§ 135, 380. (Drabinsky Decl. ¶ 15-16; Lozier Decl. ¶ 17; Botimer Decl. ¶ 11, 14.)

**COF Resp. 2:**  Undisputed, but immaterial and redundant. (*See* Resp. 77.)

    3. Customers processed through Plaintiffs' TSA-approved 12-5 Program cannot mix with those processed at Terminal TSA. (Drabinsky Decl. ¶ 16; Lozier Decl. ¶ 17; Botimer Decl. ¶ 14.)

**COF Resp. 3:**  Partially disputed; customers on Plaintiffs' arriving flights could utilize the Terminal. (*See* ¶¶ 56–57).  Also, redundant. (*See* Resp. 56 & 58.)

    4. The County did not know the purpose of (1) the nine seat/sales to public limitation; or (2) the TUP enforcement other than it is County law. (McDonald Tr. 163:21-164:2,118:13-25.)

**COF Resp. 4:**  Disputed. (*See* ¶ 82 (citing Local Law 17-2005 at C895.)

    5. Passenger allocations at the Terminal are limited. Only 240 passengers can enplane or

deplane every half-hour from 5:30 a.m-12:00 a.m. From 12:00-6:30 a.m. there is also a strongly encouraged curfew. (Gasparri Tr. 263:7-266:8, 274:19-275:24; Rumbarger Tr. 35:12-16, 36:5-15.)

**COF Resp. 5**:  Undisputed, but immaterial.

## II.    Airport Noise and Capacity Act ("ANCA") Claim

6. The 2004 TUPs applied only to use of the HPN Terminal and Terminal ramp, at which Plaintiffs have never operated. (C874;Drabinsky Decl. ¶ 23; Lozier Decl. ¶ 10; Botimer Decl. ¶ 7.)

**COF Resp. 6**:  Partially disputed; the TUPs apply to all of HPN and direct which HPN-based activities must occur at the Terminal. (*See* LWC § 712.462.)

7. Plaintiffs do not offer scheduled passenger services under federal regulations. (14 C.F.R. § 110.2 (Part 380 "on demand"); C1393-94; C1397; Scherrer Tr. 51:24-53:10, 233:3-234:24.)

**COF Resp. 7**:  Undisputed, but immaterial.  Plaintiffs offer "Passenger Service" as that term is defined in the TUPs. (*See* LWC § 712.462.)

8. Part 380 indirect carriers like Plaintiffs were first referenced in Policy No. 1's definition of "Single Seat Charter Operators," a term the County created.  This term is not used in federal regulations or the industry. (C874-888; and LWC § 712.462Gasparri Tr. 76:13-77:10;171:24-172:13; Rumbarger Tr. 57:23-58:3;84:5-85:23; Chaifetz Tr. 49:13-19; Scherrer Tr. 80:5-11.)

**COF Resp. 8**:  Partially disputed; the TUPs explicitly apply to "Airlines providing Passenger Service," a term that encompasses Plaintiffs. (*See* LWC § 712.462(1).)

9. Plaintiff Delux does not sell seats to the public. (Drabinsky Decl. ¶ 4.)

**COF Resp. 9**:  Undisputed, but immaterial; JSX—Delux's parent company—sells seats to the public. (*See* ¶ 3; Complt. ¶ 16.)

10. The County tracked data for Part 121 commercial carriers, but not Part 135 or Part 380 carriers prior to late 2020. (Rumbarger Tr. 24:17-25:13, 27:2-10; Gasparri Tr. 169:12-16.)

**COF Resp. 10**:  Undisputed, but immaterial.

11. The 2005 Amendment and Policy No. 1 restrict Plaintiffs' access to FBOs and HPN. (Drabinsky Decl., ¶¶ 34-35; Lozier Decl. ¶ 27; Botimer Decl. ¶ 20; Rumbarger Tr. 119:22-120:6.)

