# Exhibit I
# FAA Letter



U.S. Department
of Transportation
**Federal Aviation
Administration**

800 Independence Ave., S.W.
Washington, D.C. 20591

JUN 9 2004

Peter J. Kirsch, Esq.
Kaplan, Kirsch & Rockwell LLP
1675 Broadway, Suite 2300
Denver, CO 80202

   RE: Proposed Codification and Modification of Terminal Capacity Restrictions at
      Westchester County Airport

Dear Mr. Kirsch:

This is in response to an April 20, 2004 request from Westchester County (County) for the views of the Office of the Chief Counsel, Federal Aviation Administration (FAA) concerning the County's proposal to take several actions with regard to its use restrictions and limitations in effect at Westchester County Airport (Airport). We understand that you represent the County in this matter. The County's restrictions include limitations on passenger throughput of the Airport terminal, limitations on the number of gates available for scheduled commercial passenger operations, a lottery mechanism to allocate terminal capacity and to ensure competition among commercial air carriers, and technical specifications based upon such factors as runway weight limitations[1] and aircraft fuselage length.

You have advised that recently it has become clear to the County that its existing Airport use restrictions (set forth in various resolutions, policies, and agreements) were difficult to understand, especially for Airport users. As a result, you reported that in connection with negotiations with the air carriers for renewal of the County's 1994 Terminal Capacity Agreement – which is set to expire at the end of 2004 – the County believes it would be prudent to collect and codify existing legal requirements so that all use restrictions would be more easily accessible.[2] Specifically, the County proposes to take the following actions: (1) codify and clarify existing legal restrictions; (2) extend and renew the existing Airport terminal use agreement with air carriers who use the commercial passenger terminal by entering into a new terminal use agreement; and (3) codify and modify

---

[1] In a notice published on July 1, 2003, *Weight-Based Restrictions at Airports: Proposed Policy* (68 Fed. Reg. 39176), the FAA affirmed its policy that reasonable weight-based access restrictions at airports can be used to protect airport pavement. Use of weight-based restrictions for other purposes, such as noise mitigation, would not be consistent with the airport operator's obligation to provide reasonable, not unjustly discriminatory access to the airport.

[2] As the County notes, not all operational constraints are appropriate for codification since some of the existing constraints are contractual or technical in nature because they affect only the business relationship between the County and the air carriers.

2

existing technical specifications and procedures for allocation of Airport capacity. According to the County, all changes will make the limitations less restrictive than those in effect today.

In this letter, we conclude that the proposed County actions are exempt from the Airport Noise and Capacity Act of 1990 (ANCA) since the actions relate to airport noise or access restrictions that were in effect on November 5, 1990 and would not "reduce or limit aircraft operations or affect aircraft safety." 49 U.S.C. § 47524(d)(4). We also advise that the FAA will not act to prevent adoption and approval of the proposed County actions under any transfer or grant agreements, and that the adoption and approval itself will not adversely affect future County grant applications under the Airport and Airway Improvement Act of 1982, as amended (AAIA), or applications to impose or collect passenger facility charges under 49 U.S.C. § 40117.

The County's March 16, 2004 submission, *Terminal Capacity Restrictions: Briefing Materials for FAA Staff*, assisted the FAA in reviewing and analyzing the County's proposed actions. The various timelines and tables of historic sources for the County's restrictions were especially helpful. The materials describe the history of the County's restrictions; the 1984 *Midway* litigation; the subsequent 1985 *Midway* stipulation; and air carrier agreement over the years with the County's terminal capacity limit, lottery system, and various technical limitations.

The material provided by the County indicates that there are currently three restrictions in effect at the Airport:

- The use of the Airport terminal is limited to 240 passengers per half-hour;
- Commercial air carriers are limited to four operations per half-hour to correspond to the four gate positions in the terminal. Two of these positions have historically been designated for aircraft with fuselages no longer than 85 feet and two for aircraft with fuselages up to 126 feet in length[3]; and
- Aircraft may not exceed 120,000 pounds maximum gross takeoff weight with dual landing gear. The County currently provides prior permission for operations up to 135,000 pounds maximum gross takeoff weight.

Passenger terminal space and terminal ramp space has been allocated through a lottery system since 1985.

The County proposes to codify, clarify, and/or modify its existing use restrictions through the adoption of three documents: (1) a new Terminal Use Agreement (TUA), which would be required to be executed by any carrier desiring to have terminal use privileges; (2) a new set of Terminal Use Procedures (TUP) which will be codified as a new Section 712.462 of the Laws of Westchester County; and (3) Technical Specifications and Procedural Requirements (TSPR) which would primarily codify existing regulations on Airport use and be promulgated by Airport management.

