UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DELUX PUBLIC CHARTER, LLC
  d/b/a JSX AIR and JETSUITEX, INC.;

XO GLOBAL, LLC; and

BLADE URBAN AIR MOBILITY, INC.,

                    Plaintiffs,

        - vs -

COUNTY OF WESTCHESTER,

                    Defendant.

Civil Action No.
22-CV-01930 (PMH)

# MEMORANDUM OF LAW IN SUPPORT OF COUNTY OF WESTCHESTER'S MOTION FOR SUMMARY JUDGMENT

Date:   White Plains, New York
        August 31, 2023

**JOHN M. NONNA**
Westchester County Attorney
*Attorney for Defendants*
Michaelian Office Building
148 Martine Avenue, Room 600
White Plains, New York 10601

Sean T. Carey (SC8804)
Associate County Attorney, of Counsel

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTORY STATEMENT ......................................................................................1

STATEMENT OF FACTS....................................................................................................1

STANDARD OF REVIEW ...................................................................................................1

DISCUSSION .........................................................................................................................2

    I.    ADA Preemption Claim .............................................................................................2

        A.    Legal Standards .................................................................................................2

            1.    Preemption, Generally...........................................................................2

            2.    ADA's Express Preemption Provision ................................................3

            3.    ADA's Proprietor Exception..............................................................4

        B.    Analysis ..............................................................................................................4

            1.    ADA's Proprietor Exception..............................................................4

            2.    **ADA's Express Preemption Provision**........................................7

    II.    ANCA Preemption Claim .........................................................................................8

        A.    Legal Standard...................................................................................................8

        B.    Analysis ..............................................................................................................9

            1.    2004 TUP ...............................................................................................9

            2.    2005 Amendment................................................................................11

    III.    Equal Protection Claims...........................................................................................13

        A.    Legal Standards ...............................................................................................13

            1.    Class-of-One Claim .............................................................................13

            2.    Rational-Basis Review ........................................................................14

         B.    Analysis ............................................................................................................15

             1.    Plaintiffs Have Not Identified Similarly Situated Comparators .............15

            2.    The TUP Passes Rational Basis Review .................................................18

    IV.    Plaintiffs' Equitable Defenses...................................................................................20

        A.    Legal Standards ...............................................................................................20

        B.    Analysis ............................................................................................................21

    V.    Declaratory Judgment ..............................................................................................22

        A.    Legal Standard.................................................................................................22

        B.    Analysis ............................................................................................................23

CONCLUSION.....................................................................................................................24

# TABLE OF AUTHORITIES

## CASES

*Abdu-Brisson v. Delta Air Lines,*
  128 F.3d 77 (2d Cir. 1997) ..................................................................................8

*Air Transport Association of America v. Cuomo,*
  520 F.3d 218 (2d Cir. 2008) ..........................................................................3, 8

*American Airlines v. Wolens,*
  513 U.S. 219 (1995) ...........................................................................................3

*Baxtrom v. Herold,*
  383 U.S. 107 (1966) .........................................................................................14

*Boykin v. KeyCorp,*
  521 F.3d 202 (2d Cir. 2008) ..............................................................................9

*British Airways Bd. v. Port Auth. of N.Y. & N.J.,*
  558 F.2d 75 (2d Cir. 1977) ..........................................................................4, 21

*Brod v. Omya, Inc.,*
  653 F.3d 156 (2d Cir. 2011) ..............................................................................1

*Brodsky v. N.Y. City Campaign Fin. Bd.,*
  796 F. App'x 1 (2d Cir. 2019) .........................................................................23

*Chapman v. Priceline Grp., Inc.,*
  No. 15-CV-1519 (RNC),
  2017 U.S. Dist. LEXIS 162137 (D. Conn. Sept. 30, 2017) ...............................3

*CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP,*
  735 F.3d 114 (2d Cir. 2013) ..............................................................................2

*City of New York v. FedEx Ground Package,*
  351 F. Supp. 3d 456 (S.D.N.Y. 2018) .............................................................22

*City of New York v. Shalala,*
  34 F.3d 1161 (2d Cir. 1994) ............................................................................21

*Clear Channel Outdoor, Inc v. City of New York,*
  594 F.3d 94 (2d Cir. 2010) ..............................................................................20

*Clementine, Co., v. Adams,*
  74 F.4th 77, 2023 U.S. App. LEXIS 18448 (2d Cir. July 20, 2023) ................14

*Clubside, Inc. v. Valentin,*
  468 F.3d 144 (2d Cir. 2006) ......................................................................14, 18

*Cordiano v. Metacon Gun Club, Inc.,*
  575 F.3d 199 (2d Cir. 2009) ..............................................................................2

*Dan's City Used Cars, Inc. v. Pelkey,*
  569 U.S. 251 (2013) ...........................................................................................3

*Delta Air Lines, Inc. v. New York City Department of Consumer Affairs,*
   564 F. Supp. 3d 109 (E.D.N.Y. 2021).............................................................3

*Drever v. State of New York,*
   18 N.Y.S.3d 207 (App. Div. 2015)..............................................................22

*Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.,*
   411 F.3d 384 (2d Cir. 2005).......................................................................23

*Eldars v. State Univ. of N.Y.,*
   Nos. 20-2693 (Lead), 20-4255 (Con),
   2021 U.S. App. LEXIS 30213 (2d Cir. Oct. 8, 2021) .................................14

*F.C.C. v. Beach Commc'ns,*
   508 U.S. 307 (1993)..................................................................................15

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
   152 F. Supp. 3d 90 (E.D.N.Y. 2015),
   *vacated in part on other grounds*
   *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
   841 F.3d 133 (2d Cir. 2016).......................................................................4

*Gayle v. Pfizer, Inc.,*
   452 F. Supp. 3d 78 (S.D.N.Y. 2020) ...........................................................2

*Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n,*
   634 F.3d 206 (2d Cir. 2011)........................................................................8

*Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n,*
   681 F. Supp. 2d 183 (D. Conn. 2010),
   *aff'd* 634 F.3d 206 (2d Cir. 2011) ..............................................................9

*Heller v. Doe,*
   509 U.S. 312 (1993)..................................................................................15

*Holve v. McCormick & Co.,*
   334 F. Supp. 3d 535 (W.D.N.Y. 2018).........................................................3

*Hu v. City of New York,*
   927 F.3d 81 (2d Cir. 2019)...................................................................14, 18

*JLNW, Inc. v. National Retirement Fund.,*
   No. 18-CV-9156 (AJN),
   2019 U.S. Dist. LEXIS 164381 (S.D.N.Y. 2019)...........................................9

*Kwong v. Bloomberg,*
   723 F.3d 160 (2d Cir. 2013)..................................................................14, 20

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986)....................................................................................2

*Midway Airlines, Inc. v. County of Westchester,*
   584 F. Supp. 436 (S.D.N.Y. 1984) ...................................................4, 5, 6, 21

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374 (1992) ..................................................................................3

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
  138 S. Ct. 1461 (2018) ..............................................................................2

*N.Y. State Med. Transporters Ass'n v. Perales*,
  566 N.E.2d 134 (N.Y. 1990) ...................................................................20

*Nat'l Helicopter Corp. of Am. v. City of New York*,
  137 F.3d 81 (2d Cir. 1998) .............................................................4, 6, 7

*Nevada v. United States*,
  463 U.S. 110 (1983) ................................................................................20

