Page 1

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   -------------------------------------------X
    DELUX PUBLIC CHARTER, LLC d/b/a JSXAIR and
4   JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE
    URBAN AIR MOBILITY, INC.,
5                           PLAINTIFFS,
6       -against-          Case No.:
                           7:22-CV-01930(pmh)
7

    COUNTY OF WESTCHESTER, NEW YORK, a charter
8   county; APRIL GASPARRI, in her official
    capacity as AIRPORT MANAGER; and AVPORTS,
9   LLC,
                            DEFENDANTS.
10  -------------------------------------------X
11                  DATE:  February 13, 2023
12                  TIME:  10:00 A.M.
13
14          DEPOSITION of the DEFENDANT, THE
15  COUNTY OF WESTCHESTER, NEW YORK, a charter
16  county, by a Witness, NICHOLAS HARTMAN,
17  taken by the Plaintiff, pursuant to Court
18  Order, held at the law offices of Dorf &
19  Nelson, LLP., 555 Theodore Fremd Avenue,
20  Rye, New York 10580, before Joanne
21  Sheridan, a Notary Public of the State of
22  New York.
23
24
25

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4    DORF & NELSON, LLP
         Attorneys for Plaintiffs
 5       555 Theodore Fremd Avenue
         Rye, New York 10580
 6       BY:  PAUL NOTO, ESQ.
                  -and-
 7            CHRISTINA GRIMES, ESQ.
 8
 9    TROUTMAN, PEPPER, HAMILTON, SANDERS, LLP
         Attorneys for Plaintiffs
10       5 Park Plaza, Suite 1400
         Irvine, California 92614-2545
11       (Not Present)
12
13    OFFICE OF THE WESTCHESTER COUNTY ATTORNEY
         Attorneys for Defendants
14       148 Martine Avenue, Suite 600
         White Plains, New York 10601
15       BY:  PHOENIX MARINO, ESQ.,
              Assistant County Attorney
16                -and-
              SEAN CAREY, ESQ.,
17            Senior Assistant County Attorney
18
19          *              *              *
20
21
22
23
24
25
```

Page 3

1

2     F E D E R A L   S T I P U L A T I O N S

3

4        IT IS HEREBY STIPULATED AND AGREED,

5   by and between the counsel for the

6   respective parties herein, that the

7   sealing, filing and certification of the

8   within deposition be waived; that the

9   original of the deposition may be signed

10   and sworn to by the witness before anyone

11   authorized to administer an oath, with the

12   same effect as if signed before a Judge of

13   the Court; that an unsigned copy of the

14   deposition may be used with the same force

15   and effect as if signed by the witness, 30

16   days after service of the original & 1 copy

17   of same upon counsel for the witness.

18

19        IT IS HEREBY STIPULATED AND AGREED

20   that all objections as to form are reserved

21   to the time of trial.

22

23          *              *              *

24

25

```
 1                 N.   HARTMAN
 2   N I C H O L A S   H A R T M A N, called as a
 3   witness, having been first duly sworn by a
 4   Notary Public of the State of New York, was
 5   examined and testified as follows:
 6   EXAMINATION BY
 7   MR. NOTO:
 8        Q.    Please state your name for the
 9   record.
10        A.    Nicholas Hartman
11        Q.    What is your address?
12        A.    516 Pelhamdale Avenue, Pelham
13   Manor, New York 10803.
14        Q.    Mr. Hartman, good morning.
15        A.    Good morning.
16        Q.    My name is Paul Noto.  I
17   represent the plaintiffs, with me is
18   Christina Grimes.  We're going to ask you
19   some questions.  A few ground rules.  This
20   is a verbal, so if I ask you a question,
21   I'd appreciate your answers have to be
22   verbal, so a nod of the head, whatnot,
23   doesn't really work, the reporter needs to
24   get it down.
25                If I ask a question and you
```

```
 1                    N.   HARTMAN
 2   don't understand it I can try to rephrase
 3   it.  If I ask a question and your attorneys
 4   object, you should wait until we decide if
 5   you can answer or not, they will direct you
 6   answer, don't answer.
 7                  If you want to take a break,
 8   let me know and we'll have to do that.  And
 9   if you need anything, we'll take a break,
10   we have obviously anything you need here,
11   drinks, or food.
12          A.    Okay.
13          Q.    We have your address in Pelham.
14   What is your date of birth?
15          A.    March 2nd, 1981.
16          Q.    And what is your educational
17   background?
18          A.    I have a Bachelor's degree in
19   chemistry from Penn State University and a
20   Ph.D. in biochemistry from the University
21   of Cambridge.
22          Q.    And are you employed?
23          A.    Yes.
24          Q.    And where are you employed?
25          A.    Amazon Web Services.
```

```
 1                    N.  HARTMAN
 2        Q.    And where do you work out of?
 3        A.    My office is in midtown
 4   Manhattan.
 5        Q.    And did you meet with anyone
 6   prior to your deposition today?
 7        A.    In regards to the deposition?
 8        Q.    In regard to this deposition.
 9        A.    Yes.
10        Q.    And who was that?
11        A.    The attorneys here.
12        Q.    Okay.  And did you review any
13   documents or notes with them prior to
14   today's testimony?
15        A.    Yes.
16        Q.    And what notes and documents
17   were those?
18        A.    It was a binder full of
19   previous correspondence and meeting minutes
20   and such.
21        Q.    So, do you have a pilot's
22   license?
23        A.    Yes.
24        Q.    And when did you obtain that?
25        A.    I believe it was 2015.  I could
```

```
 1                 N.   HARTMAN
 2    tell you exactly if you need to know, but
 3    it was --
 4           Q.    No, I don't need exactly, the
 5    year is fine.
 6           A.    -- about 2015.
 7           Q.    And, so, what does that license
 8    permit you to fly, what types of aircraft?
 9           A.    I have a single-engine private
10    pilot license, so I can fly single-engine
11    aircraft up to 12,500 pounds under FAA Part
12    91.
13           Q.    And do you own an aircraft?
14           A.    I do, yes.
15           Q.    What kind of aircraft?
16           A.    It's a Trinidad.  It's -- yeah,
17    2001 Trinidad.
18           Q.    Is it propeller --
19           A.    Yes, single-engine propeller
20    aircraft.
21           Q.    And where do you keep that
22    aircraft?
23           A.    It's parked at Atlantic West at
24    Westchester County airport.
25           Q.    And Atlantic West is what?
```

Page 8

```
 1                    N.   HARTMAN
 2         A.    It's an FBO, fixed-base
 3   operator.
 4         Q.    So, you're familiar with what
 5   an FBO is?
 6         A.    Yes.
 7         Q.    So, I'm going to ask you that
 8   later.  How long have you lived in
 9   Westchester County?
10         A.    Since 2008.
11         Q.    And where did you live before
12   that?
13         A.    At six months prior to that I
14   was living in Pennsylvania, and then for
15   the four and a half years before that I
16   lived in the United Kingdom.
17         Q.    Where in the United Kingdom?
18         A.    Cambridge.
19         Q.    So, what year were you
20   appointed to the Airport Advisory Board?
21         A.    I believe it was January of
22   2019 if my memory is correct.
23         Q.    And who appointed you to that
24   board?
25         A.    The County Executive.
```

```
 1                    N.   HARTMAN
 2         Q.     And how did you get that
 3    appointment?  Did you solicit it?
 4         A.     No.
 5         Q.     Did he solicit you?  Explain to
 6    me the genesis of it.
 7         A.     Yeah.  I was approached by, I
 8    believe it was Susan Spear, who was at the
 9    time I think an assistant relative to
10    infrastructure, or something in that realm,
11    had called me and asked if it was something
12    I'd be interested in doing.  We had a few
13    conversations about it, and then I was
14    nominated by the County Executive, and
15    there was like a hearing with the Board of
16    Legislatures, and then after that I was
17    appointed.
18         Q.     And how did you come to Susan
19    Spear's attention, like how did she --
20         A.     As it was explained to me, I
21    had been attending Airport Advisory Board
22    meetings prior, in the year or so leading
23    up to that time, and also a number of other
24    county meetings.  This was around the time
25    when the county was considering this
```

```
 1              N.   HARTMAN
 2    privatization proposal, and I had been at a
 3    number of those meetings and made
 4    statements and comments, and I think that's
 5    probably how I fell on the radar of the
 6    county.
 7         Q.    Were the statements or comments
 8    you made about privatization supportive
 9    or --
10         A.    Generally not, no.
11         Q.    So, did you think that that
12    proposal was a good one or a bad one?
13              MS. MARINO:  Objection.  You
14         can answer.
15              MR. NOTO:  Objection as to form
16         or...?
17              MS. MARINO:  Yeah.
18         A.    I did not like it because --
19    yeah, I did not like it.
20         Q.    Why didn't you like it?
21         A.    Because it would remove the
22    county's ability to have a lot of day-to-
23    day control over the airport, and a number
24    of elements of the proposal did not look
25    like they would be favorable to like
```

```
 1                  N.   HARTMAN
 2   general aviation, which is sort of where my
 3   interest in the airport ultimately lie,
 4   being a customer of the airport or a tenant
 5   of the airport.
 6          Q.     Have you served on any other
 7   board or commission of the county?
 8          A.     No.
 9          Q.     And do you serve on any local
10   board or commission, you know, in Pelham or
11   anywhere else?
12          A.     Not in a -- for a government
13   scenario.
14          Q.     Do you belong to any civic
15   organizations?
16          A.     No.  I mean I'm a member of the
17   Westchester County -- or Westchester
18   Aviation Association, but I wouldn't
19   describe that as a civic organization.
20          Q.     And how would you describe it?
21          A.     It's an aviation, a group of
22   aviation, local aviation interests.
23          Q.     And is it mostly aircraft
24   owners?
25          A.     It's a mix of essentially all
```

```
 1                    N.   HARTMAN
 2  elements of aviation that are not the
 3  commercial airlines, so there's corporate
 4  operators in there, there's charter
 5  operators, private pilots, student pilots.
 6        Q.    Can anybody join?
 7        A.    Yes.
 8        Q.    So, if I don't own a plane I
 9  can join?
10        A.    Yes.
11        Q.    Is there a fee to join?
12        A.    I think it's a $35 a year or
13  something to that effect.
14        Q.    So, there's no membership
15  requirement?
16        A.    No, just sign up.  And we also
17  host a lot of events which are free to
18  anybody to attend.
19        Q.    Does the Westchester Aviation
20  Association advocate with the county for
21  any particular policies related to the
22  airport?
23        A.    It has at times in the past,
24  yes.
25        Q.    Can you describe a recent
```

```
                                        Page 13
 1                  N.   HARTMAN
 2   lobbying effort by the association?
 3         A.    I think the two recent ones,
 4   one the privatization, which I mentioned
 5   earlier, which generally was advocating
 6   against the privatization, and more
 7   recently some elements of this hangar
 8   proposal that Million Air has -- is
 9   currently in discussion with the county.
10         Q.    And has the Westchester
11   Aviation Association taken a position on
12   the Million Air hangar issue?
13         A.    I don't know that it formally
14   has, but members of it definitely have
15   generally, so yeah.
16         Q.    As a member, have you taken a
17   position on it?
18         A.    Yes.
19              MS. MARINO:  Object to form.
20         You can answer.
21         A.    Yes.
22         Q.    And what is that position?
23         A.    Well, there's kind of two
24   aspects to it.  There's the work that
25   they've already completed, and there's the
```

```
                                        Page 14
 1                N.   HARTMAN
 2   work that they are proposing, which is the
 3   work that they're proposing is demolishing
 4   some light GA infrastructure.
 5          Q.    Can you explain what GA is?
 6          A.    General aviation.
 7          Q.    Thank you.
 8          A.    And by general aviation is less
 9   than 12,500 pounds, just to define that
10   term.  There's a proposal to demolish some
11   light general aviation infrastructure and
12   replace it with a single, very large
13   hangar, and so I've been very vocal that
14   that's not a good idea, because there's
15   significant demand for the facility that is
16   currently there in its current form.
17          Q.    So, your position is based on
18   the fact that it's not needed because
19   there's already a demand, is that --
20          A.    Well, the position -- my
21   personal position is more on the grounds
22   that the proposal would demolish a facility
23   that is very much in demand and replace it
24   with something that is different.  So, I'm
25   not necessarily against Million Air wanting
```

Page 15

```
1                    N.   HARTMAN
2    to have a new hangar, but I am against them
3    destroying other facilities to make room
4    for a bigger hangar.
5         Q.    When you were advocating on the
6    privatization issue, do you recall if the
7    county had sent out an RFP, a request for
8    proposals, on that issue to solicit, you
9    know, companies to come in and run the
10   airport?
11             MS. MARINO:  Object to form.
12        You can answer.
13        A.    I'm aware that they were
14   soliciting proposals to -- what proposal
15   for privatization looks like, I wasn't
16   aware if that was specifically an RFP or in
17   another sense.
18        Q.    So you, personally, never saw
19   an RFP?
20        A.    I don't believe so, no.
21        Q.    And this predated your time on
22   the AAB?
23        A.    Correct.
24        Q.    Do you file an Annual Financial
25   Disclosure form with the county?
```

Page 16

1                   N.   HARTMAN

2          A.     Yes.

3          Q.     And are you current in that,

4    that you've filed the most recent required

5    form?

6          A.     Yes.

7          Q.     So, what is your current

8    portion on the Airport Advisory Board?

9          A.     I am currently a member and I'm

10   also the chairperson.

11         Q.     And when did you become chair?

12         A.     That was January of 2020.

13         Q.     And you were appointed in '19,

14   so within a year you became chair?

15         A.     Yes.

16         Q.     And how did you become chair?

17         A.     I was elected by the other

18   members of the board to be the chair.  We

19   elect the chair once per year in January.

20         Q.     And what happened to the prior

21   chair?

22         A.     They're still there as a

23   member, they were not reelected as the

24   chair.

25         Q.     And who was that?

```
 1                    N.   HARTMAN
 2        A.    Peter Schlactus.
 3        Q.    And why was he not reelected?
 4        A.    You'd have to ask the other
 5   members, I don't -- I don't --
 6        Q.    Well, let me ask you this.  Did
 7   he seek reelection?
 8        A.    I believe he did.  He was -- if
 9   I recall he was nominated.  I'd have to go
10   check the records, but I believe he was
11   nominated.
12        Q.    And were you nominated?
13        A.    Yes, yes.
14        Q.    And you won?
15        A.    Yes.
16        Q.    So, how many people are on the
17   board?
18        A.    There are 11 spots, currently
19   ten are occupied, so there's one vacant
20   position.
21        Q.    And how are the spots
22   allocated?
23        A.    So, there are three spots that
24   are allocated to county officials, so one
25   is the Commissioner of Transportation, one
```

```
 1                  N.  HARTMAN
 2     is the Commissioner of Planning, and then
 3     one goes to a member of the Board of
 4     Legislatures.  There are a number of slots,
 5     I don't recall exactly how many, that are
 6     allocated to specific municipalities that
 7     are around the airport, and then there are
 8     a few that are sort of at-large open
 9     positions.
10          Q.    And how often does the board
11     meet?
12          A.    Once per month generally.
13          Q.    Is it a regular day?
14          A.    Usually the second Wednesday of
15     the month is our standard slot.
16          Q.    Is it during the day or in the
17     evening?
18          A.    At 7:00 in the evening.
19          Q.    And where are the meetings
20     held?
21          A.    Now they are held at the
22     airport conference room, during Covid they
23     were Zoom meetings or Webex meetings.
24          Q.    So, how does an item get placed
25     on the agenda for a board meeting?
```

1              N.   HARTMAN

2       A.     Technically any member can

3   propose an agenda item, generally they

4   would send that -- while I'm the chairman

5   they would send that to me and I would

6   place it under New Business typically.

7       Q.     Is it only members can place

8   items on the agenda or can members of the

9   general public put something on the agenda?

10      A.     So, somebody on the board would

11  have to propose that as an item, but a lot

12  of times a member of the public might say

13  something, and then either myself or

14  another member of the board could put it on

15  the agenda.  We also have a public comments

16  at multiple points in the meeting, so new

17  items of discussion can get introduced

18  because a member of the public mentions it

19  at a meeting, as well.

20      Q.     So, as a county board, are you

21  subject to the Open Meetings Law?

22      A.     Yes.

23      Q.     So, you're meetings are public?

24      A.     Yes.

25      Q.     So, anybody can attend?

1                    N.   HARTMAN

2          A.      Yes.

3          Q.      And you notice the meetings

4     publicly?

5          A.      Yes.

6          Q.      So, again, in your capacity as

7     chair of the board, are you familiar with

8     any, you know, groups that advocate on

9     airport issues?

10         A.      Yes.

11         Q.      And could you name a couple of

12    those groups?

13         A.      So, the Westchester Aviation

14    Association I mentioned previously, there's

15    another group, I believe it's called The

16    Coalition to Prevent Westchester Aviation

17    Airport Expansion I think is their name,

18    and then they have a number of other groups

19    that fall underneath that.  Those are the

20    two major ones that I'm aware of.

21         Q.      Well, are you familiar with an

22    organization called PEPA?

23         A.      Yes, yes, Purchase

24    Environmental Protection Association, I

25    think, yes, and they are a member of this

Page 21

```
 1                  N.  HARTMAN
 2   coalition I mentioned, as well.
 3        Q.    So, to your knowledge, what
 4   other groups make up The Coalition for the
 5   Prevention of Airport Expansion?
 6        A.    I think the Sierra Club is
 7   there, and I know there's quite a few
 8   others, but I don't remember a specific
 9   group there.
10        Q.    So, have you ever met with
11   representatives from PEPA?
12        A.    Yes.
13        Q.    And when was the last time you
14   had a meeting with PEPA?
15        A.    Six months ago.
16        Q.    And do you recall what the
17   subject matter was?
18        A.    It was generally about airport
19   issues overall.  I think there was several
20   PEPA members that were concerned about
21   traffic patterns, I believe it was related
22   to that.
23        Q.    And, to your recollection, did
24   they ever discuss the issue of the Terminal
25   Use Regulations and single-seat charter
```

Page 22

```
 1              N.   HARTMAN
 2  operations?
 3        A.     I definitely recall that,
 4  either from PEPA or other members of that
 5  coalition, that the topic had come up, I
 6  don't recall if that was what we discussed
 7  at the last meeting.
 8        Q.     Well, as part of your job as
 9  chair, do you routinely meet with advocacy
10  groups?
11        A.     Yeah.  I mean effectively I'll
12  meet with members of the public, other
13  advocacy groups.  I pretty much would never
14  turn down a meeting if somebody wanted to
15  discuss about the airport.
16        Q.     And then does the board meet
17  with these groups, as well?
18        A.     From time to time we do have
19  them attend our meetings, I don't recall
20  that we've specifically had the coalition
21  attend the meeting; however, there are at
22  least two members of the board that are on
23  the coalition and they are effectively
24  representing that group.
25        Q.     Which two members are those?
```

```
                                              Page 23
 1                    N.   HARTMAN
 2          A.      Peter Schlactus is involved
 3     there and I think Rob Fleisher is also a
 4     member.   I think actually a third maybe, as
 5     well, Tracy Levy I believe is also
 6     associated with that.
 7          Q.      Does the board operate using
 8     Robert's Rules of Order?
 9          A.      Loosely, yeah.
10          Q.      Can anyone speak at a board
11     meeting?
12          A.      Yes.
13          Q.      With obviously your permission
14     as chair?
15          A.      Yes.
16          Q.      Does the board ever meet with
17     representatives from airlines that operate
18     at the airport?
19          A.      In the last -- since I've been
20     on the board I know -- I think there's been
21     representatives that have been there, I
22     don't think we've like formally set up a
23     meeting with them, to my knowledge, but at
24     some point in the past they probably would
25     have.
```

```
 1              N.  HARTMAN
 2        Q.    But your testimony is, that
 3   during your term as chair, and membership,
 4   I'm going to go back to when you were
 5   actually a member, that goes back to '19,
 6   you don't recall any meetings with airline
 7   representatives --
 8        A.    No --
 9        Q.    -- with the board?
10        A.    -- no, not that I --
11        Q.    As a policy, would you meet
12   with them?
13        A.    If they wanted to meet, yes.
14        Q.    Are you familiar with JSXAir,
15   Blade Urban Air Mobility, and XO Global?
16        A.    Yes.
17        Q.    So, those are our clients.
18        A.    Yes.
19        Q.    So, if I reference plaintiffs,
20   that's what I'm talking about.  Is that
21   okay with you?
22        A.    Yes.
23        Q.    And when did you first hear of
24   them?
25        A.    Probably just seeing them
```

```
                                        Page 25
 1                  N.   HARTMAN
 2   around the airport, and also I've seen
 3   their advertisements maybe three, four
 4   years ago I would say.
 5          Q.     And in your capacity as a
 6   member of the board, Airport Advisory
 7   Board, you know, did you have any
 8   interaction with these three airlines?
 9          A.     No.
10          Q.     Could you describe to me how
11   they operate at -- I'm going to say HPN,
12   Westchester County Airport?
13          A.     So, my understanding is
14   there's -- some of their operations are
15   under Part 135 as more traditional charter
16   flights, and then some of them are
17   operating as -- either all the time or part
18   of the time -- as a Part 380 public charter
19   operation.  They may have other operations,
20   too, but those are the ones that I've most
21   commonly seen.
22          Q.     And could you describe for me
23   what a Part 135 operator is?
24          A.     Part 135 would be an operator
25   that's authorized to effectively do
```

```
 1              N.   HARTMAN
 2   charters, and the FAA has very nuanced
 3   descriptions of what they consider to be a
 4   charter, but effectively individuals
 5   looking to arrange for a flight, and then
 6   arranging with an operator to have that
 7   flight, and there's lots of rules about,
 8   Can that be scheduled in advance?  Or is
 9   that an on-demand basis?  But that's, at a
10   high level, you know, what a 135 would be.
11   Part 380 -- oh, sorry.
12        Q.    Well, that's my next question.
13        A.    Sorry.
14        Q.    No, that's okay.  You read my
15   mind.  Could you describe what a Part 380
16   operator is?
17        A.    So, Part 380 is what the FAA
18   calls a public charter, and essentially
19   it's a, as I understand it, it's sort of a
20   hybrid between the booking of travel and
21   the servicing of travel.  So, there is one
22   legal entity that would offer travel to
23   individuals, under various arrangements
24   could book a seat, you could book a trip,
25   other things of that nature, and that those
```

```
                                           Page 27
 1                    N.   HARTMAN
 2     legal entities then have relationships
 3     with, I believe, a direct air carrier,
 4     which would be, I think most frequently, a
 5     Part 135 operator to, in essence, take the
 6     group of individuals that have expressed
 7     their interest in traveling and then
 8     chartering an operation to deliver on that
 9     interest in travel.
10          Q.     Does Westchester County Airport
11     have both Part 135 and Part 380 operators?
12          A.     Yes.
13          Q.     And as chair of the board, are
14     you familiar with those?
15          A.     The 135, there are many
16     different operations, large and small, the
17     Part 380, the ones I'm familiar with, are
18     essentially your clients.
19          Q.     To your knowledge, are there
20     any others other than my clients?
21          A.     I've been told that there's --
22     operations have happened in the past, but
23     I'm not personally familiar with any of
24     them other than your clients.
25          Q.     You've been told by whom?
```

```
 1                    N.   HARTMAN
 2         A.    Well, the filings in your case
 3    essentially.
 4         Q.    Other than the filings in this
 5    matter, has anyone else told you that they
 6    were?
 7         A.    No.
 8         Q.    So, is it safe to say you're
 9    familiar with the business model of my
10    clients?
11         A.    Yes.
12         Q.    Now, have you ever reached out
13    to any of my clients to get information
14    about their operations?
15         A.    No.
16         Q.    And do you know how long
17    they've been operating at HPN?
18         A.    From my own observations, four
19    years or so.
20         Q.    And have you ever received a
21    complaint about any of their flights?
22         A.    Yes.
23         Q.    And what complaints were those?
24         A.    There were complaints from
25    members of the Airport Advisory Board
```

Page 29

