**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**Dorf Nelson & Zauderer LLP**
**555 Theodore Fremd Ave**
**Rye, New York 10580**
**(914) 381-7600**
**Attorneys for Plaintiff**
**Jonathan B. Nelson (JN 8705)**
**Paul J. Noto (PN 8388)**

-----------------------------------------------------------------

DELUX PUBLIC CHARTER, LLC
d/b/a JSX AIR and JETSUITEX, INC.;
XO GLOBAL, LLC; and
BLADE URBAN AIR MOBILITY, INC.,

                                        Plaintiffs,

            -against -

COUNTY OF WESTCHESTER,

                                        Defendant.

-----------------------------------------------------------------

Civil Action No.
22-cv-01930 (PMH)


**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**


D N Z

Dorf Nelson & Zauderer LLP
The International Corporate Center
555 Theodore Fremd Avenue
Rye, New York 10580
Phone: 914.381.7600
Fax: 914.381.7608

## <u>TABLE OF CONTENTS</u>

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. ii

Preliminary Statement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 1

Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     I.    ANCA Preemption Claim. . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . .3

         A.  ANCA and the 2004 Terminal Use Procedures. . . . . . . . . . . . . . . . . . . . . .3

         B.  The 2005 Amendment is Preempted by ANCA. . . . . . . . . .. . . . . . . . .. . . .5

     II.    The Airline Deregulation Act Preempts the 2005 Amendment . . . . . . . . . . . . . . .9

         A.  The Airline Deregulation Act's
            Proprietor Exception Does Not Apply. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .9

         B.  The 2005 Amendment Has a Clear Effect
            on Plaintiff's Businesses and is Preempted Under the ADA. . . . . . . . . . . .  12

             i.  Routes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

             ii.  Services. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

             iii.  Prices. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .20

     III.    Enforcement of the 2005 Amendment is Barred
           by the Doctrine of Laches . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

     IV.    The 2005 Amendment Violates the Equal Protection Clause
            of the Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . .25

# TABLE OF AUTHORITIES

<u>CASES</u>                                                                                                                    <u>PAGE</u>

*Abdu-Brisson v. Delta Air Lines*,
   128 F.3d 77 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

*Air Transport Ass'n of America, Inc. v. Cuomo*,
   520 F.3d 218 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. .18

*Allens Creek/Corbetts Glen Pres. Grp., Inc. v. West*,
   2 F. App'x 162 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Arapahoe County Public Airport Authority v. F.A.A.*,
   242 F.3d 1213 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12

*Barnahrt v. Sigmon Coal Co., Inc.*
   534 U.S. 438 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Bravman v. Baxter Healthcare Corp.*,
   842 F. Supp. 747 (S.D.N.Y. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 9

*Cayuga Indian Nation of N.Y. v. Pataki*,
   413 F.3d 266 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Conopco, Inc. v. Campbell Soup Co.*,
   95 F.3d 187 (2d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

*Friends of East Hampton Airport, Inc. v. Town of East Hampton*,
   841 F. 3d 133 (2d Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*,
   634 F.3d 206 (2d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Harlen Associates v. Incorporated Village of Mineola*,
   273 F.3d 494 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..24

*Hekmat v. U.S. Transportation Security Administration*,
   247 F.Supp.3d 427 (S.D.N.Y. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .18

*Midway Airlines, Inc. v. Westchester County, N.Y.*,
   584 F. Supp. 436 (S.D.N.Y. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 10, 11

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*National Helicopter Corp. of America v. City of New York*,
    137 F.3d 81 (2d Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Northwest Inc. v. Ginsberg*
    572 U.S. 273 (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . 13

*Puerto Rico v. Franklin California Taz-Free Tr.,*
    579 U.S. 115 (2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Rowe v. New Hampshire Motor Transport Ass'n*,
    552 U.S. 364 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*Warren v. Stop & Shop Supermarket, LLC*,
    592 F.Supp.3d 268 (S.D.N.Y. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .13

*U.S. v. Dauray*,
    215 F.3d 257 (2d. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15

*Zuckerman v. Metropolitan Museum of Art*,
    928 F.3d 186 (2d Cir. 2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

## **STATUTES**

U.S. Const. amend XIV, § 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

14 C.F.R. § 110.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

14 C.F.R. § 161.7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . 7

14 C.F.R. Part 119. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

14 C.F.R. Part 121. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1, 4

14 C.F.R. Part 135. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

14 C.F.R. Part 380. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . 1

49 C.F.R. 1544.101(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .14

49 U.S.C. § 41713(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13

49 U.S.C. § 47524(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .. 8

49 U.S.C. § 47524(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

49 U.S.C. § 47524(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3, 7, 8

49 U.S.C. § 47524(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6, 7

## PRELIMINARY STATEMENT

Plaintiffs DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR, JETSUITEX, INC., XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC. (collectively, "Plaintiffs'"), by their attorneys Dorf Nelson & Zauderer LLP, submit this memorandum of law in opposition to Defendant's Motion for Summary Judgment, for judgment in Plaintiffs' favor pursuant to FRCP 56(f) and for such other and further relief as this Court deems just and proper. Accordingly, for the reasons further articulated below, this Court should deny Defendant's Motion for Summary Judgment in its entirety and grant judgment in favor of Plaintiffs.

