UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DELUX PUBLIC CHARTER, LLC d/b/a JSX
AIR, et al.,

                              Plaintiffs,

                  -against-

COUNTY OF WESTCHESTER, NEW YORK,
a charter county,

                              Defendant.

**OPINION AND ORDER**

22-CV-01930 (PMH)

PHILIP M. HALPERN, United States District Judge:

Delux Public Charter, LLC d/b/a JSX Air ("Delux"), JetSuiteX, Inc. ("JetSuiteX"), XO Global, LLC ("XO Global"), and Blade Urban Air Mobility, Inc. ("Blade," and collectively, "Plaintiffs") are federally authorized direct and/or indirect air carriers, each of whom provide flight services at the Westchester County Airport ("HPN" or the "Airport"). Plaintiffs commenced this action against the County of Westchester ("Defendant" or the "County") on March 7, 2022, asserting claims of federal preemption and deprivation of equal protection. (Doc. 1, "Compl.").[1]

The Court issued a Memorandum Opinion and Order on May 23, 2022, denying Plaintiffs' motion for a preliminary injunction and Defendant's request to abstain in favor of an action that was pending in Supreme Court of the State of New York, County of Westchester (the "State Court Action"). (Doc. 57).[2] The parties thereafter agreed that, *inter alia*, Defendant would dismiss without prejudice the State Court Action and Plaintiffs would dismiss without prejudice any right

---

[1] Plaintiffs also originally named AvPorts, LLC, a private company that provides certain services on behalf of HPN, and April Gasparri, HPN's Airport Manager as defendants. On March 16, 2022, the Court endorsed a stipulation whereby, *inter alia*, Plaintiffs dismissed without prejudice Ms. Gasparri and AvPorts, LLC from this action. (Doc. 51).

[2] This decision is available on commercial databases. *Delux Pub. Charter, LLC v. Cnty. of Westchester, New York*, No. 22-CV-01930, 2022 WL 1620300 (S.D.N.Y. May 23, 2022).

to attorneys' fees and costs in this action. (Doc. 59). Defendant then filed an Answer and Counterclaims against Plaintiffs on June 19, 2022. (Doc. 60, "Ans."). Plaintiffs filed an Answer to the Counterclaims on July 11, 2022 (Doc. 62) and the parties thereafter engaged in discovery pursuant to a Civil Case Discovery Plan and Scheduling Order (Doc. 64).

Before the Court is Defendant's motion for summary judgment dismissing the Complaint and granting relief on its First Counterclaim. (Doc. 111; Doc. 112, "Carey Decl."; Doc. 113, "Def. Br."). Defendant seeks no relief with respect to its Second Counterclaim. Plaintiffs opposed Defendant's motion and requested that the Court search the record and grant summary judgment in their favor pursuant to Rule 56(f). (Doc. 116, "Nelson Decl."; Doc. 117, "Pl. Opp."). Defendant's motion was briefed fully with the filing of a reply memorandum of law and supporting declaration on November 30, 2023. (Doc. 114, "Reply Decl."; Doc. 115, "Reply Br."). Plaintiffs thereafter requested that the Court schedule oral argument on the pending motion. (Doc. 118).

For the reasons set forth below, Defendant's motion for summary judgment is GRANTED IN PART.

## **BACKGROUND**

The Court recites the facts herein only to the extent necessary to adjudicate the extant motion for summary judgment and draws them from the pleadings, the Rule 56.1 Statement and responses thereto (Doc. 93, "56.1"), and the admissible exhibits proffered on this motion. Unless otherwise indicated, the facts cited herein are undisputed.[3]

Plaintiffs are federally authorized direct air carriers that fly customers for compensation or

---

[3] Plaintiffs' responses to Defendant's statements of fact in the Rule 56.1 Statement indicate that Plaintiffs largely dispute them. However, the Court deems admitted for purposes of this motion those material facts which are not "specifically controverted" and/or where the responses are lacking "citation to evidence which would be admissible." Local Civil Rule 56.1; *see Malarczyk v. Lovgren*, No. 22-504, 2023 WL 8073099, at *1 (2d Cir. Nov. 21, 2023).

hire under the Federal Aviation Administration's ("FAA") operating rules contained in 14 C.F.R. Part 135 ("Part 135") and/or indirect air carriers authorized by the Department of Transportation ("DOT") who partner with Part 135 direct air carriers to market commercial air carrier services under 14 C.F.R. Part 380 ("Part 380"). (Compl. ¶¶ 3, 15-17, 19). Delux is a Part 135 operator for JetSuiteX. (Carey Decl., Ex. AG, "Gasparri Tr." at 121). JetSuiteX, XO Global, and Blade are Part 380 Operators. (Compl. ¶¶ 15-17, 19; Carey Decl., Ex. AC, "Tomkiel Tr." at 23-24; Ex. AF, "Lozada Tr." at 35; Gasparri Tr. at 121). Plaintiffs provide air service out of one of HPN's privately run Fixed-Base Operators ("FBOs"), pursuant to agreements with those FBOs. (56.1 ¶ 4). The FBOs operate on the opposite side of the Airport from the Terminal that serves commercial airline passengers such as JetBlue, Delta, and United Airlines. (*See, e.g., id.* ¶ 80; Carey Decl., Ex. A).

Defendant, on September 14, 2004, passed Section 712.462 of the Laws of Westchester County (the "2004 Law"), which codified HPN's Terminal Use Procedures ("TUPs"). (56.1 ¶ 38; Carey Decl., Ex. B). The 2004 Law was the codification of a court-ordered settlement of a litigation titled *Midway Airlines v. County of Westchester*, bearing Docket No. 84-CV-02229 entered on April 19, 1984 (the "*Midway* Litigation"). (56.1 ¶ 19; Pl. Opp. at 3 n.10). The settlement order directed Defendant to "promulgate rational and nondiscriminatory rules governing the allocation of ground facilities and flight slots" within 50 days. (56.1 ¶ 19 (citing *Midway Airlines, Inc. v. County of Westchester*, 584 F. Supp. 436, 441-42 (S.D.N.Y. 1984))). On June 7, 1984, Defendant promulgated its first formal set of local use restrictions. (*Id.* ¶ 20). Thereafter, Defendant implemented access limits, allocation terms, and technical specifications, and entered into the Terminal Capacity Agreement with air carriers, "the purpose of which was to continue the terms set forth in [the] Stipulation and to continue to apply those same constraints to the new Terminal." (*Id.* ¶¶ 22-23). In mid-2003, Defendant carried out an in-depth review of HPN's existing use

restrictions and, as a result of that review, resolved to codify and clarify the existing restrictions into a single set of use restrictions. (*Id*. ¶¶ 28, 30). That process resulted in the draft 2004 Law, which was then submitted to the FAA's Office of the Chief Counsel together with maps, a chart of then-current terminal and ramp use allocations, a technical analysis of runway weight-bearing capacity, and a twenty-six-page memorandum detailing the history of HPN's use restrictions. (*Id*. ¶ 34; Carey Decl., Ex. A). The FAA thereafter found "nothing in the proposed actions by [Defendant] – codifying and clarifying existing legal restrictions, extending and renewing the existing Airport terminal use agreements with the air carriers, and codifying and modifying existing technical specifications and procedures for allocation of terminal space and gates – that is inconsistent at this time" with the "obligation to provide access by air carriers on reasonable and not unjustly discriminatory terms." (Carey Decl., Ex. I at 10). On November 15, 2004, Defendant amended the TUPs (the "2005 Law"). (56.1 ¶ 44; Carey Decl., Ex. C).