**COF Resp. 11:** A legal conclusion and disputed. (*See* ¶¶ 49, 57.)

### III.   Airline Deregulation Act ("ADA") Claim

12. Policy No. 1/County's TUP reading affect Plaintiffs' pricing, routes, and/or services.

**COF Resp. 12:** A legal conclusion and disputed. (*See* ¶ 64.)

13. If required to operate at the Terminal, even only for enplaning, Plaintiffs would be unable to provide their federally authorized service at HPN. (Drabinsky Decl. ¶ 24, 35, 36; Lozier Decl. ¶¶ 11, 13-14, 28-29; Botimer Decl. ¶¶ 11, 12, 14, 23; Lozada Tr. 95:11-96:7.)  Nor could they continue to offer other valuable services, such as valet and shuttle, concierge, special catering, private lounges, specialized health and safety protocols, and faster check-in and boarding. (Drabinsky Decl. ¶¶ 36; Lozier Decl. ¶¶ 28-29; Botimer Decl. ¶ 12; Tomkiel Tr. 160:6-161:22.) Plaintiffs would also be forced to use SIDA TSA, a different protocol than their TSA 12-5. (Gasparri Tr. 160:3-166:12; Drabinsky Decl. ¶ 34; Lozier Decl. ¶¶ 28-29; Botimer Decl. ¶ 22.)

**COF Resp. 13:** Disputed. (*See* ¶ 60.)

14. Plaintiffs also serve the immunocompromised, elderly, and disabled who want less touchpoints, people flying with non-service pets, and those desiring easier boarding, which they could not offer at the Terminal. (Drabinsky Tr. 187:12-188:24; Drabinsky Decl. ¶ 6; Botimer Decl. ¶ 6;Lozier Decl. ¶ 6.) JSX also has an autism certification it would lose. (Drabinsky Tr. 195:7-19.)

**COF Resp. 14:** Undisputed, but immaterial.

15. At the Terminal, Plaintiffs will be newly subject to the lottery system and will be unable to fly their current routes either for lack of available gates or remaining passenger allocations. Plaintiffs would be left with slots (if any) that passengers don't want. (Tomkiel Tr. 171:17-172:11; Drabinsky Tr. 216:17-218:4; McDonald Tr. 173:25-175:2; Rumbarger Ex. 2; Rumbarger Tr.

51:15-52:15; Gasparri Tr. 267:21-268:8, 274:2-18, 283:9-22; Mahmoud Decl. Ex. A.)

**COF Resp. 15:** Disputed. (*See* McDonald Tr. 174:6–175:2; Rumbarger Tr. 35:6–40:4.)

16. The FAA did not evaluate any version of the TUP's for ADA compliance.  (C9479.)

**COF Resp. 16:** Undisputed, but immaterial.

17. The County does not understand Plaintiffs' services and did not determine how Policy No. 1 would affect their services. (Rumbarger Tr. 126:15-127:25, 128:20-24; Gasparri Tr. 95:23-96:15, 193:15-22; McDonald Tr. 154:5-18; Latimer Tr. 94:3-95:7, 114:14-115:10, 138:7-139:8.)

**COF Resp. 17:** Immaterial and unsupported by the cited evidence.

## IV.    Equal Protection Claim (Facts may also relate to ADA claim)

18. Corporate charters, Part 91 carriers, sports teams, other common-purpose groups chartering aircraft from HPN's FBOs under Part 135 have no limitation on the number of flights or passengers. (Rumbarger Tr. 92:3-95:4; Tomkiel Tr. 147:17-150:3.)

**COF Resp. 18:**  Disputed; the TUP applies to HPN air service irrespective of the part under which an Airline operates. (*See* LWC § 712.462.)

19. AvPorts was inconsistent on whether carriers with memberships fell under the TUPs. (*See* Scherrer Tr. 116:14-117:16, 133:10-25, 241:13-25; Rumbarger Tr. 86:20-88:13; C8149.)

**COF Resp. 19:** Disputed and unsupported by the cited evidence.

20. The County considered Yellowstone, and similar clubs, to be a Part 135 operator not subject to the TUP even though they sell seats to segments of the public on aircraft designed for more than 9 seats. (C1404; Scherrer Tr. 241:13-25; Rumbarger Tr. 89:18-90:23.)

**COF Resp. 20:** Disputed. (*See* ¶ 71; 14 C.F.R. § 212.5.)  Redundant. (*See* Resp. 71.)

21. The County has provided no rational reason Plaintiffs must go to the Terminal but other Part 135s can stay at FBOs. (McDonald Tr. 118:13-25,163:21-164:2; Gasparri Tr. 75:20-76:12.)

**COF Resp. 21:** Disputed. (*See* ¶¶ 42–44 (citing, *inter alia*, C893–94, C896, C899–914.)

22. Requiring Plaintiffs to operate from the Terminal increases passenger traffic in the Terminal. (Drabinsky Decl. ¶ 33; Rumbarger Tr. 140:24-141:8, 141:23-142:14.)