Through numerous consultations with air carriers and other interested stakeholders, the County

---

[3] In order to comply with airport design criteria and avoid obstructions, the County has historically limited aircraft length. The apron adjacent to the terminal is significantly constrained by the Airport fence and by obstructions outside the fence, by the proximity of the terminal and fence to active taxiways, by the need to allow space for ground handling equipment movements and by Object Free Area and similar constraints.

3

agreed to make the following changes to its existing use restrictions. As the County points out, these changes, if implemented, would have the effect of relaxing, rather than limiting, certain existing use restrictions at the Airport:

- Upon completion of pending engineering analysis, the County expects that it will be able to revise the Airport's technical specifications to accommodate commercial aircraft with longer overall fuselage length than currently allowed. The length limitations would/could be revised from the current 85 feet (for the two shorter terminal apron positions) to 107 feet, and from 126 feet (for the two longer terminal apron positions) to 130 feet. This would/could accommodate, among other aircraft, the Boeing 737-800 which exceeds current technical specifications.
- At the request of the air carriers, the County has prepared an updated analysis of its runway pavement capacity of 120,000 pounds, dual wheel. At this time, the County expects to be able to accommodate aircraft weighing up to 180,000 pounds certificated maximum gross takeoff weight on a prior-permission basis based upon forecast operations through at least 2010. The County proposes to issue a blanket prior permission to air carriers who execute the TUA to provide service consistent with their slot allocations.

At the request of the air carriers, the County has also agreed to make several changes which govern the air carriers' use of the terminal. These changes are not restrictions but instead reflect an adjustment of the business relationship between the County and the carriers. The TUA contains commitments by the County to:

- Construct jet bridges for regional jets if so requested;
- Implement a system of allocation of limited terminal building space for proprietary electronic ticket kiosks;
- Refurbish ticket and gate counter areas; and
- Utilize its best efforts to construct secure overnight parking for commercial aircraft.

The County advises that none of these changes would reduce or limit aircraft operations from the airport's current levels or affect aircraft safety.

The issues for FAA review include whether the County's proposed codification, clarifications, and modifications are in compliance with ANCA, and whether they are consistent with the County's contractual grant assurance obligations under the AAIA.

Application of the Airport Noise and Capacity Act of 1990

Under Federal law, sponsors of federally-funded airports like the County must comply with the national program for review of airport noise and access restrictions under ANCA before implementing restrictions on operations by Stage 2 and/or Stage 3 aircraft. ANCA applies to airports imposing restrictions on Stage 2 aircraft operations proposed after October 1, 1990, and to airports imposing restrictions on Stage 3 aircraft operations that became effective after October 1, 1990. 14 C.F.R. § 161.3(a). Airport noise or access restrictions proposed (Stage 2) or enacted (Stage 3) prior to these deadlines are "grandfathered" under ANCA and are therefore not subject to its requirements. 49 U.S.C. §§ 47524(b), 47524(c)(1); 14 C.F.R. § 161.3(a). In addition, certain
COW-00009473

4

restrictions are exempt from ANCA, including "a subsequent amendment[4] to an airport noise or access agreement or restriction in effect on November 5, 1990, that does not reduce or limit aircraft operations or affect aircraft safety." 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.7(b)(4).

Since Westchester County has had three restrictions in effect since 1985, the restrictions are grandfathered under ANCA. 49 U.S.C. §§ 47524(b), 47524(o)(1); 14 C.F.R. § 161.3(a). The legislative history shows that County Resolution 59-1985, which adopted the use restrictions contained in the 1985 Stipulation, has been in continuous effect since 1985. Another Resolution which adopted a new "Statement of Airport Policy" (which incorporates the terminal capacity limitation established in the Stipulation) has also been in effect since 1985. In addition, to the extent that the proposed County actions amend the two Resolutions, the actions would constitute "a subsequent amendment to an airport noise or access agreement or restriction in effect on November 5, 1990, that does not reduce or limit aircraft operations or affect aircraft safety" and are therefore exempt from ANCA and Part 161. 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.7(b)(4).