*New York v. FedEx Ground Package Sys.*,
  314 F.R.D. 348 (S.D.N.Y. 2016) ......................................................20, 22

*New York v. United Parcel Serv., Inc.*,
  160 F. Supp. 3d 629 (S.D.N.Y. 2016),
  *vacated in part on reconsideration by*
  No. 15-CV-1136 (KBF),
  2016 U.S. Dist. LEXIS 201153 (S.D.N.Y. June 21, 2016) .......................20, 22

*Northwest, Inc. v. Ginsberg*,
  572 U.S. 273 (2014) ..................................................................................3

*Progressive Credit Union v. City of New York*,
  889 F.3d 40 (2d Cir. 2018) ...........................................................13, 14, 15, 18

*Puerto Rico v. Franklin California Tax-Free Trust*,
  579 U.S. 115 (2016) ..................................................................................2

*Rojas-Reyes v. I.N.S.*,
  235 F.3d 115 (2d Cir. 2000) ...................................................................21

*Roman v. Evans*,
  517 U.S. 620 (1996) ................................................................................14

*Rowe v. New Hampshire Motor Transport Association*,
  552 U.S. 364, 370 (2008) ..........................................................................3

*Ruston v. Town Bd. for the Town of Skaneateles*,
  610 F.3d 55 (2d Cir. 2010) .................................................................14, 18

*Sensational Smiles, LLC v. Mullen*,
  793 F.3d 281 (2d Cir. 2015) .................................................................15, 20

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ..................................................................................9

*United States. v. New York*,
  552 F. Supp. 255 (N.D.N.Y. 1982),
  *aff'd* 708 F.2d 92 (2d Cir. 1983) ...........................................................22

*Utah Power & Light Co. v. United States,*
 243 U.S. 389 (1917) ...........................................................................................20

*Village of Willowbrook v. Olech,*
 528 U.S. 562 (2000) ...........................................................................................13

*Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.,*
 373 F.3d 241 (2d Cir. 2004) .................................................................................1

*Wallace v. City of New York,*
 No. 20-CV-1424 (KPF),
 2021 U.S. Dist. LEXIS 246760 (S.D.N.Y. Dec. 28, 2021)...........................................22

*Washington v. N.Y. City Dep't of Educ.,*
 740 F. App'x 730 (2d Cir. 2018) ..........................................................................23

*Western Air Lines, Inc. v. Port Authority of New York and New Jersey,*
 817 F.2d 222 (2d Cir. 1987) ..............................................................................4, 6

*Western Air Lines, Inc. v. Port Authority of New York and New Jersey,*
 658 F. Supp. 952 (S.D.N.Y. 1986),
 *aff'd* 817 F.2d 222 (2d Cir. 1987) ..........................................................................4

*Wrobel v. County of Erie,*
 692 F.3d 22 (2d Cir. 2012) ...................................................................................2

## CONSTITUTIONAL PROVISIONS

U.S. Const. art. VI, cl. 2..........................................................................................2

## STATUTES

28 U.S.C. § 2201.................................................................................................22

49 U.S.C. § 41713(b)(1) ........................................................................................3

49 U.S.C. § 41713(b)(3) ........................................................................................4

49 U.S.C. § 44706..............................................................................................19

49 U.S.C. § 47524(b), (c)(1), (d) ....................................................................8, 9, 13

Airport Noise and Capacity Act of 1990 ("ANCA"),
 Pub. L. No. 101-508 §§ 9301–09, 104 Stat. 1388, 378–84
 (recodified at 49 U.S.C. §§ 47521–34)...................................................................8

Fed. R. Civ. P. 12(b)(6) ........................................................................................18

Fed. R. Civ. P. 56 .................................................................................................1

Fed. R. Civ. P. 57 ...............................................................................................22

## REGULATIONS

14 C.F.R. § 1.1..................................................................................................17

14 C.F.R. § 91.147..............................................................................................18

14 C.F.R. § 91.501 ..................................................................................................16, 18

14 C.F.R. Part 91, Subpart K ........................................................................................18

14 C.F.R. § 110.2 ...................................................................................................16, 20

14 C.F.R. § 135.411 ......................................................................................................19

14 C.F.R. § 161.3 ..................................................................................................8, 9, 13

14 C.F.R. § 212.5 ...................................................................................................16, 17

14 C.F.R. § 298.50 ........................................................................................................16

**OTHER AUTHORITIES**

Airport Improvement Program (AIP) Grant Assurances,
  79 Fed. Reg. 18,755 (Apr. 3, 2014) ................................................................5

Black's Law Dictionary
  (Delux 11th ed. 2019) ....................................................................................21

Civil Aeronautics Authority Regulation 400–1(a),
  3 Fed. Reg. 2,515 (Oct. 20, 1938) .................................................................13

Eileen M. Gleimer,
  *Corporate Aircraft Operations: The Twilight Zone of Regulation*,
  62 J. Air L. & Com. 987 (1997)......................................................................17

FAA Advisory Circular 120-12A,
  Private Carriage Versus Common Carriage of Persons or Property (Apr. 24,
  1986)..........................................................................................................17, 20

*In re Large Irregular Carriers, Exemptions*,
  11 C.A.B. 609 (1950) .....................................................................................13

Laws of Westchester County § 712.391 ..........................................................................5

Laws of Westchester County § 712.462 ............................................................1, 7, 21, 22

Regulatory Review Program; Air Taxi Operators and Commercial Operators,
  43 Fed. Reg. 46,742 (Oct. 10, 1978)..............................................................19

Special Federal Aviation Regulation No. 38-2; Certification and Operating Requirements,
  50 Fed. Reg. 23,941 (June 7, 1985)
  (codified at SFAR 38-2 (14 C.F.R. Parts 121, 125, 127, 129, and 135)) .........13

## INTRODUCTORY STATEMENT

In 2004, Westchester County codified its then-existing Westchester County Airport use procedures (the "2004 Terminal Use Procedures" or "2004 TUP"). The following year, it amended those procedures (the "2005 Amendment"). As detailed below, both the 2004 TUP and the 2005 Amendment complied with the Airline Deregulation Act of 1978 ("ADA") and the Airport Noise and Capacity Act of 1990 ("ANCA"). Furthermore, there are no issues of fact precluding this Court from confirming this result.

For the reasons set forth in these motion papers, the Court should dismiss Plaintiffs' twin preemption claims, dismiss Plaintiffs' equal protection claim, and grant the County a Declaratory Judgment confirming that the current iteration of the TUP, now codified at Section 712.462 at the Laws of Westchester County ("LWC"), is not preempted by the ADA or by ANCA.

## STATEMENT OF FACTS

The County relies on the facts set forth in its accompanying Rule 56.1 Statement.

## STANDARD OF REVIEW

Summary judgment is appropriate where a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted).

"It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted). "However, '[w]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's

claim." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quoting *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009) (alteration in original)). Furthermore, to survive a summary judgment motion, a nonmovant "need[s] to create more than a 'metaphysical' possibility that his allegations [are] correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial." *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (emphasis omitted)).

## DISCUSSION

I.    <u>ADA Preemption Claim</u>

    *A.*    *Legal Standards*

        **1.**    **Preemption, Generally**

The preemption doctrine is rooted in the Supremacy Clause of the United States Constitution, which provides that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.  Under the doctrine, where state and federal law conflict, the latter prevails. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1479 (2018); *Gayle v. Pfizer, Inc.*, 452 F. Supp. 3d 78, 86 (S.D.N.Y. 2020).