```
 1              N.   HARTMAN
 2   questioning whether they were in violation
 3   of the Terminal Use Agreement.
 4        Q.    Let me rephrase the question.
 5   Have you ever received a complaint about
 6   any particular or individual flight of my
 7   clients?
 8        A.    Oh, as in like a noise
 9   complaint?
10        Q.    Yes, or any other kind of
11   complaint you might get.
12        A.    So, I don't recall -- so, let
13   me back -- so, we get reporting about noise
14   complaints and complaints overall, they're
15   usually very aggregated, I don't recall a
16   specific instance where one of your
17   clients' flights was specifically called
18   out and named; however, I would be very
19   surprised if they were not in the aggregate
20   data overall because --
21        Q.    Why?
22        A.    We tend to get complaints about
23   jet operations of all types.  The airlines,
24   charter operators, corporate operators, and
25   so over several years it would be very
```

```
                                        Page 30
 1                  N.   HARTMAN
 2   surprising if your clients were not somehow
 3   in there.
 4          Q.    But you're not aware of any
 5   specific complaint about any of our
 6   flights?
 7          A.    In terms of noise?
 8          Q.    Let's start with noise.   In
 9   terms of noise, yes.
10          A.    Not that I can recall, no.
11          Q.    So, are you aware of any other
12   complaints about my clients' operations?
13          A.    The only complaints that I
14   recall were related to the Terminal Use
15   Agreement specifically.
16          Q.    Okay.  And who -- let me take a
17   step back, sorry.  Who made those
18   complaints to you?
19          A.    There was members of the board
20   were commenting on it, I believe, in the
21   conversations I had with members of the
22   public it had come up a few times, I don't
23   recall kind of specifically when or where,
24   but there had been a range of complaints
25   related to questioning if those operations
```

Page 31

                    N.   HARTMAN

1

2   were allowed to do what they were doing.

3        Q.   Okay.  And which board members?

4        A.   Mr. Schlactus and Mr. Fleisher,

5   in particular, I think had made complaints

6   about that, or I should say were raising

7   questions about it.

8        Q.   Other than Mr. Fleisher and Mr.

9   Schlactus, anyone else on the board?

10       A.   Not that I recall, no.

11       Q.   And do you recall the names of

12  any members of the public that raised this

13  question with you?

14       A.   I believe that it had come up

15  in one of my conversations with PEPA, and

16  that would have been with the executive

17  director of PEPA, Gould or Gould, I can't

18  remember if it's Gould or Gould, but we had

19  had a number of conversations related to

20  just topics of the day related to the

21  airport, and I believe this had come up at

22  one point.

23       Q.   Do you remember when that

24  conversation took place?

25       A.   I would guess between six and

```
                                              Page 32
 1                    N.   HARTMAN
 2   18 months ago, but I don't know exactly.
 3          Q.    So, are you familiar with a
 4   company called Avports?
 5          A.    Yes.
 6          Q.    And what is your knowledge of
 7   Avports?
 8          A.    Avports is contracted by the
 9   county to run the day-to-day operations of
10   the airport on behalf of the county.
11          Q.    And, so, what is the
12   relationship between the Airport Advisory
13   Board and Avports?
14          A.    I don't think there's any
15   official relationship; however, we work
16   very closely together because they are
17   operating the airport, the airport manager
18   and a number of people of the airport staff
19   attend their meetings and provide reports.
20               So, the airport manager
21   provides a report at every meeting, the
22   representative from the environmental
23   office provides a report about traffic and
24   noise complaints, and then any other topics
25   that we are discussing typically members of
```

```
                                      Page 33
 1                   N.   HARTMAN
 2   the Avports staff would chime in with
 3   information about that topic.
 4        Q.    Do you routinely reach out to
 5   them on airport issues?
 6        A.    Yes.
 7        Q.    Have you ever reached out to
 8   them about a complaint about my clients'
 9   operations?
10        A.    Yes.
11        Q.    Okay.  And when was the most
12   recent communication?
13        A.    I think it was somewhere around
14   2019 or early 2020.
15        Q.    And what was the nature of your
16   communication with Avports?
17        A.    There was questions about --
18   sort of as I was mentioning earlier -- the
19   questions about if the operations of your
20   clients were in violation of the TUR.
21        Q.    And did Avports respond to you?
22        A.    Yes.
23        Q.    And did they respond in writing
24   or verbally?
25        A.    Verbally.
```

```
                                          Page 34
 1                   N.   HARTMAN
 2        Q.     And who did you speak to at
 3   Avports?
 4        A.     I believe it was the airport
 5   manager at the time, Peter Scherrer.
 6        Q.     And did you have any other
 7   communication with Avports about this issue
 8   other than that one you just described?
 9        A.     I don't think so, no.
10        Q.     What is the relationship
11   between the board and the county
12   government?
13        A.     So, the board is defined in the
14   county's code as an entity, and I believe
15   the way that that's written is we advise
16   the county on matters related to the
17   airport, and so sometimes the county will
18   come to us and specifically ask for input
19   on a matter; however, other times we will,
20   on our own volition, provide feedback to
21   the county, as well.
22        Q.     Is there a county employee
23   that's designated as like a liaison to the
24   Airport Advisory Board?
25        A.     Yes.
```

```
1                    N.   HARTMAN
2         Q.     Who's that?
3         A.     Presently that's Aviva Meyer,
4    who I believe is the assistant to the
5    County Executive for Health &
6    Infrastructure I think is her title.
7         Q.     And do you work directly with
8    her?
9         A.     Yes.
10        Q.     Let's start with our stuff.
11   So, let's start with Exhibit O.  I'm going
12   to mark this as Hartman 1, please.
13                (Whereupon, Avports document
14        was marked Hartman Exhibit 1 for
15        identification as of this date by the
16        Reporter.)
17        Q.     So, I'm going to show you a
18   document that we're marking as Hartman 1.
19   Do you see that?
20        A.     Yes.
21        Q.     It's a letter from -- it says
22   Avports at the top?
23        A.     Um-hum.
24        Q.     It's dated January 21, 2022?
25        A.     Yes.
```

```
                                      Page 36
 1                 N.   HARTMAN
 2        Q.    Okay.  So, my first question
 3   is, have you ever seen this document
 4   before?
 5        A.    Yes.
 6        Q.    And when did you first see this
 7   document?
 8        A.    Sometime in early 2022, I
 9   believe, or mid -- maybe mid 2022, but it
10   was after the date that's listed there.
11        Q.    I'm sorry, it was after January
12   21st, 2022, you saw it first?
13        A.    Yes, yes.
14        Q.    So, your testimony is you never
15   saw this before January 21, 2022?
16        A.    Correct.
17        Q.    So, was the Airport Advisory
18   Board consulted about this policy --
19        A.    No.
20        Q.    -- prior to 1/21/22 --
21        A.    No.
22        Q.    -- which is the date of the
23   document?
24        A.    No, no.
25        Q.    Okay.  Thank you.  So, this
```

```
                                    Page 37
 1                N.   HARTMAN
 2   document is described as Policy Number 1,
 3   it's an operational policy, you know, on
 4   public charters.  Is that your
 5   understanding of it?
 6         A.    Yes.
 7         Q.    And, to your knowledge, is this
 8   a new policy?
 9         A.    Yes.
10         Q.    And is it normal that the
11   Avports would promulgate a new policy
12   without consulting the Airport Advisory
13   Board?
14              MS. MARINO:  Objection to form.
15         You can answer.
16         A.    I don't know that there's been
17   a lot of new policies, but relative to
18   other policies we were consulted or made
19   aware of prior to the fact.  So I guess,
20   yes, the answer to your question would be
21   yes.
22         Q.    But it's your testimony you
23   were not consulted before this document was
24   sent out?
25         A.    Yes.
```

```
                                        Page 38
 1                 N.   HARTMAN
 2        Q.     Thank you.   Prior to January
 3   21st, 2022, had the Airport Advisory Board
 4   discussed the issue of my clients'
 5   operations?
 6        A.     Yes.
 7        Q.     And do you remember when those
 8   discussions took place?
 9        A.     I think there had been a number
10   of points when the topic was raised, but
11   the earliest that I recall was in 2019.
12        Q.     When did you first get a copy
13   of this document?
14        A.     It was sometime later in 2022,
15   I don't remember exactly when, though.
16        Q.     And when you received the
17   document, did you share it with anybody?
18        A.     I don't recall, but I possibly
19   did.
20        Q.     And when you received the
21   document, did you react to it?
22              MS. MARINO:   Object to form.
23        You can answer.
24        A.     What do you mean by react to
25   it?
```

```
                                        Page 39
 1                  N.   HARTMAN
 2        Q.     Did you have an opinion on it?
 3        A.     I'm sure I did probably.
 4        Q.     And would you share that
 5   opinion with us, please?
 6                MS. MARINO:  Object to form.
 7        You can answer.
 8        A.     That it appears to be
 9   clarifying how the TUR would apply to these
10   operators given some potential ambiguity
11   with the original TUR language as it
12   applies to a Part 380 operation.
13        Q.     So, is it fair to say you
14   support this policy?
15                MS. MARINO:  Object to form.
16        You can answer.
17        A.     Well, I think there's probably
18   a lengthy answer to that question.
19        Q.     Okay.
20        A.     I think the way the TUR is
21   currently written in the county code it
22   would appear that the definition would
23   encompass that of your clients and some
24   language related to seats sold and whether
25   that be by the operator or charterer, so
```

1                    N.   HARTMAN

2    it's a very broad definition.  I think the

3    question that I had had, and it's related

4    to the answer to your question is, Was that

5    always the definition?  Because as I had

6    understood the definition of the TUR, it

7    was for scheduled airline operations.  When

8    the TUR originated in 1985 there was a

9    settlement, and broadly around the airport

10   was spoken that the TUR was for scheduled

11   operations, and I believe the specific

12   language in the TUR is -- the original

13   language of the TUR says scheduled

14   operations or scheduled airline operations.

15            The FAA does not consider a

16   Part 380 operations to be a scheduled

17   operation, so I guess whether or not I

18   support it depends on whether or not, at

19   the time ANCA came into effect, the

20   definition of the TUR is as it is currently

21   written today.  If that was the case then I

22   would support it, but I don't know if --

23   and I think that's the legal question

24   you're all trying to answer is, Is that

25   current definition a definition in 1990, or

```
                                    Page 41
 1                   N.   HARTMAN
 2   had that definition somehow been made more
 3   restrictive since 1990?
 4        Q.      Thank you.   As a matter of
 5   policy, as chair of the Airport Advisory
 6   Board, do you agree with this policy?
 7               MS. MARINO:   Object to form.
 8        You can answer.
 9        A.      If the current TUR is the
10   language that was used at the time when the
11   FAA sort of grandfathered everything in,
12   then I would definitely support the
13   county's attempts to enforce its laws.
14        Q.      Do you know if this document
15   was placed on an agenda of the Airport
16   Advisory Board?
17        A.      It was not, to my knowledge.
18        Q.      So, we're going to go to M and
19   N.  So, that's Hartman 2.
20               (Whereupon, Local Law Number 12
21         was marked Hartman Exhibit 2 for
22         identification as of this date by the
23         Reporter.)
24        Q.      I'm going to show you a
25   document that's marked Hartman 2.   The top
```

```
 1                N.   HARTMAN
 2  says Local Law Number 12, 2004.  I'm going
 3  to ask you to look at it briefly.  Okay?
 4        A.    Yes.
 5        Q.    Have you seen this before?
 6        A.    Yes.
 7        Q.    Okay.  And I'm just going to
 8  refer you to Section 7124621,
 9  Applicability.  Do you see that?
10        A.    Yes.
11        Q.    So, could you read that
12  paragraph for me, please?
13        A.    Applicability:  This section
14  shall apply to all use of the passenger
15  terminal at the terminal ramp at the
16  Westchester County Airport by airlines
17  providing scheduled passenger service.  The
18  terminal ramp shall be for the exclusive
19  use of airlines providing scheduled
20  passenger service.  This section does not
21  apply to any activities by airport users
22  not providing passenger service or not
23  using the terminal building or the terminal
24  ramp.
25        Q.    Thank you.  So, reading that
```

Page 43

```
 1               N.   HARTMAN
 2   paragraph, would you agree that the
 3   Terminal Use Procedures do not apply to
 4   airport users not using the terminal
 5   building or terminal ramp?
 6               MS. MARINO:   Object to form.
 7        You can answer.
 8        A.    Let me read this one second
 9   again, sorry.
10        Q.    Just Paragraph 1,
11   Applicability, that's it.
12        A.    Yeah.   Yes, as I read that it
13   says, If you're using the terminal, then it
14   applies, but it doesn't appear to say that
15   if you're not using the terminal you must
16   use the terminal, if that's the nature of
17   your question.
18        Q.    Well, I guess if you just look
19   at the last sentence in that paragraph --
20        A.    Yeah.
21        Q.    -- would you agree that this
22   does not apply to airport users not using
23   the terminal building or terminal ramp?
24        A.    Yes, that's what it says.
25        Q.    Okay.   Thank you.   So, I'm
```

```
 1                  N.   HARTMAN
 2   going to give you Exhibit N, and we're
 3   going to mark that Hartman 3.
 4               (Whereupon, Rules and
 5         Regulations were marked Hartman
 6         Exhibit 3 for identification as of
 7         this date by the Reporter.)
 8         Q.    I'm just going to ask you to
 9   skim through that, and I'm going to ask you
10   a question about it.  Have you ever seen
11   this document before?
12         A.    This is a section of the county
13   code, correct.
14         Q.    Well, I can't answer that
15   question for you.  It says on the front,
16   Rules and Regulations for Westchester
17   County Airport.  You tell me, my question
18   to you is, have you ever seen this before?
19         A.    So, I've seen the county code
20   chapter, which is referred to as the rules
21   of the airport, so provided that is this,
22   then yes, I have seen it.
23         Q.    So, I'm going to ask you to
24   look at Section 712.462, which is on
25   Page -- well, there's a Bates stamp at the
```

```
                                        Page 45
 1                 N.   HARTMAN
 2   bottom, that would be 6538, if it's helpful
 3   here at the bottom, yeah, those little
 4   Bates stamp.  So, if you jump to 6538, COW
 5   stands for County of Westchester, which
 6   means they produced this document for us.
 7   So, I'm going to ask you to look down at
 8   712.462, Paragraph 1, and then read that
 9   for me, please.
10        A.    Sure.  This section shall apply
11   to all use of the passenger terminal and
12   the terminal ramp at Westchester County
13   Airport by airlines providing passenger
14   service as that term is defined herein.
15   The terminal ramp shall be for the
16   exclusive use of airlines providing
17   passenger service.  This does not apply to
18   any activities by airport users not
19   providing passenger service.  All passenger
20   service provided at the airport shall be
21   provided at the terminal.
22        Q.    Thank you.  So, would you say
23   that this definition is different than the
24   one in Hartman 1?
25               MS. MARINO:  Object to form.
```

```
                                             Page 46
 1                  N.   HARTMAN
 2          You can answer.
 3          A.     Yes.
 4          Q.     Do you know when the
 5   definitions were changed?
 6          A.     No.
 7          Q.     And, so, do you know if the
 8   Airport Advisory Board was involved in the
 9   drafting of the change?
10          A.     I do not.  And based on what it
11   says on the cover that would have been
12   prior to my -- long before my time.  It
13   says it was --
14          Q.     No, I understand you, I'm
15   asking, you know, if the board, that you're
16   the --
17          A.     No, not to my knowledge.
18          Q.     That's my question.  Thank you.
19   So, let's jump to R.  Hartman 4.
20                 (Whereupon, Agenda, 10/24/18,
21          was marked Hartman Exhibit 4 for
22          identification as of this date by the
23          Reporter.)
24          Q.     I'm going to ask you to look at
25   this document and see if you recognize it.
```

```
 1                    N.   HARTMAN
 2         A.     Yes, this appears to be a pack
 3    from one of our board meetings.
 4         Q.     So, attached to this document
 5    are the minutes, so I'm going to have you
 6    jump to the -- no, this is not Bates
 7    stamped, is it?  So, I'm going to have you
 8    go to -- there's a resolution about ten
 9    pages from the rear.  If you want I'll find
10    it for you to make it easier.  We're up to
11    Hartman 4.  So, this is our Exhibit R,
12    attached are the October 2018 AAB meeting
13    notes.  So, if you look on Page 29, you see
14    at the top where there's a resolution?
15         A.     Yes, yeah.  Starting Whereas?
16         Q.     Yes, correct.  And it says,
17    Whereas the Westchester County Airport
18    terminal use procedures applies...?
19         A.     Um-hum.
20         Q.     So, have you ever seen this
21    resolution?
22         A.     Yeah.  I was not on the Airport
23    Advisory Board at this time, but I do
24    believe I had seen this somewhere before.
25         Q.     Okay.  And, so, what is your
```

```
                                      Page 48
 1                 N.   HARTMAN
 2   understanding of this resolution?
 3         A.    It's attempting to have the TUR
 4   enforced against some named operators on
 5   here, specifically says JetSmarter, Blade,
 6   ClipperJet, and other booking services
 7   where sole seats are sold individually for
 8   nine or more passengers.
 9         Q.    So, after a resolution gets
10   passed, where does it go?
11         A.    We would provide it back to the
12   county.  Typically in practice I would --
13   well, Aviva was not in that role at that
14   time, but it would go to Aviva and she
15   would pass it back to the county.  She was
16   not in that role at this time.
17         Q.    Are you familiar with any
18   discussion that took place prior to the
19   adoption of this resolution?
20         A.    Not directly, no.
21         Q.    And do you know if, in fact,
22   this resolution was adopted?
23         A.    I don't know.  I was -- this
24   was before I was a member of the board, so
25   I don't know.
```

```
 1                    N.   HARTMAN
 2        Q.     And, so, do you know how this
 3   got to the board, on the board agenda?
 4        A.     Well, per what I was saying
 5   earlier, somebody on the board would have
 6   likely proposed it or put it on the agenda.
 7        Q.     Thank you.  So, I'm going to
 8   jump up to A.  Are you good?  Do you want
 9   to take a break?
10        A.     I'm good.
11        Q.     So, we're up to Hartman 5.
12               (Whereupon, Agenda, 11/14/18,
13               was marked Hartman Exhibit 5 for
14               identification as of this date by the
15               Reporter.)
16        Q.     So, Mr. Hartman, I'm going to
17   show you a document we've marked as Hartman
18   5.  Can you look at this and see if you
19   recognize this document?
20        A.     It appears to be the board pack
21   from a November 2018 meeting.
22        Q.     I'm going to direct your
23   attention to New Business, Item C.  What is
24   that?
25        A.     It says, Discussion of Terminal
```

1                N.   HARTMAN

2    Use Regulations applicability to charter.

3         Q.    Okay.  So, were you at the

4    meeting, this meeting?

5         A.    I believe I was.  Can I check

6    the meeting?  Because I was attending -- or

7    maybe -- maybe I was not.  I was at a

8    meeting -- well, okay.  I was there at a

9    meeting when there was a presentation

10   regarding rehabilitation of the runway, I

11   was definitely at that meeting, I don't see

12   my name listed as being in attendance,

13   but -- so, I don't specifically recall, but

14   I was at a meeting around that time, yeah.

15        Q.    Well, the meeting attached --

16        A.    Oh, that's the previous.

17        Q.    -- is October 24th, which you

18   were not attending.

19        A.    I see.

20        Q.    I just want to know if you were

21   in attendance on November 14th, 2018?

22        A.    Actually, yes, I believe I was,

23   because I was looking at the meeting

24   minutes from the October 24th meeting.

25        Q.    I understand.

```
 1                    N.   HARTMAN
 2         A.     So, I believe I was, yes.
 3         Q.     And do you recall the
 4   discussion, under New Business, Discussion
 5   of Terminal Use Regulations applicability
 6   to charter?
 7         A.     Not directly, no.  I mean most
 8   of what I remember about that meeting was
 9   related to the runway repaving component.
10         Q.     Do you recall if there was any
11   discussion on new business, I'm going to
12   say 10C discussion, do you recall if there
13   was a discussion?
14         A.     I don't specifically recall.  I
15   know there was a general discussion about
16   the topic at some point around that time,
17   but I don't remember this meeting
18   specifically if there was a discussion.
19         Q.     So, we're going to jump to S.
20   This is 6, Hartman 6.
21              (Whereupon, Agenda, 1/23/19,
22         was marked Hartman Exhibit 6 for
23         identification as of this date by the
24         Reporter.)
25         Q.     So, I'm going to show you a
```

```
                                            Page 52
 1                N.   HARTMAN
 2   document marked Hartman 6, which is the
 3   agenda for January 23rd, 2019.  Do you see
 4   this, what you have in front of you?
 5        A.    Yes.
 6        Q.    Attached to this agenda are the
 7   minutes from the November meeting?
 8        A.    Yes.
 9        Q.    So, I'm going to direct your
10   attention to the minutes of the November
11   meeting.  And I'm going to ask you to take
12   a few minutes to read those minutes, or at
13   least look through them, if you would.
14        A.    Sure.
15        Q.    And my specific question is, do
16   you see any record of any conversation
17   about the TUR applicability to what was in
18   the prior, which was on the agenda?
19        A.    No, it does not appear that
20   there's any discussion about that
21   resolution.
22        Q.    Thank you.  So, is that a
23   common occurrence, that something would be
24   on the agenda for discussion and there's no
25   record of any discussion?
```

Page 53

```
 1                  N.   HARTMAN
 2         A.    Well, it can happen that we
 3   don't get to the item, and I do remember
 4   that meeting was particularly lengthy
 5   because of the discussion about the
 6   repaving project for the runway, which had
 7   a number of people, a number of extended
 8   conversations and public comments, which do
 9   seem to be reflected by those minutes.  So,
10   the fact that perhaps it -- just didn't get
11   to it on the agenda and ran out of time
12   would not be unusual per se.
13         Q.    All right.  So, we're done with
14   that exhibit.  Did you have any knowledge
15   of our clients' operations prior to the
16   commencement of the litigation, that you
17   know of?
18         A.    Yes, yeah.
19         Q.    And what was the extent of that
20   knowledge?
21         A.    Well, I was aware they existed,
22   because I physically saw them around the
23   airport, I received advertisements from
24   them, including now I still keep getting
25   JSX advertisements on Facebook almost
```

```
                                       Page 54
 1                  N.   HARTMAN
 2   daily.
 3        Q.    Good.
 4        A.    And also questions that people
 5   have been asking about the Terminal Use
 6   Agreement and whether it applied to these
 7   operators.
 8        Q.    And other than the people you
 9   mentioned in your prior testimony, are
10   there any other people that have asked you
11   about this?
12        A.    It was a topic that had come up
13   generally, and so there probably were, but
14   I don't specifically recall who it was or
15   when.
16        Q.    Do the operations of the
17   plaintiffs have any impact on your personal
18   use of the airport?
19              MS. MARINO:   Object to form.
20        You can answer.
21        A.    Yes.
22        Q.    And what would that be?
23        A.    So, JSX currently is based out
24   of Atlantic West, they park several of
25   their aircraft there, and they use the FBO
```

Page 55

```
 1                N.   HARTMAN
 2   lobby effectively as their terminal.  And
 3   when they have flights coming in and out
 4   that can be disruptive to the tenants of
 5   the FBO, because they're effectively using
 6   the FBO as a terminal and it gets very
 7   crowded, it's not really designed to do
 8   that.  They set up magnetometers sort of in
 9   the corner of the space, and, you know,
10   it's -- it creates some challenges because
11   it becomes very crowded.
12        Q.    So, are you inconvenienced by
13   their operation?
14        A.    Yes.
15        Q.    And does that affect your
16   judgement, as chairman of the advisory
17   board, as it pertains to my client?
18             MS. MARINO:  Object to form.
19        You can answer.
20        A.    I always seek to be as
21   impartial in terms of my role as chair, but
22   unavoidably I have my own opinions on
23   matters.
24        Q.    So, would it be easier for you
25   if they did not operate out of an FBO?
```

1                   N.   HARTMAN

2                   MS. MARINO:   Object to form.

3          You can answer.

4          A.     Well, I would say, if I can

5    clarify, there's two different types of

6    FBO's at the airport, there are light GA

7    designated FBO's, of which Atlantic West is

8    one, that's where I am based; and then

9    there are other FBO's that do not have that

10   designation.  So, I find it is disruptive

11   for those operations to be at a light GA

12   FBO in part for some of the reasons that I

13   described, and in part because they take up

14   space that could be used for light GA

15   activities, which is what the primary

16   purpose of those facilities is supposed to

17   be.  However, if they were at one of the

18   other FBO's that do not have those

19   designations and generally do not have

20   light GA traffic then I don't think it

21   would be disruptive to the light GA

22   community.

23          Q.     How often do you take your

24   plane out to fly?

25          A.     Three or four times a month.