## STATEMENT OF FACTS[1]

Plaintiffs provide public charter flights under 14 C.F.R. Part 380 ("Part 380"), which are on-demand, non-scheduled air carriers. Plaintiffs have continuously provided safe, economical, and federally authorized air transportation services to the public at Westchester County Airport ("HPN").[2] Plaintiffs are federally authorized direct and/or indirect air carriers that comply with all applicable federal laws and regulations.[3]

Like 14 C.F.R. Part 121 ("Part 121") passenger airlines such as JetBlue or Delta, Plaintiffs, as Part 380 public charter operators, are authorized by the U.S. Department of Transportation ("DOT") to sell tickets to the public.[4] In this regard, Plaintiffs partner with 14 C.F.R. Part 135 ("Part 135") operators (which are direct air carriers certificated by the Federal Aviation Administration ("FAA")), and Plaintiffs' flights enplane and deplane at Fixed Base Operator

---

[1] In addition, Plaintiffs rely on the facts set forth in their accompanying Rule 56.1 Statement, ECF Doc. No. 93.
[2] *See* Exhibit ("Exh") 1, Plaintiffs' Counter Statement of Facts ("COF") ⁋ 2, attached to Declaration of Jonathan B. Nelson, submitted herewith.
[3] Exh 1, COF ⁋ 13.
[4] Exh 1, ⁋ 3.

spaces ("FBOs") at HPN.[5]  This is a common form of federally approved operations and a business model that has been in existence for decades.

Despite years of open and uneventful operations at HPN, in 2021 Defendant Westchester County ("Defendant" or the "County") attempted to improperly regulate Plaintiffs' operations by forcing Plaintiffs to discontinue operating out of the FBOs and enter the lottery for gate access at the main terminal (the "Terminal").[6] Historically at HPN, the use of the Terminal and the lottery has been exclusively for Part 121 passenger airlines, such as Delta or JetBlue.

Now, Defendant seeks to force Plaintiffs to enplane and deplane through the Terminal building, which includes clearing passengers through Transportation Security Administration ("TSA") screening checkpoints.[7] Such regulation would end Plaintiffs' current operations at HPN, as Plaintiffs' customers cannot deplane at the Terminal.[8] The Terminal lottery which is, by definition a game of chance, has limited spots available.[9] The safety and convenience offered at the FBOs would be discontinued and Plaintiffs' ability to service underserved routes and airports from HPN would end.

Importantly and contrary to Defendant's assertion, Plaintiffs do not seek to "invalidate" the Terminal Use Procedures ("TUP").  Indeed, Plaintiffs seek no relief with regard to the 2004 TUP. Instead, Plaintiffs seek a ruling that, as Part 380 operators, they are exempt from the provisions of the TUP as amended in 2005 and that the 2005 Amendment, as applied to Part 380 and Part 135 operators, is preempted by Federal law.  This is consistent with existing Federal regulations and case law.

---

[5] Exh 2, ¶ 7.
[6] Exh 3.
[7] Id.
[8] Exh 4, ¶ 16.
[9] Exh 1, COF ¶15.

Defendant fails to acknowledge the very important distinction between Part 380 operators which are considered on demand, non-scheduled operations and Part 121 operators which operate under a different set of rules and regulations.  Defendant attempts to regulate Plaintiffs' operations is preempted by the Airline Deregulation Act of 1978 ("ADA") and the Airport Noise and Capacity Act of 1990 ("ANCA").

## ARGUMENT

I.    ANCA Preemption Claim

*A. ANCA and the 2004 Terminal Use Procedures*

ANCA preempts noise or access restrictions on Stage 3 aircraft that were not in effect on or before October 1, 1990, unless agreed to by all aircraft operators or approved by the Department of Transportation. *See* 49 U.S.C.A. § 47524(c)(1). The County, in their passage of the 2005 Amendment to the Terminal Use Procedures ("TUP"), materially altered the 2004 TUP and violated ANCA.

The 2004 TUP codified the three allowable restrictions that resulted from the *Midway* litigation[10], which are (i) the Terminal is limited to 240 passenger per half hours, (ii) commercial air carriers are limited to 4 operations per half hours, and (iii) aircraft weight maximums.[11] These restrictions, which are memorialized throughout the 2004 TUP, are "grandfathered" under ANCA, as they were effective prior to the passage of ANCA in 1990.

By its terms, the 2004 TUP was applicable only to "all use of the Passenger Terminal and the Terminal Ramp at the Westchester County Airport ("Airport" or "HPN") by Airlines providing

---

[10] The litigation entitled *Midway Airlines v. County of Westchester*, No. 84 Civ. 2229 is commonly referred to as the "Midway Litigation" in which the DOT and FAA were Plaintiffs-Intervenors.  The 2004 TUP was the codification of the settlement resulting from the Midway Litigation.

[11] So as to not overburden the Court, Plaintiffs have refrained from submitting duplicative exhibits and, instead, will cite to Defendant's exhibits ("Def. Exh") when possible. Def. Exh I, Page 3.

scheduled passenger service."[12] It did not apply "to any activities by Airport user not providing passenger service or not using the Terminal Ramp."[13]

Further, "Airline" was defined in the 2004 TUP as "any person providing scheduled passenger air service, including but not limited to, any air carrier or other operator certificated to provide scheduled passenger service under Parts 119, 121 or 135 of the Federal Aviation Regulations."[14]

The following are important to note at this point:

a. The 2004 TUP was applicable to Airlines (as defined above) providing "scheduled air service"; however, Plaintiffs are statutorily on demand, non-scheduled operators[15];

b. The 2004 TUP was applicable to all use of the Passenger Terminal; however, Plaintiffs do not use, and have never used, the Passenger Terminal;

c. The 2004 TUP did not apply to Airport users not using the Terminal Ramp and Plaintiffs do not use the Terminal Ramp;

d. The 2004 TUP never referred to non-scheduled Part 380 operators.

It is therefore abundantly clear that the 2004 TUP did not and does not apply to Plaintiffs. At a bare minimum, there certainly is a triable issue of fact whether the 2004 TUP apply to Plaintiffs.

---

[12] Def. Exh B, p. 12
[13] Id.
[14] Def. Exh B, p. 12.
[15] Pursuant to the § 110.2 of the Federal Aviation Regulations, "Scheduled Operation means any common carriage passenger-carrying operation for compensation or hire conducted by an air carrier or commercial operator for which the certificate holder or its representative offers in advance the departure location, departure time, and arrival location. **It does not include any passenger-carrying operation that is conducted as a public charter operation under part 380 of this chapter**." 14 CFR § 110.2 (emphasis added). Plaintiff Delux Public Charter holds an air carrier certificate issued by the FAA authorizing on-demand operations under 14 C.F.R. Part 135, pursuant to which it operates passenger-carrying flights conducted as Part 380 public charters. Plaintiffs JetSuiteX, XO Global, and Blade are all Part 380 public charter operators.  None of the Plaintiffs engages in scheduled operations under the Federal Aviation Regulations.