The TUPs require certain air carriers to operate from the Terminal pursuant to a Terminal Use Agreement which in turn imposes further requirements, such as the use of a lottery system to determine allocation and flight capacity, and to alter flight schedules to adhere to Terminal ramp allocations and passenger limitation restrictions. *See* Westchester, N.Y., Code of Ordinances § 712.462(1)-(5).

Plaintiffs did not and do not operate from the Terminal pursuant to a Terminal Use Agreement. (56.1 ¶¶ 3, 4, 15, 16). Instead, Blade and XO Global have been operating from FBOs at HPN since 2015 (Compl. ¶¶ 26, 29); and Plaintiffs allege that Delux began operating a 30-seat aircraft from an FBO at HPN in June 2020 (*id*. ¶ 32). On January 21, 2022, Defendant published Westchester County Airport Operational Policy No. 1 ("Policy No. 1"), requiring Plaintiffs to operate out of the Terminal, enter into a Terminal Use Agreement, and utilize HPN's

Transportation Security Administration ("TSA") checkpoints. (Nelson Decl., Ex. 3). Pursuant to a so-ordered stipulation entered on March 16, 2022 (Doc. 45), Defendant agreed that neither it nor any of its agents will seek to or take any action to enforce Policy No. 1 and/or the TUPs against Plaintiffs and their Air Carriers without a valid court order, thus permitting Plaintiffs to continue their operations pending resolution of this action. (56.1 ¶ 16).

Plaintiffs contend that the TUPs—specifically and only the 2005 Law—are preempted by the Airport Noise and Capacity Act of 1990 ("ANCA") and the Airline Deregulation Act of 1978 ("ADA"). Plaintiffs further maintain that Defendant's reliance on the TUPs is for the sole purpose of singling out Plaintiffs for discriminatory treatment in violation of the Equal Protection Clause of the Fourteenth Amendment, targeting Plaintiffs and treating them differently from other similarly situated carriers. (*See generally* Compl.). Plaintiffs seek declaratory and injunctive relief on each of their claims for relief.[4] Defendant's First Counterclaim seeks an order declaring that the TUPs apply to all of Plaintiffs with respect to their actions at HPN. (Ans. ¶ 206).

Pursuant to a so-ordered stipulation, Plaintiffs have withdrawn all relief sought concerning Policy No. 1 and it, and the factual allegations concerning the relief sought, have been deemed dismissed from this action. (Doc. 108). Further, Plaintiffs, in their opposition brief, state as follows: "Plaintiffs seek no relief with regard to the 2004 [Law]. Instead, Plaintiffs seek a ruling that, as Part 380 operators, they are exempt from the provisions of the TUP <u>as amended in 2005</u> and that the 2005 Amendment, as applied to Part 380 and Part 135 operators, is preempted by Federal law." (Pl. Opp. at 2 (emphasis in original)). Plaintiffs' representations on this score further

---

[4] The prayer for relief in the Complaint seeks, *inter alia*, an order declaring that Defendant "must provide an accommodation to Plaintiffs"; and damages for the "tortious interference claims" (Compl. at 36). There are no predicate claims for such relief pled in the Complaint, and a properly pled claim "is a necessary predicate to any recovery." *Melvin v. UA Loc. 13 Pension Plan*, 236 F.R.D. 139, 144 (W.D.N.Y. 2006). Accordingly, and to the extent Plaintiffs seek such relief, it is denied.

narrows the subject of their preemption claims for relief. Plaintiffs have abandoned any claims in this action concerning Policy No. 1 and the 2004 Law and they are, accordingly, dismissed. *See Allegrino v. Ruskin Moscou Faltischek, P.C.*, No. 19-CV-08900, 2021 WL 429121, at *5 (S.D.N.Y. Feb. 8, 2021), *aff'd*, No. 21-484-CV, 2021 WL 5500084 (2d Cir. Nov. 24, 2021) (deeming claims abandoned and dismissed based upon representations in opposition brief). To be clear, in light of the parties' express limitations, the Court need not and does not consider whether the 2004 Law passes muster under ANCA and the ADA and expresses no opinion on the subject other than to recognize that the FAA indicated that the 2004 Law was not preempted when given the opportunity to do so. (*See* Carey Decl., Ex. I).

Defendant now seeks summary judgment dismissing Plaintiffs' Complaint and granting relief on its First Counterclaim for declaratory relief.

## **STANDARD OF REVIEW**

Pursuant to Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). "A fact is 'material' if it 'might affect the outcome of the suit under the governing law,' and is genuinely in dispute 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Liverpool v. Davis*, No. 17-CV-03875, 2020 WL 917294, at *4 (S.D.N.Y. Feb. 26, 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).[5] "'Factual disputes that are irrelevant or unnecessary' are not material and thus cannot preclude summary judgment." *Sood v. Rampersaud*, No. 12-CV-05486, 2013 WL 1681261, at *1 (S.D.N.Y. Apr. 17, 2013) (quoting *Anderson*, 477 U.S. at 248).

---

[5] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.

"The question at summary judgment is whether a genuine dispute as to a *material* fact exists—not whether the parties have a dispute as to any fact." *Hernandez v. Comm'r of Baseball*, No. 22-343, 2023 WL 5217876, at *5 (2d Cir. Aug. 15, 2023); *McKinney v. City of Middletown*, 49 F.4th 730, 737 (2d Cir. 2022)).

The Court's duty, when determining whether summary judgment is appropriate, is "not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Id.* (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)). Indeed, the Court's function is not to determine the truth or weigh the evidence. *Porter v. Dartmouth-Hitchcock Medical Center*, No. 92 F.4th 129, 147 (2d Cir. 2024) ("[T]he court may not make credibility determinations or weigh the evidence." (quoting *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010))). The task is material issue spotting, not material issue determining. Therefore, "where there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements of the claim are immaterial." *Bellotto v. Cnty. of Orange*, 248 F. App'x 232, 234 (2d Cir. 2007) (quoting *Salahuddin v. Goord*, 467 F.3d 263, 281 (2d Cir. 2006)).