**COF Resp. 22:** Undisputed, but immaterial; directing passenger traffic within a municipal airport is a quintessential proprietary right of the municipality. (*See* 49 U.S.C. § 41713(b)(3).)

23. Policy No. 1 will increase flights. Customers will charter entire aircraft or aggregate on one with less than 9 seats. (Drabinsky Decl. ¶ 9; Lozier Decl. ¶¶ 15-16; Scherrer Tr. 265:22-266:3.)

**COF Resp. 23:** Immaterial, inadmissible, and speculative. Plaintiffs' (non-expert) 30(b)(6) witnesses merely opined on this matter at their depositions.

## V.   Plaintiffs' Equitable Defenses of Waiver, Estoppel, and Laches

24. In 2015, JetSmarter and Blade filed public prospectuses disclosing they intended to fly at HPN aircraft designed for more than 9. (*See e.g.,* C9364, C9369; C978; C985; *see also* Mahmoud Decl. Ex. B; Rumbarger Tr. 192:24-193:25, 195:19-196:18; Lozier Tr. 26:24-27:7.)

**COF Resp. 24:** Undisputed, but immaterial.

25. Blade and XO widely advertised their services at HPN since 2015. (BLD_10335-10337; BLD_3-8; BLD_35-45; BLD_79-81; BLD_60-78; BLD_54-59; Rumbarger Ex. 27.)

**COF Resp. 25:** Undisputed, but immaterial.

26. In April 2018, County/Avports discussed a policy from citizens that stated "JetSmarter . . .bills itself as the 'Uber for private jets,' to promote its operation at HPN." (C1128, C1139.)

**COF Resp. 26:** Undisputed, but immaterial.

27. AvPorts was notified Blade was investing to create a dedicated customer lounge at Million Air. (Lozier Decl. ¶ 22; C1242; C1244; Scherrer 197:16-199:8.).)

**COF Resp. 27:** Undisputed, but immaterial.

28. The former and current Airport Manager's office overlooks the tarmac from which he/she could see Plaintiffs' planes taking off and landing. (Gasparri Tr. 96:11-97:19.)

**COF Resp. 28:** Undisputed, but immaterial.

29. Even if Plaintiffs employed memberships they would be subject to enforcement of the TUPs. (Rumbarger Tr. 88:7-13; Gasparri Tr. 128:7-129:15; C8419-8154.)

**COF Resp. 29:** Undisputed, immaterial, and speculative.

30. Dave Montiverdi, HPN Operations Supervisor, invited JSX to operate out of the FBOs stating the TUPs would not apply. (Drabinsky Tr. 113:19-129:24, JSX204-JSX205.)

**COF Resp. 30:** Undisputed but immaterial, as Montiverdi had no authority to invite JSX to operate out of the FBOs and his understanding of the TUPs' applicability is not controlling. (Gasparri Tr. 102:24–13, 108:22–109:4, 112:17–18, 113:21–25.)

31. Policy No. 1 was issued after advocacy against HPN expansion. (C8530; Scherrer Ex. 8 at 3.) These activists rallied against former County Exec. Astorino, who sought to privatize and expand HPN, and for County Exec. Latimer who promised to curb expansion. (McDonald Tr. 167:22-170:6; Latimer Tr: 22:5-28:7; Scherrer Tr. 108:3-110:9, 123:10-125:12.)

**COF Resp. 31:** Disputed, cited authority does not support the proposition, and Policy No. 1 offered potential solutions for those public charter operators displeased by the County's enforcement of the TUP. (*See* ¶ 56.)

32. Plaintiffs invested significant time and money at HPN and would lose millions if Policy No. 1 is now enforced. (Botimer Decl. ¶ 24; Drabinsky Decl. ¶¶ 40-43; Lozier Decl. ¶¶ 30.)

**COF Resp. 32:** Disputed; whether Plaintiffs would "lose millions if Policy No. 1 is now enforced" is both immaterial and inadmissible as speculative.

Dated: May 5, 2023

**TROUTMAN PEPPER HAMILTON**       **JOHN M. NONNA**
**SANDERS LLP**       Westchester County Attorney
*Attorneys for Plaintiffs*       *Attorney for County*

By   /s Steven D. Allison          By                      
     Steven D. Allison                   Sean T. Carey
     Samrah R. Mahmoud            David H. Chen
     5 Park Plaza, Suite 1400         148 Martine Avenue, Suite 600
     Irvine, CA 92614                   White Plains, NY 10601