In order for the County's existing use restrictions to be grandfathered under ANCA, there must have been an airport noise or access restriction proposed (Stage 2) or enacted (Stage 3) on or before October 1, 1990. The materials submitted by the County indicate that existing use restrictions were in effect at the Airport on or before October 1, 1990. The fact that the current terminal use agreements with the air carriers expire on December 31, 2004, does not affect the grandfathered status of the underlying use restrictions under ANCA.

According to the County, the first expression of its policies concerning use of the terminal occurred in 1980 when a consultant completed a Master Plan Study Phase II Report which determined, among other things, that the practical hourly capacity of the Airport was between 60 and 125 aircraft operations per hour, depending upon weather conditions, and that the Airport was currently operating at a level equal to its practical annual capacity. At the end of 1983, seven Part 121 air carriers and ten commuter air carriers expressed an interest in initiating new service at the Airport. Accordingly, in January 1984, the County hired a consultant to develop a comprehensive airport access plan and began to defer decisions on pending applications for commercial access until completion of the study and promulgation of rules.

The County's February 1984 deferral of Midway Airlines' application for access became the subject of litigation in March 1984 when Midway sued the County seeking injunctive relief to allow immediate access to the Airport.[5] While the Federal court denied Midway's motion for injunctive relief, it ordered the County to conclude its study within 30 days and "promulgate rational and nondiscriminatory rules governing the allocation of ground facilities ..." within 20 days thereafter. *Midway*, 584 F. Supp. at 441.

---

[4] Although the plain language of §47524(d)(4) states "a" subsequent amendment (and thus could be read to authorize only one amendment per airport), we interpret "a" to mean "any." *See Black's Law Dictionary* 1 (6th ed. 1999), "[t]he word "a" has varying meanings and uses. "A" means "one" or "any ...."

[5] *Midway Airlines, Inc. v. County of Westchester*, 584 F. Supp. 436 (S.D.N.Y. 1984).

The court's order resulted in the County's first formal limitation on the use of the Airport. On June 6, 1984, the County Board of Legislators approved Resolution 95-1984[6] which adopted numerous findings (e.g., that the existing terminal facility was utilized far beyond reasonable and safe levels during the peak hours of usage, and that terminal's reasonable passenger capacity was about 80 passengers per quarter-hour) and promulgated an auction mechanism to allocate available space to the air carriers. The Resolution specified that both the capacity and the allocation provisions were adopted on an interim basis, pending adoption of a final airport policy statement. Resolution 95-1984 was forwarded to the Federal district court judge on June 7, 1984.

In October 1984, 22 intervenor air carriers in the *Midway* litigation filed a complaint alleging the interim rules (i.e., Resolution 95-1984) violated Federal law. In February 1985, the County, the FAA, the National Business Aviation Association, and 13 air carriers entered into a *Stipulation and Order of Partial Settlement and Dismissal*. The parties agreed that the Airport's principal function "at present and in the foreseeable future" was one of "accommodating general aviation with an emphasis on business use; by comparison its commercial service function is relatively modest." Settlement Agreement at 4. The Stipulation set forth the following restrictions on the use of the Airport:

- Passenger throughput was to be limited to 240 passengers per half-hour;
- Passenger capacity was to be allocated through a slot-lottery mechanism;
- Apron space for air carriers was to be limited to four ramp positions, two of which were to be designed for aircraft with a wingspan under 75 feet, and the other two for aircraft with a wingspan in excess of 75 feet;
- Aircraft length was to be limited to 126 feet in order to comply with the Airport's Crash Fire Rescue (CFR) Index B capability;
- Aircraft weight was to be limited to 120,000 pounds maximum gross takeoff weight for aircraft with dual wheel landing gear;[7] and
- The County committed not to adopt any rule, regulation, or technical specification to decrease the capacity of the Airport.

The Stipulation contained a complex expiration clause which created two deadlines for changing the stipulated terms. An agreement to make changes was deemed to be reached if the County, the United States and a majority of the remaining parties to the Stipulation and other airlines then conducting operations at the Airport were in accord. The record indicates that the parties to the Stipulation invoked the second deadline:

> In the event the [parties] are not able to achieve such agreement by December 31, 1987, then the allocating mechanisms set forth herein shall be renewed for a two-year period

---

[6] According to the County, its use restrictions were initially promulgated through resolution (as opposed to regulation or ordinance) due to the short timeframes in the court order. The County has advised us that it is not known why subsequent articulations of the restrictions were not accomplished through regulation or ordinance.