In *Puerto Rico v. Franklin California Tax-Free Trust*, 579 U.S. 115 (2016), the Court held that where "[a] statute contains an express pre-emption clause, [courts] do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Id.* at 135.  But while the presumption against preemption has fallen away, a party arguing in favor of preemption *still* "bears a heavy burden." *See, e.g., Chapman v. Priceline Grp., Inc.*, No. 15-CV-1519 (RNC), 2017 U.S. Dist. LEXIS 162137, at *5 (D.

Conn. Sept. 30, 2017); *see also, e.g., Holve v. McCormick & Co.*, 334 F. Supp. 3d 535, 553–54 (W.D.N.Y. 2018).

### 2.     ADA's Express Preemption Provision

The ADA's express preemption provision provides that "[a] political subdivision of a State . . . may not enact or enforce a law, regulation or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1); *see also Am. Airlines v. Wolens*, 513 U.S. 219, 221 (1995) (identifying same as the "preemptive provision").  Congress enacted this provision "[t]o ensure that the States would not undo . . . with regulation of their own" the economic deregulation lying at the heart of the ADA. *Air Transp. Ass'n of Am. v. Cuomo*, 520 F.3d 218, 222 (2d Cir. 2008) [hereinafter, "*ATA*"] (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 380–81 (1992) (internal quotation marks and alterations in original omitted)).

The provision's "key phrase 'related to' expresses a 'broad pre-emptive purpose.'" *Northwest, Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014) (quoting *Morales*, 504 U.S. at 383).  "At the same time, the breadth of the words 'related to' does not mean the sky is the limit." *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (determining "the preemptive scope of a provision of the Federal Aviation Administration Authorization Act of 1994 [the "FAAAA"]"); *see also Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) (clarifying that its interpretation of the language in the ADA's preemption clause applied to the identical language of the FAAAA's preemption clause).

Under the two-prong ADA preemption test advanced by at least one court, "part one . . . is to determine if the state or local law has 'a connection with, or reference to,' carrier rates, routes or services, even if the state or local law's effect on rates, routes, or services 'is only indirect.'" *Delta Air Lines, Inc. v. N.Y. City Dep't of Consumer Affairs*, 564 F. Supp. 3d 109, 119 (E.D.N.Y. 2021) (quoting *Rowe*, 552 U.S. at 370).  Part two "is to determine whether or not the relation is substantial enough to trigger preemption." *Delta Air Lines*, 564 F. Supp. 3d at 120.

### 3.    ADA's Proprietor Exception

The ADA's express preemption provision includes an important exception: it "does not limit a . . . political subdivision of a State . . . from carrying out its proprietary powers and rights." 49 U.S.C. § 41713(b)(3); *see also Nat'l Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81, 88 (2d Cir. 1998) (identifying same as "the proprietor exception").  "[T]he proprietor exception allows municipalities to promulgate 'reasonable, nonarbitrary and non-discriminatory' regulations of noise and other environmental concerns at the local level." *Nat'l Helicopter*, 137 F.3d at 88 (quoting *British Airways Bd. v. Port Auth. of N.Y. & N.J.*, 558 F.2d 75, 84 (2d Cir. 1977) and citing *Western Air Lines, Inc. v. Port Auth. of N.Y. and N.J.*, 658 F. Supp. 952, 957 (S.D.N.Y. 1986), *aff'd* 817 F.2d 222 (2d Cir. 1987)).  This exception "recognizes the traditional authority of local governments to regulate airport usage by the 'exercise of [their] proprietary powers and rights'" including "the legitimate needs of local airport proprietors to ensure the safety of passengers while on the ground." *Midway Airlines, Inc. v. County of Westchester*, 584 F. Supp. 436, 440 & n.18 (S.D.N.Y. 1984) (quoting an earlier iteration of 49 U.S.C. § 41713(b)(3)).

### B.    *Analysis*

### 1.    ADA's Proprietor Exception

While a preemption analysis might normally first focus on the express preemption provision, the line of cases most precisely on point—those dealing with proprietary laws—sidestep this fulsome analysis and turn immediately to the issue of the proprietor exception. *See, e.g., Nat'l Helicopter*, 137 F.3d at 88; *Western Air Lines, Inc. v. Port Auth. of N.Y. & N.J.*, 817 F.2d 222, 226 (2d Cir. 1987); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 152 F. Supp. 3d 90, 108 (E.D.N.Y. 2015), *vacated in part on other grounds Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133 (2d Cir. 2016). Here, in line with those cases, the analysis of the TUPs can begin and end with the ADA's Proprietor Exception.

4

The TUP fits squarely within ADA's Proprietor Exception:  The County is HPN's owner and sponsor. *See* LWC § 712.391(1); Complt. ¶ 21 (sentences 2 and 5); Answer ¶¶ 21.2, 21.5.  The local-use restrictions now codified as the TUP were first promulgated pursuant to a federal court order explicitly premised upon the ADA's Proprietor Exception. 56.1 ¶ 19; *see also Midway*, 584 F. Supp. at 440.  In advance of the TUP's 2004 codification, the FAA affirmatively found that the proposed TUP would not violate the County's obligation under the grant assurances "to provide access by air carriers on reasonable and not unjustly discriminatory terms." 56.1 ¶ 62 (citing Carey Decl., Ex. I [hereinafter, "FAA Letter"] at COW-9479).  The FAA also confirmed that it found nothing in the 2004 TUP "that is inconsistent at this time with [the] grant assurances." *See id.* at COW-9479.  Those grant assurances included then and include now the obligation to comply with all applicable Federal laws, including but not limited to the ADA. *See* Airport Improvement Program (AIP) Grant Assurances, 79 Fed. Reg. 18,755, 18,755 (Apr. 3, 2014) (noting that a "complete list of the current grant assurances can be viewed" at https://www.faa.gov/airports/aip/grant_assurances).

The TUP's 2005 Amendment is simply an extension of the 2004 TUPs; it was passed to correct some unintended ambiguities in the law as originally codified. *See* 56.1 ¶ 49 (citing Carey Aff., Ex. C [hereinafter, "Local Law 17-2005"] at COW-894).  Furthermore, the TUP's 2005 Amendment is rooted in the same consideration as the 2004 TUP:  allocating scarce space at HPN by directing carriers to leave from one part of the airport or the other. *Compare* Carey Decl., Ex B [hereinafter, "Local Law No. 12-2004"] at COW-859 to COW-861 (setting forth which HPN-based air services must use the Terminal), *with* Local Law 17-2005 at COW-899 to COW-901 (same).  For the purposes of the ADA preemption analysis, it would be inconsistent to find that the County possessed the authority to direct

5

air carriers to use the Terminal in the 2004 TUP but lacked that authority under the TUP's 2005 Amendment.[1]

Collectively and individually, each step of the TUP's creation occurred wholly within the County's proprietary authority to allocate scarce space and landing and takeoff slots. *See Midway*, 584 F. Supp. at 440.  The relevant cases parsing the Proprietor Exception confirm this result:

- *Western Air Lines*:  To reduce ground congestion at LaGuardia Airport ("LGA"), the Port Authority issued a "perimeter rule" prohibiting non-stop flights of more than 1,500 miles from arriving at or departing from LGA. *Western Air Lines*, 817 F.2d at 223.  An air carrier sued, claiming the ADA preempted the perimeter rule. *Id.*  The Second Circuit gave that argument short shrift, recognizing that "[a]lthough . . . the perimeter rule may be a regulation relating to routes within the meaning of [the ADA's Preemption Provision], . . . at least when enacted by a multi-airport proprietor such as the [Port] Authority, [it] falls within the proprietary powers of airport operators exempted from preemption." *Id.* at 226 (internal quotation marks and alterations omitted).  Similarly, the TUP—which is rooted in allocating scarce space and landing and takeoff slots, *see* 56.1 ¶ 19—is within the County's proprietary powers.