```
                                    Page 57

 1                 N.   HARTMAN
 2        Q.     Where do you go?
 3        A.     Usually either to Pennsylvania
 4   to visit family, or local airports that
 5   have restaurants and pilots get together
 6   there on the weekends.
 7        Q.     Okay.  Thank you.  So, you are
 8   familiar with the term FBO, obviously --
 9        A.     Yes, yes.
10        Q.     -- since you've mentioned it
11   many times.  But, for the record, could you
12   describe what an FBO is?
13        A.     So, it stands for fixed-based
14   operator, and the FBO serve a number of
15   purposes.  I once heard them classified as
16   a very fancy gas station, which is perhaps
17   one way.  They offer fueling services to
18   aircraft, that's one of their primary
19   businesses, they offer places to
20   permanently base aircraft that essentially
21   live at Westchester normally, like my
22   aircraft, on tiedown spots outside on the
23   ramp, or in spots inside in hangars, they
24   offer parking for transient aircraft, so
25   those that are coming in on a temporary
```

```
 1                  N.   HARTMAN
 2    basis, so places for them to park.  They
 3    offer a range of services associated with
 4    aircraft, like ground power units and
 5    servicing of the aircraft.  They typically
 6    have a lounge for passengers to use when
 7    they're arriving and departing, and a
 8    number of other kind of ancillary services
 9    that they would provide to customers.
10         Q.    And an FBO also would, for
11    people that aren't into aviation, would be
12    like a hangar, is it a fair description?
13    Is it a large hangar?
14         A.    Well, an FBO doesn't have to
15    have a hangar, but most FBO's do have some
16    form of hangars, either T hangars or larger
17    hangars that can fit multiple airplanes.
18         Q.    And these FBO's that are at
19    Westchester County Airport, do they lease
20    the property from the airport?  How is it
21    they can operate legally at the airport?
22         A.    Yeah.  My understanding is the
23    county owns all the land, they lease the
24    land to the operators, the operators have
25    typically long leases of 30-plus years, and
```

```
                                        Page 59
 1                  N.   HARTMAN
 2   then if -- at the end of that lease, if
 3   it's not renewed, the property and the
 4   facilities would return to the county.  So,
 5   the county technically owns it all, but
 6   it's leased to these operators.
 7           Q.    Does the Airport Advisory Board
 8   review the leases with the FBO's?
 9           A.    Not typically before they're
10   signed, no, but after -- we have seen them
11   after they've been signed.
12           Q.    Is the Airport Advisory Board
13   consulted by the county prior to either
14   entering into a lease or renewing a lease?
15           A.    Since I've been on their board,
16   advisory board, the topic of the content of
17   the leases has come up, but we've never, to
18   my knowledge, directly been consulted and
19   asked about it prior to a change being
20   made.
21           Q.    Okay.  I'm going to show you
22   another exhibit.  This one is a little bit
23   smaller, our Exhibit A.  Hartman 7.
24                 (Whereupon, email, 11/6/18, was
25           marked Hartman Exhibit 7 for
```

```
 1                    N.  HARTMAN
 2         identification as of this date by the
 3         Reporter.)
 4         Q.    So, Hartman 7.  I'm going to
 5    share what you have in front of.  It is an
 6    email from a Jonathan Wang, Wang --
 7         A.    Yeah.
 8         Q.    -- dated November 6th, 2018.
 9    So, I want you to just take a look at it
10    briefly.  And then, you ready?  Can I ask
11    you a question on it?
12         A.    Just give me a moment.  I want
13    to finish reading.
14         Q.    Go ahead.  Take your time.
15         A.    Okay.
16         Q.    Okay.  So, first question, have
17    you ever seen this document, this email,
18    I'm sorry?
19         A.    No.
20         Q.    Are you familiar with someone
21    named Jonathan Wang?
22         A.    Yes.
23         Q.    And how do you know him?
24         A.    He was previously a member of
25    the Airport Advisory Board, and also I
```

```
 1                 N.   HARTMAN
 2    guess you could describe a local activist
 3    on items related to the airport.
 4          Q.    Is he a pilot, do you know?
 5          A.    Yes.
 6          Q.    Have you ever flown with him?
 7          A.    No.
 8          Q.    Have you ever had a
 9    conversation with him?
10          A.    Yes.
11          Q.    I would direct your attention
12    to Number 2 on this email, that Mr. Wang
13    apparently requested an item be placed on
14    the agenda on Terminal Use Regulations
15    applicable to charter operators selling
16    single seats.  Have you read that?
17          A.    Yes.
18          Q.    So, was Mr. Wang a member of
19    the Airport Advisory Board?
20          A.    At that time, yes.
21          Q.    Okay.  And, to your knowledge,
22    did the board have that conversation?
23          A.    This was just prior to me being
24    on the board, so I don't know if they had
25    the conversation at the meeting that he's
```

Page 62

1                    N.   HARTMAN

2    referring to, but the topic of the Terminal

3    Use Regulations did come up later.  He's

4    asking about that item for the agenda on

5    the 14th, so I don't know if they had that

6    conversation on the 14th.

7         Q.    To your knowledge, was this the

8    first time JetSmarter and SSCO's were

9    mentioned to the board?

10        A.    To my knowledge, yes, but I was

11   not attending every board meeting at that

12   time.

13        Q.    Understood, understood.  Only

14   to your knowledge.

15        A.    Yeah.

16        Q.    So, let's jump up to K.

17   Hartman 8.

18              (Whereupon, Agenda, 3/20/19,

19         was marked Hartman Exhibit 8 for

20         identification as of this date by the

21         Reporter.)

22        Q.    Okay.  I'm going to show you a

23   document marked Hartman 8, and I'm going to

24   ask you if you've seen this document.

25        A.    Yes.  This appears to be one of

Page 63

```
 1                    N.   HARTMAN
 2    our board meeting packs.
 3           Q.    And according to this document
 4    it includes Airport Advisory Board minutes
 5    from February 27th, 2019?
 6           A.    Yes.
 7           Q.    So, I'm going to direct your
 8    attention to the minutes, specifically Page
 9    8 on the minutes.  So, on the top of Page 8
10    there is a comment from Hugh Greechan.  Do
11    you see that?
12           A.    Regarding the highway sign?
13           Q.    Nope.  On Page 8 it says, It is
14    a state matter, we'll check into it.
15           A.    Yeah.
16           Q.    So, in that first bullet, do
17    you see that?
18           A.    That list of companies?
19           Q.    No, it says Jetsmarter --
20           A.    So, you're talking about right
21    below it, I'm looking above it.
22           Q.    Yeah.  Do you see that?
23           A.    Yes, yes.
24           Q.    So, could you just explain to
25    me what this discussion was about?
```

Page 64

1                    N.   HARTMAN

2          A.     Yeah.   So, as I recall there

3    was a flight -- as it says there's a flight

4    from Las Vegas to White Plains where a

5    passenger became disruptive and the flight

6    had to divert in order to address that

7    situation, and so there was discussion

8    amongst the board about if these types of

9    operations had a problem with security.

10               And as I recall there was a

11   brief discussion just related to how

12   security works in general on these flights,

13   and also, if I recall, some commentary to

14   the effect that the scheduled airliners are

15   not immune from security incidents, either,

16   and that there have been security incidents

17   where county police have to remove people

18   from aircraft and such, so that this was

19   not unique to these operators.

20          Q.    Was that the first time you had

21   heard of JetSmarter?

22          A.     I don't recall.  I mean in this

23   context probably, but they -- there's lots

24   of these operators around the airport, so I

25   may have heard of it previously.

1                    N.   HARTMAN

2          Q.      Have you, as a member of the

3    board, ever been made aware of any security

4    issues as it pertains to the single-seat

5    charter operations?

6          A.      There's been a number of

7    conversations on the board, over the last

8    few years, about security operations of

9    those operators.  In general it's been --

10   it's been me, actually, interrupting when

11   somebody makes comments to the effect of

12   there is no security, and when I would ask

13   for clarification they would say, Well,

14   they don't go through the TSA, and I would

15   clarify, that the lack of a traditional TSA

16   checkpoint is not no security, that it is

17   simply a different model.  So, just to --

18   and to clarify, that it's not a total free-

19   for-all, that there is actually security in

20   place.

21               MR. NOTO:  Thank you.  I'm

22          going to take a five-minute break if

23          that's okay with everyone and then

24          resume?

25               MS. MARINO:  That's fine.

```
 1              N.   HARTMAN
 2              MR. CAREY:  Yeah, it's 11:07.
 3       Can we just come back at 11:15?
 4              MR. NOTO:  Yes, sure.
 5              (Whereupon, a short recess was
 6       taken.)
 7       Q.     And, so, we're on the record so
 8  you're still under oath.  I'm going to show
 9  you a document that's Hartman 9.
10              (Whereupon, email, 3/1/19, was
11       marked Hartman Exhibit 9 for
12       identification as of this date by the
13       Reporter.)
14       Q.     So, I'd like you to take a look
15  at this document.  It has a Bates stamp, so
16  we got this 5947 at the bottom.
17       A.     Um-hum.
18       Q.     Okay.  So, first question is,
19  this document contains, it's from Susan
20  Spear.  Do you know who Susan Spear is?
21       A.     Yes.
22       Q.     Who is Susan Spear?
23       A.     She was effectively at the time
24  doing the role that Aviva Meyer is doing
25  now as it relates to the Airport Advisory
```

Page 67

1                    N.    HARTMAN

2    Board.

3           Q.     And who's David Gutierra?

4           A.     I'm not familiar with who that

5    is.

6           Q.     So, as you see down below she

7    is apparently forwarding an email from

8    Peter Schlactus.  Have you seen this email

9    from Peter Schlactus?

10          A.     I don't believe so, no.

11          Q.     Well, do you know if this was

12   ever placed on an Airport Advisory Board

13   agenda?

14          A.     I know that Peter was very

15   vocal about this topic, and including

16   things that are mentioned here, but I don't

17   specifically recall this email ever being

18   something that was put on a board agenda.

19          Q.     Okay.  Do you see, in his first

20   paragraph, Peter says he appreciates the

21   work of the county law department?  Do you

22   see that?

23          A.     Yes.

24          Q.     And he makes reference to a

25   conclusion?

Page 68

```
 1                   N.   HARTMAN
 2         A.     Yes.
 3         Q.     Are you familiar with that?
 4         A.     I'm familiar that he had
 5   reached out to the county about this topic
 6   and that he was given some information,
 7   yes.
 8         Q.     And are you familiar with what
 9   information he was given?
10               MS. MARINO:  Objection.  I'm
11         just going to caution the witness
12         here, as it relates to any attorney-
13         client privileged communication, I
14         would advise the witness not to
15         answer.  If there's other information
16         that you are aware of you can
17         respond.
18               MR. NOTO:  Yeah.  I mean, if
19         it's from Peter then it's not
20         privileged.
21               MS. MARINO:  I understand.
22         A.     So, my understanding was that
23   he had raised concerns about these issues,
24   and either I or somebody referred him to
25   speak to the airport manager about them.  I
```

```
 1                N.  HARTMAN
 2   believe he did, and I believe he was told
 3   by the airport manager at the time
 4   information that sounds similar to what is
 5   being described here.
 6        Q.    That really wasn't my question.
 7        A.    Okay.  Well, what was your
 8   question?
 9        Q.    Well, so, Peter makes reference
10   to a response to his concerns.
11        A.    Right.
12        Q.    And so my question to you is,
13   are you familiar with the response that
14   Peter was talking about?
15        A.    In reference to this email?
16        Q.    Yes.
17        A.    No, I don't believe so, no.
18        Q.    So, did you have any
19   conversations with Peter Schlactus about
20   his concerns about the county's response to
21   his concerns?
22        A.    Yes.
23        Q.    And what were Peter's concerns
24   as he explained them to you?
25        A.    Peter's -- concerns about the
```

```
 1                    N.   HARTMAN
 2   issue or concerns about the response?
 3        Q.    Both.
 4        A.    So, Peter's concerns about the
 5   issue were that he felt that the current
 6   language in the TUR applied to these
 7   operations because of the language
 8   regarding selling of individual seats and
 9   there being nine or more seats available.
10              MR. CAREY:  I just want to make
11         sure I have the right of this.  So,
12         the question with respect to the
13         response includes the legal response
14         that Peter Schlactus received?
15              MR. NOTO:  No, I'm saying the
16         conversations between him and Peter.
17              MR. CAREY:  But if Peter had
18         received a legal response from the
19         county, in his role as a member of
20         the AAB, and it was discussed
21         internally among AAB members, then
22         it would be privileged material.
23              MR. NOTO:  Well, not if it
24         comes from Peter, it's only
25         privileged if it comes from you.  I
```

```
 1                    N.   HARTMAN
 2          didn't ask him to tell me what's in
 3          the document, I asked him to tell me
 4          what Peter said.
 5                 MR. CAREY:  But the discussions
 6          were happening when they were both
 7          members of the AAB?
 8                 MR. NOTO:  I don't know, that's
 9          what I'm trying to find out.
10                 MR. CAREY:  I mean to the
11          degree that it was, it would be
12          covered by -- it's the county giving
13          legal advice to members of the AAB,
14          and if it's discussed internally
15          downstream it would retain its
16          privilege.
17                 MR. NOTO:  Well, again, I
18          haven't gotten to the question
19          whether this was placed on a -- I
20          guess we're off the record.
21                 (Whereupon, an off-the-record
22          discussion was held.)
23                 MR. NOTO:  So, let's go back on
24          the record, and if you could reread
25          the question.
```

Page 72

```
 1              N.  HARTMAN
 2              (Whereupon, the referred to
 3         question was read back by the
 4         Reporter.)
 5              MR. NOTO:  That's not
 6         privileged.  It's Peter's concerns.
 7              MR. CAREY:  To the degree we're
 8         getting -- because I thought the
 9         earlier question involved a response.
10              MR. NOTO:  So, he can answer
11         that.
12              MR. CAREY:  That one, yes.
13         A.    So, his concerns were that the
14    county was not enforcing the TUR relative
15    to the language that it contained at that
16    time in terms of its definition of where it
17    applied, specifically the selling of --
18    defining it as operations where more than
19    nine seats were told individually to
20    customers.
21         Q.   And did Peter tell you why he
22    thought they weren't enforcing those rules?
23         A.    I think he speculated that they
24    were not either aware of it or were
25    deciding not to, I think he had also had
```

```
 1                    N.   HARTMAN
 2  conversations with the airport management
 3  who told him that they didn't apply.
 4         Q.    And who in airport management
 5  told him that?
 6         A.    I believe it was the airport
 7  manager at the time.
 8         Q.    And at the time, meaning are we
 9  talking about March of 2019?
10         A.    Yeah, so that was -- I'm
11  sorry -- Peter Scherrer.
12         Q.    You've previously testified
13  that the airport --
14         A.    Yes, yes, Peter Scherrer, yes,
15  sorry.
16         Q.    So, back to this.
17         A.    Because he was -- he was --
18         Q.    Sorry.
19         A.    Yeah, so, like I said, I was
20  not aware that he had had this
21  correspondence with the county.  I had
22  conversations with Peter where I told him
23  to ask the airport manager what the
24  situation was, because at the time that
25  seemed like the most direct person, so
```

```
 1                N.    HARTMAN
 2   yeah.
 3          Q.     Thank you.  So, were you ever
 4   made aware that Peter reached out to the
 5   county law department for an opinion?
 6          A.     I believe he had mentioned that
 7   he had had some conversations, other
 8   conversations with the county, I don't
 9   think I was specifically aware that he had
10   had this detailed conversation with the law
11   department.
12          Q.     Okay.  Do you know if Peter
13   received any documents from the county law
14   department?
15          A.     That, I don't know.
16          Q.     But reading this email --
17          A.     Right.
18          Q.     -- would it -- would it leave
19   you with the understanding that he did?
20              MS.  MARINO:   Object to form.
21          You can answer.
22          A.     Well, documents as in this --
23   the email being a document, or are you
24   talking about --
25          Q.     No, in his email, when he says,
```

```
1                  N.  HARTMAN
2   Its conclusion that the terminal use
3   procedures do not apply, et cetera, et
4   cetera, et cetera.
5         A.    Oh, well, yes, it would appear
6   to imply that there was some correspondence
7   that's not included with this email, yeah.
8         Q.    Thank you.  And have you ever
9   seen that correspondence?
10        A.    I do not believe so, no.
11        Q.    Thank you.  Now, to your
12  knowledge, was this email ever placed on an
13  agenda of the board?
14        A.    Not that I recall, no.
15        Q.    Are you aware of any
16  conversations that the board might have had
17  about this email?
18        A.    Specifically this email, no.
19        Q.    Okay.  But are you aware of
20  conversations the board had about the
21  Terminal Use Procedures and our clients'
22  operations?
23             MS. MARINO:  Object to form.
24        You can answer.
25        A.    Yes.  Around about this time
```

```
                                       Page 76
 1                 N.   HARTMAN
 2    the topic periodically would come up in our
 3    meetings and informally amongst board
 4    members.
 5         Q.    Okay.  Is it your sense that
 6    there was a push on the board to restrict
 7    the operations of our clients at the
 8    airport?
 9              MS. MARINO:  Object to form.
10         You can answer.
11         A.    I think, at least as I saw it,
12    I would classify it as trying to understand
13    what was going on.  It was not clear
14    exactly the nature of the operations, in
15    terms from the regulatory aspect.  Where, I
16    mean, I can see they were advertising, but
17    under what -- like were they Part 135?
18    Were they Part 380?  Et cetera?  It was not
19    immediately clear.  And then we were also
20    trying to understand the wording of the TUR
21    and whether that would apply.  So, I think
22    that was the topic that was coming up.  I
23    would classify it as trying to understand
24    what the -- how this all fit together,
25    because as it -- you know, the first time I
```

```
                                      Page 77
 1                 N.   HARTMAN
 2   had read the TUR, as it was written in that
 3   sense, it sounds like it applies, so the
 4   fact that there would be AAB members kind
 5   of asking those questions I think seemed
 6   reasonable.
 7        Q.    And yet you had earlier
 8   testified that you did not invite the
 9   plaintiffs into a meeting to discuss their
10   operations?
11             MS. MARINO:  Object to form.
12        You can answer.
13        A.    That's correct, yeah.
14        Q.    Okay.  Would you normally
15   invite an operator in to discuss their
16   operations before adopting resolutions that
17   impact them?
18             MS. MARINO:  Object to form.
19        You can answer.
20        A.    We have in the past.  I mean, I
21   referenced the Million Air matter earlier
22   and we had invited them to come, and so
23   there is precedent for doing that, yeah.
24        Q.    But you didn't do it in this
25   case?
```

Page 78

```
 1                    N.   HARTMAN
 2          A.     No.
 3          Q.     Okay.  I'll jump up to T.
 4    Hartman 10.
 5                    (Whereupon, Agenda, 7/12/2019,
 6           was marked Hartman Exhibit 10 for
 7           identification as of this date by the
 8           Reporter.)
 9          Q.     I'm going to show you.  This is
10    Hartman 10.  I'm just going to direct your
11    attention to Page 5 on the minutes.
12          A.     Right.
13          Q.     Take a look at that.  So, I'm
14    showing you the minutes from the June 26th,
15    2019, meeting of the Airport Advisory
16    Board.
17          A.     Yes.
18          Q.     And you were present?
19          A.     Yes.
20          Q.     I'm directing you to Page 5
21    where there is a conversation between Nick
22    Hartman, you, and Peter Schlactus.  Do you
23    see that?
24          A.     Yes.
25          Q.     So, in this conversation you
```

```
                                     Page 79
 1                  N.   HARTMAN
 2   are explaining to him what a Part 135
 3   operator is; correct?
 4        A.    Yes.   Well, we're discussing
 5   questions about a 135.
 6        Q.    So, the first question is, why
 7   were you even having this conversation?
 8   Because there's nothing on the agenda that
 9   indicates that this is a topic.   So, what
10   started this conversation?
11        A.    So, it appears that this is in
12   relation to overall traffic volumes, and
13   that led into a conversation about these
14   particular types of operations, and so I
15   was trying to get some clarification from
16   Peter Scherrer, who was the airport manager
17   at the time, regarding the nature of the
18   operations and whether they were permitted.
19        Q.    And Peter Scherrer responded to
20   you; correct?
21        A.    Yes.
22        Q.    Did his response say that they
23   could not continue to do what they were
24   doing at the airport?
25              MS. MARINO:   Object to form.
```

```
 1              N.   HARTMAN
 2        You can answer.
 3        A.    He indicated that they were
 4   permitted to do what they were doing.  He
 5   did not reference Part 380, which I think
 6   at the time we didn't know that they were
 7   operating as a Part 380 operator, but he
 8   does say that they are permitted in terms
 9   of the way that they operate.
10        Q.    And what you're saying here is,
11   quoting you, I'm not saying I'm for it or
12   against it, that's an accurate quote, I
13   guess?
14        A.    Yeah, I recall saying something
15   to that effect, yes.
16        Q.    And you say, and I quote, Their
17   scheduled airline flights are legal under
18   Part 135, but it's different than charter
19   operations.
20        A.    Yes.  So, Part 135 -- this is
21   where it gets into some of the nuance, but
22   Part 135 is allowed to have scheduled
23   operations within precise limitations
24   between certain city pairs and a certain
25   number of times per week, but the FAA does
```

```
 1                    N.  HARTMAN
 2  not consider that to be a scheduled air
 3  carrier operation, which that's a little
 4  bit of what I'm referring to there, in the
 5  sense I was trying to understand, Was this
 6  135 operation, which to the general public
 7  appears to be an airline, a scheduled
 8  operation, are they operating under this
 9  caveat of Part 135?  Which would allow them
10  to operate a very limited scheduled
11  operation, but it's not technically a
12  scheduled operation.  It turns out, as we
13  now know it, that that actually wasn't
14  going on, this was really Part 380, but we
15  didn't know that at the time.
16         Q.    Based on the minutes of this
17  meeting, there are no other board members
18  that are commenting on this issue?
19         A.    Right -- well, yeah, Peter
20  Schlactus --
21         Q.    Other than you and Peter
22  Schlactus?
23         A.    -- me, and the airport manager.
24         Q.    So, according to these minutes,
25  there was no board vote on this issue?
```

Page 82

```
 1                    N.   HARTMAN
 2        A.      Correct.
 3        Q.      And there was no consensus of
 4   the board on this issue?
 5        A.      I think the only consensus was
 6   to try to understand more information about
 7   what was going on, but there was no
 8   recommendation made or anything, yeah.
 9        Q.      But in your quest to get more
10   information, nobody -- you didn't reach out
11   to the plaintiffs to get information from
12   them as to how they were operating?
13        A.      No.
14        Q.      Thank you.  Is it fair to say
15   then, that in April 2019, that the board
16   was aware of the operations of the
17   plaintiffs?
18               MS.  MARINO:   Object to form.
19        You can answer.
20        A.      We were aware that they
21   existed, I think we didn't necessarily know
22   the nuances of under which regulatory
23   elements of the FAA they were operating,
24   but we knew that they were operating in the
25   general nature of the business model, yes.
```

1                    N.   HARTMAN

2         Q.    And let me follow-up with that.

3    So, you are familiar with the business

4    model?

5         A.    Yes.

6         Q.    And could you describe that to

7    me?

8         A.    So, I'm specifically thinking

9    of JSX, which is the one that advertises

10   very heavily, but they have proposed --

11   well, they advertise what looks like

12   scheduled flights on certain days, to

13   certain cities, with prices, you can book a

14   seat on those flights, and they -- somewhat

15   similar to what a traditional airline would

16   do, you would turn up to the terminal and

17   get on the flight and go to that location.

18   I think that's, to the general public, how

19   the flight appears, but the -- they're

20   operating as a Part 380 operation, which is

21   the public charter, so they are --

22   according to their terms and conditions

23   they are chartering an aircraft based on

24   the interest documented by those that have

25   purchased seats, and then they contract

```
 1                 N.   HARTMAN
 2   with a direct air carrier, Part 135
 3   typically, and then they execute the
 4   charter flight.
 5         Q.    So, what is the difference then
 6   between a non-scheduled and a scheduled?
 7               MS. MARINO:   Object to form.
 8         You can answer.
 9         A.    Well, so the FAA has had lots
10   of legal opinions about that, but it's my
11   understanding that the FAA has defined that
12   a Part 380 and Part 135 operation is, in
13   their terms, not scheduled, even though,
14   yes, they might have published times when
15   they would occur.
16         Q.    So, based on the model you
17   described, these would be considered
18   non-scheduled?
19         A.    Per my understanding of the way
20   the FAA defines those words, yes, they
21   would non-scheduled.
22         Q.    Back to this document.  Do you
23   know who Nancy Barr is?
24         A.    Yes.
25         Q.    She made a reference to a
```

Page 85