*B. The 2005 Amendment is Preempted by ANCA*

In the 2005 Amendment, the County eviscerated the above carve-outs which made the 2004 TUP inapplicable to the Plaintiffs and it did so without FAA approval in violation of ANCA. Specifically, the County first altered the "Applicability" section, by removing the term "scheduled passenger service" and replaced it with a new defined term of "Passenger Service."[16] Passenger Service under the 2005 Amendment was defined as "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity."[17]

In this regard, the 2004 TUP applied to "scheduled passenger service," yet the Plaintiffs do not engage in scheduled operations under FAA regulations.  In contrast, the 2005 Amendment applied to "Passenger Service" which includes any service to or from the Airport for which seats are offered or sold to the public.  While the 2004 TUP, on its face, is inapplicable to Plaintiffs; the 2005 Amendment might be interpreted to apply to Plaintiffs.

It is important to highlight the significance of the difference between an airline being scheduled and non-scheduled pursuant to the Federal Aviation Regulations. As the Plaintiffs are non-scheduled operators under § 14 C.F.R. § 110.2, the 2004 TUP would not be applicable to them, as it only applied to those Airlines providing scheduled passenger service.

In response, the County contends that the 2005 Amendment merely resolved unintended ambiguity by clarifying that the TUP includes "all commercial passenger operations, including

---

[16] Def. Exh C, p. 9.
[17] Def. Exh C, p. 11.

5

those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations."[18] However, neither the text of the 2004 TUP nor the 2005 Amendment ever included reference to the non-scheduled Part 380 operators.[19]

Moreover, the County has not provided any evidence that the 2004 TUP was ambiguous or that the definitions created any confusion or problems.  In fact, the opposite is true.  Part 380 operations at HPN have long occurred at FBOs.  Numerous operators have for decades operated HPN flights using aircraft with more than 9 aircraft seats from FBOs, including Part 380 public charter flights.[20] As a result, it was more than reasonable for Plaintiffs – and other similar operators – to conclude that the TUPs, whether the 2004 or 2005 version, never applied to them.

Now, under the 2005 Amendment, if an operator is providing passenger service to or from the Airport, the passenger Terminal and/or ramp must be utilized, despite the operator's air carrier classification.[21] This is more than a mere "clarification" as the County claims, because the County has materially altered the 2004 TUP, and did so without obtaining FAA approval. The County is forced to contort itself into a pretzel and argue that the 2005 Amendment was a mere clarification to the 2004 TUP for a simple reason: ANCA's grandfathering only applies to "subsequent amendments to an airport noise or access agreement or restriction in effect on November 5, 1990, that *does not reduce or limit aircraft operations* or affect aircraft safety." *See* 49 U.S.C. § 47524(d)(4) (emphasis added).

However, as set forth above in detail, the 2005 Amendment in no way *clarified* the 2004 TUP but, instead, materially altered and eviscerated the carveouts created by the 2004 TUP all to

---

[18] Exh 1, ⁋ 49.
[19] Def. Exh AG, 76:13-18, 77:6-10, Def. Exh AD, 80:5-11.
[20] Exh 1, COF ⁋ 1.
[21] Def. Exh C.

6

(evidently) limit Plaintiffs' and similar carriers' access to HPN. Indeed, the 2004 TUP did not even apply to Plaintiffs. Now, not only would the 2005 Amendment arguably apply to Plaintiffs, it would effectively shut down their entire business operations (see Section II below).

By way of an analogy: the 2004 TUP placed a 55 mile per hour speed limit on operators with a car license and truck license. The 2004 TUP was amended by the 2005 Amendment which took the 55 mile per hour speed limit and applied it to those operators with a motorcycle license as well. The 2005 Amendment is clearly more restrictive, as it applied the speed limit to a new classification of licenses that was not before restricted. This is exactly what happened here, when the County enacted the 2005 Amendment – it took restrictions and placed them on carriers that were not before subject to the them.

Moreover, the County does not even argue that the 2005 Amendment is an access or noise restriction. Instead, the County conveniently relies on the argument that the 2005 TUP is "grandfathered" under ANCA, while ignoring the statutory requirement that a subsequent amendment cannot reduce or limit aircraft operations or affect aircraft safety.[22] Furthermore, the 2005 Amendment is clearly preempted, as the County overlooks the language in the statute that noise and access restrictions are preempted under ANCA if not in effect before October 1, 1990, *unless* agreed upon by all aircraft operators or approved by the Department of Transportation.[23] As demonstrated herein, the 2005 Amendment is clearly more restrictive than the 2004 TUP, as it now requires all passenger service to operate out of the Terminal subject to a limited lottery, thereby reducing Plaintiffs' aircraft operations. Accordingly, the 2005 Amendment would not qualify for any "grandfather" protection under ANCA.

---

[22] 49 U.S.C.A. § 47524(d)(4): 14 C.F.R. § 161.7 (b) (4); See also Def. Exh I.
[23] 49 U.S.C.A. § 47524(c)(1).

Pursuant to ANCA's passage, new local airport use restrictions are subject to strict notice, review, and approval requirements which were established by the FAA. *See* 49 U.S.C. § 47524(a). The Second Circuit has held that Sections 47524(b) and (c) mandate procedures for the enactment of local noise and access restrictions for *any* public airport operator. *See Friends of East Hampton Airport, Inc. v. Town of East Hampton*, 841 F. 3d 133,152 (2d Cir. 2016) (explaining that "local laws not enacted in compliance with [ANCA] are federally preempted"). As the 2005 TUP Amendment was not enacted in compliance with ANCA, it is federally preempted.