"It is the movant's burden to show that no genuine factual dispute exists." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). The Court must "resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Id.* (citing *Giannullo v. City of N.Y.*, 322 F.3d 139, 140 (2d Cir. 2003)). Further, "while the court is required to review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Porter*, 92 F.4th at 147 (quoting *Kaytor*, 609 F.3d at 545). Once the movant has met its burden, the non-movant "must come forward with specific facts showing that there is a genuine issue for trial." *Liverpool*,

2020 WL 917294, at * 4 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)). The non-movant cannot defeat a summary judgment motion by relying on "mere speculation or conjecture as to the true nature of the facts." *Id.* (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986)). However, if "there is any evidence from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper." *Sood*, 2013 WL 1681261, at *2 (citing *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004)).

Should there be no genuine issue of material fact, the movant must also establish its entitlement to judgment as a matter of law. *See Glover v. Austin*, 289 F. App'x 430, 431 (2d Cir. 2008) ("Summary judgment is appropriate if, but only if, there are no genuine issues of material fact supporting an essential element of the plaintiffs' claim for relief."); *Pimentel v. City of New York*, 74 F. App'x 146, 148 (2d Cir. 2003) (holding that because plaintiff "failed to raise an issue of material fact with respect to an essential element of her claim, the District Court properly granted summary judgment dismissing that claim"). Simply put, the movant must separately establish that the law favors the judgment sought.

The Court may, after giving notice and a reasonable time to respond, grant judgment for a nonmoving party. Fed. R. Civ. P. 56(f). Judgment for the nonmoving party may be appropriate where the record is clear "that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court . . . if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 140 (2d Cir. 2000).[6]

---

[6] The Court, at the pre-motion conference on June 29, 2023 and at Plaintiffs' request, put the parties on notice that it would search the record and consider granting summary judgment in favor of Plaintiffs, the nonmoving party, should that be warranted by the facts and law. (Carey Decl., Ex. Y at 66-67). Plaintiffs, in their opposition, reiterated their request for judgment in their favor under Rule 56(f), though they did not

## ANALYSIS

I.   First Claim for Relief: ANCA Preemption

Plaintiffs' First Claim for Relief seeks a declaration that the 2005 Law is invalid under ANCA and an injunction preventing Defendants from enforcing the 2005 Law against them. (Compl. ¶ 115).

The Supremacy Clause of the United States Constitution invalidates state and local laws that "interfere with or are contrary to, the laws of congress." *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 317 (1981). As is relevant to the claim concerning ANCA preemption, Congress, in that statutory scheme, preempted state and local noise restrictions which were not enacted under the specified procedures set forth in ANCA. *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton* ("*Friends*"), 841 F.3d 133, 151 (2d Cir. 2016); 49 U.S.C. § 47521, *et seq.*

ANCA, enacted on November 5, 1990, "(1) directs the Department of Transportation (which has delegated its authority to the FAA) to establish 'a national aviation noise policy,' 49 U.S.C. § 47523(a), including 'a national program for reviewing airport noise and access restrictions on operations of Stage 2 and Stage 3 aircraft,' *id*. § 47524(a); and (2) outlines the requirements of that program." *Friends*, 841 F.3d at 138. The FAA promulgated a national aviation noise policy through 14 C.F.R. Part 161, and established the "notice, review, and approval requirements," which apply to new local airport-use restrictions. *See* 49 U.S.C. § 47524(b), (c)(1), (d); 14 C.F.R. § 161.3(a), (b). Local airport-use restrictions that pre-date ANCA's passage are explicitly excluded from the strict "notice, review, and approval" requirements and are considered "grandfathered" under ANCA. 42 U.S.C. § 47524(b), (c)(1), (d); 14 C.F.R. § 161.3(a), (b).

identify each claim, counterclaim or defense—or the part of each claim, counterclaim or defense—on which they believe themselves entitled to summary judgment. (Pl. Opp. at 1).

Likewise, amendments to grandfathered local airport-use restrictions are also grandfathered and therefore not preempted by ANCA, provided that such amendments do not "reduce aircraft operations, limit aircraft operations, or affect aircraft safety." 49 U.S.C. § 47524(d)(4); 14 C.F.R. § 161.3(b).

Plaintiffs take issue with the 2005 Law to the extent it added a defined term that they believe so materially changed the 2004 Law that the 2005 Law cannot be a grandfathered amendment. Specifically, Plaintiffs argue that the new defined term "Passenger Service" made the TUPs applicable to Part 380 operators when the 2004 Law did not so apply to them. The effect of that change, Plaintiffs argue, reduces and/or limits their aircraft operations and this makes the amendments invalid under ANCA. Defendant takes the position that the new defined term in the 2005 Law is not preempted because it was merely a clarification of the grandfathered 2004 Law which did not change the aircraft operations for entities to which the rules applied, and is therefore a grandfathered amendment.

The first paragraph of the 2004 Law made the law applicable to "all use of the Passenger Terminal ("Terminal") and the Terminal Ramp at the Westchester County Airport ("Airport") by Airlines providing scheduled passenger service." (Carey Decl., Ex. B at 12). The term "Airline" was defined, in relevant part, as "any person providing scheduled passenger air service, including but not limited to, any air carrier or other operator certificated to provide scheduled passenger service under Parts 119, 121, or 135 of the Federal Aviation Regulations . . ." (*Id.*).

That paragraph was amended by the 2005 Law, removing the words "scheduled passenger service" and replacing them with "Passenger Service, as that term is defined herein." (Carey Decl., Ex. C at 9). The defined term, "Passenger Service," means "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless

whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or another entity.'" (*Id*. at 11). The 2005 Law further specified that "[a]ll Passenger Service provided at the Airport shall be provided at the Terminal." (*Id*. at 9).

Plaintiffs argue that the 2005 Law impermissibly expands the reach of the TUPs to Part 380 operators; and now requires them to provide their services at the Terminal instead of at the FBOs. The impact of such application would, according to Plaintiffs, effectively shut down their entire business operations. Plaintiffs argue that enforcing the 2005 Law, besides requiring them to operate out of the Terminal (as opposed to the FBOs), would subject them to a limited gate lottery (whereas at the FBOs there currently is none), and thereby reduce Plaintiffs' aircraft operations. (Pl. Opp. at 7). Plaintiffs support this contention by arguing that none of them provide "scheduled operations" as defined in section 110.2 of the Federal Aviation Regulations; and therefore, the 2004 Law which applied to "scheduled passenger service" could not have applied to them. (Pl. Opp. at 4 n.15, 5). Plaintiffs' conclusion then is that the 2005 Law was a material alteration to existing law that required FAA approval under ANCA.