[7] The County's weight-based restriction is included in County Resolution 59-1985 (appended as one of the technical specifications) and at some point in time (the County advises the date of codification is uncertain) was codified into § 712.411 of the Laws of Westchester County. It exists today in the Resolution, the ordinance, and in technical specifications attached to the air carrier terminal use agreements.

6

commencing May 1, 1988. The parties and the scheduled airlines then operating at the Airport may then, by an agreement as defined above, modify this Stipulation on or before December 31, 1989, such modifications, if any, shall become effective on May 1, 1990.

Stipulation and Order of Partial Settlement and Dismissal, Midway Airlines, Inc. v. FAA, 14.

In the event that no agreement on extension of the terms could be reached by the parties, the Stipulation and Order would have terminated on April 30, 1990. Because the parties agreed to modify the Stipulation on or before December 31, 1989 (accomplished through a terminal capacity agreement which the carriers then serving the Airport each signed), consistent with the Stipulation's expiration clause, the modified terms became effective on or before May 1, 1990. Thus, the Stipulation's termination clause was not invoked. Had the County not been able to reach an agreement with the air carriers as to the extension of the terms of the Stipulation, the Stipulation provided that "the County shall then be free to implement such allocation mechanism and such procedures as it may then deem appropriate and other parties hereto shall have the right to interpose such opposition or make such legal challenge to such mechanisms and procedures ...." Stipulation at 14. Thus, it would appear that the County had court-approved authority and consent of the parties to enact use restrictions at the Airport beyond and independent of the Stipulation.

The County authorized and implemented the Stipulation through the adoption of two Resolutions: (1) Resolution 58-1985, which approved the Stipulation and settlement and authorized the County Attorney to execute all necessary documents in the United States District Court; and (2) Resolution 59-1985, which repealed Resolution 95-1984 and implemented the access limits, allocation terms, and technical specifications as set forth in the Stipulation. Thus, among other things, Resolution 59-1985 states that the "normal operating capacity of the existing terminal at the Airport will be 240 passengers per half hour" and establishes an allocation mechanism for the Airport's terminal capacity among scheduled air carriers. Unlike the Stipulation, Resolution 59-1985 contains no termination provision. The Resolution states that

> In the event that ... there be no agreement to modify this Resolution ... then ... the County shall be free to either continue the allocation mechanisms then in effect or to adopt such new Statement of Airport Policy and such new airline allocation mechanism(s) as the County Board of Legislators may then deem appropriate.

Resolution 59-1985, paragraph 5(L) (February 28, 1985).

According to the materials provided to us by the County, the Board of Legislators has not repealed Resolution 59-1985 or otherwise modified the terms and conditions set forth therein. On its face, the February 28, 1985 Resolution does not contemplate termination of its provisions and has been continually enforced since its adoption and treated as the legislative authority for the current use restrictions at the Airport.

On October 8, 1985, the County Board of Legislators approved by Resolution 266-1985 a "Statement of Airport Policy" that declared a new policy for the use of the Airport (which compliments Resolution 59-1985), and was also intended as a "guide for the day to day management of the airport" and to provide information to the public, Airport users, and Airport neighbors about the role of the Airport in the community. This Resolution, which remains in effect today, provides for, among other things:

COW-00009476

- Terminal capacity shall not be increased beyond the level established in the Stipulation and authorized by the Board Resolution 58-1985;
- The Airport's capacity, measured in terms of its capability to accept annual numbers of aircraft operations, shall not be increased;
- Preparation of a revised Master Plan and a revised Airport Layout Plan (ALP) within six months;
- The ALP is to provide for improved passenger terminal facilities.
- The ALP is to contain no provision or contingency for any parallel runways.

A master plan update developed the concept of a new terminal building to be designed to accommodate 240 passengers each half-hour, the capacity of the existing terminal. Subsequent environmental approvals for the master plan update and new terminal building assumed the continuing existence of the 240 passenger per half-hour limit throughout the forecast periods.