- *Nat'l Helicopter*:  NYC's Economic Development Corporation ("EDC") issued a request for proposals (an "RFP") seeking a new fixed-base operator for Manhattan's East 34th Street Heliport (the "Heliport"). *Nat'l Helicopter*, 137 F.3d at 84.  The RFP included new requirements, including curfews and operation reductions. *Id.*  The Heliport's then-existing operator challenged the new requirements in federal court as preempted by the ADA. *Id.*  On appeal, the Second Circuit found that the EDC was acting in its proprietary capacity and upheld four of the seven requirements. *Id.* at 89–92.  With respect to the upheld restrictions, the court found that they were reasonable and

---

[1] Note, of course, that this rationale is limited to the ADA analysis; it does <u>not</u> extend to the ANCA analysis. *See* Discussion § II(B)(1), (2), *infra*.

not arbitrary because "the Heliport was a source of excessive noise" and "[t]hat it is a sufficient basis on which a proprietor may impose a weekend curfew." *Id.* at 90.  In doing so, the court rejected the claim that the restrictions were unreasonable because the underlying analysis was flawed, stating "[w]e do not require that studies offered as empirical support for a proprietor's actions be conducted pursuant to any one specific methodology, accepted in scientific communities as the *most* appropriate way of conducting an analysis" and that "[r]ather, the test is one of reasonableness." *Id.* at 91.  Additionally, with respect to *one* of the overturned restrictions,[2] the court found that the EDC's prohibition on a specific type of aircraft was both unreasoned and in contravention of the existing evidence. *See id.* at 91.  In the matter at bar—and as discussed above—the TUP was codified after a fulsome analysis. *See* 56.1 ¶¶28–32.  The TUP's 2005 Amendment is likewise rooted in that analysis. *See* 56.1 ¶ 49 (citing Local Law 17-2005 at COW-894 (explaining that the amendment was made to resolve an unintended ambiguity)).  Moreover—unlike the EDC's prohibition on one type of aircraft—the TUP is not applied discriminatorily; it applies equally to all airlines selling seats to the public. *See* LWC § 712.462(2)(a) (defining "[a]irline"), (3) (requiring each airline to hold a ramp allocation).

As illustrated by the foregoing, the TUP was enacted pursuant to the County's proprietary authority; it is therefore not preempted by the ADA.

## 2.   ADA's Express Preemption Provision[3]

If this Court turns to the express preemption provision, it can similarly dispense with the case, as the relation between the TUP and Plaintiffs' services is not substantial enough to trigger

---

[2] *N.b.*, the other two overturned restrictions concerned the EDC's efforts to "control[] flight paths through navigable airspace," a type of restriction that is both completely preempted and irrelevant to this case. *See id.* at 91–92.

[3] During the pre-motion conference of June 29, 2023, the County mistakenly recalled that the ADA's preemption provision's use of the term "services" dealt with what air carriers provide on their aircraft. *See* Carey Aff., Ex. Y [hereinafter, "Pre-Motion Conference Transcript" or "PMC Tr."] 31:16–

preemption. *See, e.g., Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 212 (2d Cir. 2011) ("[T]he impact on air carriers of the laws and regulations at issue here, if any, is too remote to be expressly preempted under the terms of the [ADA]."); *Abdu-Brisson v. Delta Air Lines*, 128 F.3d 77, 86 (2d Cir. 1997) ("[A]lthough enforcement of the claims may have some effect on prices, routes, or services, nothing in the record suggests that this effect is the type of effect which Congress intended to prohibit under the ADA"). Given that proprietary regulations do not enter the scope of the preempted field in either their purpose or their effect (*see* Discussion §I(B)(1)), their impact is therefore too remote to be expressly preempted. *Cf. Goodspeed Airport*, 634 F.3d at 212.

## II.   ANCA Preemption Claim

### A.   *Legal Standard*

On November 5, 1990, Congress enacted the Airport Noise and Capacity Act of 1990 ("ANCA"). Pub. L. No. 101-508 §§ 9301–09, 104 Stat. 1388, 378–84 (recodified at 49 U.S.C. §§ 47521–34); *see also* 56.1 ¶ 24. Following ANCA's passage, <u>new</u> local airport-use restrictions became subject to strict "notice, review, and approval requirements" established by the FAA. 49 U.S.C. § 47524(b), (c)(1), (d); 14 C.F.R. § 161.3(a), (b); *see also* 56.1 ¶ 25. Local airport-use restrictions that <u>predate</u> ANCA, however, are explicitly excluded from the "notice, review, and approval" requirements (*i.e.*, "grandfathered"). 42 U.S.C. § 47524(b), (c)(1), (d); 14 C.F.R. § 161.3(a), (b); *see also* 56.1 ¶ 26; Carey Aff., Ex. AP (Fed. Aviation Admin., Airport Compliance Manual) § 13.14(b) at p. 13-15. Furthermore, amendments to grandfathered, local, airport-use restrictions are themselves

---

25. That statement was an incomplete reference to *ATA*'s holding that "[o]nboard amenities, regardless of whether they are luxuries or necessities, still relate to airline service and fall within the express terms of the preemption provision." *ATA*, 520 F.3d at 224. The County hereby corrects its statement and acknowledges that the provision's definition of "Services" includes both on- and off-flight procedures.

grandfathered, provided that such amendments do not reduce aircraft operations, limit aircraft operations, or affect aircraft safety. 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.3(b).

B.    *Analysis*

1.    **2004 TUP**

In 2003, the County resolved "to codify and clarify [its then-]existing legal restrictions . . . into a single set of use restrictions." Carey Decl., Ex. A [hereinafter, "Briefing Materials"] at COW-5805; *see also* 56.1 ¶ 30.  On or about February 27, 2004, the process resulted in a draft law that, if adopted by the Westchester County Board of Legislators (the "BOL"), would codify the "procedures applicable to all Airlines providing passenger service at [HPN]." Briefing Materials at COW-5839 to COW-5856; *see also* 56.1 ¶ 32.  In advance of codifying the draft law, the County elected to submit it to the FAA's Office of the Chief Counsel for review and approval. *See* 56.1 ¶ 34.  On June 9, 2004, the FAA wrote to the County, finding that the proposed local law "[is] exempt from the Airport Noise and Capacity Act of 1990 (ANCA) since the action[] relate[s] to airport noise or access restrictions that were in effect on November 5, 1990 and would not 'reduce or limit aircraft operations or affect aircraft safety.'" FAA Letter at COW-9472 (quoting 49 U.S.C. §47524(d)(4)); *see also id.* at COW-9478 (concluding that the 2004 TUP is "grandfathered").  This opinion letter is entitled to the standard of deference described in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944). *See, e.g., Goodspeed Airport, LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 681 F. Supp. 2d 183, 210–14 (D. Conn. 2010), *aff'd* 634 F.3d 206 (2d Cir. 2011); *see also, e.g., JLNW, Inc. v. Nat'l Ret. Fund.*, No. 18-CV-9156 (AJN), 2019 U.S. Dist. LEXIS 164381, at *11 (S.D.N.Y. 2019).