```
 1                    N.   HARTMAN
 2   safety issue, you saw that?
 3        A.    Yes.
 4        Q.    She made a statement in here
 5   that's not accurate.  Did anybody correct
 6   her about the security?
 7              MS. MARINO:  Object to form.
 8        You can answer.
 9        A.    So, I think that's going back a
10   little bit to what I had mentioned
11   previously, where there were from time to
12   time comments about safety and whether or
13   not these operators had security, in the
14   general sense.  I do not recall if in this
15   particular meeting I commented about the
16   nature of the security arrangements of
17   these operators, but I have certainly done
18   so in the past, I don't recall if it was
19   specifically at this meeting.
20        Q.    So, is the Airport Advisory
21   Board aware of the security procedures that
22   these operators use?
23        A.    We have been told by the
24   airport management in a general sense how
25   that works, and I have personally observed
```

```
                                      Page 86
1                  N.   HARTMAN
2    it in the ways that I referenced earlier at
3    Atlantic West.  So, the Airport Advisory
4    Board's been informed about that a few
5    times.
6         Q.    So, are you familiar with the
7    term SITA and non-SITA?
8         A.    Yes.
9         Q.    So, are you familiar with the
10   process of creating a new master plan for
11   the airport?
12        A.    In a general sense, yes.
13        Q.    Well, have you participated in
14   the process?
15        A.    Yes.
16        Q.    Are you aware there were public
17   hearings?
18        A.    Yes.
19        Q.    Did you attend any of the
20   public hearings?
21        A.    Yes.
22        Q.    Did you speak at any of the
23   public hearings?
24        A.    Yes.
25        Q.    What did you say?
```

Page 87

1                    N.   HARTMAN
2          A.     As I recall I spoke primarily
3     about the need for the master plan to
4     address the future of light general
5     aviation at the airport.  I think I spoke
6     twice, I can't remember if I mentioned --
7     I've made lots of statements and I can't
8     remember if it was at that hearing or if it
9     was at other things.
10         Q.     Are you familiar with the term
11    airport expansion?
12         A.     Yes.
13         Q.     And what does that mean to you?
14         A.     So, I think it's a term that is
15    thrown around but often undefined.  I think
16    to me, and the way I've heard it often
17    described by others, is the physical
18    expansion of the airport's boundaries or
19    core components of it, like lengthening the
20    runway or making the -- you know, extending
21    the physical perimeter of the airport, but
22    I'm aware that other people define it
23    differently.
24         Q.     Well, so, has the Airport
25    Advisory Board discussed the term airport

Page 88

```
 1                 N.   HARTMAN
 2    expansion?
 3          A.    Yes.
 4          Q.    And has the board come up with
 5    a definition of airport expansion?
 6                MS. MARINO:  Object to form.
 7          You can answer.
 8          A.    We have.  It's been a hotly
 9    discussed topic.  I think we have in the
10    past referred to a county resolution, that
11    I believe was from 2003, where the county
12    put some definitions around that.  But we
13    have also, in letters that we have written
14    to the county, cited that even that
15    definition is not consistently acknowledged
16    or followed.  So, I think we've never made
17    a definitive statement about it, but it's
18    a -- we've made references to that term.
19          Q.    So, let me ask you this.  Then
20    what impact would more flights out of
21    Westchester have on the airport?
22                MS. MARINO:  Object to form.
23          You can answer.
24          A.    When you say impact, what do
25    you mean by that?
```

Page 89

1                  N.   HARTMAN
2        Q.    Well, I mean what impact would
3    additional flights out of the airport have
4    on the airport?
5              MS. MARINO:   Object to form.
6        You can answer.
7        A.    Yeah, I mean at some point you
8    would hit certain physical capacity limits
9    in terms of the amount of traffic a runway
10   could handle and the taxiways and parking
11   spots, so there would reach a point when
12   there would be physical limitations simply
13   because of the way the airport is designed,
14   but it depends on how much additional
15   traffic we're talking about.
16       Q.    Would the Airport Advisory
17   Board be in favor of having more flights
18   out of the airport?
19             MS. MARINO:   Object to form.
20       You can answer.
21       A.    I think the Airport Advisory
22   Board would be split on that topic.
23       Q.    Split 50/50 or --
24       A.    I think it depends.  There's a
25   lot of nuance to answering that question,

```
 1                    N.   HARTMAN
 2   right?  So, in related to things like the
 3   Terminal Use Agreement I think the general
 4   characterization would be that as long as
 5   the traffic stays within that Terminal Use
 6   Agreement people are okay with that, even
 7   though it may go up and down in given
 8   years.  In other places I think, generally
 9   speaking, the board would not like to see
10   the airport get a lot bigger, but more
11   traffic is kind of a relative term, the
12   airport has less traffic now than it used
13   to, so we could have considerably more
14   traffic and still be less than some
15   previous periods.  So, these terms --
16        Q.    So, you're saying the airport
17   has less traffic now?
18             MS. MARINO:  Object to form.
19        You can answer.
20        Q.    Well, that was his answer.
21        A.    Less traffic than it has in the
22   past, yes.
23        Q.    You mean traffic meaning cars
24   or airplanes?
25        A.    Airplanes.
```

```
                                          Page 91

 1                N.   HARTMAN

 2        Q.    So, currently the airport has

 3   less airplane traffic than it had in the

 4   past?

 5        A.    In terms of total operations,

 6   yes.

 7        Q.    Is that due to a reduction in

 8   light general aviation or in commercial?

 9   Now I'm going to -- okay, just to clarify.

10   When I say commercial, I'm talking about

11   Delta, JetBlue, when I go online and pay

12   $300 to fly to Miami, that's commercial.

13        A.    Right.

14        Q.    Light general aviation is

15   people like Nick Hartman who have their own

16   plane and fly in and out, or a corporate

17   executive.

18        A.    Right.  My recollection of the

19   numbers, and they do change a lot, is that

20   the airline operations are less than they

21   have been historically.

22        Q.    Airline meaning commercially?

23        A.    Airline meaning, yeah, Part

24   121, airline operations, yeah.  And the

25   charter and corporate operations have gone
```

```
                                        Page 92
 1                N.   HARTMAN
 2   up, and the light GA has gone down, I think
 3   that's a high-level summary, but that's my
 4   recollection.
 5         Q.    When you say the board would be
 6   split, are there people on the board who
 7   are advocates of more flights out of the
 8   airport?
 9         A.    I don't -- I wouldn't
10   characterize it as advocates of more
11   flights, I think they are advocates of
12   having improvements to the facilities,
13   which may indirectly result in more
14   flights, but generally just advocates to
15   improve the facilities at the airport.
16   I don't think anybody is advocating to have
17   more flights I guess to directly answer
18   your question.
19         Q.    Are there people advocating to
20   have fewer flights?
21         A.    Yes.
22         Q.    Members of the board or members
23   of the public?
24         A.    Both.
25         Q.    All right.  So, let me jump to
```

```
                                        Page 93
 1                    N.   HARTMAN
 2   L.   Hartman 11.
 3                 (Whereupon, Westchester County
 4           Airport document was marked Hartman
 5           Exhibit 11 for identification as of
 6           this date by the Reporter.)
 7           Q.    So, I'm going to show you a
 8   document that just says Westchester County
 9   Airport Executive Summary.  And I just ask
10   you if you've ever seen this document
11   before.
12           A.    This appears to be some sort of
13   like white paper written by an advocacy
14   group.  I don't know if I've seen this
15   specific document, but I'm aware that there
16   were similar documents prepared, but I
17   don't recall if I've ever seen this exact
18   document before.
19           Q.    So, do you know who prepared
20   this document?
21           A.    No, not at the moment.
22           Q.    Thank you.  I'll put it away.
23   We'll go to B.  Hartman 12.
24                 (Whereupon, Resolution,
25           COW00001159, was marked Hartman
```

Page 94

```
 1                    N.   HARTMAN
 2          Exhibit 12 for identification as of
 3          this date by the Reporter.)
 4          Q.    That's going to be Hartman 12.
 5   It's a resolution for the county.  This was
 6   a resolution adopted by your board.
 7          A.    Okay.
 8          Q.    Does this look familiar to you?
 9          A.    Yes.
10          Q.    And can you tell me what the
11   intent of this resolution is?
12          A.    As I recall there was
13   discussion about the fact that the landing
14   fees at Westchester were less than some
15   nearby similar airports, and attempting to,
16   or suggesting, I should say, to raise the
17   landing fees to generate more revenue.
18          Q.    Yes.  And, so, it is the -- if
19   you go to the bottom of the resolved
20   clause, they're looking to create a funding
21   plan that excludes FAA grants.  What is the
22   point of that?
23          A.    Yes.  Oh, yes.  So, there's
24   been a -- so, when the airport takes money
25   from the federal government there are grant
```

Page 95

```
 1                 N.   HARTMAN
 2  assurances that are a long list of
 3  requirements that the airport sponsor,
 4  which in this case would be the county, has
 5  to follow, and there is a -- some of the
 6  advocates, that would like to see some
 7  change at the airport, have a sort of
 8  theory, that if the airport stops accepting
 9  federal funding then these grant assurances
10  would expire at some point, and when they
11  expired then the county could do things
12  that would otherwise be limited by these
13  grant assurances.  So, I think they're
14  attempting to essentially make the airport
15  not rely on the federal monies, and then
16  after a period of time it could do things
17  that the federal government would normally
18  prevent.
19         Q.    And what things are those that
20  they could do that the federal government
21  could not prevent?
22              MS. MARINO:   Object to form.
23         You can answer.
24         A.    So, generally speaking, I think
25  the intent, as it was explained to me by
```

```
                                    Page 96
 1              N.   HARTMAN
 2  such individuals, was to limit -- to do
 3  things like impose a curfew, to limit
 4  traffic or certain types of operations at
 5  the airport.  Currently we have a voluntary
 6  restraint from flying, but based on the
 7  legal history of that it is strictly
 8  voluntary, so one of the things they would
 9  like to do would be to impose a permanent
10  curfew.
11        Q.    Did you vote on this
12  resolution?
13        A.    I don't recall.
14        Q.    Do you support this resolution?
15        A.    Reading it now, I would not,
16  no.
17        Q.    And among those things that
18  they think, the advocates think they can
19  do, would that include limiting my clients'
20  operations?
21              MS. MARINO:  Object to form.
22        You can answer.
23        A.    As per my understanding of the
24  motivations of those individuals, I would
25  imagine that to be the case, yes.
```

```
                                          Page 97
 1                  N.   HARTMAN
 2        Q.    And who are those individuals?
 3        A.    I would think it's primarily
 4   the coalition group that I mentioned
 5   earlier, that Coalition to Prevent
 6   Westchester County Airport Expansion.
 7        Q.    Coalition to Prevent Airport
 8   Expansion?
 9        A.    Yeah, that's generally where
10   those sort of comments would come from.
11        Q.    So, let's go up to C then.
12   Hartman 13.
13             (Whereupon, Resolution,
14             COW00001160, was marked Hartman
15             Exhibit 13 for identification as of
16             this date by the Reporter.)
17        Q.    This is another resolution.
18   Have you ever seen this resolution?
19        A.    I believe so, yes.
20        Q.    Okay.  Thank you.  And does the
21   board have a noise abatement policy?
22        A.    The board does not, no.  The
23   airport does, but the board does not.
24        Q.    And is the board happy with the
25   abatement program at the airport?
```

Page 98

1                    N.   HARTMAN
2          A.    I think the -- no, because the
3    noise abatement procedures essentially
4    direct traffic to fly over certain areas
5    that are -- well, as it says, that the
6    existing noise abatement procedure directs
7    traffic to fly over the Town of New Castle
8    and Pleasantville, so we have board members
9    that are in those areas and do not like
10   that.
11         Q.    Do you have board members who
12   don't live in Pleasantville and New Castle?
13         A.    Yes.
14         Q.    And do they find the noise
15   abatement program unsuccessful?
16         A.    I think -- I don't know if it
17   characterizes it as unsuccessful, but I
18   think that they would question its
19   effectiveness.
20         Q.    So, are you satisfied with the
21   noise abatement program as chair?
22         A.    I would -- I would say -- I
23   would say yes, in the sense that it has
24   been in place for a very long time, and it
25   defines a particular set of traffic

```
 1                    N.   HARTMAN
 2   patterns that have been established for
 3   many decades, and therefore, because
 4   airplanes will unavoidably create noise,
 5   that if people at least have a clear
 6   understanding of where it is, then they can
 7   make their own decisions about whether that
 8   is an issue of concern for them or not.  If
 9   we were to change the procedure then that
10   potentially could.
11        Q.    Is the board currently
12   contemplating changing the noise abatement
13   program?
14              MS. MARINO:  Object to form.
15        You can answer.
16        A.    The noise abatement program,
17   which is maybe a bit of a broad term, I
18   don't think so, but we are -- we had looked
19   at a potential alternative approach
20   procedure which would address the issue of
21   noise.  I wouldn't characterize that as a
22   noise abatement procedure, per se, but
23   yeah.
24        Q.    Okay.  Thank you for that.  On
25   to D.  This is Hartman 14, another
```

```
 1                    N.   HARTMAN
 2   resolution.  Take a look at this, please.
 3   Are you ready?
 4                 (Whereupon, Resolution,
 5            COW00001161, was marked Hartman
 6            Exhibit 14 for identification as of
 7            this date by the Reporter.)
 8            A.    Yes.
 9            Q.    So, have you ever seen this
10   resolution?
11            A.    I believe I have, yes.
12            Q.    And did you vote for it?
13            A.    I don't recall.
14            Q.    Well, do you support what it
15   says?
16            A.    No.
17            Q.    Do you know if the board
18   adopted this resolution?
19            A.    I don't recall.
20            Q.    Okay.  So, my question to you
21   is then why would the Airport Advisory
22   Board want the county to hold all capital
23   spending on aviation pending a master plan?
24                 MS. MARINO:  Object to form.
25            You can answer.
```

```
 1                    N.   HARTMAN
 2         A.     Well, I think the concern,
 3    which has been expressed broadly, is just
 4    that the master plan should be the thing
 5    that dictates the capital expenditure, and
 6    that having capital projects without the
 7    plan in place was inappropriate.  I think
 8    that was the spirit of what was going on
 9    here.
10         Q.    Do you know who proposed this?
11         A.    I believe it was Jonathan Wang,
12    but I'm not a hundred percent certain,
13    but -- so I guess the answer is no, I
14    don't.
15         Q.    And is Jonathan Wang still on
16    the board?
17         A.    No.
18         Q.    Okay.  Thank you.  Go on to E.
19    Hartman 15.  Does this look familiar?
20              (Whereupon, Resolution,
21              COW00001162, was marked Hartman
22              Exhibit 15 for identification as of
23              this date by the Reporter.)
24         A.    I believe I've seen this
25    before, yes.
```

```
 1                  N.   HARTMAN
 2       Q.    Did you vote for it?
 3       A.    I don't recall.
 4       Q.    Do you support it?
 5       A.    No.
 6       Q.    Can you describe the voluntary
 7  restraint from flying, the VRFF --
 8       A.    Yes.
 9       Q.    -- referenced in this
10  resolution?
11       A.    Yeah.  So, there was
12  previously, I believe it was in the 1980's,
13  a curfew that was put in place during
14  overnight periods that prevented traffic
15  from flying in and out of the airport that
16  included various penalties associated with
17  it.  The county was sued in federal court
18  by a range of parties, the court ruled in
19  favor of those parties and put an
20  injunction in place that prevents the
21  county from having a curfew essentially.
22       Q.    What is the curfew, between
23  what and what?
24       A.    Well, back then I don't know
25  what the hours were, but I was trying to
```

Page 103

```
 1              N.   HARTMAN
 2   explain where the VRFF came from.  But out
 3   of that the current VRFF was born, which is
 4   between 11 P.M. and 6:30 A.M., where
 5   essentially operators are requested to not
 6   operate during that period, but it is
 7   strictly voluntary, and there are
 8   operations that happen then, they are
 9   tracked in a database and reported as part
10   of our monthly board meetings and to
11   other -- I'm assuming the county, as well,
12   receives those reports.
13        Q.     What is the relationship
14   between the voluntary restraint curfew and
15   the leases of these various FBO's?
16             MS. MARINO:  Object to form.
17        You can answer.
18        A.     So, my understanding is the
19   leases contain provisions to ensure that
20   the tenants of those -- or the customers of
21   those FBO's are aware that this program
22   exists and are aware of the request they do
23   not operate during that period.
24        Q.     And do you know if the county
25   included any language on the curfew in
```

```
 1                    N.   HARTMAN
 2   these leases?
 3                MS.  MARINO:   Object to form.
 4        You can answer.
 5        A.    Yes, yes, there's references to
 6   the VRFF in at least a few leases that I
 7   have seen.
 8        Q.    All right.  Thank you.  Go on
 9   to F, Hartman 16.
10                (Whereupon, Resolution,
11             COW00001164, was marked Hartman
12             Exhibit 16 for identification as of
13             this date by the Reporter.)
14        Q.    Does this look familiar to you?
15        A.    Yes.
16        Q.    Did you vote for this?
17        A.    I do not recall.
18        Q.    Do you support it?
19        A.    No.
20        Q.    Okay.  You're in the minority
21   on a lot of this.  So, tell me, what's
22   ANOM's?
23        A.    It's -- I can't remember what
24   the acronym stands for, but it is a network
25   of noise sensors as well as a computer
```

Page 105

```
 1              N.   HARTMAN
 2  system and other data that tracks airport
 3  operations and the noise generated by
 4  airport operations in and out of the
 5  airport.
 6        Q.    And what is the genesis of this
 7  resolution?
 8        A.    So, there was conversation
 9  amongst members of the board, advisory
10  board, regarding the accuracy of the data
11  that was produced by these microphones and
12  the system overall, in part because the
13  data from the system did not always
14  cooberate complaints that were made in
15  terms of the overall levels of noise coming
16  from the airport, and so there was a theory
17  that the system was somehow not working
18  properly, and so I think that was the
19  origin behind what this is saying.
20        Q.    To your knowledge, did the
21  county adjust to the ANOM's system?
22        A.    So, I do recall speaking with
23  the airport management about the ANOM
24  system in relation to this topic of if it
25  was accurate, and was told that it is
```

```
1                    N.  HARTMAN
2    regularly audited by a third-party, and
3    there was no evidence that there was any
4    problems with this system.
5         Q.    Is Bruel & Kjaer still your
6    vendor for ANOM's?
7         A.    I believe so, yes.
8         Q.    On to G.  We're at 17.
9              (Whereupon, Resolution,
10          COW00001165, was marked Hartman
11          Exhibit 17 for identification as of
12          this date by the Reporter.)
13        Q.    Hartman 17.  Have you ever seen
14   this before?
15        A.    This one I don't remember, so
16   I'm not sure.
17        Q.    Well, it's from your --
18        A.    Do you remember what meeting it
19   was from?
20        Q.    I don't.  Hopefully you're
21   going to tell us that.
22        A.    Yeah, I think -- yeah, I think
23   I did, yes.
24        Q.    Okay.  So, did you vote for it?
25        A.    I don't recall.
```

```
 1                    N.   HARTMAN
 2        Q.    Do you support it?
 3        A.    In its entirety, no.
 4        Q.    Do you know who proposed this
 5   resolution?
 6        A.    I believe it was Jonathan Wang,
 7   but I'm not entirely sure.
 8        Q.    And do you know if it was
 9   adopted?
10        A.    I don't recall.
11        Q.    So, did the advisory board meet
12   with any of the impacted airlines before
13   adopting this resolution?
14        A.    Not to my knowledge, no.
15        Q.    Would the AAB meet with the air
16   operators impacted by this resolution?
17             MS. MARINO:   Object to form.
18        You can answer.
19        A.    If this became -- if this came
20   before me today, yes, I would say we
21   should, so yes.
22        Q.    Well, assuming this was already
23   adopted, would you still meet with them?
24        A.    Yes.
25        Q.    Okay.  Did the AAB get any
```

Page 108

```
 1                 N.   HARTMAN
 2  information from the county before adopting
 3  this resolution?
 4             MS. MARINO:  Object to form.
 5        You can answer.
 6        A.    Not to my knowledge.
 7        Q.    And did the AAB get any
 8  information from Avports before adopting
 9  this resolution?
10        A.    Not to my knowledge.
11        Q.    Why did the board recommend the
12  hiring of an outside law firm?
13             MS. MARINO:  I would just
14        caution the witness to the extent
15        he's been -- he or the board was
16        counseled by the law department, it's
17        attorney-client privilege, and I
18        would direct him not to answer.
19        Q.    Yeah, if you were -- yeah, but
20  I'm saying, here it's pretty -- the
21  question is, why did they ask to hire an
22  outside law firm?  That's the question.
23        A.    I don't know is the answer.
24        Q.    Yeah, that's fine.  Well, in
25  your opinion, has the board lost confidence
```

1                    N.   HARTMAN

2    in the county attorney's office?

3               MS.  MARINO:   Object to form.

4         You can answer.

5         A.    I think there are some members

6    of the board who would be frustrated

7    with -- if the county attorney was doing

8    things that they wanted, but I wouldn't

9    classify that as the board, in its

10   entirety, losing faith in the county

11   attorney's office.

12        Q.    Well, do you think the county

13   attorney's office is capable of handling

14   airport-related litigation?

15        A.    Yes.

16        Q.    And how often does the board

17   recommend the retention of outside counsel?

18        A.    To my knowledge, we have not

19   done that, but --

20        Q.    Well, I would --

21        A.    Yeah, apart --

22        Q.    Other than this resolution?

23        A.    Other than this, this is --

24   other than this, no, I would not know.

25        Q.    Do you know who Kirsch, Peter

```
1                    N.   HARTMAN
2    Kirsch, is?
3         A.    No.
4         Q.    Have you ever met him?
5         A.    Not to my knowledge.
6         Q.    Are you familiar with the firm
7    Kaplan, Kirsch & Rockwell?
8         A.    No.
9              MR. CAREY:  I'm sorry, just to
10        clarify, has there been testimony
11        that this was an adopted resolution?
12             MR. NOTO:  No, I'm asking him
13        if it was adopted.  It was before the
14        board obviously and this is part of
15        your package of documents.
16             MR. CAREY:  Was it before the
17        board obviously?
18             MR. NOTO:  Yeah, apparently it
19        was, but we can't find, you know,
20        minutes on it.
21             MR. CAREY:  It's Bates stamped,
22        so it was produced.
23             MR. NOTO:  You did produce it,
24        yes.
25             MR. CAREY:  And it also could
```

```
 1                  N.   HARTMAN
 2        have been a proposal attached to an
 3        email?
 4              MR. NOTO:  Yes, yes, that's why
 5        I'm asking him.
 6        Q.    That's it on that one.  Let's
 7   jump to H.  This is Number 18.  So, have
 8   you seen this before?
 9              (Whereupon, email, 6/22/22,
10        was marked Hartman Exhibit 18 for
11        identification as of this date by the
12        Reporter.)
13        A.    Yes.
14        Q.    And this is an email you wrote?
15        A.    Yes.
16        Q.    Okay.  And the recipients are
17   members of the board?
18        A.    Members of the board, Aviva
19   Meyer, Victoria Esters, and April Gasparri.
20   April is the present airport manager, and,
21   yeah, Victoria Esters works in the office
22   at the airport.
23        Q.    Do you remember writing this
24   email?
25        A.    Yes.
```

```
 1                    N.   HARTMAN
 2        Q.    And where did you get the
 3   information that you put in this email?
 4        A.    The specific information here
 5   was, I believe, from the public court
 6   filings that had taken place at the time.
 7        Q.    So, you didn't get any of this
 8   information from your attorneys?
 9             MS. MARINO:  I would caution
10        the witness --
11             MR. NOTO:  Well, he can say he
12        got it from you, he just can't -- I
13        understand anything you said to him
14        is privileged.
15             MS. MARINO:  Correct.
16        A.    I was careful to limit the
17   things that I was writing to be things that
18   were publicly available in the docket.
19        Q.    Just the question is, where did
20   you get it --
21        A.    Yeah, yeah.
22        Q.    -- and I'm not commenting on
23   the substance of it, I'm just saying, the
24   question is, where did you get the
25   information that you put in the email?
```