Further, the County conceded that the 2005 Amendment was not submitted to the FAA for review.[24] Without the FAA's review and approval of the 2005 Amendment's expanded restrictions, the 2005 Amendment is ineligible for "grandfathering" under ANCA, as it was not effective prior to the passage of ANCA. In other words, the 2005 Amendment is subject to ANCA's procedural requirements – requirements with which the County concedes it did not comply with prior to its adoption.

Therefore, due to the County's concession that the 2005 Amendment was never submitted to the FAA, the TUP as Amended in 2005 is not "grandfathered" under ANCA, as its expanded restrictions were not effective before November 5, 1990 and were not agreed to by all aircraft operators and not approved by the FAA. 49 U.S.C. Section 47523(c); *See Friends of East Hampton Airport, Inc.* 841 F. 3d at 152 (compliance with Part 161 procedures mandatory).

---

[24] Exh 1 ¶ 63.

II.      The Airline Deregulation Act Preempts the 2005 Amendment

A.   *The Airline Deregulation Act's Proprietor Exception Does Not Apply.*

The preemption provision of the ADA provides "a State, political subdivision of a State, or political authority of 2 or more states may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier…" 49 U.S.C. § 41713(b)(1). The party claiming preemption has the burden of proof to establish that Congress has spoken clearly and made its intention to preempt unmistakable. *Bravman v. Baxter Healthcare Corp.*, 842 F. Supp. 747, 753 (S.D.N.Y. 1994).

The Second Circuit has held that the proprietor exception permits a political subdivision of a state to promulgate "reasonable, nonarbitrary and non-discriminatory" regulations of "noise and other environmental concerns at the local level" and that "the proprietor exception, allowing reasonable regulations to fix noise levels at and around an airport at an acceptable amount, gives no authority to local officials to assign or restrict routes." *National Helicopter Corp. of America v. City of New York*, 137 F.3d 81, 89 (2d Cir. 1987). Specifically, the Second Circuit has stated that a local interest does not allow the exercise of a proprietary authority to produce a patchwork of uncoordinated and inconsistent airport restrictions. *Friends of the East Hampton Airport, Inc.* 841 F. 3d at 154. In *Friends of the East Hampton Airport, Inc.*, the Second Circuit held that because the laws at issue were not enacted according to the procedures mandated in ANCA, the town could not claim the protection of the proprietor exception from federal preemption. *Id.* at 155.

The County, by arguing that the 2005 Amendment fits within the "Proprietor Exception" to the ADA, implicitly concedes the indisputable proposition that the 2005 Amendment affects prices, routes, and services.

9

The County argues that because the FAA's confirmation of the 2004 TUP was in line with grant assurances, the 2005 Amendment must be compliant as well. However, the FAA specifically stated that "[c]ompliance with the provisions of ANCA does not ensure compliance with other Federal law."[25] It is important to highlight that the FAA's confirmation was under ANCA and the grant assurances[26], not all federal law, as shown above. Further, as demonstrated herein, the 2005 Amendment significantly altered the scope of the 2004 TUP. The 2005 Amendment, which the County failed to submit to the FAA for review[27], imposed broader restrictions on a new class of operators. Consequently, the County's assertion that the 2005 Amendment must be compliant with the grant assurances because the 2004 TUP is compliant, is baseless.

Although it is clear that under the law, that the 2005 Amendment does not fall within the Proprietor Exception, the County argues that the *Midway* Litigation, which references the exception, demonstrates that the 2004 TUP were "explicitly premised" on the exception.  The County is incorrect. *See Midway Airlines, Inc. v. Westchester County, N.Y.*, 584 F. Supp. 436, 440 (S.D.N.Y. 1984). Indeed, the particular decision relied on by the County related only to a preliminary injunction, in which the Court stated that pursuant to the County's proprietary powers, "the County may study the status quo arrangement and develop rational and nondiscriminatory rules for allocating scarce space and landing and takeoff slots, consistent with local environmental and safety needs." *Id*. at 440.

The Court in *Midway* was clear, that <u>the study</u> was to be conducted consistent with local environmental and safety needs; however, it did not grant the County unfettered authority to bypass the ADA preemption provision in the future nor did it make any decisions about or authorize the

---

[25] Def. Exh I, p. 10.
[26]  Def. Exh I, p. 3.
[27] Exh 1 | ¶ 63.

County to pass any legislation. *Midway,* 584 F. Supp at 440.  This bears repeating – it was the study, not a stipulation, years into the future, that the Court spoke to.  It is not possible that the Judge in *Midway* could have prognosticated that granting the County permission to conduct a study of the status quo would, almost twenty years later, lead to a stipulation which, in turn, would lead to the enactment of 2004 TUP, and all of that he would have predicted would be based on the Proprietor Exception.

Furthermore, the *Midway* litigation, and the resulting stipulation, only applied to Part 121 operators.  No where in the litigation or subsequent stipulation was there any reference to any operators other than Part 121 operators.  The stipulation permitted the County to enact a few very specific regulations that addressed the number of gates, passengers going through those gates and the weight of the aircraft.  None of those regulations would have applied to Part 135/Part 380 operations, which use smaller planes, carry fewer passengers, and do not utilize the Terminal. Thus, the County's reliance on *Midway* as the predicate for a proprietor exception is misplaced.

But for this passing reference to the Proprietary Exception at the preliminary injunction stage of the *Midway* litigation, there is absolutely nothing in the record supporting the County's position. Indeed, but for the fact that the 2004 TUP was the result of a negotiated stipulation, even the 2004 TUP is outside the proprietary exception and seems to violate the ADA; however, as the 2004 TUP is not directed to Plaintiffs, we will leave that argument to someone else.