It is important to recall, in connection with Plaintiffs' argument, that the 2004 Law was part of a settlement of the *Midway* Litigation. At the time of the *Midway* Litigation and resulting local use restrictions which became a part of the 2004 Law, the definition of "[s]chedule operations" in the Federal Aviation Regulations was, "operations conducted in accordance with a published schedule for passenger operations which includes dates or times (or both) that is openly advertised or otherwise made readily available to the general public." (*See* Carey Decl., Ex. AM ("An operator who attempts to hold itself out as a charter operator but who, in fact, announces regularly scheduled flights to the public would be considered a scheduled operator and would have to comply with the regulations for scheduled operations under Part 121 or Part 135, as

11

appropriate.")). A review of the definition of "Passenger Service" in the 2005 Law makes clear that the operators to which the TUPs were meant to apply were those who offered or sold flights to the general public, so as to mirror that which the Federal Aviation Regulations defined.

Plaintiffs also argue that Defendant fails to provide evidence supporting its contention that the 2005 Law was a mere clarification of the 2004 Law. The record evidence demonstrates, contrary to Plaintiffs' contention, that the 2005 Law was intended to clarify "unintended ambiguities . . . to ensure that the practical application of the [TUPs] is consistent with the legislative intent which prompted their enactment." (Carey Decl., Ex. C at 4). Defendant proffers a report of the Westchester County Board of Legislators (the "BOL"), issued in advance of passing the 2005 Law, explaining why the 2004 Law required amendment. (*Id*.). The BOL report states, in relevant, part as follows: "the scope of the [TUPs] was clearly intended to include all commercial passenger operations, including those that provide infrequent or special purpose services, such as those now authorized under Part 380 of the FAA's regulations. . . . [T]he proposed technical amendments . . . would clarify the applicability of the [TUPs] to these operations." (*Id*. at 4-5). The BOL report concludes that "[i]n sum, the proposed amendment . . . will clarify long-standing practice under which the County requires that all commercial passenger service providers, including those that offer their services on an infrequent basis, use the main Airport terminal and terminal ramp and be subject, among other things, to the four primary limitations set forth in the [TUPs]." (*Id*. at 5-6).

In other words, Defendant has in fact provided evidence supporting the factual contention that the addition of the defined term "Passenger Service" in the 2005 Law was a mere clarification of the 2004 Law. The 2005 Law did not expand the reach of the TUPs to Part 380 operators because the TUPs already applied to them, at least to the extent they offered or sold flights to the general

public as discussed *supra*.

Based on the foregoing, the 2005 Law is not preempted by ANCA. It does not reduce or limit Part 380 aircraft operations or affect aircraft safety because the 2005 Law simply did not change the aircraft operations to which the TUPs already applied. Therefore the 2005 Law is a grandfathered amendment to the 2004 Law under ANCA. Because the 2005 Law is not preempted by ANCA, there is no basis under that law on which to enjoin Defendant from enforcing the TUPs and, to the extent Plaintiffs seek such relief, it is denied as Plaintiffs have failed to sustain their burden of proof in that regard. Accordingly, Defendant is entitled to summary judgment dismissing Plaintiffs' First Claim for Relief.

II.    Second Claim for Relief: ADA Preemption

The Second Claim for Relief seeks a declaration that the 2005 Law is invalid under the ADA and an injunction preventing Defendants from enforcing the 2005 Law against them. (*Id.* ¶ 134).

As relevant to the claim concerning ADA preemption, Congress preempted state and local regulations "related to a price, route or service of an air carrier" when it passed § 1305(a) of the ADA. *Nat'l Helicopter Corp. of Am. v. City of New York*, 137 F.3d 81, 88 (2d Cir. 1998); 49 U.S.C. § 41713(b)(1). The 2005 Law may be characterized as a regulation touching upon a "price, route

or service" of an air carrier and Defendant advances no significant arguments to the contrary.[7]  The ADA clarifies, however, that such preemption does not "extend to acts passed by state and local agencies in the course of 'carrying out [their] proprietary powers and rights.'" *Nat'l Helicopter Corp. of Am.*, 137 F.3d at 88 (quoting 49 U.S.C. § 41713(b)(3), the "Proprietor Exception"). Defendant thus focuses on the Proprietor Exception to the express preemption provision, arguing that the TUPs fit squarely within the exception. The Court agrees.

The right of an airport proprietor "is narrow, vesting the proprietor 'only with the power to promulgate reasonable, nonarbitrary and non-discriminatory regulations that establish acceptable noise levels for the airport and its immediate environs.'" *Friends*, 841 F.3d at 139 (quoting *Brit. Airways Bd. v. Port Auth. of New York*, 558 F.2d 75, 84 (2d Cir. 1977)). Plaintiffs seize upon this language, arguing that Defendant has not established that the 2005 Law was a restriction meant to address noise and/or environmental concerns.

Contrary to Plaintiffs' contention, however, noise and environmental regulations are not the only areas which airport proprietors may regulate. *See W. Air Lines, Inc. v. Port Auth. of New York & New Jersey*, 658 F. Supp. 952, 957 (S.D.N.Y. 1986), *aff'd*, 817 F.2d 222 (2d Cir. 1987) ("Section 1305(b)(1) does not expressly limit proprietary powers to the regulation of noise, although presumably Congress would have so limited the section if that is what it had in mind.").

---

[7] Defendant asks the Court to "sidestep" the express preemption inquiry. (Def. Br. at 4). Indeed, the only argument Defendant makes with respect to express preemption is that the relation between the TUPs and Plaintiffs' prices, routes or services is not substantial enough to trigger preemption. (*See id*. at 7-8; Reply at 3). Defendant, in support of that argument, cites cases that concern preemption of age discrimination claims (*Abdu-Brisson v. Delta Air Lines*, 128 F.3d 77, 86 (2d Cir. 1997)); and land use regulations imposing permit requirements (*Goodspeed Airport LLC v. E. Haddam Inland Wetlands & Watercourses Comm'n*, 634 F.3d 206, 212 (2d Cir. 2011)). (*Id*.). The regulatory schemes in those cases bear, at best, a tenuous relation to and are remote from the aviation field. The TUPs at issue here do invade the preempted field, as they directly concern aviation. Because the cases cited by Defendant are entirely distinguishable, the Court is not persuaded by Defendant's limited argument that the express preemption provision is inapplicable here. The issue need not be resolved however, in light of the Court's determination regarding the Proprietor Exception.