In 1988, in contemplation of the County's plans to build the new terminal, the County and the air carriers entered into the 1988 Terminal Capacity Agreement (1988 TCA) to continue the terms set forth in the *Midway* Stipulation and to memorialize use provisions for the new terminal. Consistent with the Stipulation and Resolution 59-1985, the 1988 TCA limited the capacity of the proposed terminal to 240 passengers per half-hour but modified the passenger restriction to allow the calculation to be based on total passengers, without regard to whether the passengers were enplaning or deplaning. The parties agreed that the enforcement of the capacity limits would be as set forth in the Stipulation whether or not that Stipulation be extended, except that the terminal capacity limitation shall expire January 1, 1995 and shall thereafter be reassessed in light of experience and conditions current at the time. The parties agreed to several amendments to the Airport's technical specifications relating to ramp size and runway weight limitation (*i.e.*, an 18-month trial period to allow Boeing 737-300 aircraft with a maximum gross takeoff weight of up to 135,000 pounds to operate at the Airport). According to County Resolution 43-1989, the FAA reviewed and approved the 1988 TCA (although no FAA documentation is available to support this). The 1988 TCA remained in effect through 1994, when the County and the air carriers reaffirmed the terms and provisions related to the conduct of operations and committed to extend the capacity limits and regulations for an additional ten years.

Facing the expiration of the 1988 TCA and a new terminal building, the County and the air carriers entered into a new terminal capacity agreement in 1994 (1994 TCA) which reaffirmed the terms and provisions related to the conduct of Airport operations as described in the Stipulation and 1988 TCA, including the measurement of actual terminal usage and the enforcement of the capacity limits. The parties to the 1994 TCA also agreed that the capacity of the new terminal was still limited to 240 passengers per half-hour and agreed to continue the substance of the Stipulation and 1988 TCA through December 31, 2004. Like the 1988 TCA, the 1994 TCA provided that, upon expiration of the agreement, the parties could agree to continue existing terms, adopt newly agreed-to terms, or take appropriate actions to protect their respective interests. The 1994 TCA did not modify any of the substantive restrictions contained in the 1988 TCA. The FAA's New York Airports District Office reviewed the 1994 TCA and consented

> to the extension of the 1985 Stipulation since it has been voluntarily entered into by the County and the airlines and since it merely extends a previously negotiated settlement. The

8

FAA consents with the understanding that the agreement allows access to the airport on fair and reasonable terms, without unjust discrimination and provides access on reasonable terms to new entrants.

Letter from Philip Brito, Manager, New York Airport District Office, FAA, to Joseph J. Petrocelli, Acting Commissioner, Westchester County (September 28, 1994).

To summarize:

- The Airport's current use restrictions derive from the 1985 Federal District Court Stipulation and Order, the essential terms of which were set forth in the County's February 28, 1985 Resolution 59-1985, and reflected in part in the County's October 8, 1985 Resolution 266-1985.
    - The Resolutions resulted from the Stipulation and Order to which the FAA and numerous air carriers were parties.
    - The Resolutions were adopted prior to 1990 when ANCA was enacted and have been continuously in effect since their adoption. They remain in effect today and do not contain expiration dates.
- The FAA was a party to the 1985 Stipulation, appears to have consented to the 1988 TCA, and expressly consented to the 1994 TCA.
- Since 1985, air carriers serving the Airport have consented to the use restrictions. At times, the County has modified the restrictions to accommodate air carrier needs. In exchange for carrier consent, the County has agreed since 1985 not to decrease the capacity of the Airport.[8]

Based upon the above, we can conclude that Westchester County has had an access restriction in effect on or before October 1, 1990, and as a result, the County's restriction is "grandfathered" under ANCA and is therefore not subject to its requirements. 49 U.S.C. §§ 47524(b), 47524(c)(1); 14 C.F.R. § 161.3(a). Further, the County's current proposed actions to codify, revise, or modify its three use restrictions constitute "a subsequent amendment[9] to an airport noise or access agreement or restriction in effect on November 5, 1990, that does not reduce or limit aircraft operations or affect aircraft safety." 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.7(b)(4). If the County's actions are not found to "reduce or limit aircraft operations or affect aircraft safety," then the County is exempt from the requirements of ANCA and Part 161. As noted above, we find that the County is so exempt.

As noted above, the current restrictions at the Airport are as follows:

- The use of the Airport terminal is limited to 240 passengers per half-hour;

---

[8] If the County decides in the future to take an action that reduces or limits aircraft operations or affects aircraft safety, it would have to comply with ANCA and Part 161.

[9] Although the plain language of §47524(d)(4) states "a" subsequent amendment (and thus could be read to authorize only one amendment per airport), we interpret "a" to mean "any." See Black's Law Dictionary 1 (6th ed. 1999), "[t]he word "a" has varying meanings and uses. "A" means "one" or "any ...."

COW-00009478

9

- Commercial air carriers are limited to four operations per half-hour to correspond to the four gate positions in the terminal. Two of these positions have historically been designated for aircraft with fuselages no longer than 85 feet and two for aircraft with fuselages up to 126 feet in length; and
- Aircraft may not exceed 120,000 pounds maximum gross takeoff weight with dual landing gear. The County currently provides prior permission for operations up to 135,000 pounds maximum gross takeoff weight.