"Under *Skidmore*, the weight [a court] accord[s] an agency interpretation depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade.'" *Boykin v. KeyCorp*, 521 F.3d 202, 208 (2d Cir. 2008) (quoting *Skidmore*, 323 U.S. at 140).  In the matter at bar, the thoroughness

of the FAA's consideration is evident through both the County's briefing materials <u>and</u> the decision itself. *See* 56.1 ¶¶ 28–37; *see generally* Briefing Materials, FAA Letter.  In preparing those materials, the County engaged in "numerous consultations with air carriers and other interested stakeholders." FAA Letter at COW-9472; *see also* 56.1 ¶ 31.  In 2003 and 2004, the County convened five formal consultation meetings with HPN's then-incumbent carriers. Briefing Materials at COW-5887.  "In addition to these five meetings, County staff [] received informal input both verbally and in writing from several and [] met with a carrier subcommittee to address several complex technical issues of concern to the carriers." *Id.* at COW-5887, COW-5889.  The County endeavored to consult all carriers and notified the FAA of the precise bounds of its efforts. *Id.* at COW-5889.  The results of those consultations—together with maps, a chart of then-current terminal and ramp use allocations, a technical analysis of runway weight-bearing capacity, and a twenty-six-page memorandum detailing the history of HPN's use restrictions—were all before the FAA. *See* Briefing Materials at COW-5767, FAA Letter at COW-9471 to COW-9473.

The validity of the FAA's reasoning is evident in the opinion letter itself—particularly in the FAA's careful tracing of the history of HPN's terminal-use restrictions. *See* FAA Letter at COW-5771 to COW-5792.  There is no evidence in the record that the FAA letter is inconsistent with any of the FAA's earlier or later pronouncements. *See* 56.1 ¶¶ 51, 59.  And the fact that HPN has operated pursuant to the TUP without issue from its original passage until the COVID-19 pandemic is further evidence of its persuasive power. *See* 56.1 ¶¶ 1, 10–16.[4]  Indeed, in seeking to invalidate the TUP, Plaintiffs are threatening to unravel what has underpinned HPN's day-to-day administration for over

---

[4] With respect to the FAA Letter's admissibility—an issue addressed at the Pre-Motion Conference, *see* PMC Tr. 7:8–12—the County respectfully refers the Court and the Plaintiffs to the FAA's Certification of the FAA Letter <u>and</u> the Affidavit of Peter J. Kirsh. *See* Carey Decl., Ex. Z (Kirsch Affidavit) ¶¶ 4–10 (describing his receipt of the letter), Ex. AA (FAA Certification) at 1.

thirty-five years. *See* 56.1 ¶¶ 1, 38; FAA Letter at COW-5771 to COW-5792 (tracing the history of HPN's regulation from the 1980's until 2004); Complt. ¶ 115.

For the foregoing reasons, the Court should grant the FAA Letter persuasive deference and dismiss Plaintiffs' preemption claim as against the 2004 TUP.

## 2. 2005 Amendment

As relevant to the matter at bar, the 2005 Amendment included three key provisions. 56.1 ¶ 45 (citing Local Law 17-2005 at COW-899 to COW-914); *see also id.* ¶¶ 46–48 (discussing the provisions one by one). The <u>first</u> provision coined and defined the term "Passenger Service:"

> "Passenger Service" shall mean any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity.

Local Law 17-2005 at COW-901. The <u>second</u> provision concerned the definition of the term "Airline," and it (i) replaced its references to "scheduled passenger air service"—a term left undefined in the 2004 TUP—with "Passenger Service;" and (ii) narrowed the definition further by limiting its application to "Passenger Service in aircraft defined for more than (9) passenger seats:"

> "Airline" shall mean any person providing [scheduled passenger air service] <u>Passenger Service in aircraft designed for more than (9) passenger seats</u>, including but not limited to, any air carrier or other operator certificated to provide [scheduled passenger service] <u>Passenger Service</u> under Parts 119, 121 or 135 of the Federal Aviation Regulations, Title 14, Code of Federal Regulations.

*Id.* at COW-899 (first sentence only). The <u>third</u> provision amended the TUP's applicability section, (i) replacing references to "scheduled passenger service" with "Passenger Service;" and (ii) declaring affirmatively what was already established by the interlocking procedures: that "[a]ll Passenger Service provided at the Airport shall be provided at the Terminal.

> **Applicability**. This Section shall apply to all use of the passenger terminal ("terminal") and the terminal ramp at the Westchester County Airport ("Airport") by Airlines providing [scheduled passenger service] <u>Passenger</u>

11

> Service, as that term is defined herein.  The terminal ramp shall be for the exclusive use of Airlines providing [scheduled passenger service] Passenger Service.  This Section does not apply to any activities by Airport users not providing [passenger service or not using the terminal building or building ramp] Passenger Service.  All Passenger Service provided at the Airport shall be provided at the Terminal.

*Id.* at COW-899.[5]  In advance of passing the 2005 Amendment, the BOL—acting through three of its committees—issued a report explaining why the one-year-old 2004 TUP required amendment.  *See* Local Law No. 17-2005 at COW-893 to COW-897.  In that report, the BOL committees stated:

> The 2004 codification closely followed the language that had been in use in various forms since 1984.  However, your Committee is informed that, as is common with such codifications, there are several unintended ambiguities in the Airport Procedures which your Committee believes it would be prudent to clarify in order to ensure that the practical application of the Airport Procedures is consistent with the legislative intent which prompted their enactment.
>
> For example, the scope of the Airport Procedures was clearly intended to include all commercial passenger operations, including those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations. . . . [T]he proposed technical amendments . . . would clarify the applicability of the Airport Procedures to these operations.  The proposed technical amendments would also clarify that very small passenger aircraft – those with (9) seats or less – can continue to use the general aviation facilities at the Airport, as they have always done.
>
> . . .
>
> In sum, the [2005 Amendment] will clarify long-standing practice under which the County requires that all commercial passenger service providers, including those that offer their services on an infrequent basis, use the main Airport terminal and terminal ramp and be subject . . . to the . . . limitations set forth in the Airport Procedures.

Local Law No. 17-2005 at COW-893 to COW-896.  Crucially, because the 2004 TUP was grandfathered, *see* Discussion § II(B)(1), *supra*, and because the 2005 Amendment "d[id] not reduce

---

[5] The 2005 Amendment's remaining amendments are downstream consequences of the key provisions detailed above and are not relevant to the matter at bar. *See id.* at COW-900 to COW-902, COW-914 (creating lighter procedures for those Airlines "conduct[ing] no more than four (4) operations constituting Passenger Service at the Airport within the previous 90 days" and re-lettering subsections further down in the alphabetical order).

aircraft operations, or affect aircraft safety," the 2005 Amendment was therefore also grandfathered. *See* 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.3(b).