```
 1                    N.   HARTMAN
 2         A.     So, sometimes I would get
 3    material from the docket myself, sometimes
 4    the county would send me material from the
 5    docket, because it's --
 6         Q.     County meaning who?
 7         A.     The county attorney's office.
 8         Q.     Because there's a difference
 9    between county attorney and some other
10    department.
11         A.     And to clarify, because when it
12    was a federal case, it was in PACER.  I do
13    have a PACER account, but --
14         Q.     You do?
15         A.     Yeah.  But I figured --
16         Q.     Unusual for a non-lawyer.
17         A.     But because of the way it works
18    I'm always slightly nervous using it with
19    the charges, so given that the county has
20    access to all these documents, and they are
21    technically public record, sometimes I
22    would just ask for specific docket items
23    because then I wouldn't have to pay for it,
24    but they were --
25         Q.     So, your answer is you got it
```

Page 114

```
 1                    N.   HARTMAN
 2    from?
 3         A.    Some of it came directly from
 4    the county and some of it I obtained
 5    myself.
 6         Q.    Okay.  And when you say the
 7    county, do you mean the county attorney?
 8         A.    The county attorney's office,
 9    yes, I'm sorry.
10         Q.    Do you know which you got from
11    PACER and which you got from the county
12    attorney's office
13         A.    That, I don't recall, no.
14         Q.    Has the board ever discussed
15    what impact the operations of the
16    plaintiffs have on the airport?
17         A.    Yes.
18         Q.    And does the board think that
19    the operations of the plaintiffs constitute
20    an expansion of the airport?
21              MS. MARINO:  Object to perform.
22         You can answer.
23         A.    I believe some members of the
24    board would characterize it this way.
25         Q.    Would you say a majority of the
```

Page 115

```
 1                N.   HARTMAN
 2   board?
 3        A.    That would be hard for me to
 4   say, because we haven't specifically voted
 5   on it.
 6        Q.    Okay.  Can you identify any
 7   negative impact that the plaintiffs'
 8   operations have on the airport?
 9              MS. MARINO:  Object to form.
10        You can answer.
11        A.    On the airport, itself?
12        Q.    Yes.
13        A.    Well, I think I would refer to
14   my earlier testimony around me, as a light
15   GA pilot, and the fact that one of your
16   clients operates out of the terminal and
17   that can be disruptive to other customers
18   there, so I would characterize that as a
19   negative impact.
20        Q.    And then is that your only
21   negative -- other than being
22   inconvenienced, is there any other impacts
23   you can identify?
24        A.    I think the -- there's been
25   board members who have said that if
```

```
1                    N.   HARTMAN
2    there -- if they -- if TUR can't limit them
3    then there could, in theory, be a lot of
4    activity above and beyond what the TUR was
5    intending.  I think it's been pointed out,
6    though, that the overall volume of these
7    operations is quite small relative to the
8    overall airport, so from a practical sense
9    it's hard to say that it had measurable
10   negative impact.
11        Q.    Okay.  Well, as a matter of
12   policy, do you think the board would prefer
13   more flights or fewer flights coming out of
14   the airport?
15             MS. MARINO:  Object to form.
16        You can answer.
17        A.    I think kind of to what I was
18   saying earlier, that's maybe too broad of a
19   question.  I think it depends on the type
20   of flights.  So, I think the board,
21   generally speaking, in its discussions has
22   said, it's sort of taken as an agreement
23   the TUR defines a certain capacity, and as
24   long as the numbers stay under that
25   capacity board members seem to be satisfied
```

Page 117

```
 1                  N.   HARTMAN
 2   with that.  You could, in theory, have more
 3   flights, but if they were within the limits
 4   capped by the TUR I think even those board
 5   members that are concerned about things
 6   like traffic would be okay because they
 7   would see the TUR is like a circuit
 8   breaker.
 9        Q.    Well, in terms of overall use
10   of the airport, what percentage is light
11   general aviation and what percentage is
12   commercial?
13              MS. MARINO:  Object to form.
14        You can answer.
15        A.    So, those numbers are available
16   specifically, but to my recollection it's
17   roughly 15 percent commercial, and I would
18   just clarify the Part 121, because
19   commercial could mean Part 135, too, and
20   then the light GA probably about 20
21   percent, and the remaining is charters and
22   corporate operators, to my knowledge, but
23   those numbers are all very specifically
24   tracked and available.
25        Q.    Let's go to I, Hartman 19.
```

```
 1              N.   HARTMAN

 2              (Whereupon, Minutes, 8/10/22,

 3         was marked Hartman Exhibit 19 for

 4         identification as of this date by the

 5         Reporter.)

 6         Q.    I'm going to show I, which is

 7    the meeting minutes for your board on

 8    August 10th, 2022.  So, if you look at Page

 9    3, which is the Bates stamp of 5174.

10    Midway down it says, The county has allowed

11    the charter operators to continue to

12    operate out of the FBO's until a Court

13    determines otherwise.  The board is

14    requesting additional information from

15    county and Airport Public Charter

16    Operational Policy Number 1.  Did you

17    receive that information?

18         A.    I think, as I recall, the only

19    thing we may have received is a copy of the

20    policy and additional correspondence that

21    was filed in the case, but I don't think we

22    received any other specific information.

23         Q.    So, other than the policy --

24    now this is in August of 2022, the policy

25    was dated January of 2022?
```

```
 1                    N.   HARTMAN
 2        A.     Correct, yeah.
 3        Q.     So, is it your testimony that
 4   it took seven months for the county to
 5   share that with you?
 6        A.     Yeah, we -- to my knowledge we
 7   were never pro-actively given a version, a
 8   copy of the policy, it's something we had
 9   to request.  I don't recall exactly how
10   long that time was, but we only saw the
11   policy after it was already published or
12   released.
13        Q.     Okay.  So, other than getting
14   the copy of the policy, you received no
15   other information?
16        A.     Well, the fact that there was
17   this litigation happening related to the
18   policy, but that was after the policy was
19   published.
20             MR. NOTO:  Right, right.  Okay.
21        That's it for me.  Do you have
22        anything else?
23             MS. GRIMES:  No.
24        Q.     I have one last question.  In
25   the minutes after this meeting, do you
```