 Here, the County has failed to provide any evidence that the material alteration of the 2004 TUP was to resolve any noise and/or other environmental concerns. In this regard, the County has not pointed to any evidence, be it legislative history, deposition testimony, or documents to demonstrate that the 2005 Amendment was a restriction to address noise and/or environmental concerns. Rather, the 2005 Amendment was a way to force all traffic to the main Terminal,

11

regardless of the certificate status of the operator, to restrict volume and access, which is exactly what is preempted by ANCA as discussed above. Notwithstanding the County's false narrative, it is evident that the 2005 Amendment was not enacted to resolve any noise and/or other environmental concerns, but to place new restrictions on Part 380 operators, although they were in operation prior to the passage of the 2004 TUP.

Indeed, if the 2005 Amendment (or the 2004 TUP for that matter) were truly enacted to resolve noise and/or other environmental concerns, the County would be required to provide the "reasonable, nonarbitrary and non-discriminatory" justification for such regulations.[28] The County, as the party asserting the justification, has the burden of proof to demonstrate that the 2005 Amendment is reasonable and nonarbitrary to prove it falls within the Proprietor Exception. *Arapahoe County Public Airport Authority v. F.A.A.*, 242 F.3d 1213, 1223. (10th Cir. 2001).

At the very least, one would expect a noise or environmental study.  Nothing of this kind has been produced by the County. The fact that the record is devoid of any such evidence belies the County's position and clearly demonstrates that the legislation was not a result of a noise or environmental concern. The County has not met its burden.

Therefore, as the 2005 Amendment is not a regulation concerning noise or other environmental concerns, but a regulation put in place to restrict an entire new classification of operators, and it clearly does not fall within the Proprietary Exception of the ADA.

B. *The 2005 Amendment Has a Clear Effect on Plaintiffs' Businesses and is Preempted Under the ADA.*

Where a statute includes an express preemption clause, such as the ADA, the court does not invoke any presumption against preemption but instead focuses on the plain wording of the

---

[28] In addition, the County would be required to comply with ANCA, which as shown above they did not.

clause, which necessarily contains the best evidence of Congress' preemptive intent. *Warren v. Stop & Shop Supermarket, LLC*, 592 F.Supp.3d 268, 282 (S.D.N.Y. 2022) *citing Puerto Rico v. Franklin California Taz-Free Tr.,* 579 U.S. 115, 125 (2016) (internal quotations omitted). The U.S. Supreme Court has held that the preemption provision of the ADA was put in place to prevent a "patchwork of state service-determining laws, rules, and regulations" which would be inconsistent with Congress' "legislative effort to leave such decisions, where federally unregulated, to the competitive marketplace." *Rowe v. New Hampshire Motor Transport Ass'n*, 552 U.S. 364, 373 (2008).

In enacting the ADA, Congress's overarching goal was to assure that "transportation rates, routes, and services reflected maximum reliance on competitive market forces..." *Rowe*, 552 U.S. at 371, see *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992); *Northwest Inc. v. Ginsberg*, 572 U.S. 273, 288 (2014). The ADA's emphasis on reliance on the free and open market has encouraged competition among carriers, from budget airlines such as Spirit and Frontier, to public charter operators such as the Plaintiffs.

Following the enactment of the ADA, the Supreme Court has issued key rulings interpreting the intent behind Congress's use of the phrase "related to a price, route or service of an air carrier…" in the preemption provision. *See* 49 U.S.C.A. § 41713(b). In *Morales, supra,* the Supreme Court interpreted the preemption provision of the ADA broadly, holding that "state enforcement actions having a connection with or reference to airline 'rates, routes, or services' are preempted." 504 U.S. at 384.

The County argues that the relation between the TUP and Plaintiffs' services is not substantial enough, or too remote, to trigger preemption, citing *Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206 (2d Cir. 2011) and *Abdu-*

*Brisson v. Delta Air Lines*, 128 F.3d 77 (2d Cir. 1997). Contrary to the County's position, as demonstrated below, the 2005 Amendment has a direct effect on Plaintiffs' rates, routes, and services and is preempted under the ADA

      i.     Routes[29]

If the Plaintiffs are required to operate out of the Terminal at HPN, the Part 135 Air Carriers that Plaintiffs contracts with to perform Public Charter flights ("Air Carriers"), would need to obtain an Aircraft Operator Standard Security Program ("AOSSP") to the TSA. The AOSSP is required for a scheduled passenger or public charter operation with an aircraft (1) having a passenger seating configuration of 61 or more seats; or (2) having a passenger seating configuration of 60 or fewer seats when passengers and enplaned from or deplaned into a sterile area. *See* 49 CFR 1544.101(a). The AOSSP is required for all scheduled passenger service and public charter operations operating into or out of a TSA controlled sterile area."[30]

A TSA-controlled "sterile area" refers to portions of an airport defined in the airport security program that provides passengers access to boarding aircraft and to which the access generally is controlled by the TSA, an aircraft operator, or a foreign air carrier.[31] Any individual entering a "sterile area" must be screened by TSA, as the TSA screening procedures are intended to prevent prohibited items and threats from entering the sterile area of the airport.[32] The TSA screening is what allows passengers to leave a sterile area of one airport to enter into another airport's sterile area upon arrival.[33] The Terminal is a sterile area.[34]

---

[29] Plaintiffs are submitting declarations relating to the effect the 2005 Amendment has on Plaintiffs' routes, services, and prices, due to the County's apparent reluctance to question Plaintiffs during depositions on these subjects.
[30] 49 CFR 1544.101(a).
[31] Id.
[32] Exh 4, ¶ 13.
[33] Exh 2, ¶ 10.
[34] Id.

The FBOs where Plaintiffs operate from are not sterile, as their customers do not go through a TSA checkpoint.[35] Passengers who go through a non-sterile checkpoint, like Plaintiffs' customers, cannot deplane at a sterile terminal due to insufficient screening at their departure airport. As a result, Plaintiffs would be unable to fly any of their current routes from non-sterile FBOs to HPN.[36] To the extent the County, in their reply, offers to allow the Plaintiffs to deplane at the FBOs, this offer of compromise fails for two reasons. First, there is no mention of FBOs in the text of 2004 TUP or the 2005 Amendment.[37] Second, if the County is to offer this as a proposed settlement, any evidence of settlement or attempt at settlement are not admissible. *See* Federal Rule of Evidence 408.