14

Indeed, "[a] proprietor's interest in regulating ground congestion at its airports would appear to be at the core of the proprietor's function as airport manager, perhaps even more so than the regulation of noise," *id.*, as a "legitimate need[ ] of local airport proprietors to ensure the safety of passengers while on the ground," *Midway*, 584 F. Supp. at 440. The 2004 Law was codified after a fulsome analysis, supported by maps, a chart of then-current terminal and ramp use allocations, a technical analysis of runway weight-bearing capacity, and a twenty-six-page memorandum detailing the history of HPN's use restrictions, all of which was submitted to the FAA's Office of the Chief Counsel together with the text of the draft 2004 Law. (56.1 ¶¶ 28-32, 34; Carey Decl., Ex. A). As set forth above, the 2005 Law merely clarified language in the 2004 Law. Defendant has established that the 2005 Law is rooted in the same consideration as the 2004 Law: allocating scarce space at HPN by directing carriers to leave from one part of the airport or the other. (*See* Carey Decl., Ex. B, Ex. C). There is no evidence that the reasoning behind the amendment diverged from that which precipitated the 2004 Law.

Though Plaintiffs make passing reference to the possibility that the 2004 Law is outside the Proprietor Exception, they have withdrawn any claim in this action directed to the propriety of the 2004 Law. Plaintiffs have explicitly conceded as regards the Proprietor Exception that, "as the 2004 [Law] is not directed to Plaintiffs, we will leave that argument to someone else." (Pl. Opp. at 11). Plaintiffs themselves even acknowledge the purpose of the TUPs "was a way to force all traffic to the main Terminal, regardless of the certificate status of the operator, to restrict volume and access." (*Id.* at 11-12). In other words, there is no genuine dispute that the 2005 Law was meant to regulate airport access so as to allocate scarce space and landing and takeoff slots. Such is a matter wholly within Defendant's proprietary rights and powers.

Thus, the only question Plaintiffs have left to the Court on this issue is whether the addition

of the defined term in the 2005 Law was reasonable, nonarbitrary and non-discriminatory. Plaintiffs do not identify what, if anything, is unreasonable, arbitrary, or discriminatory about the 2005 Law, merely suggesting that it is Defendant's burden to demonstrate that the amendment is reasonable and nonarbitrary. (*Id*. at 12). It appears—from what the Court can divine from this briefing—that it is Plaintiffs' position that the new defined term "Passenger Service" was only added so as to place new restrictions on Part 380 operators. (*Id*. at 11-12). Plaintiffs offer no support in the record that the defined term was added with the purpose of placing *new* restrictions on Part 380 operators, or for any other improper purpose. On its face, the TUPs apply equally to all "Airlines" selling seats to the public, regardless of the certificate status of the operator. *See* Westchester, N.Y., Code of Ordinances § 712.462(2)(a), (3). Simply put, the record demonstrates that the TUPs fit within the ADA's Proprietor Exception on reasonable, nonarbitrary, and non-discriminatory terms.

Because the Court concludes that the 2005 Law is not preempted by the ADA, there is no basis under that law either on which to enjoin Defendant from enforcing the TUPs and, to the extent Plaintiffs seek such relief, it is denied as Plaintiffs have failed to sustain their burden of proof in that regard. Accordingly, Defendant is entitled to summary judgment dismissing the Second Claim for Relief on the grounds that the 2005 Amendment is not preempted by the ADA as a result of the Proprietor Exception.

III.    Third Claim for Relief: 42 U.S.C. § 1983 (Equal Protection)

Plaintiffs bring their Third Claim for Relief under 42 U.S.C. § 1983 alleging a violation of the Equal Protection Clause of the Fourteenth Amendment and seek preliminary and permanent injunctive relief prohibiting Defendant from enforcing the 2005 Law against them, or otherwise banning Plaintiffs from operating at HPN as of January 21, 2022 (the date that Defendant published

Policy No. 1 (*see* 56.1 ¶ 52)). Plaintiffs proceed on a "class-of-one" theory, arguing that Defendant singled them out intentionally for discriminatory treatment without a rational basis, and seek a declaration that due to this Constitutional violation, the 2005 Law is invalid and they are entitled to an injunction preventing Defendants from enforcing the 2005 Law against them. (Compl. ¶¶ 148-149).

"Plaintiffs who allege a Fourteenth Amendment class-of-one claim must show that they have been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment. The claim requires an extremely high degree of similarity between [the plaintiff] and its comparators." *Lepper v. Scordino*, No. 22-CV-01064, 2023 WL 4004220, at *2 (2d Cir. June 15, 2023). "Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59-60 (2d Cir. 2010). "When a statute or regulatory regime imposes different classifications or regulatory burdens on groups of regulated participants, rational basis review contemplates 'a strong presumption of validity, and those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it.'" *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (quoting *F.C.C. v. Beach Commc'ns*, 508 U.S. 307, 314-15 (1993)).

Plaintiffs sell seats to the public on aircraft designed for more than nine passenger seats at HPN. (56.1 ¶ 3). Plaintiffs did not specifically identify in the Complaint any purported

comparators, alleging only that they were treated differently from other operators operating out of FBOs at HPN. (*See* Compl. ¶ 141). Discovery apparently revealed their alleged comparators are: (i) Part 135 operators operating "scheduled service," including Cape Air, Tradewind, Wheels Up, and Hard Rock Air; (ii) Part 135 operators "running a political campaign or . . . flying a sports team"; (iii) corporate jets owned by companies like Pepsi, Discovery, and IBM; (iv) "community groups," such as the Albany Club, the Bakers Bay Club, the Discovery Land Club, the Nexus Club, the Yellowstone Club; (v) individuals who come together and decide to charter a plane together; (vi) operators operating pursuant to 14 C.F.R. Part 91 ("Part 91"); and (vii) operators with fractional ownership interests, such as FlexJet, NetJets, and Sentient. (56.1 ¶ 67; *id*. ¶ 75 ("Aside from those entities included in the aforementioned subgroups, Plaintiffs have not identified any other Comparators.")). Although these "seven subgroups" have been identified as Plaintiffs' comparators (*id*.), Plaintiffs single out only Bakers Bay, NetJets, and Wheels Up in their opposition with respect to their analysis of Defendant's alleged differential treatment (Pl. Opp. at 24). The Court, accordingly, considers only the operators which Plaintiffs have addressed in their brief as adequate comparators.[8]

Defendant maintains that Bakers Bay is a community group, not an air carrier, and is not