Under the proposed TUP, TUA, and TSPR, the Airport terminal's limitation of 240 passengers per half-hour remains unchanged. While four gate positions remain, as noted, the County has already agreed to revise the length of aircraft fuselages permitted from the current 85 feet (for the two shorter terminal apron positions) to 107 feet, and from 126 feet (for the two longer terminal apron positions) to 130 feet. The County has also revised its maximum gross takeoff weight limitation from 135,000 to 180,000 pounds. The latter two changes will accommodate new types of aircraft at the Airport. Nothing in the County's proposed TUP, TUA, and TSPR reduces or limits aircraft operations or affects aircraft safety within the meaning of ANCA and Part 161.

As you know, airport access restrictions are also subject to other applicable Federal law in addition to ANCA, including the Airport Improvement Program ("AIP") grant assurances prescribed by 49 U.S.C. §47101, *et seq*. Compliance with the provisions of ANCA does not ensure compliance with other Federal law.

Application of Westchester County's Grant Assurance Requirements

The County has accepted grants under the Airport Improvement Program (AIP), 49 U.S.C. § 47101 *et seq.*, and is obligated by the assurances in its contractual grant agreements with the FAA. Obligations under the grant assurances include the obligation to provide access by air carriers on reasonable and not unjustly discriminatory terms. We find nothing in the proposed actions by the County – codifying and clarifying existing legal restrictions, extending and renewing the existing Airport terminal use agreements with the air carriers, and codifying and modifying existing technical specifications and procedures for allocation of terminal space and gates – that is inconsistent at this time with its grant assurances.

We also note that the aircraft length, wingspan, and takeoff weight limitations in the TSPR appear to be based on physical limitations of airfield and terminal facilities. There are references in the historical record to the fuselage length limitation being based on the airport rescue and fire fighting (ARFF) index under 14 C.F.R. §139.315. We would not consider the current ARFF[10] index of the Airport to represent a reasonable basis for a permanent restriction on access to the Airport. However, the County did not cite the ARFF index in any of the current materials submitted to the FAA for review, and the technical requirements are adequately supported by the physical facility limitations of the Airport pavement and terminal area.

For almost 20 years, the County has employed an allocation system to ensure that limited terminal and apron capacity is made available to all carriers. We note that air carriers have three times voluntarily entered into terminal use agreements with the County for commercial access. At this

---

[10] Airport rescue and firefighting (ARFF) equipment used to be denoted as "crash, fire, and rescue" (CFR).

COW-00009479

time, no air carrier to our knowledge is raising issues of noncompliance with the proposed TUA or other proposed County actions relating to the Airport. The County appears to have addressed most if not all of the air carriers' concerns regarding access to the Airport (e.g., accommodating new types of air carrier aircraft).

As noted above, the FAA will not act to prevent adoption and approval of the proposed County actions under any transfer or grant agreements, and that the adoption and approval itself will not adversely affect future County grant applications under the AAIA, or applications to impose or collect passenger facility charges under 49 U.S.C. §40117.

We considered the history and circumstances of the use restrictions in effect at Westchester County Airport, and that the County faced litigation in 1984 from numerous air carriers (led by Midway Airlines) seeking access to the Airport, resulting in the 1985 Stipulation. With the *Midway* litigation acting as a catalyst, the County has worked successfully over the years with the air carriers in providing reasonable access to both incumbent and new entrant carriers to the constrained Airport passenger facilities. We note that in the recent process of developing the TUP, TUA, and TSPR, the County has convened five formal consultation meetings with incumbent air carriers to solicit input about the effectiveness of the current use restrictions, possible modifications to the use restrictions, modifications to administrative arrangements, and review of technical specifications at the Airport. The County also made attempts to reach out to all potentially interested (but non-incumbent) air carriers and potentially affected carriers by providing these carriers with notice of all consultation meetings.

Finally, the opinions expressed above are not intended, and should not be construed, to apply to any other airport. The FAA looks forward to continue working with the County to ensure that its new period of operation under the TUA fully complies with Federal law.

I appreciate the time and effort that representatives of Westchester County have spent in meeting with representatives of the FAA and responding to our inquiries.

Sincerely,

James W. Whitlow
Deputy Chief Counsel
Office of the Chief Counsel