While Plaintiffs argue that the 2005 Amendment increased restrictions on aircraft operations, a plain reading of the local laws illustrates that the 2005 amendment actually *reduced* the restrictions: The 2004 TUP applied without reference to whether an air carrier sold seats to the public. *See* Local Law No. 12-2004 at COW-859. The 2005 Amendment affirmatively excepts non-public sales from the definition of Passenger Service. *See* Local Law No. 17-2005 at COW-901. Thus, for the reasons detailed above, the Court should find that the 2005 Amendment is exempted from ANCA preemption under the grandfather exception.[6]

## III.   Equal Protection Claims

### A.   *Legal Standards*

#### 1.   **Class-of-One Claim**

"When a [party] alleges an equal protection violation (without also alleging discrimination based upon membership in a protected class), the [party] must plausibly allege that he or she has been intentionally treated differently from others similarly situated and no rational basis exists for that different treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Such a claim is often referred to as a "class-

---

[6] In adopting the 2004 TUP, the County codified restrictions that had been in continuous effect since 1984. *See* Local Law 12-2004 at COW-850. These rules had been in place for 20 years at the time of the 2004 TUP adoption, predating ANCA. Those rules, which referenced "scheduled operations," were adopted when "scheduled" meant what everyone understands "scheduled" to mean—"operations that are conducted in accordance with a published schedule for passenger operations which includes dates or times (or both) that is openly advertised or otherwise made readily available to the general public." Special Federal Aviation Regulation No. 38-2; Certification and Operating Requirements, 50 Fed. Reg. 23,941, 23,946 (June 7, 1985) (codified at SFAR 38-2 (14 C.F.R. Parts 121, 125, 127, 129, and 135)). This definition has a history dating back to the earliest days of aviation regulation. *See* Civil Aeronautics Authority Regulation 400–1(a), 3 Fed. Reg. 2,515, 2,516 (Oct. 20, 1938); *see also In re Large Irregular Carriers, Exemptions*, 11 C.A.B. 609, 612 (1950) (citing same).

of-one" equal protection claim. *See, e.g., Hu v. City of New York*, 927 F.3d 81, 95 (2d Cir. 2019); *Ruston v. Town Bd. for the Town of Skaneateles*, 610 F.3d 55, 57 (2d Cir. 2010). "To succeed on such a claim, plaintiffs 'must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves.'" *Progressive Credit Union*, 889 F.3d at 49 (quoting *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006)). In a class-of-one claim, "the similarly situated comparator must be '*prima facie* identical to the plaintiff – that is, '(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake.'" *Eldars v. State Univ. of N.Y.*, Nos. 20-2693 (Lead), 20-4255 (Con), 2021 U.S. App. LEXIS 30213, at *7 (2d Cir. Oct. 8, 2021) (quoting *Hu*, 927 F.3d at 92)).

## 2.     Rational-Basis Review

As set forth in the subsection immediately above, a class-of-one equal protection claim includes—in addition to the requirement to identify similarly situated comparators—rational-basis review. *See* Discussion § III(A)(1), *supra*; *see, e.g., Progressive Credit Union*, 889 F.3d at 49 (discussing both the elements of a class-of-one claim and rational-basis review).

The Equal Protection Clause "'does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made.'" *Kwong v. Bloomberg*, 723 F.3d 160, 169 (2d Cir. 2013) (quoting *Baxtrom v. Herold*, 383 U.S. 107, 111 (1966)). Thus, "if a law neither burdens a fundamental right nor targets a suspect class, [courts] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Roman v. Evans*, 517 U.S. 620, 631 (1996); *see also Clementine, Co., v. Adams*, 74 F.4th 77, 2023 U.S. App. LEXIS 18448, at *24 (2d Cir. July 20, 2023) (quoting same). Courts are "required to uphold the classification 'if there is any reasonably conceivable state of facts that could provide a rational basis

for the classification.'" *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 284 (2d Cir. 2015) (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)).  "[R]ational basis review contemplates 'a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it.'" *Progressive Credit Union*, 889 F.3d at 49 (quoting *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 314–15 (1993)).

B.     *Analysis*

**1.     Plaintiffs Have Not Identified Similarly Situated Comparators**

Plaintiffs have identified as "comparators" all of the "other operators operating out of FBOs at HPN." 56.1 ¶ 66 (citing Complt. ¶ 141).  During discovery, Plaintiffs identified their comparators as seven subgroups. 56.1 ¶ 67.  This memorandum addresses each of the subgroups and the arguments regarding them one-by-one.

(i)     <u>Subgroup No. 1</u>: The first subgroup concerns 14 C.F.R. Part 135 ("Part 135") operators operating "scheduled service," including Cape Air, Tradewind, Wheels Up, and Hard Rock Air. 56.1 ¶¶ 67, 68.  In the 56.1 Statement, the County points out that "[t]he Part 135 operators operating 'scheduled service' to which Blade compares itself <u>either</u> operate aircraft with nine seats or fewer (*i.e.*, Cape Air, Tradewind, and Wheels Up) <u>or</u> complied with the TUP by moving their air service to the terminal (*i.e.*, Hard Rock)." 56.1 ¶ 68.  Plaintiffs had several responses, to which the County makes the following replies:

- *First*, Plaintiffs claimed that "[t]he nine-seat limitation is discriminatory and without rational basis." 56.1 ¶ 68 (Resp.).  While the rational-basis test is *part* of the class-of-one analysis, it is analytically distinct from the issue of "comparators." *See* Discussion § III(A)(1), (2), *supra*.  It is irrelevant to this issue—although it is addressed in the next subsection. *See* Discussion § III(B)(1)(b), *infra*.

15

- *Second*, Plaintiffs assert that "Tradewind is a Part 135 operating a Pilatus PC-12, which is designated for ten passengers, from an FBO." 56.1 ¶ 68 (Resp.).  In response, the County submits the Affidavit of Eric Zipkin, in which the CEO of Tradewind confirms that (a) "Tradewind's Westchester County flights do not include more than 9 passenger seats;" and (b) "as a 'commuter' Part 135 operator, Tradewind is not authorized to sell tickets on flights with ten or more passenger seats." Carey Decl., Ex. AB (Zipkin Affidavit) ¶¶ 7, 8; *see also* 14 C.F.R. § 110.2 (defining "[c]ommuter operation" to include a "maximum passenger-seat configuration of 9 seats or less"), § 298.50 (establishing the procedures for commuter air carrier authorization).

- *Third*, Plaintiffs allege that "Bakers and Yellowstone operate under Part 135 from an FBO and sell more than 9 seats to the public." 56.1 ¶ 68 (Resp.).  While it may be true that they are authorized under Part 135, they are also affinity groups within the meaning 14 C.F.R. § 212.5—and they are therefore addressed in "Subgroup No. 4," below.

- *Fourth*, Plaintiffs note that "Hard Rock stopped operating at HPN." 56.1 ¶ 68 (Resp.).  This fact, of course, has no impact on the relevant comparator analysis; either Hard Rock is Plaintiffs' comparator or it is not.

(ii)   <u>Subgroup No. 2</u>: The second subgroup concerns "Part 135 operators 'running a political campaign or . . . flying a sports team.'" 56.1 ¶ 67.  Suffice it to say, these entities subscribe to an entirely different business model than Plaintiffs—and one that does not allow for the sale of tickets to the public. *See* 14 C.F.R. § 91.501(8) (discussing operations "when common carriage is not involved," including "[t]he carriage of an airplane of an athletic team, sports group, . . . or similar group having a common purpose or objective **when there is no charge, assessment, or fee of any kind made by any person for that carriage**" (emphasis added)).