```
 1                    N.   HARTMAN
 2   recall any information on this other than
 3   what you've already provided and testified
 4   to?
 5           A.    No.  I mean the only other
 6   things that we discussed about this from
 7   that point forward was, I would say,
 8   factual updates regarding the progress of
 9   the case, and those things being things
10   that were in public record.
11           Q.    And when you get those updates,
12   are they provided by the county attorney or
13   someone else?
14           A.    Typically the county attorney.
15           Q.    So, does a member of the county
16   attorney's office attend your meetings and
17   then update you?
18           A.    They don't usually attend, but
19   I've spoken to them outside of the
20   meetings.
21           Q.    I mean, do you meet with the
22   county attorney's office as a board?
23           A.    Typically, no.  We have asked
24   for guidance on some matters, but I think
25   those would be privileged.
```

Page 121

1                    N.   HARTMAN

2          Q.     No, of course.   But the board

3     reaches out to the county attorney for

4     advice?

5          A.     We have done so, yes.

6          Q.     Okay.   And when you do that, do

7     you meet with them in person or is it done

8     via email?

9          A.     In the times that it's happened

10    it's been through email or phone call.

11         Q.     Okay.   So, you don't physically

12    meet with them?

13         A.     I have not, no.

14         Q.     And the board doesn't,

15    apparently?

16         A.     Not to my knowledge.

17              MR. NOTO:  All right.   Thank

18         you.  Do you guys have anything to

19         add?

20              MS. MARINO:  No, we're good.

21              MR. CAREY:  No, we're good.

22              (Whereupon, at 12:15 P.M., the

23         Examination of this Witness was

24         concluded.)

25            *              *              *

Page 122

1   DELUX PUBLIC CHARTER, et al.

    vs. COUNTY OF WESTCHESTER, et al.

2   2/13/2023 - NICHOLAS HARTMAN

3           ACKNOWLEDGEMENT OF DEPONENT

4       I, NICHOLAS HARTMAN, do hereby declare

5   that I have read the foregoing transcript,

6   I have made any corrections, additions, or

7   changes I deemed necessary as noted on the

8   Errata to be appended hereto, and that the

9   same is a true, correct and complete

10  transcript of the testimony given by me.

11

12  _____    _____

13  NICHOLAS HARTMAN               Date

14  *If notary is required

15

16        SUBSCRIBED AND SWORN TO BEFORE ME THIS

17        _____ DAY OF _____, 20___.

18

19

20        _____

21        NOTARY PUBLIC

22

23

24

25

Page 123

1
2                    E X H I B I T S
3    HARTMAN EXHIBITS:
4    EXHIBIT   EXHIBIT                        PAGE
     NUMBERS   DESCRIPTION
5
     Exhibit 1    Avports document           35
6
     Exhibit 2    Local Law Number 12        41
7
     Exhibit 3    Rules and Regulations      44
8
     Exhibit 4    Agenda, 10/24/18           46
9
     Exhibit 5    Agenda, 11/14/18           49
10
     Exhibit 6    Agenda, 1/23/19            51
11
     Exhibit 7    Email, 11/6/18             59
12
     Exhibit 8    Agenda, 3/20/19            62
13
     Exhibit 9    Email, 3/1/19              66
14
     Exhibit 10   Agenda, 7/12/29            78
15
     Exhibit 11   Westchester County
16                Airport document           93
17   Exhibit 12   COW00001159 Resolution     93
18   Exhibit 13   COW00001160 Resolution     97
19   Exhibit 14   COW00001161 Resolution     100
20   Exhibit 15   COW00001162 Resolution     101
21   Exhibit 16   COW00001164 Resolution     104
22   Exhibit 17   COW00001165 Resolution     106
23
             (Continued on following page.)
24
25

Page 124

1

2

3                   E X H I B I T S

4

   HARTMAN EXHIBITS:

5

6   EXHIBIT    EXHIBIT                      PAGE
    NUMBERS    DESCRIPTION

7

    Exhibit 18  Email, 6/22/22            111

8

    Exhibit 19  Minutes, 8/10/22          118

9

10       (Exhibits retained by counsel.)

11

12

13                 I N D E X

14

    EXAMINATION BY                        PAGE

15

    MR. NOTO                               4

16

17

18     INFORMATION AND/OR DOCUMENTS REQUESTED

19   INFORMATION AND/OR DOCUMENTS        PAGE

20   (NONE)

21

22

23

24

25

Page 125

1

2

3                     C E R T I F I C A T E

4

5      STATE OF NEW YORK          )

                                  :   ss.:

6      COUNTY OF ROCKLAND         )

7

8           I, JOANNE SHERIDAN, a Notary Public

9      for and within the State of New York, do

10     hereby certify:

11          That the witness whose examination is

12     hereinbefore set forth was duly sworn and

13     that such examination is a true record of

14     the testimony given by that witness.

15          I further certify that I am not

16     related to any of the parties to this

17     action by blood or by marriage and that I

18     am in no way interested in the outcome of

19     this matter.

20          IN WITNESS WHEREOF, I have hereunto

21     set my hand this 17th day of February 2023.

22                 *Joanne Sheridan*

23          _____

24                 JOANNE SHERIDAN

25

Page 126

1    DELUX PUBLIC CHARTER, et al.

     vs. COUNTY OF WESTCHESTER, et al.

2    2/13/2023 - NICHOLAS HARTMAN

3              E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   NICHOLAS HARTMAN                 Date

25

[& - 44]                                                                Page 1

| & | | | |
| --- | --- | --- | --- |

**&** 1:18 2:4 3:16
35:5 106:5
110:7

**0**

**01930** 1:6

**1**

**1** 3:16 35:12,14
35:18 37:2
43:10 45:8,24
118:16 123:5
**1/21/22** 36:20
**1/23/19** 51:21
123:10
**10** 78:4,6,10
123:14
**10/24/18** 46:20
123:8
**100** 123:19
**101** 123:20
**104** 123:21
**10580** 1:20 2:5
**106** 123:22
**10601** 2:14
**10803** 4:13
**10:00** 1:12
**10c** 51:12
**10th** 118:8
**11** 17:18 93:2,5
103:4 123:15
**11/14/18** 49:12
123:9
**11/6/18** 59:24
123:11

**111** 124:7
**118** 124:8
**11:07** 66:2
**11:15** 66:3
**12** 41:20 42:2
93:23 94:2,4
123:6,17
**12,500** 7:11
14:9
**121** 91:24
117:18
**12:15** 121:22
**13** 1:11 97:12
97:15 123:18
**135** 25:15,23,24
26:10 27:5,11
27:15 76:17
79:2,5 80:18
80:20,22 81:6
81:9 84:2,12
117:19
**14** 99:25 100:6
123:19
**1400** 2:10
**148** 2:14
**14th** 50:21 62:5
62:6
**15** 101:19,22
117:17 123:20
**16** 104:9,12
123:21
**17** 106:8,11,13
123:22
**17th** 125:21

**18** 32:2 111:7
111:10 124:7
**19** 16:13 24:5
117:25 118:3
124:8
**1980's** 102:12
**1981** 5:15
**1985** 40:8
**1990** 40:25
41:3

**2**

**2** 41:19,21,25
61:12 123:6
**2/13/2023**
122:2 126:2
**20** 117:20
122:17
**2001** 7:17
**2003** 88:11
**2004** 42:2
**2008** 8:10
**2015** 6:25 7:6
**2018** 47:12
49:21 50:21
60:8
**2019** 8:22
33:14 38:11
52:3 63:5 73:9
78:15 82:15
**2020** 16:12
33:14
**2022** 35:24
36:8,9,12,15
38:3,14 118:8
118:24,25

**2023** 1:11
125:21
**21** 35:24 36:15
**21st** 36:12 38:3
**23rd** 52:3
**24674** 125:22
**24th** 50:17,24
**26th** 78:14
**27th** 63:5
**29** 47:13
**2nd** 5:15

**3**

**3** 44:3,6 118:9
123:7
**3/1/19** 66:10
123:13
**3/20/19** 62:18
123:12
**30** 3:15 58:25
**300** 91:12
**35** 12:12 123:5
**380** 25:18
26:11,15,17
27:11,17 39:12
40:16 76:18
80:5,7 81:14
83:20 84:12

**4**

**4** 46:19,21
47:11 123:8
124:15
**41** 123:6
**44** 123:7

**46**  123:8
**49**  123:9

**5**

**5**  2:10 49:11,13
  49:18 78:11,20
  123:9
**50/50**  89:23
**51**  123:10
**516**  4:12
**5174**  118:9
**555**  1:19 2:5
**59**  123:11
**5947**  66:16

**6**

**6**  51:20,20,22
  52:2 123:10
**6/22/22**  111:9
  124:7
**600**  2:14
**62**  123:12
**6538**  45:2,4
**66**  123:13
**6:30**  103:4
**6th**  60:8

**7**

**7**  59:23,25 60:4
  123:11
**7/12/2019**  78:5
**7/12/29**  123:14
**712.462**  44:24
  45:8
**7124621**  42:8
**78**  123:14

**7:00**  18:18
**7:22**  1:6

**8**

**8**  62:17,19,23
  63:9,9,13
  123:12
**8/10/22**  118:2
  124:8

**9**

**9**  66:9,11
  123:13
**91**  7:12
**92614-2545**
  2:10
**93**  123:16,17
**97**  123:18

**a**

**a.m.**  1:12 103:4
**aab**  15:22
  47:12 70:20,21
  71:7,13 77:4
  107:15,25
  108:7
**abatement**
  97:21,25 98:3
  98:6,15,21
  99:12,16,22
**ability**  10:22
**above**  63:21
  116:4
**accepting**  95:8
**access**  113:20
**account**  113:13

**accuracy**
  105:10
**accurate**  80:12
  85:5 105:25
**acknowledged**
  88:15
**acknowledge...**
  122:3
**acronym**
  104:24
**action**  125:17
**actively**  119:7
**activist**  61:2
**activities**  42:21
  45:18 56:15
**activity**  116:4
**actually**  23:4
  24:5 50:22
  65:10,19 81:13
**add**  121:19
**additional**  89:3
  89:14 118:14
  118:20
**additions**  122:6
**address**  4:11
  5:13 64:6 87:4
  99:20
**adjust**  105:21
**administer**
  3:11
**adopted**  48:22
  94:6 100:18
  107:9,23
  110:11,13

**adopting**  77:16
  107:13 108:2,8
**adoption**  48:19
**advance**  26:8
**advertise**  83:11
**advertisements**
  25:3 53:23,25
**advertises**  83:9
**advertising**
  76:16
**advice**  71:13
  121:4
**advise**  34:15
  68:14
**advisory**  8:20
  9:21 16:8 25:6
  28:25 32:12
  34:24 36:17
  37:12 38:3
  41:5,16 46:8
  47:23 55:16
  59:7,12,16
  60:25 61:19
  63:4 66:25
  67:12 78:15
  85:20 86:3
  87:25 89:16,21
  100:21 105:9
  107:11
**advocacy**  22:9
  22:13 93:13
**advocate**  12:20
  20:8
**advocates**  92:7
  92:10,11,14

**[advocates - answer]**                                    Page 3

| | | | |
|---|---|---|---|
| 95:6 96:18 | **aircraft** 7:8,11 | 43:4,22 44:17 | **al** 122:1,1 |
| **advocating** | 7:13,15,20,22 | 44:21 45:13,18 | 126:1,1 |
| 13:5 15:5 | 11:23 54:25 | 45:20 46:8 | **allocated** 17:22 |
| 92:16,19 | 57:18,20,22,24 | 47:17,22 53:23 | 17:24 18:6 |
| **affect** 55:15 | 58:4,5 64:18 | 54:18 56:6 | **allow** 81:9 |
| **agenda** 18:25 | 83:23 | 58:19,20,21 | **allowed** 31:2 |
| 19:3,8,9,15 | **airline** 24:6 | 59:7,12 60:25 | 80:22 118:10 |
| 41:15 46:20 | 40:7,14 80:17 | 61:3,19 63:4 | **alternative** |
| 49:3,6,12 | 81:7 83:15 | 64:24 66:25 | 99:19 |
| 51:21 52:3,6 | 91:20,22,23,24 | 67:12 68:25 | **amazon** 5:25 |
| 52:18,24 53:11 | **airliners** 64:14 | 69:3 73:2,4,6 | **ambiguity** |
| 61:14 62:4,18 | **airlines** 12:3 | 73:13,23 76:8 | 39:10 |
| 67:13,18 75:13 | 23:17 25:8 | 78:15 79:16,24 | **amount** 89:9 |
| 78:5 79:8 | 29:23 42:16,19 | 81:23 85:20,24 | **anca** 40:19 |
| 123:8,9,10,12 | 45:13,16 | 86:3,11 87:5 | **ancillary** 58:8 |
| 123:14 | 107:12 | 87:11,21,24,25 | **annual** 15:24 |
| **aggregate** | **airplane** 91:3 | 88:5,21 89:3,4 | **anom** 105:23 |
| 29:19 | **airplanes** 58:17 | 89:13,16,18,21 | **anom's** 104:22 |
| **aggregated** | 90:24,25 99:4 | 90:10,12,16 | 105:21 106:6 |
| 29:15 | **airport** 1:8 | 91:2 92:8,15 | **answer** 5:5,6,6 |
| **ago** 21:15 25:4 | 7:24 8:20 9:21 | 93:4,9 94:24 | 10:14 13:20 |
| 32:2 | 10:23 11:3,4,5 | 95:3,7,8,14 | 15:12 37:15,20 |
| **agree** 41:6 43:2 | 12:22 15:10 | 96:5 97:6,7,23 | 38:23 39:7,16 |
| 43:21 | 16:8 18:7,22 | 97:25 100:21 | 39:18 40:4,24 |
| **agreed** 3:4,19 | 20:9,17 21:5 | 102:15 105:2,4 | 41:8 43:7 |
| **agreement** 29:3 | 21:18 22:15 | 105:5,16,23 | 44:14 46:2 |
| 30:15 54:6 | 23:18 25:2,6 | 109:14 111:20 | 54:20 55:19 |
| 90:3,6 116:22 | 25:12 27:10 | 111:22 114:16 | 56:3 68:15 |
| **ahead** 60:14 | 28:25 31:21 | 114:20 115:8 | 72:10 74:21 |
| **air** 1:4 13:8,12 | 32:10,12,17,17 | 115:11 116:8 | 75:24 76:10 |
| 14:25 24:15 | 32:18,20 33:5 | 116:14 117:10 | 77:12,19 80:2 |
| 27:3 77:21 | 34:4,17,24 | 118:15 123:16 | 82:19 84:8 |
| 81:2 84:2 | 36:17 37:12 | **airport's** 87:18 | 85:8 88:7,23 |
| 107:15 | 38:3 40:9 41:5 | **airports** 57:4 | 89:6,20 90:19 |
| | 41:15 42:16,21 | 94:15 | 90:20 92:17 |

95:23 96:22
99:15 100:25
101:13 103:17
104:4 107:18
108:5,18,23
109:4 113:25
114:22 115:10
116:16 117:14
**answering**
89:25
**answers** 4:21
**anybody** 12:6
12:18 19:25
38:17 85:5
92:16
**apart** 109:21
**apparently**
61:13 67:7
110:18 121:15
**appear** 39:22
43:14 52:19
75:5
**appears** 39:8
47:2 49:20
62:25 79:11
81:7 83:19
93:12
**appended**
122:8
**applicability**
42:9,13 43:11
50:2 51:5
52:17
**applicable**
61:15

**applied** 54:6
70:6 72:17
**applies** 39:12
43:14 47:18
77:3
**apply** 39:9
42:14,21 43:3
43:22 45:10,17
73:3 75:3
76:21
**appointed** 8:20
8:23 9:17
16:13
**appointment**
9:3
**appreciate** 4:21
**appreciates**
67:20
**approach**
99:19
**approached**
9:7
**april** 1:8 82:15
111:19,20
**areas** 98:4,9
**arrange** 26:5
**arrangements**
26:23 85:16
**arranging** 26:6
**arriving** 58:7
**asked** 9:11
54:10 59:19
71:3 120:23
**asking** 46:15
54:5 62:4 77:5

110:12 111:5
**aspect** 76:15
**aspects** 13:24
**assistant** 2:15
2:17 9:9 35:4
**associated** 23:6
58:3 102:16
**association**
11:18 12:20
13:2,11 20:14
20:24
**assuming**
103:11 107:22
**assurances**
95:2,9,13
**atlantic** 7:23,25
54:24 56:7
86:3
**attached** 47:4
47:12 50:15
52:6 111:2
**attempting**
48:3 94:15
95:14
**attempts** 41:13
**attend** 12:18
19:25 22:19,21
32:19 86:19
120:16,18
**attendance**
50:12,21
**attending** 9:21
50:6,18 62:11
**attention** 9:19
49:23 52:10

61:11 63:8
78:11
**attorney** 2:13
2:15,17 68:12
108:17 109:7
113:9 114:7
120:12,14
121:3
**attorney's**
109:2,11,13
113:7 114:8,12
120:16,22
**attorneys** 2:4,9
2:13 5:3 6:11
112:8
**audited** 106:2
**august** 118:8
118:24
**authorized**
3:11 25:25
**available** 70:9
112:18 117:15
117:24
**avenue** 1:19 2:5
2:14 4:12
**aviation** 11:2
11:18,21,22,22
12:2,19 13:11
14:6,8,11
20:13,16 58:11
87:5 91:8,14
100:23 117:11
**aviva** 35:3
48:13,14 66:24
111:18

**avports** 1:8
32:4,7,8,13
33:2,16,21
34:3,7 35:13
35:22 37:11
108:8 123:5
**aware** 15:13,16
20:20 30:4,11
37:19 53:21
65:3 68:16
72:24 73:20
74:4,9 75:15
75:19 82:16,20
85:21 86:16
87:22 93:15
103:21,22

**b**

**b** 1:3 93:23
123:2 124:3
**bachelor's** 5:18
**back** 24:4,5
29:13 30:17
48:11,15 66:3
71:23 72:3
73:16 84:22
85:9 102:24
**background**
5:17
**bad** 10:12
**barr** 84:23
**base** 8:2 57:20
**based** 14:17
46:10 54:23
56:8 57:13
81:16 83:23

84:16 96:6
**basis** 26:9 58:2
**bates** 44:25
45:4 47:6
66:15 110:21
118:9
**behalf** 32:10
**believe** 6:25
8:21 9:8 15:20
17:8,10 20:15
21:21 23:5
27:3 30:20
31:14,21 34:4
34:14 35:4
36:9 40:11
47:24 50:5,22
51:2 67:10
69:2,2,17 73:6
74:6 75:10
88:11 97:19
100:11 101:11
101:24 102:12
106:7 107:6
112:5 114:23
**belong** 11:14
**beyond** 116:4
**bigger** 15:4
90:10
**binder** 6:18
**biochemistry**
5:20
**birth** 5:14
**bit** 59:22 81:4
85:10 99:17

**blade** 1:4 24:15
48:5
**blood** 125:17
**board** 8:20,24
9:15,21 11:7
11:10 16:8,18
17:17 18:3,10
18:25 19:10,14
19:20 20:7
22:16,22 23:7
23:10,16,20
24:9 25:6,7
27:13 28:25
30:19 31:3,9
32:13 34:11,13
34:24 36:18
37:13 38:3
41:6,16 46:8
46:15 47:3,23
48:24 49:3,3,5
49:20 55:17
59:7,12,15,16
60:25 61:19,22
61:24 62:9,11
63:2,4 64:8
65:3,7 67:2,12
67:18 75:13,16
75:20 76:3,6
78:16 81:17,25
82:4,15 85:21
87:25 88:4
89:17,22 90:9
92:5,6,22 94:6
97:21,22,23,24
98:8,11 99:11

100:17,22
101:16 103:10
105:9,10
107:11 108:11
108:15,25
109:6,9,16
110:14,17
111:17,18
114:14,18,24
115:2,25
116:12,20,25
117:4 118:7,13
120:22 121:2
121:14
**board's** 86:4
**book** 26:24,24
83:13
**booking** 26:20
48:6
**born** 103:3
**bottom** 45:2,3
66:16 94:19
**boundaries**
87:18
**break** 5:7,9
49:9 65:22
**breaker** 117:8
**brief** 64:11
**briefly** 42:3
60:10
**broad** 40:2
99:17 116:18
**broadly** 40:9
101:3

**bruel**  106:5
**building**  42:23
  43:5,23
**bullet**  63:16
**business**  19:6
  28:9 49:23
  51:4,11 82:25
  83:3
**businesses**
  57:19

**c**

**c**  2:2 4:2 49:23
  97:11 125:3,3
**california**  2:10
**call**  121:10
**called**  4:2 9:11
  20:15,22 29:17
  32:4
**calls**  26:18
**cambridge**  5:21
  8:18
**capable**  109:13
**capacity**  1:8
  20:6 25:5 89:8
  116:23,25
**capital**  100:22
  101:5,6
**capped**  117:4
**careful**  112:16
**carey**  2:16 66:2
  70:10,17 71:5
  71:10 72:7,12
  110:9,16,21,25
  121:21

**carrier**  27:3
  81:3 84:2
**cars**  90:23
**case**  1:6 28:2
  40:21 77:25
  95:4 96:25
  113:12 118:21
  120:9
**castle**  98:7,12
**caution**  68:11
  108:14 112:9
**caveat**  81:9
**certain**  80:24
  80:24 83:12,13
  89:8 96:4 98:4
  101:12 116:23
**certainly**  85:17
**certification**
  3:7
**certify**  125:10
  125:15
**cetera**  75:3,4,4
  76:18
**chair**  16:11,14
  16:16,18,19,21
  16:24 20:7
  22:9 23:14
  24:3 27:13
  41:5 55:21
  98:21
**chairman**  19:4
  55:16
**chairperson**
  16:10

**challenges**
  55:10
**change**  46:9
  59:19 91:19
  95:7 99:9
  126:4,7,10,13
  126:16,19
**changed**  46:5
**changes**  122:7
**changing**  99:12
**chapter**  44:20
**characterizati...**
  90:4
**characterize**
  92:10 99:21
  114:24 115:18
**characterizes**
  98:17
**charges**  113:19
**charter**  1:3,7
  1:15 12:4
  21:25 25:15,18
  26:4,18 29:24
  50:2 51:6
  61:15 65:5
  80:18 83:21
  84:4 91:25
  118:11,15
  122:1 126:1
**charterer**  39:25
**chartering**  27:8
  83:23
**charters**  26:2
  37:4 117:21

**check**  17:10
  50:5 63:14
**checkpoint**
  65:16
**chemistry**  5:19
**chime**  33:2
**christina**  2:7
  4:18
**circuit**  117:7
**cited**  88:14
**cities**  83:13
**city**  80:24
**civic**  11:14,19
**clarification**
  65:13 79:15
**clarify**  56:5
  65:15,18 91:9
  110:10 113:11
  117:18
**clarifying**  39:9
**classified**  57:15
**classify**  76:12
  76:23 109:9
**clause**  94:20
**clear**  76:13,19
  99:5
**client**  55:17
  68:13 108:17
**clients**  24:17
  27:18,20,24
  28:10,13 29:7
  29:17 30:2,12
  33:8,20 38:4
  39:23 53:15
  75:21 76:7

96:19 115:16
**clipperjet** 48:6
**closely** 32:16
**club** 21:6
**coalition** 20:16
21:2,4 22:5,20
22:23 97:4,5,7
**code** 34:14
39:21 44:13,19
**come** 9:18 15:9
22:5 30:22
31:14,21 34:18
54:12 59:17
62:3 66:3 76:2
77:22 88:4
97:10
**comes** 70:24,25
**coming** 55:3
57:25 76:22
105:15 116:13
**commencem...**
53:16
**comment** 63:10
**commentary**
64:13
**commented**
85:15
**commenting**
30:20 81:18
112:22
**comments** 10:4
10:7 19:15
53:8 65:11
85:12 97:10

**commercial**
12:3 91:8,10
91:12 117:12
117:17,19
**commercially**
91:22
**commission**
11:7,10
**commissioner**
17:25 18:2
**common** 52:23
**commonly**
25:21
**communication**
33:12,16 34:7
68:13
**community**
56:22
**companies** 15:9
63:18
**company** 32:4
**complaint**
28:21 29:5,9
29:11 30:5
33:8
**complaints**
28:23,24 29:14
29:14,22 30:12
30:13,18,24
31:5 32:24
105:14
**complete** 122:9
**completed**
13:25

**component**
51:9
**components**
87:19
**computer**
104:25
**concern** 99:8
101:2
**concerned**
21:20 117:5
**concerns** 68:23
69:10,20,21,23
69:25 70:2,4
72:6,13
**concluded**
121:24
**conclusion**
67:25 75:2
**conditions**
83:22
**conference**
18:22
**confidence**
108:25
**consensus** 82:3
82:5
**consider** 26:3
40:15 81:2
**considerably**
90:13
**considered**
84:17
**considering**
9:25

**consistently**
88:15
**constitute**
114:19
**consulted**
36:18 37:18,23
59:13,18
**consulting**
37:12
**contain** 103:19
**contained**
72:15
**contains** 66:19
**contemplating**
99:12
**content** 59:16
**context** 64:23
**continue** 79:23
118:11
**continued**
123:23
**contract** 83:25
**contracted**
32:8
**control** 10:23
**conversation**
31:24 52:16
61:9,22,25
62:6 74:10
78:21,25 79:7
79:10,13 105:8
**conversations**
9:13 30:21
31:15,19 53:8
65:7 69:19

70:16 73:2,22
74:7,8 75:16
75:20
**cooberate**
105:14
**copy**   3:13,16
38:12 118:19
119:8,14
**core**   87:19
**corner**   55:9
**corporate**   12:3
29:24 91:16,25
117:22
**correct**   8:22
15:23 36:16
44:13 47:16
77:13 79:3,20
82:2 85:5
112:15 119:2
122:9
**corrections**
122:6
**corresponden...**
6:19 73:21
75:6,9 118:20
**counsel**   3:5,17
109:17 124:10
**counseled**
108:16
**county**   1:7,8,15
1:16 2:13,15
2:17 7:24 8:9
8:25 9:14,24
9:25 10:6 11:7
11:17 12:20

13:9 15:7,25
17:24 19:20
25:12 27:10
32:9,10 34:11
34:16,17,21,22
35:5 39:21
42:16 44:12,17
44:19 45:5,12
47:17 48:12,15
58:19,23 59:4
59:5,13 64:17
67:21 68:5
70:19 71:12
72:14 73:21
74:5,8,13
88:10,11,14
93:3,8 94:5
95:4,11 97:6
100:22 102:17
102:21 103:11
103:24 105:21
108:2 109:2,7
109:10,12
113:4,6,7,9,19
114:4,7,7,8,11
118:10,15
119:4 120:12
120:14,15,22
121:3 122:1
123:15 125:6
126:1
**county's**   10:22
34:14 41:13
69:20

**couple**   20:11
**course**   121:2
**court**   1:2,17
3:13 102:17,18
112:5 118:12
**cover**   46:11
**covered**   71:12
**covid**   18:22
**cow**   45:4
**cow00001159**
93:25 123:17
**cow00001160**
97:14 123:18
**cow00001161**
100:5 123:19
**cow00001162**
101:21 123:20
**cow00001164**
104:11 123:21
**cow00001165**
106:10 123:22
**create**   94:20
99:4
**creates**   55:10
**creating**   86:10
**crowded**   55:7
55:11
**curfew**   96:3,10
102:13,21,22
103:14,25
**current**   14:16
16:3,7 40:25
41:9 70:5
103:3

**currently**   13:9
14:16 16:9
17:18 39:21
40:20 54:23
91:2 96:5
99:11
**customer**   11:4
**customers**   58:9
72:20 103:20
115:17
**cv**   1:6

**d**

**d**   1:3 3:2 99:25
124:13
**daily**   54:2
**data**   29:20
105:2,10,13
**database**   103:9
**date**   1:11 5:14
35:15 36:10,22
41:22 44:7
46:22 49:14
51:23 60:2
62:20 66:12
78:7 93:6 94:3
97:16 100:7
101:23 104:13
106:12 111:11
118:4 122:13
126:24
**dated**   35:24
60:8 118:25
**david**   67:3
**day**   10:22,23
18:13,16 31:20

32:9,9 122:17
125:21