The 2005 Amendment would have a major impact on Plaintiff XO, as this would eliminate its routes from Fort Lauderdale International Airport ("FLL") and Palm Beach International Airport ("PBI"), as XO customers would be unable to deplane at HPN.[38] This is due to XO passengers going through non-sterile checkpoints prior to boarding at both FLL and PBI.[39] Over the last twenty-one months, XO has generated over $23 million dollars in revenue from these routes; $13 million was generated from FLL to HPN and $10 million from PBI to HPN. These routes have become their most lucrative, as approximately 11,000 people have flown on XO from FLL and PBI to HPN.[40] This route would be eliminated, as XO's passengers would not be able to deplane at HPN.[41]

---

[35] Exh 2, ⁋ 12.
[36] Exh 2, ⁋ 13.
[37] A Court's "starting point in statutory interpretation is the statute's plain meaning…" *U.S. v. Dauray*, 215 F.3d 257, 260 (2d. Cir. 2000); "Courts must presume that a legislature says in a statute what it means and means in a statute what is says there." *Barnahrt v. Sigmon Coal Co., Inc*. 534 U.S. 438, 461-2 (2002).
[38] Exh 5, ⁋ 15.
[39] Id.
[40] Exh 5, ⁋ 15.
[41] Id. at ⁋17

Further, Plaintiff Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc. (collectively, "JSX") would also have to cease operating key routes if it were forced to relocate to the Terminal at HPN. JSX would not be able to operate its route from Miami/Opa-Locka Airport ("OPF") to HPN, as its passengers would not be able to deplane as they are arriving from a non-sterile security checkpoint.[42] Further, JSX would have to eliminate its route from Nashville and Dallas to HPN, as the passengers go through non-sterile checkpoints in those airports.[43] Since the introduction of these routes, there have been 4,698 bookings from Nashville to HPN totaling $1,610,360 and 2,220 bookings from Dallas to HPN totaling $1,419,396.[44]

Moreover, if Plaintiffs are required to operate out of the Terminal, they would need to enter the lottery system at HPN. The lottery system was put in place as a result of HPN's restriction of only 240 passengers per-half hour from the Terminal.[45] An airline may choose to operate during available time slots, but cannot exceed the 240 passengers per-half hour.[46] For new entrants, such as Plaintiffs, they would sign a Terminal Use Agreement, enter the lottery, and choose an open allocation that is available.[47]

As there are only 240 passengers allowed per-half hour from the Terminal, the allocated slots are broken down in half hour increments.[48] As incumbents, airlines like Delta and JetBlue have priority in choosing their slots and are permitted to hold on to their incumbent spots.[49] New entrants, such as the Plaintiffs, are left with the remaining slots,[50] which, to the extent they exist,

---

[42] Exh 4, ¶ 17.
[43] Id. at ¶ 18.
[44] Id. at ¶ 19.
[45] Def. Exh. AE. 35:8-16
[46] Def. Exh. AE, 36:1-4.
[47] Id. at 39:14-18.
[48] Def. Exh. AE, 35:15-16.
[49] Def. Exh. AG, 264:3-11.
[50] Def. Exh. AE, 39:19-22.

usually occur early in the morning or late in the evening. Indeed, this was confirmed by Defendants' witnesses including Joan McDonald, Director of Operations for Westchester County, who confirmed that "there would be instances where the plaintiffs would not be able to maintain the same routes that they are conducting now if they were to enter into this lottery system…"[51]

Melissa Tomkiel, President and General Counsel of Blade, testified that Blade chooses "very specific times that we believe will have the highest demand. And if we're not able to get those times, then we're not going to sell our seats."[52] If subject to the lottery system, Plaintiffs will be unable to fly their current routes either for lack of available gates or remaining passenger allocations and be left with the remaining slots that passengers do not want.[53] Additionally, Tom Rumbarger testified that he notified another air carrier to hold onto the slots they already had, as they might not get the same slots at the next lottery due to new operators being added to the lottery.[54] This further demonstrates how competitive the lottery is and how important the time slots are to the incumbent airlines.

It is evident that not only will Plaintiffs not be able to deplane their passengers at the Terminal if they lose their access use the FBOs at HPN, but they also stand to lose millions of dollars in business, as well as thousands of customers with whom Plaintiffs have spent years building relationships with. Therefore, the 2005 Amendment is preempted under the ADA as it has a clear negative effect on Plaintiffs' routes.

ii.    Services

---

[51] Def. Exh. AI, 174:13-25.
[52] Def. Exh. AC, 172:6-11.
[53] Def. Exh. AC, 171:17-172:11; Def. Exh. AH, 216:17-218:4; Defendant AI, 173:25-175:2; Def. Exh. AE, 51:15-52:15; Def. Exh AG, 267:21-268:8, 274:2-18, 283:9-22.
[54] Def. Exh. AE, 51:12-53:21.

Several decisions by courts in the Second Circuit give insight into what is and is not considered a "service" under the ADA. In *Air Transport Ass'n of America, Inc. v. Cuomo*, the Second Circuit held that "[o]nboard amenities, regardless of whether they are luxuries or necessities, still relate to airline service and fall within the *express terms* of the preemption provision." 520 F.3d 218, 224 (2d Cir. 2008).[55] The U.S. District Court for the Southern District of New York expanded in *Air Transport Ass'n*, noting that a majority of circuits had interpreted service as referring to the provision or anticipated provision of labor from the airline to its passengers and encompasses matters such as boarding procedures, baggage handling, and food and drink—matters incidental to and distinct from the actual transportation of passengers. *Hekmat v. U.S. Transportation Security Administration*, 247 F.Supp.3d 427, 432 (S.D.N.Y. 2017) citing *Cuomo*, 520 F.3d at 223.