---

[8] Defendant analyzed each "subgroup" in their moving papers that they identified in the Rule 56.1 Statement with citation to record evidence. (Def. Br. at 15-18; 56.1 ¶¶ 65-75). Plaintiffs disputed the factual statements in the Rule 56.1 Statement concerning six of the seven "subgroups" (*see* 56.1 ¶¶ 68-72, 74; *id*. ¶ 73 (admitting the fact stated by Defendant concerning the sixth "subgroup")), but did not respond in their opposition brief to the points raised by Defendant, only mentioning three alleged comparators falling three of the "subgroups" identified (*see* Pl. Opp. at 23-25). Plaintiffs' silence in their brief indicates that they either: (1) believe the denials in the Rule 56.1 Statement were incorrect and therefore "conceded the argument by [their] failure to respond" (*Tyson v. Town of Ramapo*, 677 F. Supp. 3d 173, 183 n.7 (S.D.N.Y. 2023), *aff'd*, No. 23-1018-CV, 2024 WL 2890395 (2d Cir. June 10, 2024)); or (2) believe the denials in the Rule 56.1 Statement were enough to generate a genuine issue of material fact without any substantive argument in the brief. To the extent it is the latter, the denials in the Rule 56.1 Statement are particularly insufficient to create an issue of fact where, as here, the denial either does not actually respond to the stated fact (*see* Plaintiffs' Response to 56.1 ¶¶ 68, 70, 72) or cite to evidence that, upon review, actually supports Defendant's stated fact (*see id*. ¶¶ 69, 71, 74).

selling tickets to the public, so it is different from Plaintiffs. To support this contention, Defendant cites the deposition testimony of Plaintiffs' Rule 30(b)(6) witnesses Melissa Tomkiel, Jennifer Lozada, and David Drabinsky, arguing that this organization operates under 14 C.F.R. § 212.5, a section of the Code of Federal Regulations that permits "affinity (pro rata) charter[s]" that are not permitted to sell seats beyond the *bona fide* members of the organization. (Def. Br. at 17; 56.1 ¶ 71 (citing Tomkiel Tr. at 150:23-151:24, 152:17-19; Lozada Tr. at 123:20-124:17; Carey Decl., Ex. AH, "Drabinsky Tr." at 101:12-16)). Plaintiffs counter that Bakers Bay operates under Part 135 from FBOs selling seats to a "segment of the public" on aircraft designed for more than nine seats, citing the very same deposition testimony. (*See* Plaintiffs' Response to 56.1 ¶ 71 (citing Tomkiel Tr. 148:10-153:7, 159:17-160:3; Lozada Tr. 123:10-22; Drabinsky Tr. 101:12-16)). The parties, in other words, are relying upon the same evidence to reach opposing conclusions. Ordinarily, this kind of circumstance would suggest the existence of an issue of material fact precluding summary judgment. However, the Court has carefully reviewed the deposition testimony, and there is not, as Plaintiff argues, any fact disputes "regarding others similarly situated to Plaintiffs but are allowed to operate from FBOs or private hangars while the County attempts to force Plaintiffs into the lottery and Terminal." (Pl. Opp. at 24).  In other words, the Court is not picking between two interpretations of the same evidence. Rather, and only, the Court has concluded that there is but one conclusion to be drawn from the evidence.

Ms. Tomkiel, in the cited portions of the deposition testimony, described Bakers Bay as a "neighborhood in the Bahamas" and that the purchase of property in that neighborhood affords membership privileges such as the ability to purchase seats on a chartered flight to that neighborhood. (Tomkiel Tr. at 150:23-151:24). She described how the model operates: a group would charter an entire flight for the residents, aggregate the seats, and sell the seats directly to its

members. (*Id*.).  She also testified that, to her knowledge, whoever operates the flights to Bakers Bay (she did not know "whose program it is or whatever," just the destination) does so under Part 135 and that is why they are not considered commercial flights. (*Id*. at 152:3-19). She testified that these "jet aggregations" to Bakers Bay would be an example of a Part 135 operating out of FBOs that sell individual seats on aircraft with more than nine seats. (*Id*. at 159:17-160:2). Ms. Lozada, in the cited portions of the deposition testimony, described Bakers Bay as "a country club in the sky that's sharing a plane to go to the country club." (Lozada Tr. at 123:14-22). She testified that there is usually an aviation group inside a club such as Bakers Bay that helps facilitate getting fliers on an aircraft. (*Id*. at 124:4-17). Mr. Drabinsky pointed to Bakers Bay as one example of a public charter company, operating out of the FBOs at HPN as opposed to the terminal, that sells individual seats on their flights to the public on aircraft with more than nine passenger seats. (Drabinsky Tr. at 100:19-101:16). The gravamen of this collective testimony is that the "aviation group" inside Bakers Bay sells tickets to its members—the testimony does not suggest that it advertises or offers to sell seats directly to the public. Based upon the cited deposition testimony, there does not exist the "extremely high degree of similarity between [Plaintiffs] and [Bakers Bay]" that would suffice for a class-of-one claim. *Lepper*, 2023 WL 4004220, at *2.

With respect to NetJets, Defendant maintains that it is a fractional ownership operation which does not sell tickets to the public, so it is different from Plaintiffs. Defendant cites Ms. Lozada's testimony to support this contention (56.1 ¶ 74 (citing Lozada Tr. at 124:18-126:7, 136:16-139:12)) as well as a section of the Code of Federal Regulations concerning Fractional Ownership Operations (*id*. (citing 14 C.F.R. Subpart K)). Plaintiffs, disputing that fact, likewise cite Ms. Lozada's deposition transcript, and state that the public can book seats on NetJets so long as they pay the applicable fees. (*See* Plaintiffs' Response to 56.1 ¶ 74 (citing Lozada Tr. at 120:4-

121:1, 146:1-147:6)).[9] Ms. Lozada, however, specifically testified that NetJets "do[es] fractional memberships" and explained that it means that a party pays a deposit and becomes a fractional owner to a specific plane. (Lozada Tr. at 136:16-137:19). She did not testify in the portions of her transcript cited by Plaintiffs that "the public can book seats on NetJets so long as they pay the applicable fees." Accordingly, the fact stated by Defendant is deemed admitted. (56.1 ¶ 74). NetJets is not a sufficiently similarly situated comparator to support a class-of-one claim.

Finally, with respect to Wheels Up, Defendant contends it is not a comparator because it is a Part 135 operator operating "scheduled service" on aircraft with nine seats or fewer, so it is not violating the TUPs. (56.1 ¶ 68). Defendant cites the deposition testimony of Peter Scherrer, the Airport Manager employed by AvPorts, responsible for HPN's day-to-day operations (Carey Decl., Ex. AD at 8:20-9:14, 14:7-10), who stated that Wheels Up was "flying King Airs" which "was only eight seats" (*id*. at 228:13-15). Plaintiffs dispute this fact in the Rule 56.1 Statement but do not offer any citation to record evidence in connection therewith. (*See* Plaintiffs' Response to 56.1 ¶ 68 (offering citation to evidence concerning Tradewind, Bakers Bay, Yellowstone, and Hard Rock, but not Wheels Up)). Accordingly, the fact stated by Defendant is deemed admitted; and Wheels Up is not a sufficiently similarly situated comparator either.[10]

---

[9] Plaintiffs also cite "Mahmoud Decl. Ex. C," but no such document exists in this record. (*See* Plaintiffs' Response to 56.1 ¶ 74).