(iii)   <u>Subgroup No. 3</u>:  The third subgroup concerns "corporate jets owned by companies like Pepsi, Discovery, and IBM." 56.1 ¶ 67.  As with Subgroup No. 2, these entities subscribe to an entirely different business model than Plaintiffs. *See* Eileen M. Gleimer, *Corporate Aircraft Operations: The Twilight Zone of Regulation*, 62 J. Air L. & Com. 987, 989–90 (1997) (noting that most corporate aircrafts operate under Part 91 and do not engage in common carriage); FAA Advisory Circular 120-12A, Private Carriage Versus Common Carriage of Persons or Property at 1 (Apr. 24, 1986) (distinguishing "private carriage" from "common carriage" and confirming that "common carriage" cannot be conducted under Part 91).  There is also no evidence in the record that any of these air carriers are selling tickets to the public. *See* 56.1 ¶ 70 & Resp.

(iv)   <u>Subgroup No. 4</u>:  The fourth subgroup concerns "[c]ommunity groups, such as the Albany Club, the Bakers Bay Club, the Discovery Land Club, the Nexus Club, the Yellowstone Club." 56.1 ¶ 67.  These organizations all operate under a section of the Code of Federal Regulations that permits "affinity (pro rata) charter[s]," and mandates that "[n]o solicitation, sales or participation may take place beyond the <u>bona fide members</u> of an eligible chartering organization." 14 C.F.R. § 212.5 (emphasis added).  These organizations are—by definition—not selling to the general public, *see id.*; their business model is therefore completely different from Plaintiffs'. *See* 56.1 ¶ 3.

(v)   <u>Subgroup No. 5</u>:  The fifth subgroup concerns "individuals who come together and decide to charter a plane together." 56.1 ¶ 67.  By definition, such individuals do not sell seats to the public. *See* 14 C.F.R. § 1.1 (defining "[C]ommercial operator" as "a person who, for compensation or hire, engages in the carriage by aircraft in air commerce of persons or property, other than as [a foreign civil aircraft] under the authority of Part 375" and providing that "[w]here it is doubtful that an operation is for 'compensation or hire', the test applied is whether the carriage by air is merely incidental to the person's other business or is, in itself, a major enterprise for profit").  Furthermore, such individuals are not *prima facie* identical to Plaintiffs.

(vi) <u>Subgroup No. 6</u>:  The sixth subgroup concerns "operators operating pursuant to 14 C.F.R. Part 91." 56.1 ¶ 67.  As set forth in the discussion of Subgroup No. 3, Part 91 carriers do not engage in common carriage and therefore do not sell seats to the public. 14 C.F.R. § 91.147 (requiring special authorization for all "passenger-carrying flights for compensation or hire" except for passenger-carrying flights benefiting charitable, nonprofit, or community events); 14 C.F.R. § 91.501(b) (allowing limited types of commercial operations that can be conducted under Part 91 "when common carriage is not involved").

(vii) <u>Subgroup No. 7</u>:  The seventh subgroup concerns "[o]perators with fractional ownership interests, such as FlexJets, NetJets, and Sentient." 56.1 ¶ 67.  Once again, these entities have a limited operating authority that prevents them from selling to the public. *See* 14 C.F.R. Part 91, Subpart K (setting forth the regulations applicable to "Fractional Ownership Operations").

As evidenced by the forgoing, not one of the alleged comparators is *prima facie* identical for class-of-one purposes. *See, e.g.*, *Progressive Credit Union*, 889 F.3d at 50 (distinguishing medallion taxicabs from for-hire vehicles); *Ruston*, 610 F.3d at 60 (dismissing six different properties from plaintiffs' proposed development).  Additionally, the caselaw is rife with examples of dismissal of claims on motions to dismiss or summary judgment relating to comparators, despite Plaintiffs' claim that it is a question of fact. *Compare* PMC Opp'n at 4 (making the claim), *with Hu*, 927 F.3d at 107 (affirming a 12(b)(6) dismissal); *Progressive Credit Union*, 889 F.3d at 55 (same); *Ruston*, 610 F.3d at 60 (same); *Clubside*, 468 F.3d at 151 (directing the district court to enter judgment in defendants' favor on summary judgment).

## 2.    The TUP Passes Rational Basis Review

The bases for both the 2004 TUP and the 2005 Amendment are explicitly set forth in their accompanying committee reports: "[T]he principal purpose for enactment of the [2004 TUP] is to codify all of the critical use restrictions . . . in order to ensure that the procedures and regulations governing commercial use of the Airport terminal are well-defined and consistently applied to all

commercial users." Local Law No. 12-2004 at COW-851. The 2004 TUP's restrictions were established to "preserve [the County's] policy against expansion while balancing the need to allow carefully controlled commercial airline traffic at the Airport." *Id.* at COW-853. The 2005 Amendment was passed "to clarify that the Airport Procedures apply to all aviation passenger services which operate out of [HPN] pursuant to which seats are individually offered or sold to the public, regardless of the frequency of such offers or sales." Local Law No. 17-2005 at COW-893; *see also* Discussion § II(B)(2), *supra* (quoting the committee report).

Plaintiffs have argued that the TUP's "nine-seat limitation" is "discriminatory and without rational basis." 56.1 ¶¶ 68 (Resp.), 83 (Resp.); *see also* Local Law No. 17-2005 at COW-899 (amending the 2004 TUP to include the nine-seat limitation). However, this nine-seat break point has been an aviation industry standard since the 1970s. *See* Regulatory Review Program; Air Taxi Operators and Commercial Operators, 43 Fed. Reg. 46,742, 46,752 (Oct. 10, 1978) (observing that "size of aircraft operated by air commuters could be grouped into three convenient categories: 0–9 seats, 10–19 seats, and 20-30 seats" and that "[t]he break points in aircraft size groupings correspond to the differing regulatory requirements proposed for each of these categories under the part 135 notice"); *see also id.* at 46,811 (codifying the nine-seat break point ); 14 C.F.R. § 135.411 (maintaining the nine-seat break point to this very day); 49 U.S.C. § 44706(a)(1) (recognizing a "9 passenger seat" break point with respect to "airport operating certificate[s]"). Thus, the County's nine-seat limitation is rational for two overlapping reasons:  first, for all of the reasons carefully spelled out by the FAA in the Federal Register; and second, for the additional reason that it conforms with the federal aviation regulatory regime. An identical rationale applies to the TUP's "public-sale limitation." *Compare* Local Law No. 17-2005 at COW-901 (amending the 2004 TUP by defining the term "Passenger Service" to include "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public"), *with* FAA Advisory Circular 120-12A, Private Carriage Versus Common

Carriage of Persons or Property (Apr. 24, 1986) (setting forth the "general guidelines for determining whether current or proposed transportation operations by air constitute private or common carriage"), *and* 14 C.F.R. § 110.2 (defining "noncommon carriage").

For this additional reason, Plaintiffs' equal protection claim should be dismissed in its entirety. *See, e.g.*, *Sensational Smiles, LLC*, 793 F.3d at 283; *Kwong*, 723 at 172.