**days** 3:16 83:12
**decades** 99:3
**decide** 5:4
**deciding** 72:25
**decisions** 99:7
**declare** 122:4
**deemed** 122:7
**defendant** 1:14
**defendants** 1:9
2:13
**define** 14:9
87:22
**defined** 34:13
45:14 84:11
**defines** 84:20
98:25 116:23
**defining** 72:18
**definitely** 13:14
22:3 41:12
50:11
**definition**
39:22 40:2,5,6
40:20,25,25
41:2 45:23
72:16 88:5,15
**definitions** 46:5
88:12
**definitive** 88:17
**degree** 5:18
71:11 72:7
**deliver** 27:8
**delta** 91:11

**delux** 1:3 122:1
126:1
**demand** 14:15
14:19,23 26:9
**demolish** 14:10
14:22
**demolishing**
14:3
**departing** 58:7
**department**
67:21 74:5,11
74:14 108:16
113:10
**depends** 40:18
89:14,24
116:19
**deponent** 122:3
**deposition** 1:14
3:8,9,14 6:6,7,8
**describe** 11:19
11:20 12:25
25:10,22 26:15
57:12 61:2
83:6 102:6
**described** 34:8
37:2 56:13
69:5 84:17
87:17
**description**
58:12 123:4
124:6
**descriptions**
26:3
**designated**
34:23 56:7

**designation**
56:10
**designations**
56:19
**designed** 55:7
89:13
**destroying** 15:3
**detailed** 74:10
**determines**
118:13
**dictates** 101:5
**difference** 84:5
113:8
**different** 14:24
27:16 45:23
56:5 65:17
80:18
**differently**
87:23
**direct** 5:5 27:3
49:22 52:9
61:11 63:7
73:25 78:10
84:2 98:4
108:18
**directing** 78:20
**directly** 35:7
48:20 51:7
59:18 92:17
114:3
**director** 31:17
**directs** 98:6
**disclosure**
15:25

**discuss** 21:24
22:15 77:9,15
**discussed** 22:6
38:4 70:20
71:14 87:25
88:9 114:14
120:6
**discussing**
32:25 79:4
**discussion** 13:9
19:17 48:18
49:25 51:4,4
51:11,12,13,15
51:18 52:20,24
52:25 53:5
63:25 64:7,11
71:22 94:13
**discussions**
38:8 71:5
116:21
**disruptive** 55:4
56:10,21 64:5
115:17
**district** 1:2,2
**divert** 64:6
**docket** 112:18
113:3,5,22
**document**
35:13,18 36:3
36:7,23 37:2
37:23 38:13,17
38:21 41:14,25
44:11 45:6
46:25 47:4
49:17,19 52:2

60:17 62:23,24
63:3 66:9,15
66:19 71:3
74:23 84:22
93:4,8,10,15,18
93:20 123:5,16
**documented**
83:24
**documents**
6:13,16 74:13
74:22 93:16
110:15 113:20
124:18,19
**doing**  9:12 31:2
66:24,24 77:23
79:24 80:4
109:7
**dorf**  1:18 2:4
**downstream**
71:15
**drafting**  46:9
**drinks**  5:11
**due**  91:7
**duly**  4:3 125:12

**e**

**e**  2:2,2 3:2,2
101:18 123:2
124:3,13 125:3
125:3 126:3,3
126:3
**earlier**  13:5
33:18 49:5
72:9 77:7,21
86:2 97:5
115:14 116:18

**earliest**  38:11
**early**  33:14
36:8
**easier**  47:10
55:24
**educational**
5:16
**effect**  3:12,15
12:13 40:19
64:14 65:11
80:15
**effectively**
22:11,23 25:25
26:4 55:2,5
66:23
**effectiveness**
98:19
**effort**  13:2
**either**  19:13
22:4 25:17
57:3 58:16
59:13 64:15
68:24 72:24
**elect**  16:19
**elected**  16:17
**elements**  10:24
12:2 13:7
82:23
**email**  59:24
60:6,17 61:12
66:10 67:7,8
67:17 69:15
74:16,23,25
75:7,12,17,18
111:3,9,14,24

112:3,25 121:8
121:10 123:11
123:13 124:7
**employed**  5:22
5:24
**employee**  34:22
**encompass**
39:23
**enforce**  41:13
**enforced**  48:4
**enforcing**
72:14,22
**engine**  7:9,10
7:19
**ensure**  103:19
**entering**  59:14
**entirely**  107:7
**entirety**  107:3
109:10
**entities**  27:2
**entity**  26:22
34:14
**environmental**
20:24 32:22
**errata**  122:8
**esq**  2:6,7,15,16
**essence**  27:5
**essentially**
11:25 26:18
27:18 28:3
57:20 95:14
98:3 102:21
103:5
**established**
99:2

**esters**  111:19
111:21
**et**  75:3,3,4
76:18 122:1,1
126:1,1
**evening**  18:17
18:18
**events**  12:17
**evidence**  106:3
**exact**  93:17
**exactly**  7:2,4
18:5 32:2
38:15 76:14
119:9
**examination**
4:6 121:23
124:14 125:11
125:13
**examined**  4:5
**excludes**  94:21
**exclusive**  42:18
45:16
**execute**  84:3
**executive**  8:25
9:14 31:16
35:5 91:17
93:9
**exhibit**  35:11
35:14 41:21
44:2,6 46:21
47:11 49:13
51:22 53:14
59:22,23,25
62:19 66:11
78:6 93:5 94:2

97:15 100:6
101:22 104:12
106:11 111:10
118:3 123:4,4
123:5,6,7,8,9
123:10,11,12
123:13,14,15
123:17,18,19
123:20,21,22
124:6,6,7,8
**exhibits** 123:3
124:4,10
**existed** 53:21
82:21
**existing** 98:6
**exists** 103:22
**expansion**
20:17 21:5
87:11,18 88:2
88:5 97:6,8
114:20
**expenditure**
101:5
**expire** 95:10
**expired** 95:11
**explain** 9:5
14:5 63:24
103:2
**explained** 9:20
69:24 95:25
**explaining** 79:2
**expressed** 27:6
101:3
**extended** 53:7

**extending**
87:20
**extent** 53:19
108:14

## f

**f** 3:2 104:9
125:3
**faa** 7:11 26:2
26:17 40:15
41:11 80:25
82:23 84:9,11
84:20 94:21
**facebook** 53:25
**facilities** 15:3
56:16 59:4
92:12,15
**facility** 14:15
14:22
**fact** 14:18
37:19 48:21
53:10 77:4
94:13 115:15
119:16
**factual** 120:8
**fair** 39:13
58:12 82:14
**faith** 109:10
**fall** 20:19
**familiar** 8:4
20:7,21 24:14
27:14,17,23
28:9 32:3
48:17 57:8
60:20 67:4
68:3,4,8 69:13

83:3 86:6,9
87:10 94:8
101:19 104:14
110:6
**family** 57:4
**fancy** 57:16
**favor** 89:17
102:19
**favorable**
10:25
**fbo** 8:2,5 54:25
55:5,6,25
56:12 57:8,12
57:14 58:10,14
**fbo's** 56:6,7,9
56:18 58:15,18
59:8 103:15,21
118:12
**february** 1:11
63:5 125:21
**federal** 94:25
95:9,15,17,20
102:17 113:12
**fee** 12:11
**feedback** 34:20
**fees** 94:14,17
**fell** 10:5
**felt** 70:5
**fewer** 92:20
116:13
**figured** 113:15
**file** 15:24
**filed** 16:4
118:21

**filing** 3:7
**filings** 28:2,4
112:6
**financial** 15:24
**find** 47:9 56:10
71:9 98:14
110:19
**fine** 7:5 65:25
108:24
**finish** 60:13
**firm** 108:12,22
110:6
**first** 4:3 24:23
36:2,6,12
38:12 60:16
62:8 63:16
64:20 66:18
67:19 76:25
79:6
**fit** 58:17 76:24
**five** 65:22
**fixed** 8:2 57:13
**fleisher** 23:3
31:4,8
**flight** 26:5,7
29:6 64:3,3,5
83:17,19 84:4
**flights** 25:16
28:21 29:17
30:6 55:3
64:12 80:17
83:12,14 88:20
89:3,17 92:7
92:11,14,17,20
116:13,13,20

117:3
**flown** 61:6
**fly** 7:8,10 56:24
  91:12,16 98:4
  98:7
**flying** 96:6
  102:7,15
**follow** 83:2
  95:5
**followed** 88:16
**following**
  123:23
**follows** 4:5
**food** 5:11
**force** 3:14
**foregoing**
  122:5
**form** 3:20
  10:15 13:19
  14:16 15:11,25
  16:5 37:14
  38:22 39:6,15
  41:7 43:6
  45:25 54:19
  55:18 56:2
  58:16 74:20
  75:23 76:9
  77:11,18 79:25
  82:18 84:7
  85:7 88:6,22
  89:5,19 90:18
  95:22 96:21
  99:14 100:24
  103:16 104:3
  107:17 108:4

109:3 115:9
  116:15 117:13
**formally** 13:13
  23:22
**forth** 125:12
**forward** 120:7
**forwarding**
  67:7
**four** 8:15 25:3
  28:18 56:25
**free** 12:17
  65:18
**fremd** 1:19 2:5
**frequently** 27:4
**front** 44:15
  52:4 60:5
**frustrated**
  109:6
**fueling** 57:17
**full** 6:18
**funding** 94:20
  95:9
**further** 125:15
**future** 87:4

**g**

**g** 106:8
**ga** 14:4,5 56:6
  56:11,14,20,21
  92:2 115:15
  117:20
**gas** 57:16
**gasparri** 1:8
  111:19
**general** 11:2
  14:6,8,11 19:9

51:15 64:12
  65:9 81:6
  82:25 83:18
  85:14,24 86:12
  87:4 90:3 91:8
  91:14 117:11
**generally** 10:10
  13:5,15 18:12
  19:3 21:18
  54:13 56:19
  90:8 92:14
  95:24 97:9
  116:21
**generate** 94:17
**generated**
  105:3
**genesis** 9:6
  105:6
**getting** 53:24
  72:8 119:13
**give** 44:2 60:12
**given** 39:10
  68:6,9 90:7
  113:19 119:7
  122:10 125:14
**giving** 71:12
**global** 1:4
  24:15
**go** 17:9 24:4
  41:18 47:8
  48:10,14 57:2
  60:14 65:14
  71:23 83:17
  90:7 91:11
  93:23 94:19

97:11 101:18
  104:8 117:25
**goes** 18:3 24:5
**going** 4:18 8:7
  24:4 25:11
  35:11,17 41:18
  41:24 42:2,7
  44:2,3,8,9,23
  45:7 46:24
  47:5,7 49:7,16
  49:22 51:11,19
  51:25 52:9,11
  59:21 60:4
  62:22,23 63:7
  65:22 66:8
  68:11 76:13
  78:9,10 81:14
  82:7 85:9 91:9
  93:7 94:4
  101:8 106:21
  118:6
**good** 4:14,15
  10:12 14:14
  49:8,10 54:3
  121:20,21
**gotten** 71:18
**gould** 31:17,17
  31:18,18
**government**
  11:12 34:12
  94:25 95:17,20
**grandfathered**
  41:11
**grant** 94:25
  95:9,13

grants  94:21
greechan  63:10
grimes  2:7 4:18
  119:23
ground  4:19
  58:4
grounds  14:21
group  11:21
  20:15 21:9
  22:24 27:6
  93:14 97:4
groups  20:8,12
  20:18 21:4
  22:10,13,17
guess  31:25
  37:19 40:17
  43:18 61:2
  71:20 80:13
  92:17 101:13
guidance
  120:24
gutierra  67:3
guys  121:18

**h**

h  4:2,2 111:7
  123:2 124:3
  126:3
half  8:15
hamilton  2:9
hand  125:21
handle  89:10
handling
  109:13
hangar  13:7,12
  14:13 15:2,4

58:12,13,15
hangars  57:23
  58:16,16,17
happen  53:2
  103:8
happened
  16:20 27:22
  121:9
happening  71:6
  119:17
happy  97:24
hard  115:3
  116:9
hartman  1:16
  4:1,10,14 5:1
  6:1 7:1 8:1 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1,12
  35:14,18 36:1
  37:1 38:1 39:1
  40:1 41:1,19
  41:21,25 42:1
  43:1 44:1,3,5
  45:1,24 46:1
  46:19,21 47:1
  47:11 48:1
  49:1,11,13,16
  49:17 50:1

51:1,20,22
52:1,2 53:1
54:1 55:1 56:1
57:1 58:1 59:1
59:23,25 60:1
60:4 61:1 62:1
62:17,19,23
63:1 64:1 65:1
66:1,9,11 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1,4,6
78:10,22 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
91:15 92:1
93:1,2,4,23,25
94:1,4 95:1
96:1 97:1,12
97:14 98:1
99:1,25 100:1
100:5 101:1,19
101:21 102:1
103:1 104:1,9
104:11 105:1
106:1,10,13
107:1 108:1
109:1 110:1
111:1,10 112:1
113:1 114:1
115:1 116:1
117:1,25 118:1

118:3 119:1
120:1 121:1
122:2,4,13
123:3 124:4
126:2,24
head  4:22
health  35:5
hear  24:23
heard  57:15
  64:21,25 87:16
hearing  9:15
  87:8
hearings  86:17
  86:20,23
heavily  83:10
held  1:18 18:20
  18:21 71:22
helpful  45:2
hereinbefore
  125:12
hereto  122:8
hereunto
  125:20
high  26:10 92:3
highway  63:12
hire  108:21
hiring  108:12
historically
  91:21
history  96:7
hit  89:8
hold  100:22
hopefully
  106:20

**host**  12:17
**hotly**  88:8
**hours**  102:25
**hpn**  25:11
    28:17
**hugh**  63:10
**hum**  35:23
    47:19 66:17
**hundred**
    101:12
**hybrid**  26:20

**i**

**idea**  14:14
**identification**
    35:15 41:22
    44:6 46:22
    49:14 51:23
    60:2 62:20
    66:12 78:7
    93:5 94:2
    97:15 100:6
    101:22 104:12
    106:11 111:11
    118:4
**identify**  115:6
    115:23
**imagine**  96:25
**immediately**
    76:19
**immune**  64:15
**impact**  54:17
    77:17 88:20,24
    89:2 114:15
    115:7,19
    116:10

**impacted**
    107:12,16
**impacts**  115:22
**impartial**  55:21
**imply**  75:6
**impose**  96:3,9
**improve**  92:15
**improvements**
    92:12
**inappropriate**
    101:7
**incidents**  64:15
    64:16
**include**  96:19
**included**  75:7
    102:16 103:25
**includes**  63:4
    70:13
**including**  53:24
    67:15
**inconvenienc...**
    55:12 115:22
**indicated**  80:3
**indicates**  79:9
**indirectly**
    92:13
**individual**  29:6
    70:8
**individually**
    48:7 72:19
**individuals**
    26:4,23 27:6
    96:2,24 97:2
**informally**  76:3

**information**
    28:13 33:3
    68:6,9,15 69:4
    82:6,10,11
    108:2,8 112:3
    112:4,8,25
    118:14,17,22
    119:15 120:2
    124:18,19
**informed**  86:4
**infrastructure**
    9:10 14:4,11
    35:6
**injunction**
    102:20
**input**  34:18
**inside**  57:23
**instance**  29:16
**intending**
    116:5
**intent**  94:11
    95:25
**interaction**
    25:8
**interest**  11:3
    27:7,9 83:24
**interested**  9:12
    125:18
**interests**  11:22
**internally**
    70:21 71:14
**interrupting**
    65:10
**introduced**
    19:17

**invite**  77:8,15
**invited**  77:22
**involved**  23:2
    46:8 72:9
**irvine**  2:10
**issue**  13:12
    15:6,8 21:24
    34:7 38:4 70:2
    70:5 81:18,25
    82:4 85:2 99:8
    99:20
**issues**  20:9
    21:19 33:5
    65:4 68:23
**item**  18:24 19:3
    19:11 49:23
    53:3 61:13
    62:4
**items**  19:8,17
    61:3 113:22

**j**

**january**  8:21
    16:12,19 35:24
    36:11,15 38:2
    52:3 118:25
**jet**  29:23
**jetblue**  91:11
**jetsmarter**  48:5
    62:8 63:19
    64:21
**jetsuitex**  1:4
**joanne**  1:20
    125:8,24
**job**  22:8

**join**   12:6,9,11
**jonathan**   60:6
  60:21 101:11
  101:15 107:6
**jsx**   53:25 54:23
  83:9
**jsxair**   1:3 24:14
**judge**   3:12
**judgement**
  55:16
**jump**   45:4
  46:19 47:6
  49:8 51:19
  62:16 78:3
  92:25 111:7
**june**   78:14

**k**

**k**   62:16
**kaplan**   110:7
**keep**   7:21 53:24
**kind**   7:15 13:23
  29:10 30:23
  58:8 77:4
  90:11 116:17
**kingdom**   8:16
  8:17
**kirsch**   109:25
  110:2,7
**kjaer**   106:5
**knew**   82:24
**know**   5:8 7:2
  11:10 13:13
  15:9 20:8 21:7
  23:20 25:7
  26:10 28:16

32:2 37:3,16
40:22 41:14
46:4,7,15
48:21,23,25
49:2 50:20
51:15 53:17
55:9 60:23
61:4,24 62:5
66:20 67:11,14
71:8 74:12,15
76:25 80:6
81:13,15 82:21
84:23 87:20
93:14,19 98:16
100:17 101:10
102:24 103:24
107:4,8 108:23
109:24,25
110:19 114:10
**knowledge**
  21:3 23:23
  27:19 32:6
  37:7 41:17
  46:17 53:14,20
  59:18 61:21
  62:7,10,14
  75:12 105:20
  107:14 108:6
  108:10 109:18
  110:5 117:22
  119:6 121:16

**l**

**l**   3:2,2 4:2 93:2
**lack**   65:15

**land**   58:23,24
**landing**   94:13
  94:17
**language**   39:11
  39:24 40:12,13
  41:10 70:6,7
  72:15 103:25
**large**   14:12
  18:8 27:16
  58:13
**larger**   58:16
**las**   64:4
**law**   1:18 19:21
  41:20 42:2
  67:21 74:5,10
  74:13 108:12
  108:16,22
  123:6
**laws**   41:13
**lawyer**   113:16
**leading**   9:22
**lease**   58:19,23
  59:2,14,14
**leased**   59:6
**leases**   58:25
  59:8,17 103:15
  103:19 104:2,6
**leave**   74:18
**led**   79:13
**legal**   26:22
  27:2 40:23
  70:13,18 71:13
  80:17 84:10
  96:7

**legally**   58:21
**legislatures**
  9:16 18:4
**lengthening**
  87:19
**lengthy**   39:18
  53:4
**letter**   35:21
**letters**   88:13
**level**   26:10 92:3
**levels**   105:15
**levy**   23:5
**liaison**   34:23
**license**   6:22 7:7
  7:10
**lie**   11:3
**light**   14:4,11
  56:6,11,14,20
  56:21 87:4
  91:8,14 92:2
  115:14 117:10
  117:20
**likely**   49:6
**limit**   96:2,3
  112:16 116:2
**limitations**
  80:23 89:12
**limited**   81:10
  95:12
**limiting**   96:19
**limits**   89:8
  117:3
**line**   126:4,7,10
  126:13,16,19

**list** 63:18 95:2
**listed** 36:10
  50:12
**litigation** 53:16
  109:14 119:17
**little** 45:3 59:22
  81:3 85:10
**live** 8:11 57:21
  98:12
**lived** 8:8,16
**living** 8:14
**llc** 1:3,4,9
**llp** 1:19 2:4,9
**lobby** 55:2
**lobbying** 13:2
**local** 11:9,22
  41:20 42:2
  57:4 61:2
  123:6
**location** 83:17
**long** 8:8 28:16
  46:12 58:25
  90:4 95:2
  98:24 116:24
  119:10
**look** 10:24 42:3
  43:18 44:24
  45:7 46:24
  47:13 49:18
  52:13 60:9
  66:14 78:13
  94:8 100:2
  101:19 104:14
  118:8

**looked** 99:18
**looking** 26:5
  50:23 63:21
  94:20
**looks** 15:15
  83:11
**loosely** 23:9
**losing** 109:10
**lost** 108:25
**lot** 10:22 12:17
  19:11 37:17
  89:25 90:10
  91:19 104:21
  116:3
**lots** 26:7 64:23
  84:9 87:7
**lounge** 58:6

**m**

**m** 4:2 41:18
**made** 10:3,8
  30:17 31:5
  37:18 41:2
  59:20 65:3
  74:4 82:8
  84:25 85:4
  87:7 88:16,18
  105:14 122:6
**magnetometers**
  55:8
**major** 20:20
**majority**
  114:25
**make** 15:3 21:4
  47:10 70:10
  95:14 99:7

**makes** 65:11
  67:24 69:9
**making** 87:20
**management**
  73:2,4 85:24
  105:23
**manager** 1:8
  32:17,20 34:5
  68:25 69:3
  73:7,23 79:16
  81:23 111:20
**manhattan** 6:4
**manor** 4:13
**march** 5:15
  73:9
**marino** 2:15
  10:13,17 13:19
  15:11 37:14
  38:22 39:6,15
  41:7 43:6
  45:25 54:19
  55:18 56:2
  65:25 68:10,21
  74:20 75:23
  76:9 77:11,18
  79:25 82:18
  84:7 85:7 88:6
  88:22 89:5,19
  90:18 95:22
  96:21 99:14
  100:24 103:16
  104:3 107:17
  108:4,13 109:3
  112:9,15
  114:21 115:9

  116:15 117:13
  121:20
**mark** 35:12
  44:3
**marked** 35:14
  41:21,25 44:5
  46:21 49:13,17
  51:22 52:2
  59:25 62:19,23
  66:11 78:6
  93:4,25 97:14
  100:5 101:21
  104:11 106:10
  111:10 118:3
**marking** 35:18
**marriage**
  125:17
**martine** 2:14
**master** 86:10
  87:3 100:23
  101:4
**material** 70:22
  113:3,4
**matter** 21:17
  28:5 34:19
  41:4 63:14
  77:21 116:11
  125:19
**matters** 34:16
  55:23 120:24
**mean** 11:16
  22:11 38:24
  51:7 64:22
  68:18 71:10
  76:16 77:20

87:13 88:25
89:2,7 90:23
114:7 117:19
120:5,21
**meaning** 73:8
90:23 91:22,23
113:6
**means** 45:6
**measurable**
116:9
**meet** 6:5 18:11
22:9,12,16
23:16 24:11,13
107:11,15,23
120:21 121:7
121:12
**meeting** 6:19
18:25 19:16,19
21:14 22:7,14
22:21 23:11,23
32:21 47:12
49:21 50:4,4,6
50:8,9,11,14,15
50:23,24 51:8
51:17 52:7,11
53:4 61:25
62:11 63:2
77:9 78:15
81:17 85:15,19
106:18 118:7
119:25
**meetings** 9:22
9:24 10:3
18:19,23,23
19:21,23 20:3

22:19 24:6
32:19 47:3
76:3 103:10
120:16,20
**member** 11:16
13:16 16:9,23
18:3 19:2,12
19:14,18 20:25
23:4 24:5 25:6
48:24 60:24
61:18 65:2
70:19 120:15
**members** 13:14
16:18 17:5
19:7,8 21:20
22:4,12,22,25
28:25 30:19,21
31:3,12 32:25
70:21 71:7,13
76:4 77:4
81:17 92:22,22
98:8,11 105:9
109:5 111:17
111:18 114:23
115:25 116:25
117:5
**membership**
12:14 24:3
**memory** 8:22
**mentioned** 13:4
20:14 21:2
54:9 57:10
62:9 67:16
74:6 85:10
87:6 97:4

**mentioning**
33:18
**mentions** 19:18
**met** 21:10
110:4
**meyer** 35:3
66:24 111:19
**miami** 91:12
**microphones**
105:11
**mid** 36:9,9
**midtown** 6:3
**midway** 118:10
**million** 13:8,12
14:25 77:21
**mind** 26:15
**minority**
104:20
**minute** 65:22
**minutes** 6:19
47:5 50:24
52:7,10,12,12
53:9 63:4,8,9
78:11,14 81:16
81:24 110:20
118:2,7 119:25
124:8
**mix** 11:25
**mobility** 1:4
24:15
**model** 28:9
65:17 82:25
83:4 84:16
**moment** 60:12
93:21

**money** 94:24
**monies** 95:15
**month** 18:12,15
56:25
**monthly**
103:10
**months** 8:13
21:15 32:2
119:4
**morning** 4:14
4:15
**motivations**
96:24
**multiple** 19:16
58:17
**municipalities**
18:6

**n**

**n** 2:2 3:2 4:1,2
4:2 5:1 6:1 7:1
8:1 9:1 10:1
11:1 12:1 13:1
14:1 15:1 16:1
17:1 18:1 19:1
20:1 21:1 22:1
23:1 24:1 25:1
26:1 27:1 28:1
29:1 30:1 31:1
32:1 33:1 34:1
35:1 36:1 37:1
38:1 39:1 40:1
41:1,19 42:1
43:1 44:1,2
45:1 46:1 47:1
48:1 49:1 50:1

**[n - object]**                                                                    Page 18

| | | | |
|---|---|---|---|
| 51:1 52:1 53:1 | **nature** 26:25 | 126:24 | 110:18,23 |
| 54:1 55:1 56:1 | 33:15 43:16 | **nick** 78:21 | 111:4 112:11 |
| 57:1 58:1 59:1 | 76:14 79:17 | 91:15 | 119:20 121:17 |
| 60:1 61:1 62:1 | 82:25 85:16 | **nine** 48:8 70:9 | 124:15 |
| 63:1 64:1 65:1 | **nearby** 94:15 | 72:19 | **november** |
| 66:1 67:1 68:1 | **necessarily** | **nod** 4:22 | 49:21 50:21 |
| 69:1 70:1 71:1 | 14:25 82:21 | **noise** 29:8,13 | 52:7,10 60:8 |
| 72:1 73:1 74:1 | **necessary** | 30:7,8,9 32:24 | **nuance** 80:21 |
| 75:1 76:1 77:1 | 122:7 | 97:21 98:3,6 | 89:25 |
| 78:1 79:1 80:1 | **need** 5:9,10 7:2 | 98:14,21 99:4 | **nuanced** 26:2 |
| 81:1 82:1 83:1 | 7:4 87:3 | 99:12,16,21,22 | **nuances** 82:22 |
| 84:1 85:1 86:1 | **needed** 14:18 | 104:25 105:3 | **number** 9:23 |
| 87:1 88:1 89:1 | **needs** 4:23 | 105:15 | 10:3,23 18:4 |
| 90:1 91:1 92:1 | **negative** 115:7 | **nominated** | 20:18 31:19 |
| 93:1 94:1 95:1 | 115:19,21 | 9:14 17:9,11 | 32:18 37:2 |
| 96:1 97:1 98:1 | 116:10 | 17:12 | 38:9 41:20 |
| 99:1 100:1 | **nelson** 1:19 2:4 | **non** 84:6,18,21 | 42:2 53:7,7 |
| 101:1 102:1 | **nervous** 113:18 | 86:7 113:16 | 57:14 58:8 |
| 103:1 104:1 | **network** | **nope** 63:13 | 61:12 65:6 |
| 105:1 106:1 | 104:24 | **normal** 37:10 | 80:25 111:7 |
| 107:1 108:1 | **never** 15:18 | **normally** 57:21 | 118:16 123:6 |
| 109:1 110:1 | 22:13 36:14 | 77:14 95:17 | **numbers** 91:19 |
| 111:1 112:1 | 59:17 88:16 | **notary** 1:21 4:4 | 116:24 117:15 |
| 113:1 114:1 | 119:7 | 122:14,21 | 117:23 123:4 |
| 115:1 116:1 | **new** 1:2,7,15,20 | 125:8 | 124:6 |
| 117:1 118:1 | 1:22 2:5,14 4:4 | **noted** 122:7 | |
| 119:1 120:1 | 4:13 15:2 19:6 | **notes** 6:13,16 | **o** |
| 121:1 124:13 | 19:16 37:8,11 | 47:13 | **o** 3:2 4:2 35:11 |
| **name** 4:8,16 | 37:17 49:23 | **notice** 20:3 | **oath** 3:11 66:8 |
| 20:11,17 50:12 | 51:4,11 86:10 | **noto** 2:6 4:7,16 | **object** 5:4 |
| **named** 29:18 | 98:7,12 125:5 | 10:15 65:21 | 13:19 15:11 |
| 48:4 60:21 | 125:9 | 66:4 68:18 | 38:22 39:6,15 |
| **names** 31:11 | **nicholas** 1:16 | 70:15,23 71:8 | 41:7 43:6 |
| **nancy** 84:23 | 4:10 122:2,4 | 71:17,23 72:5 | 45:25 54:19 |
| | 122:13 126:2 | 72:10 110:12 | 55:18 56:2 |
| | | | 74:20 75:23 |

| | | | |
|---|---|---|---|
| 76:9 77:11,18 | 113:7 114:8,12 | **ones** 13:3 20:20 | 72:18 75:22 |
| 79:25 82:18 | 120:16,22 | 25:20 27:17 | 76:7,14 77:10 |
| 84:7 85:7 88:6 | **offices** 1:18 | **online** 91:11 | 77:16 79:14,18 |
| 88:22 89:5,19 | **official** 1:8 | **open** 18:8 | 80:19,23 82:16 |
| 90:18 95:22 | 32:15 | 19:21 | 91:5,20,24,25 |
| 96:21 99:14 | **officials** 17:24 | **operate** 23:7,17 | 96:4,20 103:8 |
| 100:24 103:16 | **oh** 26:11 29:8 | 25:11 55:25 | 105:3,4 114:15 |
| 104:3 107:17 | 50:16 75:5 | 58:21 80:9 | 114:19 115:8 |
| 108:4 109:3 | 94:23 | 81:10 103:6,23 | 116:7 |
| 114:21 115:9 | **okay** 5:12 6:12 | 118:12 | **operator** 8:3 |
| 116:15 117:13 | 24:21 26:14 | **operates** | 25:23,24 26:6 |
| **objection** 10:13 | 30:16 31:3 | 115:16 | 26:16 27:5 |
| 10:15 37:14 | 33:11 36:2,25 | **operating** | 39:25 57:14 |
| 68:10 | 39:19 42:3,7 | 25:17 28:17 | 77:15 79:3 |
| **objections** 3:20 | 43:25 47:25 | 32:17 80:7 | 80:7 |
| **observations** | 50:3,8 57:7 | 81:8 82:12,23 | **operators** 12:4 |
| 28:18 | 59:21 60:15,16 | 82:24 83:20 | 12:5 27:11 |
| **observed** 85:25 | 61:21 62:22 | **operation** | 29:24,24 39:10 |
| **obtain** 6:24 | 65:23 66:18 | 25:19 27:8 | 48:4 54:7 |
| **obtained** 114:4 | 67:19 69:7 | 39:12 40:17 | 58:24,24 59:6 |
| **obviously** 5:10 | 74:12 75:19 | 55:13 81:3,6,8 | 61:15 64:19,24 |
| 23:13 57:8 | 76:5 77:14 | 81:11,12 83:20 | 65:9 85:13,17 |
| 110:14,17 | 78:3 90:6 91:9 | 84:12 | 85:22 103:5 |