The operations of each Plaintiff are similar, as they each offer customers the chance to travel on semi-private jet flights to various destinations across the United States from HPN. Despite their shared premise, the unique services provided by each Plaintiff will be impacted differently if they were required to operate out of the Terminal. Again, although the County has offered to let Plaintiffs deplane from the FBOs (contrary to the text of the 2005 Amendment), this would still have a direct impact on their operations. Enplaning and deplaning in two separate locations at the Airport is not logistically feasible. This would cause Plaintiffs to offer different services, as Plaintiffs are limited to what they can offer from the Terminal, as demonstrated below.[56]

---

[55] The County, in their memorandum of law, acknowledges that the ADA's definition of services "includes both on- and off-flight procedures" as was held in *Air Transport Ass'n*.

[56] Exh 4, ¶ 23.

For example, Plaintiff XO currently provides catered meals to its passengers on both inbound and outbound flights, allowing its passengers to choose their in-flight meal prior to boarding.[57] Depending on the time of day, passengers can choose from a variety of breakfast and lunch options. The catered meals are supplied by gourmet restaurants.[58] The meals are then stored at the FBOs prior to takeoff.[59] This service would be eliminated if XO was required to fly out of the Terminal, as HPN does not allow catering on outbound flights.[60]

Moreover, the entire FBOs experience of waiting in a lounge would be eliminated. Customers can now be dropped off right in front of the FBOs, proceed through a fast and efficient security screening process, and relax in the lounge area. Here, customers are offered snacks, drinks, comfortable seatings, and access office space if needed.[61] For Plaintiffs' customers, a significant aspect the experience is the ability to wait comfortably at the FBOs before boarding the plane.[62]

Additionally, JSX is the first air carrier certified as Autism-Aware by Autism Double-Checked, which allows them to cater to the specific needs of those traveling with autism.[63] If forced to operate from the Terminal, this would cause JSX to lose its autism certification as passengers would have to go through a different process as the one JSX currently offers.[64] This would also impact the ease of boarding for those passengers who have disabilities, travel with small children, or travel with oversized pets. [65] These are all services that the Plaintiffs offer that would be eliminated if they were to operate out of the Terminal.

---

[57] Exh 5, ❡ 26.
[58] Id. at ❡ 27.
[59] Id. at ❡ 27.
[60] Id. at ❡ 31.
[61] Id. at ❡ 21.
[62] Id. at ❡ 20.
[63] https://www.jsx.com/equality
[64] Def. Exh. AH, 187:17-188:24
[65] Id., 193:8-15; See also Exh 4.

If forced to embark and exit through the Terminal, Plaintiffs would not be able to offer these services.[66] Therefore, as the services Plaintiffs provide to their customers would be eliminated if they were to fly from the Terminal, the 2005 Amendment is preempted under the ADA as they have a direct effect on Plaintiffs' services.

    iii.    Prices

The Plaintiffs' business models allow for them to charge the prices they do because of the convenience of flying in and out of the FBOs.[67] If Plaintiffs are to operate out of the Terminal, it would eliminate the unique aspects of their business and essentially impose a rate ceiling on their services as they would not be able to charge for the services they currently offer.[68] For example, passengers would now have to arrive at the Terminal up to two hours before to ensure they are able to make their flight.[69] Further, passengers would be required to engage in the cumbersome practice of standing in lengthy lines before the TSA checkpoint and waiting outside the overcrowded Terminal gate prior to boarding. The entire luxury experience is obliterated, resulting in Plaintiffs being required to lower their prices, as the cost would no longer align with the diminished quality of service, which will in turn make provision of the flight not feasible.

In sum, it is evident that the 2005 Amendment would have a devastating effect of the Plaintiffs' business. The 2005 Amendment would have a drastic impact on Plaintiffs' businesses, essentially dismantling their operations. Therefore, the Court should find that the 2005 Amendment is federally preempted under the ADA, as it impacts Plaintiffs' prices, routes, and services.

---

[66] Exh 5, ¶ 25.
[67] Exh 4, ¶ 22.
[68] Id. at ¶ 22.
[69] Westchester County Airport https://airport.westchestergov.com/airlines/airline-information

Thus, the County's overreaching attempt to apply the 2005 Amendment to Plaintiffs' operations is in direct conflict with the letter and spirit of the ADA and its strong reliance on allowing the competition found in the free market to further efficiency, innovation, and competition.

III.   Enforcement of the 2005 Amendment is Barred by the Doctrine of Laches

The equitable defense of laches bars an equitable claim where a [party] has unreasonably and inexcusably delayed, resulting in prejudice to the [alleging party]." *Allens Creek/Corbetts Glen Pres. Grp., Inc. v. West*, 2 F. App'x 162, 164 (2d Cir. 2001). A mere lapse of time, without a showing of prejudice, will not sustain a defense of laches. *Zuckerman v. Metropolitan Museum of Art*, 928 F.3d 186, 193 (2d Cir. 2019). Prejudice ensues when the alleging party has changed his position in a way that would not have occurred if the other party delayed. *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996). The Second Circuit has held that the defense of laches can be pursued against the government, where the government seeks to enforce a right akin to a private one. *Cayuga Indian Nation of N.Y. v. Pataki*, 413 F.3d 266, 278 (2d Cir. 2005).