[10] Defendant, in its reply brief, posits that "Wheels Up is understood by the County to be a Part 135 air carrier operating aircraft with nine seats or fewer.. . . [b]ut to the degree the County is incorrect and Wheels Up is violating the TUP—or if it does so in the future—the County has every intention of enforcing the TUP to prohibit Wheels Up and all other carriers from operating outside of the Terminal while offering single-seat sales to the general public, or any segment thereof, on aircraft with more than nine seats." (Reply at 6-7). To the extent this surplusage has created any issue of fact, Plaintiffs have not established that the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that Defendant acted on the basis of a mistake. *See, e.g., Komondy v. Gioco*, 253 F. Supp. 3d 430, 444 (D. Conn. 2017) ("Moreover, '[s]mall town governments often make decisions with less than perfect information and ordinarily without the benefit of sophisticated enforcement resources.' . . . Accordingly, 'not every wrong or ill-informed decision by a local government official is grounds for a federal constitutional cause of action.'" (citing *Gray v. Town of Easton*, 115 F. Supp. 3d 312, 317 (D. Conn. 2015))).

"[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiffs' failure to produce any evidence of an adequate comparator constitutes a failure of proof and their approach here is insufficient to create a genuine issue of material fact.

Even if Plaintiffs had provided evidence of an adequate comparator, Plaintiffs have failed to carry their "burden to negative every conceivable basis which might support [the rationality of the legislative classification]." *Progressive Credit Union*, 889 F.3d at 49. As explicitly set forth in the BOL report, "the principal purpose for enactment of the [2004 Law] is to codify all of the critical use restrictions . . . in order to ensure that the procedures and regulations governing commercial use of the Airport terminal are well-defined and consistently applied to all commercial users" so as to "preserve [Defendant's] policy against expansion while balancing the need to allow carefully controlled commercial airline traffic at [HPN]." (Carey Decl., Ex. B at 4-6). As set forth *supra*, the 2005 Law is rooted in the same consideration as the 2004 Law. That consideration is the allocation of scarce space at HPN by directing carriers to leave from one part of the airport or the other. The 2005 Law merely clarified "that the [TUPs] apply to all aviation passenger services which operate out of [HPN] pursuant to which seats are individually offered or sold to the public, regardless of the frequency of such offers or sales." (Carey Decl., Ex. C at 3).

Defendant further made clear in its moving brief that the TUPs' public-sale limitation conforms with the federal aviation regulatory regime. (Def. Br. at 19-20 (citing Carey Decl., Ex. AN; 14 C.F.R. § 110.2)). Defendant also explained that the "nine-seat break point has been an

22

aviation industry standard since the 1970s." (Def. Br. at 19 (citing Carey Decl., Ex. AL ("size of aircraft operated by air commuters could be grouped into three convenient categories: 0-9 seats, 10-19 seats, and 20-30 seats"); 14 C.F.R. § 135.411 (nine-seat break point); 49 U.S.C. § 44706(a)(1) (recognizing a "9 passenger seat" break point with respect to airport operating certificates))). Plaintiffs, in opposition, respond only by stating that "the County has never articulated a rationale for the nine-seat limitation or the distinction between private and public other than to use these arbitrary standards to negatively impact Plaintiffs' ability to operate out of HPN." (Pl. Opp. at 24). In other words, Plaintiffs fail to substantively respond to Defendant's explanation for the rationality of the legislative classification and have not met their burden on this score.

Accordingly, Defendant is entitled to summary judgment dismissing the Third Claim for Relief.

IV.   Fourth Affirmative Defense: Laches

Defendant also seeks dismissal of "Plaintiffs' equitable defenses." (Def. Br. at 22).[11] Plaintiffs' fourth affirmative defense alleges that Defendant's Counterclaims are "barred by the doctrines of waiver, estoppel, laches, and/or other equitable defenses." (Doc. 62). Defendant argues that as a government entity discharging its statutory duties, it is not subject to equitable

---

[11] Local Rule 7.1(a)(1) provides that "[a] notice of motion . . . shall specify the applicable rules or statutes pursuant to which the motion is brought, and shall specify the relief sought by the motion." Defendant's Notice of Motion seeks "an order pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the Complaint as against Defendant with prejudice, granting Defendant's first counterclaim seeking a declaratory judgment, and for such other relief as this Court deems just and proper." (Doc. 111). That notice does not identify that Defendant seeks summary judgment dismissing any of the affirmative defenses asserted in Plaintiff's Answer to the Counterclaims. While failure to comply with the Local Rules is, on its own, a sufficient ground to warrant denial of a motion, the Court has discretion to overlook a failure to comply with Local Rule 7.1 and exercises such discretion on this motion, as the parties have fully briefed the propriety of dismissing the laches affirmative defense. *See Singer v. Massachusetts Mut. Life Ins. Co.*, No. 21-CV-08450, 2023 WL 3506404, at *1 (S.D.N.Y. May 17, 2023), *aff'd*, No. 23-0863, 2024 WL 1172893 (2d Cir. Mar. 19, 2024).

defenses that could ordinarily be invoked against a private actor. (Def. Br. at 20-22). Plaintiffs counter that laches applies to the government where Defendant is seeking to enforce a right akin to a private one.[12] (Pl. Br. at 21-23).

Plaintiffs have not argued, however, that the TUPs involve a private interest. (*See id*.). Their sole argument is that Defendant knew that Plaintiffs were developing their business over the past few years while they were operating openly at HPN, only first raised an issue regarding single seat charter operations in 2018, and waited until November 2021 to notify Plaintiffs that their operations were in violation of the TUPs. (*Id*.). They argue that this "unexplained and prejudicial delay" should permit a laches defense against the municipality. (*Id*. at 23).

Defendant, in enforcing the TUPs, is "acting in a law enforcement capacity in [its] role[ ] as [a] government entit[y]." *State of New York v. United Parcel Serv., Inc.*, 160 F. Supp. 3d 629, 647 (S.D.N.Y. 2016), *vacated on other grounds in part on reconsideration sub nom. New York v. United Parcel Serv., Inc.*, No. 15-CV-01136, 2016 WL 10672074 (S.D.N.Y. June 21, 2016). When local government entities act in such a capacity as to which they have broad discretion, and not in a capacity akin to that of a private entity—such as a municipality's enforcement of an ordinary contract—equitable defenses do not apply. *Id*.; *see also United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002) ("[L]aches is not available against the federal government when it undertakes to enforce a public right or protect the public interest."). Plaintiffs are undoubtedly troubled that Defendant previously failed to enforce its restrictions against them until 2021, but "laches or estoppel do not bar a municipality from enforcing ordinances that have been allowed to lie fallow." *Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 111 (2d Cir. 2010) (quoting

---

[12] Plaintiffs' failure to respond to Defendant's arguments concerning equitable defenses other than laches amounts to abandonment of those non-laches equitable defenses. *See Tyson*, 677 F. Supp. 3d at 183, n.7; *Ventillo v. Falco*, No. 19-CV-03664, 2020 WL 7496294, at *12 (S.D.N.Y. Dec. 18, 2020); *Allegrino*, 2021 WL 429121, at *5.

*LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)).

Accordingly, Defendant is entitled to summary judgment dismissing Plaintiffs' fourth affirmative defense alleged in their Answer to the Counterclaims.

V.   Defendant's First Counterclaim

Defendant's First Counterclaim is brought pursuant to Rule 3001 of the New York Civil Practice Law and Rules ("N.Y. C.P.L.R."), which permits a court to "render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy . . ." As an initial matter, N.Y. C.P.L.R. 3001 is a state law, not a federal statute. Because "[f]ederal courts apply federal procedural rules, not state rules" this Court cannot grant relief under N.Y. C.P.L.R. 3001. *Gustavia Home, LLC v. Rutty*, No. 16-CV-02823, 2018 WL 2198742, at *5 (E.D.N.Y. May 14, 2018), *aff'd*, 785 F. App'x 11 (2d Cir. 2019). This reality sounds the death knell to this counterclaim. In any event, if the Court could grant declaratory relief to Defendant, it now has—for all intents and purposes—secured the relief sought to the extent the First Counterclaim seeks a declaration that the 2005 Law is not preempted under ANCA or the ADA, based upon the Court's findings herein.

Defendant, perhaps anticipating this determination, explains in its moving brief that if the Court grants summary judgment dismissing the Complaint, "there is still the possibility that other air carriers at some future date—perhaps twenty years in the future—will, like Plaintiffs, emerge and challenge the TUP." (Def. Br. at 23). Thus, Defendant asks for a declaration "that the TUP is not precluded under the ADA or ANCA" in order "[t]o prevent future suits challenging the TUP." (*Id.*). "Declaratory relief is available only when 'there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *US Airways, Inc. v. Sabre Holdings Corp.*, No. 11-CV-02725, 2015 WL

5188812, at *3 (S.D.N.Y. Sept. 4, 2015) (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)). A declaratory judgment is available to adjudicate a present substantial controversy, not for relief from speculation regarding future injury. Any potential impact that a declaratory judgment might have on Defendant's future relationship with other non-parties who have yet to—and may never—materialize, "is just that—potential and speculative. In order for a declaratory judgment claim to 'satisfy the case-or-controversy requirement,' the dispute must be 'definite and concrete, touching the legal relations of parties having adverse legal interests . . . as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *Id*. at *4 (quoting *MedImmune, Inc.*, 549 U.S. at 127); *see also Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (Nathan, J.) ("As with any federal action, courts may not entertain actions for declaratory judgment 'when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been mooted by subsequent developments, and when there is no standing to maintain the action.'" (quoting *Flast v. Cohen*, 392 U.S. 83, 95 (1968))). A potential and future fight over preemption does not satisfy the case-or-controversy requirement.

Accordingly, the Court, pursuant to Rule 56(f), grants summary judgment to Plaintiff dismissing Defendant's First Counterclaim.

VI.    Defendant's Second Counterclaim

Defendant's Second Counterclaim is a standalone claim for a permanent injunction which seeks an order "permanently enjoining the Plaintiffs from violating the TUPs" on the grounds that Plaintiffs have repeatedly violated the "the local laws in question." (Ans. ¶¶ 207-212). This

purported claim for relief[13] does not raise an issue of federal law, for it alleges only a violation of local law, which is not sufficient to establish federal question jurisdiction. *See, e.g., New York v. Shinnecock Indian Nation*, 686 F.3d 133, 138 (2d Cir. 2012) ("A cause of action raises an issue of federal law only when a right or immunity created by the Constitution or laws of the United States is an essential element of the cause of action." (cleaned up)).

Neither party moved with respect to Defendant's Second Counterclaim. Nevertheless, federal courts "have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party." *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 237 (S.D.N.Y. 2019) (quoting *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)). Having dismissed all claims over which this Court has original jurisdiction, the Court declines to exercise jurisdiction over any outstanding state or local law claims. *See McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 158 n.6 (2d Cir. 2017) ("Of course, a district court may decline to exercise supplemental jurisdiction over state and local law claims if it has dismissed all claims over which it has original jurisdiction."); s*ee also Offor v. Mercy Med. Ctr.*, No. 17-CV-01872, 2018 WL 2947971, at *7 (S.D.N.Y. May 31, 2018) ("A federal district court may decline to exercise supplemental jurisdiction over pendent state law claims when it 'has dismissed all claims over which it has original jurisdiction.'" (quoting 28 U.S.C. § 1367(c)(3))).

Accordingly, the Court *sua sponte* dismisses without prejudice the Second Counterclaim on the ground that the Court lacks subject matter jurisdiction under Federal Rule of Civil Procedure 12(h)(3).

---

[13] The Court notes that the Second Counterclaim may not be a viable claim for relief in any event. "[A] request for injunctive relief is not a separate cause of action . . . . [R]ather, the injunction is merely the remedy sought for the legal wrongs alleged in the . . . substantive counts." *Milligan v. GEICO Gen. Ins. Co.*, No. 20-3726-CV, 2022 WL 433289, at *6 (2d Cir. Feb. 14, 2022). As all substantive claims have been dismissed, there no longer exists a basis for the injunctive remedy sought.

## <u>CONCLUSION</u>

Based on the foregoing, Defendant's motion for summary judgment is GRANTED IN PART (Doc. 111). The motion is granted to the extent that the claims for relief alleged in the Complaint and Plaintiffs' fourth affirmative defense alleged in the Answer to the Counterclaims are dismissed. Defendant's motion is denied to the extent it sought summary judgment granting relief on its First Counterclaim. The Court grants summary judgment to Plaintiffs dismissing Defendant's First Counterclaim. The Court declines to exercise supplemental jurisdiction over Defendant's Second Counterclaim and dismisses it without prejudice.

Plaintiffs' request for oral argument (Doc. 118) is denied as unnecessary.

The Clerk of Court is respectfully requested to terminate the pending motions (Doc. 111 and Doc. 118) and close this case.


**SO ORDERED:**

Dated: White Plains, New York
      July 1, 2024

_____
Philip M. Halpern
United States District Judge

28