IV.    Plaintiffs' Equitable Defenses

    *A.     Legal Standards*

"Courts have routinely held that, when acting in a capacity to enforce public rights in the public interest and discharge statutory responsibilities, government entities are not subject to all equitable defenses . . . that could ordinarily be invoked against a private actor." *New York v. United Parcel Serv., Inc.*, 160 F. Supp. 3d 629, 640 (S.D.N.Y. 2016), *vacated in part on reconsideration by* No. 15-CV-1136 (KBF), 2016 U.S. Dist. LEXIS 201153 (S.D.N.Y. June 21, 2016) [hereinafter, "*UPS*"] (analyzing an affirmative defense sounding in "waiver, estoppel, laches, unclean hands, *in pari delicto*, and/or similar doctrines and equitable doctrines"); *see also Utah Power & Light Co. v. United States*, 243 U.S. 389, 409 (1917) ("As a general rule, laches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest."); *Nevada v. United States*, 463 U.S. 110, 141 (1983) (quoting same).   Under this line of authority, equitable defenses are inapplicable when a municipality is discharging its statutory duties—as opposed to "'acting . . . in a capacity akin to that of a private entity.'" *New York v. FedEx Ground Package Sys.*, 314 F.R.D. 348, 357–58 (S.D.N.Y. 2016) [hereinafter, "*FedEx I*"] (quoting *UPS*, 160 F. Supp. 3d at 647); *see also Clear Channel Outdoor, Inc v. City of New York*, 594 F.3d 94, 111 (2d Cir. 2010) ("Principles of laches or estoppel do not bar a municipality from enforcing ordinances that have been allowed to lie fallow." (internal quotation marks, alteration, and citation omitted)); *N.Y. State Med. Transporters Ass'n v. Perales*, 566 N.E.2d 134, 137 (N.Y. 1990) ("While we have not absolutely precluded the possibility

of estoppel against a governmental agency, our decisions have made clear that it is foreclosed in all but the rarest cases." (internal quotation marks and citation omitted)).

Separate and apart from the aforementioned prohibition—where estoppel *is* applicable to the government, it is "only in those limited cases where the party can establish both that the [g]overnment made a misrepresentation upon which the party reasonably and detrimentally relied <u>and</u> that the [g]overnment engaged in affirmative misconduct." *City of New York v. Shalala*, 34 F.3d 1161, 1168 (2d Cir. 1994) (emphasis added); *see also Rojas-Reyes v. I.N.S.*, 235 F.3d 115, 126 (2d Cir. 2000) ("[E]stoppel will only be applied upon a showing of 'affirmative misconduct' by the government.").

B.    *Analysis*

*Firstly*, when the County enforces the TUP, it is discharging its statutory duties. *See* 56.1 ¶ 1 (citing LWC § 712.462).  As the Second Circuit recognized when discussing the powers of airport proprietors before the ADA was even passed:

> The regulation of excessive aircraft noise has traditionally be a cooperative enterprise, in which both federal authorities and local airport proprietors play an important part. . . .
>
> It is understandable that the numerous localities in the vicinity of major airports cannot be permitted an independent role in controlling the noise of passing aircraft. . . . The task of protecting the local population from airport noise has, accordingly, fallen to the agency, usually of local government, charged with operating the airport. . . . [T]he inherently local aspect of noise control can be most effectively left to the operator, as the unitary local authority who controls airport access. . . .'
>
> Congress has reserved to proprietors the authority to enact reasonable noise regulations, as an exercise of ownership rights in the airport, because they are in a better position to assure the public weal.

*British Airways*, 558 F.2d at 83, 85 (citations omitted and emphasis added); *see also* Black's Law Dictionary 1474 (Delux 11th ed. 2019) (defining "proprietor" as "[a]n owner").  This "proprietary" role, with respect to airports, permits "local governments to regulate airport usage" in a manner "consistent with local environmental and safety needs." *Midway*, 584 F. Supp. at 440.  This is a

quintessential function of a municipality's police powers. *See Drever v. State of New York*, 18 N.Y.S.3d 207, 210 (App. Div. 2015) (collecting cases). With respect to airport regulations, it "is well accepted that a state may act in both a proprietary and governmental capacity" in enacting those regulations. *United States. v. New York*, 552 F. Supp. 255, 264 (N.D.N.Y. 1982), *aff'd* 708 F.2d 92 (2d Cir. 1983). Given that the County is acting in both a proprietary and governmental capacity, the equitable relief sought by Plaintiffs should be rejected. *See UPS*, 160 F. Supp. 3d at 647; *FedEx I*, 314 F.R.D. at 357–58.

*Secondly*, assuming that Plaintiffs *did* detrimentally rely on any misrepresentation by the County, that reliance would have been unreasonable *per se* as it contravened codified, published, and promulgated law. Indeed, LWC § 712.462, which was last amended in 2010 (for a technical reason that is not a subject in this litigation) predates any of Plaintiffs' operations at HPN, none of which began prior to 2015. *See* 56.1 ¶ COF 24.

*Thirdly*, there is no evidence or allegation that the County engaged in "affirmative misconduct." 56.1 ¶ 84. For this additional reason, Plaintiffs' equitable defenses should be dismissed with prejudice. *See, e.g., Wallace v. City of New York*, No. 20-CV-1424 (KPF), 2021 U.S. Dist. LEXIS 246760, at *39 (S.D.N.Y. Dec. 28, 2021); *City of New York v. FedEx Ground Package*, 351 F. Supp. 3d 456, 490 (S.D.N.Y. 2018).

## V.   Declaratory Judgment

### A.   *Legal Standard*

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also* Fed. R. Civ. P. 57 (explicitly cross referencing the Declaratory Judgment Act). "In order to decide whether to entertain an action for declaratory judgment, [the Second Circuit has]

instructed district courts to ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005).

B.       *Analysis*

Should the court grant the County's motion and dismiss Plaintiffs' complaint with prejudice, there is still the possibility that other air carriers at some future date—perhaps twenty years in the future—will, like Plaintiffs, emerge and challenge the TUP. *Brodsky v. N.Y. City Campaign Fin. Bd.*, 796 F. App'x 1, 3 (2d Cir. 2019) (discussing *res judicata*); *Washington v. N.Y. City Dep't of Educ.*, 740 F. App'x 730, 732 (2d Cir. 2018) (discussing collateral estoppel).

To prevent future suits challenging the TUP—and for the reasons detailed above, *see* Discussion §§ I–II—the County hereby seeks a declaratory judgment that the TUP is not precluded under the ADA or ANCA.

[*Remainder of Page Intentionally Left Blank*]

## CONCLUSION

For the reasons set forth above, the County respectfully requests that the Court grant its motion for summary judgment, grant its counterclaim for declaratory relief, dismiss the Complaint with prejudice, and grant such other relief as this Court deems just and proper.

DATED:  White Plains, New York       **JOHN M. NONNA**
         August 31, 2023             Westchester County Attorney
                                       *Attorney for Defendant*

                               By   _____
                                    Sean T. Carey
                                  Associate County Attorney, of Counsel
                                  Michaelian Office Building
                                  148 Martine Avenue, Room 600
                                  White Plains, New York 10601
                                  (914) 995-2243
                                  stca@westchestercountyny.gov

TO:    DORF & NELSON LLP (*via Sharefile*)
       *Co-Counsel for Plaintiffs*
       555 Theodore Fremd Avenue
       Rye, NY 10580
       JNelson@dorflaw.com
       PNoto@dorflaw.com

       TROUTMAN PEPPER HAMILTON SANDERS LLP (*via Sharefile*)
       *Co-Counsel for Plaintiffs*
       5 Park Plaza, Suite 1400
       Irvine, CA 92614
       Steven.Allison@troutman.com
       Samrah.Mahmoud@troutman.com
       Jenna.Hutchinson@troutman.com
       Nicholas.Schuchert@troutman.com