| **occupied** 17:19 | 94:7 97:20 | **operational** | 107:16 117:22 |
| **occur** 84:15 | 99:24 100:20 | 37:3 118:16 | 118:11 |
| **occurrence** | 101:18 104:20 | **operations** 22:2 | **opinion** 39:2,5 |
| 52:23 | 106:24 107:25 | 25:14,19 27:16 | 74:5 108:25 |
| **october** 47:12 | 111:16 114:6 | 27:22 28:14 | **opinions** 55:22 |
| 50:17,24 | 115:6 116:11 | 29:23 30:12,25 | 84:10 |
| **offer** 26:22 | 117:6 119:13 | 32:9 33:9,19 | **order** 1:18 23:8 |
| 57:17,19,24 | 119:20 121:6 | 38:5 40:7,11 | 64:6 |
| 58:3 | 121:11 | 40:14,14,16 | **organization** |
| **office** 2:13 6:3 | **once** 16:19 | 53:15 54:16 | 11:19 20:22 |
| 32:23 109:2,11 | 18:12 57:15 | 56:11 64:9 | **organizations** |
| 109:13 111:21 | | 65:5,8 70:7 | 11:15 |

**origin** 105:19
**original** 3:9,16
  39:11 40:12
**originated** 40:8
**outcome**
  125:18
**outside** 57:22
  108:12,22
  109:17 120:19
**overall** 21:19
  29:14,20 79:12
  105:12,15
  116:6,8 117:9
**overnight**
  102:14
**own** 7:13 12:8
  28:18 34:20
  55:22 91:15
  99:7
**owners** 11:24
**owns** 58:23
  59:5

**p**

**p** 2:2,2 3:2
**p.m.** 103:4
  121:22
**pacer** 113:12
  113:13 114:11
**pack** 47:2
  49:20
**package** 110:15
**packs** 63:2
**page** 44:25
  47:13 63:8,9
  63:13 78:11,20

118:8 123:4,23
  124:6,14,19
  126:4,7,10,13
  126:16,19
**pages** 47:9
**pairs** 80:24
**paper** 93:13
**paragraph**
  42:12 43:2,10
  43:19 45:8
  67:20
**park** 2:10
  54:24 58:2
**parked** 7:23
**parking** 57:24
  89:10
**part** 7:11 22:8
  25:15,17,18,23
  25:24 26:11,15
  26:17 27:5,11
  27:11,17 39:12
  40:16 56:12,13
  76:17,18 79:2
  80:5,7,18,20,22
  81:9,14 83:20
  84:2,12,12
  91:23 103:9
  105:12 110:14
  117:18,19
**participated**
  86:13
**particular**
  12:21 29:6
  31:5 79:14
  85:15 98:25

**particularly**
  53:4
**parties** 3:6
  102:18,19
  125:16
**party** 106:2
**pass** 48:15
**passed** 48:10
**passenger**
  42:14,17,20,22
  45:11,13,17,19
  45:19 64:5
**passengers**
  48:8 58:6
**past** 12:23
  23:24 27:22
  77:20 85:18
  88:10 90:22
  91:4
**patterns** 21:21
  99:2
**paul** 2:6 4:16
**pay** 91:11
  113:23
**pelham** 4:12
  5:13 11:10
**pelhamdale**
  4:12
**penalties**
  102:16
**pending** 100:23
**penn** 5:19
**pennsylvania**
  8:14 57:3

**people** 17:16
  32:18 53:7
  54:4,8,10
  58:11 64:17
  87:22 90:6
  91:15 92:6,19
  99:5
**pepa** 20:22
  21:11,14,20
  22:4 31:15,17
**pepper** 2:9
**percent** 101:12
  117:17,21
**percentage**
  117:10,11
**perform** 114:21
**perimeter**
  87:21
**period** 95:16
  103:6,23
**periodically**
  76:2
**periods** 90:15
  102:14
**permanent**
  96:9
**permanently**
  57:20
**permission**
  23:13
**permit** 7:8
**permitted**
  79:18 80:4,8
**person** 73:25
  121:7

**personal** 14:21
54:17
**personally**
15:18 27:23
85:25
**pertains** 55:17
65:4
**peter** 17:2 23:2
34:5 67:8,9,14
67:20 68:19
69:9,14,19
70:14,16,17,24
71:4 72:21
73:11,14,22
74:4,12 78:22
79:16,19 81:19
81:21 109:25
**peter's** 69:23
69:25 70:4
72:6
**ph.d.** 5:20
**phoenix** 2:15
**phone** 121:10
**physical** 87:17
87:21 89:8,12
**physically**
53:22 121:11
**pilot** 7:10 61:4
115:15
**pilot's** 6:21
**pilots** 12:5,5
57:5
**place** 19:6,7
31:24 38:8
48:18 65:20

98:24 101:7
102:13,20
112:6
**placed** 18:24
41:15 61:13
67:12 71:19
75:12
**places** 57:19
58:2 90:8
**plains** 2:14
64:4
**plaintiff** 1:17
**plaintiffs** 1:5
2:4,9 4:17
24:19 54:17
77:9 82:11,17
114:16,19
115:7
**plan** 86:10 87:3
94:21 100:23
101:4,7
**plane** 12:8
56:24 91:16
**planning** 18:2
**plaza** 2:10
**pleasantville**
98:8,12
**please** 4:8
35:12 39:5
42:12 45:9
100:2
**plus** 58:25
**pmh** 1:6
**point** 23:24
31:22 51:16

89:7,11 94:22
95:10 120:7
**pointed** 116:5
**points** 19:16
38:10
**police** 64:17
**policies** 12:21
37:17,18
**policy** 24:11
36:18 37:2,3,8
37:11 39:14
41:5,6 97:21
116:12 118:16
118:20,23,24
119:8,11,14,18
119:18
**portion** 16:8
**position** 13:11
13:17,22 14:17
14:20,21 17:20
**positions** 18:9
**possibly** 38:18
**potential** 39:10
99:19
**potentially**
99:10
**pounds** 7:11
14:9
**power** 58:4
**practical** 116:8
**practice** 48:12
**precedent**
77:23
**precise** 80:23

**predated** 15:21
**prefer** 116:12
**prepared** 93:16
93:19
**present** 2:11
78:18 111:20
**presentation**
50:9
**presently** 35:3
**pretty** 22:13
108:20
**prevent** 20:16
95:18,21 97:5
97:7
**prevented**
102:14
**prevention**
21:5
**prevents**
102:20
**previous** 6:19
50:16 90:15
**previously**
20:14 60:24
64:25 73:12
85:11 102:12
**prices** 83:13
**primarily** 87:2
97:3
**primary** 56:15
57:18
**prior** 6:6,13
8:13 9:22
16:20 36:20
37:19 38:2

46:12 48:18
52:18 53:15
54:9 59:13,19
61:23
**private**  7:9
12:5
**privatization**
10:2,8 13:4,6
15:6,15
**privilege**  71:16
108:17
**privileged**
68:13,20 70:22
70:25 72:6
112:14 120:25
**pro**  119:7
**probably**  10:5
23:24 24:25
39:3,17 54:13
64:23 117:20
**problem**  64:9
**problems**  106:4
**procedure**  98:6
99:9,20,22
**procedures**
43:3 47:18
75:3,21 85:21
98:3
**process**  86:10
86:14
**produce**  110:23
**produced**  45:6
105:11 110:22
**program**  97:25
98:15,21 99:13

99:16 103:21
**progress**  120:8
**project**  53:6
**projects**  101:6
**promulgate**
37:11
**propeller**  7:18
7:19
**properly**
105:18
**property**  58:20
59:3
**proposal**  10:2
10:12,24 13:8
14:10,22 15:14
111:2
**proposals**  15:8
15:14
**propose**  19:3
19:11
**proposed**  49:6
83:10 101:10
107:4
**proposing**  14:2
14:3
**protection**
20:24
**provide**  32:19
34:20 48:11
58:9
**provided**  44:21
45:20,21 120:3
120:12
**provides**  32:21
32:23

**providing**
42:17,19,22
45:13,16,19
**provisions**
103:19
**public**  1:3,21
4:4 19:9,12,15
19:18,23 22:12
25:18 26:18
30:22 31:12
37:4 53:8 81:6
83:18,21 86:16
86:20,23 92:23
112:5 113:21
118:15 120:10
122:1,21 125:8
126:1
**publicly**  20:4
112:18
**published**
84:14 119:11
119:19
**purchase**  20:23
**purchased**
83:25
**purpose**  56:16
**purposes**  57:15
**pursuant**  1:17
**push**  76:6
**put**  19:9,14
49:6 67:18
88:12 93:22
102:13,19
112:3,25

| **q** |
| --- |
| **quest**  82:9 |
| **question**  4:20 |
| 4:25 5:3 26:12 |
| 29:4 31:13 |
| 36:2 37:20 |
| 39:18 40:3,4 |
| 40:23 43:17 |
| 44:10,15,17 |
| 46:18 52:15 |
| 60:11,16 66:18 |
| 69:6,8,12 |
| 70:12 71:18,25 |
| 72:3,9 79:6 |
| 89:25 92:18 |
| 98:18 100:20 |
| 108:21,22 |
| 112:19,24 |
| 116:19 119:24 |
| **questioning** |
| 29:2 30:25 |
| **questions**  4:19 |
| 31:7 33:17,19 |
| 54:4 77:5 79:5 |
| **quite**  21:7 |
| 116:7 |
| **quote**  80:12,16 |
| **quoting**  80:11 |

| **r** |
| --- |
| **r**  2:2 3:2 4:2 |
| 46:19 47:11 |
| 125:3 126:3,3 |
| **radar**  10:5 |
| **raise**  94:16 |

**raised** 31:12
38:10 68:23
**raising** 31:6
**ramp** 42:15,18
42:24 43:5,23
45:12,15 57:23
**ran** 53:11
**range** 30:24
58:3 102:18
**reach** 33:4
82:10 89:11
**reached** 28:12
33:7 68:5 74:4
**reaches** 121:3
**react** 38:21,24
**read** 26:14
42:11 43:8,12
45:8 52:12
61:16 72:3
77:2 122:5
**reading** 42:25
60:13 74:16
96:15
**ready** 60:10
100:3
**really** 4:23 55:7
69:6 81:14
**realm** 9:10
**rear** 47:9
**reason** 126:6,9
126:12,15,18
126:21
**reasonable**
77:6

**reasons** 56:12
**recall** 15:6 17:9
18:5 21:16
22:3,6,19 24:6
29:12,15 30:10
30:14,23 31:10
31:11 38:11,18
50:13 51:3,10
51:12,14 54:14
64:2,10,13,22
67:17 75:14
80:14 85:14,18
87:2 93:17
94:12 96:13
100:13,19
102:3 104:17
105:22 106:25
107:10 114:13
118:18 119:9
120:2
**receive** 118:17
**received** 28:20
29:5 38:16,20
53:23 70:14,18
74:13 118:19
118:22 119:14
**receives** 103:12
**recent** 12:25
13:3 16:4
33:12
**recently** 13:7
**recess** 66:5
**recipients**
111:16

**recognize**
46:25 49:19
**recollection**
21:23 91:18
92:4 117:16
**recommend**
108:11 109:17
**recommendat...**
82:8
**record** 4:9
52:16,25 57:11
66:7 71:20,21
71:24 113:21
120:10 125:13
**records** 17:10
**reduction** 91:7
**reelected** 16:23
17:3
**reelection** 17:7
**refer** 42:8
115:13
**reference** 24:19
67:24 69:9,15
80:5 84:25
**referenced**
77:21 86:2
102:9
**references**
88:18 104:5
**referred** 44:20
68:24 72:2
88:10
**referring** 62:2
81:4

**reflected** 53:9
**regard** 6:8
**regarding**
50:10 63:12
70:8 79:17
105:10 120:8
**regards** 6:7
**regular** 18:13
**regularly** 106:2
**regulations**
21:25 44:5,16
50:2 51:5
61:14 62:3
123:7
**regulatory**
76:15 82:22
**rehabilitation**
50:10
**related** 12:21
21:21 30:14,25
31:19,20 34:16
39:24 40:3
51:9 61:3
64:11 90:2
109:14 119:17
125:16
**relates** 66:25
68:12
**relation** 79:12
105:24
**relationship**
32:12,15 34:10
103:13
**relationships**
27:2

**relative** 9:9
  37:17 72:14
  90:11 116:7
**released** 119:12
**rely** 95:15
**remaining**
  117:21
**remember** 21:8
  31:18,23 38:7
  38:15 51:8,17
  53:3 87:6,8
  104:23 106:15
  106:18 111:23
**remove** 10:21
  64:17
**renewed** 59:3
**renewing** 59:14
**repaving** 51:9
  53:6
**rephrase** 5:2
  29:4
**replace** 14:12
  14:23
**report** 32:21,23
**reported** 103:9
**reporter** 4:23
  35:16 41:23
  44:7 46:23
  49:15 51:24
  60:3 62:21
  66:13 72:4
  78:8 93:6 94:3
  97:16 100:7
  101:23 104:13
  106:12 111:12

  118:5
**reporting**
  29:13
**reports** 32:19
  103:12
**represent** 4:17
**representative**
  32:22
**representatives**
  21:11 23:17,21
  24:7
**representing**
  22:24
**request** 15:7
  103:22 119:9
**requested**
  61:13 103:5
  124:18
**requesting**
  118:14
**required** 16:4
  122:14
**requirement**
  12:15
**requirements**
  95:3
**reread** 71:24
**reserved** 3:20
**resolution** 47:8
  47:14,21 48:2
  48:9,19,22
  52:21 88:10
  93:24 94:5,6
  94:11 96:12,14
  97:13,17,18

  100:2,4,10,18
  101:20 102:10
  104:10 105:7
  106:9 107:5,13
  107:16 108:3,9
  109:22 110:11
  123:17,18,19
  123:20,21,22
**resolutions**
  77:16
**resolved** 94:19
**respect** 70:12
**respective** 3:6
**respond** 33:21
  33:23 68:17
**responded**
  79:19
**response** 69:10
  69:13,20 70:2
  70:13,13,18
  72:9 79:22
**restaurants**
  57:5
**restraint** 96:6
  102:7 103:14
**restrict** 76:6
**restrictive** 41:3
**result** 92:13
**resume** 65:24
**retain** 71:15
**retained**
  124:10
**retention**
  109:17

**return** 59:4
**revenue** 94:17
**review** 6:12
  59:8
**rfp** 15:7,16,19
**right** 53:13
  63:20 69:11
  70:11 74:17
  78:12 81:19
  90:2 91:13,18
  92:25 104:8
  119:20,20
  121:17
**rob** 23:3
**robert's** 23:8
**rockland** 125:6
**rockwell** 110:7
**role** 48:13,16
  55:21 66:24
  70:19
**room** 15:3
  18:22
**roughly** 117:17
**routinely** 22:9
  33:4
**ruled** 102:18
**rules** 4:19 23:8
  26:7 44:4,16
  44:20 72:22
  123:7
**run** 15:9 32:9
**runway** 50:10
  51:9 53:6
  87:20 89:9

| | | | |
|---|---|---|---|
| **rye** 1:20 2:5 | 84:13,18,21 | 78:23 90:9 | 45:14,17,19,20 |
| **s** | **scherrer** 34:5 | 95:6 117:7 | **services** 5:25 |
| **s** 2:2 3:2,2 4:2 | 73:11,14 79:16 | **seeing** 24:25 | 48:6 57:17 |
| 51:19 123:2 | 79:19 | **seek** 17:7 55:20 | 58:3,8 |
| 124:3 126:3 | **schlactus** 17:2 | **seem** 53:9 | **servicing** 26:21 |
| **safe** 28:8 | 23:2 31:4,9 | 116:25 | 58:5 |
| **safety** 85:2,12 | 67:8,9 69:19 | **seemed** 73:25 | **set** 23:22 55:8 |
| **sanders** 2:9 | 70:14 78:22 | 77:5 | 98:25 125:12 |
| **satisfied** 98:20 | 81:20,22 | **seen** 25:2,21 | 125:21 |
| 116:25 | **se** 53:12 99:22 | 36:3 42:5 | **settlement** 40:9 |
| **saw** 15:18 | **sealing** 3:7 | 44:10,18,19,22 | **seven** 119:4 |
| 36:12,15 53:22 | **sean** 2:16 | 47:20,24 59:10 | **several** 21:19 |
| 76:11 85:2 | **seat** 21:25 | 60:17 62:24 | 29:25 54:24 |
| 119:10 | 26:24 65:4 | 67:8 75:9 | **share** 38:17 |
| **saying** 49:4 | 83:14 | 93:10,14,17 | 39:4 60:5 |
| 70:15 80:10,11 | **seats** 39:24 | 97:18 100:9 | 119:5 |
| 80:14 90:16 | 48:7 61:16 | 101:24 104:7 | **sheridan** 1:21 |
| 105:19 108:20 | 70:8,9 72:19 | 106:13 111:8 | 125:8,24 |
| 112:23 116:18 | 83:25 | **selling** 61:15 | **short** 66:5 |
| **says** 35:21 | **second** 18:14 | 70:8 72:17 | **show** 35:17 |
| 40:13 42:2 | 43:8 | **send** 19:4,5 | 41:24 49:17 |
| 43:13,24 44:15 | **section** 42:8,13 | 113:4 | 51:25 59:21 |
| 46:11,13 47:16 | 42:20 44:12,24 | **senior** 2:17 | 62:22 66:8 |
| 48:5 49:25 | 45:10 | **sense** 15:17 | 78:9 93:7 |
| 63:13,19 64:3 | **security** 64:9 | 76:5 77:3 81:5 | 118:6 |
| 67:20 74:25 | 64:12,15,16 | 85:14,24 86:12 | **showing** 78:14 |
| 93:8 98:5 | 65:3,8,12,16,19 | 98:23 116:8 | **sierra** 21:6 |
| 100:15 118:10 | 85:6,13,16,21 | **sensors** 104:25 | **sign** 12:16 |
| **scenario** 11:13 | **see** 35:19 36:6 | **sent** 15:7 37:24 | 63:12 |
| **scheduled** 26:8 | 42:9 46:25 | **sentence** 43:19 | **signature** |
| 40:7,10,13,14 | 47:13 49:18 | **serve** 11:9 | 125:22 |
| 40:16 42:17,19 | 50:11,19 52:3 | 57:14 | **signed** 3:9,12 |
| 64:14 80:17,22 | 52:16 63:11,17 | **served** 11:6 | 3:15 59:10,11 |
| 81:2,7,10,12 | 63:22 67:6,19 | **service** 3:16 | **significant** |
| 83:12 84:6,6 | 67:22 76:16 | 42:17,20,22 | 14:15 |

similar  69:4
83:15 93:16
94:15
simply  65:17
89:12
single  7:9,10,19
14:12 21:25
61:16 65:4
sita  86:7,7
situation  64:7
73:24
six  8:13 21:15
31:25
skim  44:9
slightly  113:18
slot  18:15
slots  18:4
small  27:16
116:7
smaller  59:23
sold  39:24 48:7
sole  48:7
solicit  9:3,5
15:8
soliciting  15:14
somebody
19:10 22:14
49:5 65:11
68:24
somewhat
83:14
sorry  26:11,13
30:17 36:11
43:9 60:18
73:11,15,18

110:9 114:9
sort  11:2 18:8
26:19 33:18
41:11 55:8
93:12 95:7
97:10 116:22
sounds  69:4
77:3
southern  1:2
space  55:9
56:14
speak  23:10
34:2 68:25
86:22
speaking  90:9
95:24 105:22
116:21
spear  9:8 66:20
66:20,22
spear's  9:19
specific  18:6
21:8 29:16
30:5 40:11
52:15 93:15
112:4 113:22
118:22
specifically
15:16 22:20
29:17 30:15,23
34:18 48:5
50:13 51:14,18
54:14 63:8
67:17 72:17
74:9 75:18
83:8 85:19

115:4 117:16
117:23
speculated
72:23
spending
100:23
spirit  101:8
split  89:22,23
92:6
spoke  87:2,5
spoken  40:10
120:19
sponsor  95:3
spots  17:18,21
17:23 57:22,23
89:11
ss  125:5
ssco's  62:8
staff  32:18 33:2
stamp  44:25
45:4 66:15
118:9
stamped  47:7
110:21
standard  18:15
stands  45:5
57:13 104:24
start  30:8
35:10,11
started  79:10
starting  47:15
state  1:21 4:4,8
5:19 63:14
125:5,9

statement  85:4
88:17
statements
10:4,7 87:7
states  1:2
station  57:16
stay  116:24
stays  90:5
step  30:17
stipulated  3:4
3:19
stops  95:8
strictly  96:7
103:7
student  12:5
stuff  35:10
subject  19:21
21:17
subscribed
122:16
substance
112:23
sued  102:17
suggesting
94:16
suite  2:10,14
summary  92:3
93:9
support  39:14
40:18,22 41:12
96:14 100:14
102:4 104:18
107:2
supportive
10:8

| | | | |
|---|---|---|---|
| **supposed** 56:16 | 89:15 91:10 | **terms** 30:7,9 | **things** 26:25 |
| **sure** 39:3 45:10 | **taxiways** 89:10 | 55:21 72:16 | 67:16 87:9 |
| 52:14 66:4 | **technically** | 76:15 80:8 | 90:2 95:11,16 |
| 70:11 106:16 | 19:2 59:5 | 83:22 84:13 | 95:19 96:3,8 |
| 107:7 | 81:11 113:21 | 89:9 90:15 | 96:17 109:8 |
| **surprised** | **tell** 7:2 44:17 | 91:5 105:15 | 112:17,17 |
| 29:19 | 71:2,3 72:21 | 117:9 | 117:5 120:6,9 |
| **surprising** 30:2 | 94:10 104:21 | **testified** 4:5 | 120:9 |
| **susan** 9:8,18 | 106:21 | 73:12 77:8 | **think** 9:9 10:4 |
| 66:19,20,22 | **temporary** | 120:3 | 10:11 12:12 |
| **sworn** 3:10 4:3 | 57:25 | **testimony** 6:14 | 13:3 20:17,25 |
| 122:16 125:12 | **ten** 17:19 47:8 | 24:2 36:14 | 21:6,19 23:3,4 |
| **system** 105:2 | **tenant** 11:4 | 37:22 54:9 | 23:20,22 27:4 |
| 105:12,13,17 | **tenants** 55:4 | 110:10 115:14 | 31:5 32:14 |
| 105:21,24 | 103:20 | 119:3 122:10 | 33:13 34:9 |
| 106:4 | **tend** 29:22 | 125:14 | 35:6 38:9 |
| | **term** 14:10 | **thank** 14:7 | 39:17,20 40:2 |
| **t** | 24:3 45:14 | 36:25 38:2 | 40:23 56:20 |
| | 57:8 86:7 | 41:4 42:25 | 72:23,25 74:9 |
| **t** 3:2,2 4:2 | 87:10,14,25 | 43:25 45:22 | 76:11,21 77:5 |
| 58:16 78:3 | 88:18 90:11 | 46:18 49:7 | 80:5 82:5,21 |
| 123:2 124:3 | 99:17 | 52:22 57:7 | 83:18 85:9 |
| 125:3,3 126:3 | **terminal** 21:24 | 65:21 74:3 | 87:5,14,15 |
| 126:3 | 29:3 30:14 | 75:8,11 82:14 | 88:9,16 89:21 |
| **take** 5:7,9 27:5 | 42:15,15,18,23 | 93:22 97:20 | 89:24 90:3,8 |
| 30:16 49:9 | 42:23 43:3,4,5 | 99:24 101:18 | 92:2,11,16 |
| 52:11 56:13,23 | 43:13,15,16,23 | 104:8 121:17 | 95:13,24 96:18 |
| 60:9,14 65:22 | 43:23 45:11,12 | **theodore** 1:19 | 96:18 97:3 |
| 66:14 78:13 | 45:15,21 47:18 | 2:5 | 98:2,16,18 |
| 100:2 | 49:25 51:5 | **theory** 95:8 | 99:18 101:2,7 |
| **taken** 1:17 | 54:5 55:2,6 | 105:16 116:3 | 105:18 106:22 |
| 13:11,16 66:6 | 61:14 62:2 | 117:2 | 106:22 109:5 |
| 112:6 116:22 | 75:2,21 83:16 | **thing** 101:4 | 109:12 114:18 |
| **takes** 94:24 | 90:3,5 115:16 | 118:19 | 115:13,24 |
| **talking** 24:20 | | | 116:5,12,17,19 |
| 63:20 69:14 | | | |
| 73:9 74:24 | | | |

116:20 117:4
118:18,21
120:24
**thinking**  83:8
**third**  23:4
106:2
**thought**  72:8
72:22
**three**  17:23
25:3,8 56:25
**thrown**  87:15
**tiedown**  57:22
**time**  1:12 3:21
9:9,23,24
15:21 21:13
22:18,18 25:17
25:18 34:5
40:19 41:10
46:12 47:23
48:14,16 50:14
51:16 53:11
60:14 61:20
62:8,12 64:20
66:23 69:3
72:16 73:7,8
73:24 75:25
76:25 79:17
80:6 81:15
85:11,12 95:16
98:24 112:6
119:10
**times**  12:23
19:12 30:22
34:19 56:25
57:11 80:25

84:14 86:5
121:9
**title**  35:6
**today**  6:6 40:21
107:20
**today's**  6:14
**together**  32:16
57:5 76:24
**told**  27:21,25
28:5 69:2
72:19 73:3,5
73:22 85:23
105:25
**took**  31:24 38:8
48:18 119:4
**top**  35:22 41:25
47:14 63:9
**topic**  22:5 33:3
38:10 51:16
54:12 59:16
62:2 67:15
68:5 76:2,22
79:9 88:9
89:22 105:24
**topics**  31:20
32:24
**total**  65:18 91:5
**town**  98:7
**tracked**  103:9
117:24
**tracks**  105:2
**tracy**  23:5
**traditional**
25:15 65:15
83:15

**traffic**  21:21
32:23 56:20
79:12 89:9,15
90:5,11,12,14
90:17,21,23
91:3 96:4 98:4
98:7,25 102:14
117:6
**transcript**
122:5,10
**transient**  57:24
**transportation**
17:25
**travel**  26:20,21
26:22 27:9
**traveling**  27:7
**trial**  3:21
**trinidad**  7:16
7:17
**trip**  26:24
**troutman**  2:9
**true**  122:9
125:13
**try**  5:2 82:6
**trying**  40:24
71:9 76:12,20
76:23 79:15
81:5 102:25
**tsa**  65:14,15
**tur**  33:20 39:9
39:11,20 40:6
40:8,10,12,13
40:20 41:9
48:3 52:17
70:6 72:14

76:20 77:2
116:2,4,23
117:4,7
**turn**  22:14
83:16
**turns**  81:12
**twice**  87:6
**two**  13:3,23
20:20 22:22,25
56:5
**type**  116:19
**types**  7:8 29:23
56:5 64:8
79:14 96:4
**typically**  19:6
32:25 48:12
58:5,25 59:9
84:3 120:14,23

## u

**u**  3:2
**ultimately**  11:3
**um**  35:23 47:19
66:17
**unavoidably**
55:22 99:4
**undefined**
87:15
**under**  7:11
19:6 25:15
26:23 51:4
66:8 76:17
80:17 81:8
82:22 116:24
**underneath**
20:19

**understand** 5:2
26:19 46:14
50:25 68:21
76:12,20,23
81:5 82:6
112:13
**understanding**
25:13 37:5
48:2 58:22
68:22 74:19
84:11,19 96:23
99:6 103:18
**understood**
40:6 62:13,13
**unique** 64:19
**united** 1:2 8:16
8:17
**units** 58:4
**university** 5:19
5:20
**unsigned** 3:13
**unsuccessful**
98:15,17
**unusual** 53:12
113:16
**update** 120:17
**updates** 120:8
120:11
**urban** 1:4
24:15
**use** 21:25 29:3
30:14 42:14,19
43:3,16 45:11
45:16 47:18
50:2 51:5 54:5

54:18,25 58:6
61:14 62:3
75:2,21 85:22
90:3,5 117:9
**used** 3:14 41:10
56:14 90:12
**users** 42:21
43:4,22 45:18
**using** 23:7
42:23 43:4,13
43:15,22 55:5
113:18
**usually** 18:14
29:15 57:3
120:18

**v**

**vacant** 17:19
**various** 26:23
102:16 103:15
**vegas** 64:4
**vendor** 106:6
**verbal** 4:20,22
**verbally** 33:24
33:25
**version** 119:7
**victoria** 111:19
111:21
**violation** 29:2
33:20
**visit** 57:4
**vocal** 14:13
67:15
**volition** 34:20
**volume** 116:6

**volumes** 79:12
**voluntary** 96:5
96:8 102:6
103:7,14
**vote** 81:25
96:11 100:12
102:2 104:16
106:24
**voted** 115:4
**vrff** 102:7
103:2,3 104:6
**vs** 122:1 126:1

**w**

**wait** 5:4
**waived** 3:8
**wang** 60:6,6,21
61:12,18
101:11,15
107:6
**want** 5:7 47:9
49:8 50:20
60:9,12 70:10
100:22
**wanted** 22:14
24:13 109:8
**wanting** 14:25
**way** 34:15
39:20 57:17
80:9 84:19
87:16 89:13
113:17 114:24
125:18
**ways** 86:2
**we've** 22:20
23:22 49:17

59:17 88:16,18
**web** 5:25
**webex** 18:23
**wednesday**
18:14
**week** 80:25
**weekends** 57:6
**west** 7:23,25
54:24 56:7
86:3
**westchester** 1:7
1:15 2:13 7:24
8:9 11:17,17
12:19 13:10
20:13,16 25:12
27:10 42:16
44:16 45:5,12
47:17 57:21
58:19 88:21
93:3,8 94:14
97:6 122:1
123:15 126:1
**whatnot** 4:22
**whereof** 125:20
**white** 2:14 64:4
93:13
**witness** 1:16
3:10,15,17 4:3
68:11,14
108:14 112:10
121:23 125:11
125:14,20
**won** 17:14
**wording** 76:20

**[words - zoom]**                                                        Page 30

| | |
|---|---|
| **words**  84:20 | 82:8 89:7 |
| **work**  4:23 6:2 | 91:23,24 97:9 |
| 13:24 14:2,3 | 99:23 102:11 |
| 32:15 35:7 | 106:22,22 |
| 67:21 | 108:19,19,24 |
| **working** | 109:21 110:18 |
| 105:17 | 111:21 112:21 |
| **works**  64:12 | 112:21 113:15 |
| 85:25 111:21 | 119:2,6 |
| 113:17 | **year**  7:5 8:19 |
| **writing**  33:23 | 9:22 12:12 |
| 111:23 112:17 | 16:14,19 |
| **written**  34:15 | **years**  8:15 25:4 |
| 39:21 40:21 | 28:19 29:25 |
| 77:2 88:13 | 58:25 65:8 |
| 93:13 | 90:8 |
| **wrote**  111:14 | **york**  1:2,7,15 |
| **x** | 1:20,22 2:5,14 |
| | 4:4,13 125:5,9 |
| **x**  1:3,10 123:2 | **z** |
| 124:3,13 | **zoom**  18:23 |
| **xo**  1:4 24:15 | |
| **y** | |
| **yeah**  7:16 9:7 | |
| 10:17,19 13:15 | |
| 22:11 23:9 | |
| 43:12,20 45:3 | |
| 47:15,22 50:14 | |
| 53:18 58:22 | |
| 60:7 62:15 | |
| 63:15,22 64:2 | |
| 66:2 68:18 | |
| 73:10,19 74:2 | |
| 75:7 77:13,23 | |
| 80:14 81:19 | |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.