In this case, Plaintiffs have expended millions of dollars in the development of their businesses over the past few years, all under the watchful eye of the County.[70]  The Plaintiffs' actions and investments in furthering their businesses were undertaken with the understanding that there were no legal impediments and that their operations at the Airport were in line with the Airport's regulations.[71] Plaintiffs have been operating openly at HPN. Plaintiff XO's sister company, JetsSmarter, and Plaintiff Blade began operating at HPN since as early as 2015 without incident.[72]  The sudden emergence of the County's claim that they can no longer operate from the

---

[70] Def Exh. AC, 160:13-161:4.
[71] Exh 3.
[72] Exh 1, COF ¶ 24

FBOs and must operate from the Terminal, directly impacts the Plaintiffs' position.[73] The Plaintiffs' future operations at HPN are seriously jeopardized due to the delayed legal action by the County.[74]

On November 8, 2018, the issue was first raised regarding single seat charter operations ("SSCOs"), when an email was submitted to add an item to the agenda for the Westchester County Airport Advisory Board regarding the applicability of the TUP to SSCOs like JetSmarter, now XO.[75] At this point, nothing was done by the County to address the issue or to communicate with the Plaintiffs. Then on March 1, 2019, Peter Schlactus, Chair of the Airport Advisory Counsel, outlined his concerns to Susan Spear, Westchester County Executive George Latimer's Assistant, regarding JetSmarter's alleged noncompliance with the TUP.[76] Again, at this point, nothing was done by the County to stop Plaintiffs from continuing their operations at the FBOs.[77]

Further, multiple employees of the County testified at their depositions that they were aware of Plaintiffs' operations before any Plaintiff was notified it was operating in purported violation of the TUP. Specifically, Tom Rumbarger, Property Manager at Westchester County Airport[78], testified that he became aware of Blade's operations in which it paired with operators that flew charters in around 2020.[79] Nicholas Hartman, Chairman of the Airport Advisory Board, testified that he became aware of Plaintiffs' operations about three or four years ago, as early as

---

[73] Def Exh. AC,162:20-163:9.
[74] Exh 4, ¶ 28
[75] Exh 6.
[76] Exh 7.
[77] Exh 3.
[78] Def. Exh. AE, 13:13-15
[79] Id. at 72:5-12

2019.[80]  Indeed, it stretches credulity to believe that the County did not know about Plaintiffs'
operations when the Airport Manager's office looks right out over the runway.

Here, the Plaintiffs have invested substantial resources, in both time and money, into
developing their businesses that operate out of the Airport. This development occurred over a span
over eight years, during which the County was aware. The sudden demand to relocate operations
from the FBOs to the Terminal, after years of unrestricted activity, has disrupted their established
operations and jeopardized their investments. It was only in November 2021 that AvPorts, the
managing company of the Airport, communicated with Plaintiffs, notifying them that aircraft
departures could no longer take place at the FBOs and must be moved into the Terminal.[81] This
was the first time after years of operation and hundreds of flights for some of the Plaintiffs, that
they were notified their operations were in violation of the TUPs.

Therefore, it is evident that the Plaintiffs have valid grounds to invoke the defense of laches
against the County, based on the unexplained and prejudicial delay in enforcing the alleged
violations of the TUP.

IV.   The 2005 Amendment Violates the Equal Protection Clause of the Fourteenth
      Amendment

The Equal Protection Clause of the Fourteenth Amendment "provides that no state shall
deny to any person within its jurisdiction the equal protection of the law."[82]  The Second Circuit
has held that it is a general rule that whether items are similarly situated, for the purposes of an
equal protection claim, is a factual issue that should be submitted to the jury, unless it is clear that
no reasonable jury could find the similarly situated prong met. *Harlen Associates v. Incorporated*

---

[80] Exh 8, 24:14-25:4.
[81] Exh 3.
[82] U.S. Const. amend XIV, § 1.

23

*Village of Mineola*, 273 F.3d 494 (2d Cir. 2001). The County's attempted enforcement of the 2005 Amendment against Plaintiffs, but not any other Part 380 or Part 135 operator, singles out Plaintiffs and demonstrates the discriminatory treatment Plaintiffs are receiving in violation of the Equal Protection Clause.

The County has targeted the Plaintiffs and treated them differently from other carriers operating out of FBOs at HPN, such as Bakers Bay, NetJets, and Wheels Up.[83] Plaintiff's operations involve similar if not identical aircraft to those who are permitted to continue operations at FBOs. These aircraft have a similar noise profile, fly similar routes, and in many cases carry a similar number of passengers.[84] There are factual disputes as to Plaintiff's Equal Protection Claim. Plaintiffs have set forth many disputed facts regarding others similarly situated to Plaintiffs but are allowed to operate from FBOs or private hangars[85] while the County attempts to force Plaintiffs into the lottery and Terminal.[86]

 Further, the County has never articulated a rationale for the nine-seat limitation or the distinction between private and public other than to use these arbitrary standards to negatively impact Plaintiffs' ability to operate out of HPN.  The County has failed to provide any rational reason why the Plaintiffs must enter the lottery and operate out of the Terminal while other similarly situated carriers can operate from FBOs and private hangars.[87]

---

[83] Def. Exh. AH, 101-102
[84] Def. Exh. AC, 146:7-160:3
[85] Def. Exh. AC, 148:10-153:7, 159:17-160:3; Def. Exh. AF, 123:10-22; Def Exh. AH, 101:12–16
[86] Exh 1, ¶ 68-72, 76-77,83; COF ¶ 4, 18-23,29
[87] Def. Exh. AI, 118:13-25,163:21-164:2; Def. Exh. AG, 75:20-76:12

Therefore, the disparate treatment becomes glaringly apparent as the County is singling out the Plaintiffs' operations despite the presence of similarly situated operators operating from the FBOs at HPN.

<u>**CONCLUSION**</u>

For the reasons set forth herein, Plaintiffs respectfully request that this Court deny Defendant's Motion for Summary Judgment in its entirety; enter judgment in favor of Plaintiffs; along with any such other and further relief as this Court may deem just and proper.

Dated:      Rye, New York
             October 31, 2023

                        Dorf Nelson & Zauderer LLP

By:   _____
      Jonathan B. Nelson, Esq.
      Paul J. Noto, Esq.
      Christina L. Grimes, Esq.
      *Attorneys for Plaintiffs*
      555 Theodore Fremd Ave.
      Rye, New York 10580
      (914) 381-7600

To:    Sean T. Carey, Esq.
       Associate County Attorney, of Counsel
       *Attorney for Defendant*
       Michaelian Office Building
       148 Martine Avenue, Room 600
       White Plains, New York 10601
       (914) 995-2243
       stca@westchestercountyny.gov