**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DELUX PUBLIC CHARTER, LLC d/b/a JSX AIR and JETSUITEX, INC.; XO GLOBAL, LLC; and BLADE URBAN AIR MOBILITY, INC., | ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Civil Action No. 22-cv-01930 (PMH) |
| COUNTY OF WESTCHESTER, | ) ) | |
| *Defendant*. | ) ) | |
| _____ | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A STAY, OR IN THE ALTERNATIVE AN INJUNCTION PENDING APPEAL

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 4

    A. Plaintiffs' Public Charter Jet Services ................................................................ 4

    B. The 2005 Amendment to the County's Airport Regulations ................................ 6

    C. This Litigation ...................................................................................................... 8

ARGUMENT ................................................................................................................... 10

   I. The Court Should Stay Its Order Pending Appeal ...................................................... 10

    A. Plaintiffs Will Suffer Immense Irreparable Harm Absent a Stay. ........................ 10

    B. Plaintiffs' Appeal Presents Serious Questions that the Second Circuit Is Likely to Resolve in Their Favor. ......................................................................... 14

    C. The Public Interest and Equities Favor a Stay ...................................................... 22

  II. Alternatively, the Court Should Enjoin the County from Enforcing the 2005 Amendment Pending Appeal. ..................................................................................... 24

  III. At Minimum, the Court Should Grant an Administrative Stay. ................................. 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Air Cargo Shipping Servs. Antitrust Litig.*,
   697 F.3d 154 (2d Cir. 2012) ............................................................. 16, 19

*Air Transp. Ass'n of Am., Inc. v. Cuomo*,
   520 F.3d 218 (2d Cir. 2008) ............................................................. 16, 19

*Am. Airlines, Inc. v. Dep't of Transp.*,
   202 F.3d 788 (5th Cir. 2000) ............................................................. 20

*Brenntag Int'l Chems., Inc. v. Bank of India*,
   175 F.3d 245 (2d Cir. 1999) ............................................................. 10

*Brit. Airways Bd. v. Port Auth. of N.Y.*,
   558 F.2d 75 (2d Cir. 1977) ............................................................. 16

*Brit. Airways Bd. v. Port Auth. of N.Y.*,
   564 F.2d 1002 (2d Cir. 1977) ............................................................. 20

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund*,
   598 F.3d 30 (2d Cir. 2010) ......................................................... 3, 14, 15, 25

*City of Burbank v. Lockheed Air Terminal Inc.*,
   411 U.S. 624 (1973) ............................................................. 16

*City of Naples Airport Auth. v. FAA*,
   409 F.3d 431 (D.C. Cir. 2005) ............................................................. 17

*Connecticut Dep't of Env't Prot. v. OSHA*,
   356 F.3d 226 (2d Cir. 2004) ............................................................. 14

*Doe v. Trump Corp.*,
   No. 18 CIV. 9936 (LGS), 2020 WL 2538400 (S.D.N.Y. May 18, 2020) ............................... 14

*Flatiron Health, Inc. v. Carson*,
   602 F. Supp. 3d 482 (S.D.N.Y. 2020) ............................................................. 3, 24

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*,
   841 F.3d 133 (2d Cir. 2016) ............................................................. 17, 20

*Harlen Assocs. v. Inc. Vill. of Mineola*,
   273 F.3d 494 (2d Cir. 2001) ............................................................. 21

*IMS Health Inc. v. Sorrell*,
   631 F. Supp. 2d 429 (D. Vt. 2009) ......................................................................24

*Jock v. Sterling Jewelers, Inc.*,
   738 F. Supp. 2d 445 (S.D.N.Y. 2010) ...........................................................15, 20

*Jolly v. Coughlin*,
   76 F.3d 468 (2d Cir. 1996) ................................................................................14

*Meaders v. Helwaser*,
   436 F. Supp. 3d 677 (S.D.N.Y. 2020) ...............................................................22

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992) ..........................................................................................19

*N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*,
   612 F.3d 97 (2d Cir. 2010) ................................................................................16

*Nat'l Helicopter Corp. of Am. v. City of N.Y.*,
   137 F.3d 81 (2d Cir. 1998) ...........................................................................19, 20

*Nat'l Immigr. Project of the Nat'l Lawyers Guild v. DHS*,
   842 F. Supp. 2d 720 (S.D.N.Y. 2012) ...........................................................15, 17

*Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*,
   992 F.2d 430 (2d Cir. 1993) .........................................................................2, 3, 13

*Nken v. Holder*,
   556 U.S. 418 (2009) .................................................................................10, 14, 22

*Nw., Inc. v. Ginsberg*,
   572 U.S. 273 (2014) ..........................................................................................19

*Register.com, Inc. v. Verio, Inc.*,
   356 F.3d 393 (2d Cir. 2004) ..............................................................................13

*Reuters Ltd. v. United Press Int'l, Inc.*,
   903 F.2d 904 (2d Cir. 1990) ..........................................................................13, 14

*Rex Medical L.P. v. Angiotech Pharms. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010) ...............................................................14

*Sarr v. Garland*,
   50 F.4th 326 (2d Cir. 2022) ...............................................................................22

*SEC v. Citigroup Glob. Markets Inc.*,
   673 F.3d 158 (2d Cir. 2012) ..............................................................................10

*Statharos v. New York City Taxi & Limousine Comm'n,*
    198 F.3d 317 (2d Cir. 1999) ............................................................... 14

*Sutherland v. Ernst & Young LLP,*
    856 F. Supp. 2d 638 (S.D.N.Y. 2012) ................................................ 14

*Thapa v. Gonzales,*
    460 F.3d 323 (2d Cir. 2006) ......................................................... 10, 15

*Ticor Title Ins. Co. v. Cohen,*
    173 F.3d 63 (2d Cir. 1999) ................................................................. 14

*Torres-Jurado v. Biden,*
    No. 19 CIV. 3595 (AT), 2023 WL 7130898 (S.D.N.Y. Oct. 29, 2023) ................ 24

*United States v. Halkbank,*
    No. 15 CR. 867 (RMB), 2020 WL 6273887 (S.D.N.Y. Oct. 26, 2020) ............... 22

*United States v. Rem,*
    38 F.3d 634 (2d Cir. 1994) ................................................................. 21

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,*
    559 F.2d 841 (D.C. Cir. 1977) ............................................................ 15

**Statutes, Codes & Regulations**

49 U.S.C. § 41713 ...................................................................... 19, 20

49 U.S.C. § 47521 ........................................................................... 16

49 U.S.C. § 47524 ............................................................... 17, 18, 19

14 C.F.R. Part 135 ............................................................................ 4

14 C.F.R. Part 380 ............................................................................ 4

14 C.F.R. § 110.2 ........................................................................... 4, 7

49 C.F.R. § 1540.105 ....................................................................... 11

49 C.F.R. § 1544.105 ..................................................................... 2, 11

49 C.F.R. § 1550.7 ..................................................................... 2, 5, 11

Westchester Cnty. Mun. Code § 712.462 ..................................... 1, 6, 8, 18

**Other Authorities**

*Aviation Programs*, TSA, https://perma.cc/Z8L2-7548 (last visited July 19, 2024) ................... 11

County of Westchester, Comment Letter on Revisions to the Regulatory
    Definitions of "On-Demand Operation", "Supplemental Operation" and
    "Scheduled Operation" at 12 (Oct. 13, 2023), https://perma.cc/JXP4-4Q54 ...................... 7, 8

*FAA Ensuring Safe Public Charter Flights, Exploring Future Solutions for All
    Flyers*, FAA (June 17, 2024), https://perma.cc/R9ZP-4K7Q .................................................. 7

Fed. R. Civ. P. 56 .......................................................................................................................... 21

Fed. R. App. P. 8 ........................................................................................................................... 25

Stephanie Waldek, *This Semi-private Carrier Was Voted Best U.S. Airline by T+L
    Readers-and One-way Fares Start at $249*, Travel + Leisure (July 9, 2024),
    https://perma.cc/8UTA-5SRP .................................................................................................. 5

## INTRODUCTION

Defendant Westchester County wants to evict Plaintiffs from its airport before the Second Circuit can hear the appeal. This threatened shutdown would force Plaintiffs to cancel hundreds of flights, upend the travel plans of countless passengers, cause extreme irreparable harm, and serve no public benefit. Accordingly, Plaintiffs Delux Public Charter, LLC d/b/a JSX Air and JetSuiteX, Inc.; XO Global, LLC; and Blade Urban Air Mobility, Inc. (collectively "Plaintiffs") respectfully ask this Court to order Defendant (the "County') to maintain the status quo at its airport (the "Airport") pending appeal of this Court's order (ECF 120) and judgment (ECF 121).

There is every reason to maintain the status quo—and no reason to condone the County's hasty actions. Plaintiffs have been offering their crowd-free, public charter jet services out of Fixed Base Operator spaces ("FBOs") at the Airport since 2015. For almost a decade, the County has not enforced the law that it now claims requires the eviction of Plaintiffs from their New York bases of operations. *See* Westchester Cnty. Mun. Code § 712.462. Indeed, for six years, the County never even raised the issue. For years, the County had no concerns with Plaintiffs operating out of the FBOs. Even after the County changed its mind and commenced litigation in 2022, the County stipulated not to enforce the law until, in the Court's words, "resolution of this action." ECF 120 at 5. Put simply, the law at issue has been dormant for many years—until now.

Nonetheless, after Plaintiffs filed their Notice of Appeal, the County abruptly threatened to shut down Plaintiffs' operations and force them out of Westchester. The County sent Plaintiffs an ultimatum demanding that they immediately commit (by Monday, July 29) to leave the FBOs and operate exclusively out of the terminal starting on October 31, or else face suspension of all operations at the Airport. *See* Edmondson Decl., Ex. G & J; Khurana Decl., Ex. L & M. That is not a viable option, and the County knows it. Capitulation to the County's demand would require

Plaintiffs to change their business model entirely, causing a "[m]ajor disruption" of Plaintiffs' business tantamount to "termination." *Nemer Jeep-Eagle, Inc. v. Jeep-Eagle Sales Corp.*, 992 F.2d 430, 435 (2d Cir. 1993).

Moreover, capitulation would conflict with the federal regulations applicable to Plaintiffs' operations. These regulations do not permit what the County is requiring. This bears repeating: To comply with the County's ultimatum would require Plaintiffs to breach federal aviation laws. The County knows this and is equally aware that its mandate is tantamount to shutting down Plaintiffs' businesses and evicting them from the Airport.

Under federal law, the terminal is a sterile location that requires screening through a Transportation Security Administration ("TSA") security checkpoint before departure or arrival. *See* 49 C.F.R. § 1544.105(a)(2). Passengers who were not screened through a TSA security checkpoint cannot be present in the terminal sterile passenger gate area. Many of the airports that Plaintiffs use to fly into Westchester do not even have TSA security checkpoints. Plaintiffs operate under a different TSA-approved security program specific for their kind of operations away from main airline terminals, as required under TSA regulations. *See* 49 C.F.R. § 1550.7(a). Their passengers are not permitted to use a TSA checkpoint or enter a secure gate area on arrival or departure. Only airlines that are subject to the TSA-approved security protocol for airline terminals are authorized to use TSA checkpoints and pay the associated screening fees. In forcing operation through the terminal, the County is presenting Plaintiffs with the impossible choice of moving to a location where it cannot lawfully operate or ceasing operations at the Airport altogether.

The County's ultimatum also confirms that the County will suffer no harm from the status quo through at least October 31, 2024. The County is seeking an immediate commitment (by Monday, July 29) to leave the FBOs by that date. Plaintiffs request only a modest extension, pending

resolution of their appeal in the Second Circuit. And that extension may well be very modest: Plaintiffs intend to move for expedited briefing in the Second Circuit, which could yield a decision in a matter of weeks, and certainly before the end of the year.

This Court should use one of two available mechanisms to maintain the status quo and prevent the extensive and irreparable harm that enforcement of the County's dormant law would cause both Plaintiffs and the public they serve.

*First*, the Court should stay effectiveness of its order pending appeal. All four stay factors are satisfied. Absent a stay, Plaintiffs would suffer "[m]ajor disruption of [their] business" that is akin to "termination." *Nemer Jeep-Eagle*, 992 F.2d at 435. There is also at least a substantial possibility that the Second Circuit will disagree with the Court on the serious questions presented in the pending appeal. The public interest and balance of the equities also tip decidedly in favor of a stay. The public has a strong interest in preserving the status quo to prevent disruption of planned air travel, and the County can demonstrate no urgent need given that it declined to enforce the law at issue for nearly a decade. Plaintiffs' good-faith efforts to secure a speedy resolution of their appeal is all the more reason to maintain the status quo and avoid the chaos and irreparable harm that enforcement would create.

*Second*, in the alternative, the Court should issue an injunction pending appeal. This Court has the "inherent power" to "make whatever order is deemed necessary to preserve the status quo and to ensure the effectiveness of the eventual judgment." *Flatiron Health, Inc. v. Carson*, 602 F. Supp. 3d 482, 486 (S.D.N.Y. 2020) (citation omitted). Here, as noted, the status quo is non-enforcement. *See also Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund*, 598 F.3d 30, 37 (2d Cir. 2010) (stay and injunction standards "overlap[] substantially").

Plaintiffs tried their best to avoid seeking a stay, but the County is hellbent on hasty action without any accommodation or negotiation. The County flat-out refused any stay of any kind, however limited, and also refused to make any changes to the terminal that would enable Plaintiffs to use it without violating federal law. *See* Edmondson Decl., Ex. I. In other words, the County is unabashedly seeking the immediate eviction of Plaintiffs from Westchester. There is no sugar-coating it or denying it.

For these reasons, the Court should maintain the status quo through either a stay or an injunction. And, in the meantime, the Court should issue an administrative stay pending consideration of Plaintiffs' motion for a stay pending appeal, because the County is threatening immediate action if Plaintiffs do not capitulate by Monday, July 29.

## BACKGROUND

### A.    Plaintiffs' Public Charter Jet Services

Plaintiffs are air carriers that provide public charter flights under federal aviation laws established over 40 years ago. *See* 14 C.F.R. Part 380 ("Part 380"); 14 C.F.R. Part 135 ("Part 135"); 14 C.F.R. § 110.2 (as amended in 1995). In practical terms, this means that Plaintiffs sell and provide individual seats on charter flights to members of the public.[1]

Plaintiffs fill an underserved niche in the air travel space between massive commercial airlines and private jets. In that space, they are able to provide their customers an experience that is efficient and pleasant but also affordable and safe. Edmondson Decl. ¶ 7; Khurana Decl. ¶¶ 6,

---

[1] Delux is a Part 135 direct air carrier. Edmondson Decl. ¶ 3. JetSuiteX, XO Global, and Blade are Part 380 indirect air carriers. *Id.* at 4; Khurana Decl. ¶ 3; ECF 17 ¶ 3. JetSuiteX charters entire Delux flights and sells tickets for seats on those flights to the public. Edmondson Decl. ¶ 4. Delux then operates the flights using the time, location, and destination designated by JetSuiteX. *Id.* XO Global and Blade similarly charter entire flights from Part 135 direct air carriers, sell tickets for seats on those flights to the public, and then dictate to the direct air carriers the time, location, and destination of the flights. Khurana Decl. ¶ 3; ECF 17 ¶ 3.

12. And they also provide an alternative travel option for when the major airlines are hit by disruptions that do not affect Plaintiffs. Plaintiffs' customers value their services highly. JSX, for example, enjoys the highest customer satisfaction of any air carrier in the United States, was named "Best Regional Airline" in North America by the Airline Passenger Experience Association ("APEX"), and has earned "5-Star Regional Airline" designation from APEX for five consecutive years. Edmondson Decl. ¶ 22. Just this month, JSX was voted the "No. 1 Domestic Airline" by the readers of *Travel + Leisure* magazine and earned this distinction by a margin of 20 points over the runner-up on a 100-point scale.[2] *Id.* ¶ 23.

A defining characteristic of Plaintiffs' public charter air transportation services is that, like private charters, they operate out of FBOs and private terminals rather than main airport terminals, allowing them to serve 4,500 public use airports that are not served by any major carriers and that do not have an airline terminal at all.[3] *See id.* ¶ 19. At main airport terminals, passengers must be screened through TSA checkpoints pursuant to a TSA-approved security program. *See id.* ¶ 14; Khurana Decl. ¶ 15. At FBOs, public charter passengers undergo a different, more efficient (though equally secure) TSA-approved screening protocol under TSA-approved "Twelve-Five Standard Security Programs" appropriate for operations of their nature. *See* 49 C.F.R. § 1550.7. Operating out of FBOs allows Plaintiffs to offer conveniences that major airlines operating out of main terminals cannot. These services include valet parking and shuttle services; concierge services; private lounge access; and speedier check-in and boarding processes. Khurana Decl. ¶ 12.

---

[2] *See* Stephanie Waldek, *This Semi-private Carrier Was Voted Best U.S. Airline by T+L Readers— and One-way Fares Start at $249*, Travel + Leisure (July 9, 2024), https://perma.cc/8UTA-5SRP.
[3] An FBO is an aeronautical service provider located at an airport who offers, among other things, fueling, maintenance, and other ground-based services to aircraft operators. Edmondson Decl. ¶ 27; Khurana Decl. ¶ 7. Roughly 90% of U.S. public use airports, and half of the airports served by Plaintiffs, do not have terminals or airlines at all, making Plaintiffs' services the only ones available to those without access to private jets of their own. Edmondson Decl. ¶ 19.

The benefits of Plaintiffs' air transportation services extend beyond their customers. Plaintiffs' public charter aircraft are typically quieter than their commercial competitors. Edmondson Decl. ¶ 21; Khurana Decl. ¶ 6. They also help minimize the impact of private charter planes by aggregating in a single plane multiple passengers who may otherwise charter their own individual planes. Edmondson Decl. ¶ 21; Khurana Decl. ¶ 14.

The Airport is an important part of Plaintiffs' business operations. From the fall of 2024, JSX will fly an average of at least 28 flights per week into the Airport (from 4 other airports) and 28 flights out of the Airport (to 4 other airports). Edmondson Decl. ¶ 30. XO Global, meanwhile, arranges a weekly average of 10 flights into the Airport and 10 flights out of the Airport. Khurana Decl. ¶ 8. This year to date, JSX has flown 14,946 passengers through the Airport. Edmondson Decl. ¶ 30. And in the last 18 months, XO Global flew more than 17,000 passengers through the Airport. Khurana Decl. ¶ 8.

Plaintiffs have been operating out of FBOs at the Airport for years. Plaintiffs Blade and XO Global (in connection with its sister company JetSmarter, Inc.) began operating from the FBOs in 2015, and Plaintiff JSX has been operating out of the FBOs since 2020. Edmondson Decl. ¶ 25; Khurana Decl. ¶ 7; ECF 17 ¶ 7.

### B.    The 2005 Amendment to the County's Airport Regulations

Air carriers that operate out of the main terminal at the Airport are subject to the County's Terminal Use Procedures ("TUPs"), Westchester Cnty. Mun. Code § 712.462, which require such air carriers to enter into Terminal Use Agreements with the County. Those agreements subject operators to certain requirements, including participation in a lottery system to determine gate allocation and flight capacity and forced alteration of flight schedules to adhere to terminal ramp allocations and passenger limitation restrictions. *See id.* § 712.462(5).

As of 2004, the County's TUPs were applicable only to "use of the Passenger Terminal and the Terminal Ramp at the Westchester County Airport . . . by Airlines providing *scheduled* passenger service," *see* ECF 112-2 at 12 (emphasis added), which has a particular meaning in the industry under federal law. The TUPs did not *require* Plaintiffs, or anyone else not already operating out of the terminal, to begin doing so.

Thus, Plaintiffs fall outside the scope of the 2004 TUPs for two reasons. *First*, Plaintiffs do not provide "scheduled passenger service." Federal law explicitly defines "[s]cheduled" operations to "not include any passenger-carrying operation that is conducted as a public charter operation under part 380." 14 C.F.R. § 110.2.[4] Plaintiffs provide public charter operations under Part 380, *see supra* p.4, so those operations are categorically not "scheduled" under the federal definition. The County expressly acknowledged this in a recent comment to the Federal Aviation Administration ("FAA") and Department of Transportation. As the County stated: "In short, these Part 380 operations are not deemed to be 'scheduled' operations simply because the regulations state that they are not included within the definition of scheduled."[5]

*Second*, Plaintiffs do not operate out of the main terminal, and the 2004 TUPs did not require them to do so. In fact, the 2004 TUPs *prohibited* Plaintiffs from using the main terminal because the terminal ramp was reserved *exclusively* for "*scheduled* passenger service." ECF 112-

---

[4] The FAA recently indicated that it is exploring amending this definition as it relates to public charters. *See FAA Ensuring Safe Public Charter Flights, Exploring Future Solutions for All Flyers*, FAA (June 17, 2024), https://perma.cc/R9ZP-4K7Q. The fact that the FAA is actively exploring these issues through the regulatory process makes the County's efforts to jump out in front of that process all the more improper.

[5] *See* County of Westchester, Comment Letter on Revisions to the Regulatory Definitions of "On-Demand Operation", "Supplemental Operation" and "Scheduled Operation" at 12 (Oct. 13, 2023), https://perma.cc/JXP4-4Q54.

2 at 12 (emphasis added). Again, the County has stated that Part 380 operations "are not included within the definition of scheduled."[6]

In 2005, however, the County amended its TUPs (the "2005 Amendment"), extending them in a way that supposedly sweeps in Plaintiffs. First, the amendment deleted the word "scheduled." The TUPs now apply to any "use of the passenger terminal . . . and the terminal ramp at the Westchester County Airport . . . by airlines providing . . . *Passenger Service*." ECF 112-3 at 9 (emphasis added); *see* Westchester Cnty. Mun. Code § 712.462(1). The amendment defines "Passenger Service" broadly to include "any air service to or from the Airport for which seats are individually offered or sold to the public or a segment of the public, regardless of whether such individual seats are offered or sold directly by the aircraft operator, a charterer, another Airline, or any other entity." ECF 112-3 at 11; *see* Westchester Cnty. Mun. Code § 712.462(2)(j). Second, the TUPs impose a new requirement that "*[a]ll* Passenger Service provided at the Airport *shall be provided at the Terminal*." ECF 112-3 at 9 (emphasis added); *see* Westchester Cnty. Mun. Code § 712.462(1).The County relies on these amendments as grounds to evict Plaintiffs from the FBOs.

### C.    This Litigation

After six years of allowing Plaintiffs to operate out of FBOs at the Airport without issue, in late 2021, the County began demanding for the first time that Plaintiffs operate out of the main terminal. *See* Edmondson Decl. ¶ 31; Khurana Decl. ¶ 19.

In March 2022, the County initiated a state-court action seeking a declaration that Plaintiffs' operations are subject to the 2005 Amendment. *See* ECF 21-1. Promptly thereafter, Plaintiffs commenced the present action. *See* ECF 1. Plaintiffs brought three claims alleging that (1) the 2005 Amendment is preempted by the Airport Noise and Capacity Act of 1990 ("ANCA"), (2) the

---

[6] *Id.*

2005 Amendment is preempted by the Airline Deregulation Act of 1978 ("ADA"), and (3) the 2005 Amendment as applied to them violates the Equal Protection Clause. *See id.* ¶¶ 101-50. The County later brought two counterclaims seeking declaratory and injunctive relief that would force Plaintiffs to comply with the 2005 Amendment. ECF 60 ¶¶ 196-212.

Plaintiffs initially sought a temporary restraining order and preliminary injunction. ECF 14. In response, the County represented to the Court that it "has not interfered with [Plaintiffs'] flights and will not do so without a valid court order." ECF 29 at 5; *see also* ECF 21 at 2 ("Westchester will not take (and has not taken) any action whatsoever . . . in the interim."). Based on that representation, the Court denied both a temporary restraining order and a preliminary injunction. ECF 34 at 1 (referring to "the promises set forth in the County's letters with respect to plaintiffs' operations at the Westchester County Airport" (citations omitted)); ECF 57 at 6 ("[T]he parties' agreement is now an order of this Court and is entitled to the same respect as any order that could have issued as a result of the instant motion [for a preliminary injunction]." (citing ECF 45)). And the parties stipulated that "neither Westchester nor any of its agents will seek to or take any action to enforce Policy No. 1 and/or section 712.462 of the Laws of Westchester County (the 'TUP') against Plaintiffs and their Air Carriers without a valid court order." ECF 45 at 3.

The County subsequently moved for summary judgment, and the Court granted the motion in part. *See* ECF 120; ECF 121. The Court dismissed each of Plaintiffs' claims. The Court determined that the 2005 Amendment was not preempted by ANCA or the ADA, and also rejected the Equal Protection claim. ECF 120 at 9-23. In addition, the Court dismissed the County's counterclaims. *Id.* at 25-28. The Court did not order any declaratory or injunctive relief to *either* party.

The Court entered its final judgment on July 2, 2024, ECF 121, and Plaintiffs filed their notice of appeal on July 12, 2024, ECF 123.

**ARGUMENT**

**I.    The Court Should Stay Its Order Pending Appeal.**

The Court has "judicial discretion" to stay the effectiveness of its order pending appeal. *Nken v. Holder*, 556 U.S. 418, 433 (2009) (citation omitted). In deciding whether to issue a stay, courts consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *SEC v. Citigroup Glob. Markets Inc.*, 673 F.3d 158, 162-63 (2d Cir. 2012) (citation omitted). These factors operate as a "sliding scale" whereby "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury plaintiff will suffer." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (citation omitted). All four factors weigh in favor of a stay here.

**A.    Plaintiffs Will Suffer Immense Irreparable Harm Absent a Stay.**

Irreparable harm occurs where, "but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Brenntag Int'l Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999). The County has informed Plaintiffs that, unless they immediately agree (by July 29) to come into compliance with the 2005 Amendment by October 31, they will face suspension of their services at the Airport and legal proceedings. Edmondson Decl., Ex. G & J; Khurana Decl., Ex. L & M. Plaintiffs would suffer three forms of irreparable harm if a stay is not granted.

*First*, Plaintiffs would have to stop operating at the Airport. Operation out of the main terminal is fundamentally incompatible—not only with Plaintiffs' business model—but also with the federal regulations applicable to Plaintiffs.[7]

Because of the type of public charter services Plaintiffs provide, Plaintiffs use TSA-approved security protocols that are different from those at the main terminal. *See* 49 C.F.R. § 1550.7(a). Plaintiffs use these security protocols both at the Airport and at every other airport in which they operate nationwide. Edmondson Decl. ¶¶ 12, 15; Khurana Decl. ¶¶ 11, 16. Plaintiffs' passengers—both departing from and arriving to the Airport—are screened using these alternative protocols. Operating at the main terminal would require TSA security checkpoint screening that differs from Plaintiffs' approved security programs. *See* 49 C.F.R. § 1544.105(a)(2).[8] The main terminal is a sterile area, which means that federal law requires all passengers present within its boundaries to have undergone TSA security checkpoint screening. *See* 49 C.F.R. § 1540.105(a)(2) ("No person may . . . [e]nter, or be present within . . . [a] SIDA or sterile area without complying with the systems, measures, or procedures being applied to control access to, or presence or movement in, such areas").

Incoming passengers on Plaintiffs' flights—who departed from FBOs or private terminals elsewhere—will not have undergone such screening. They therefore *cannot* enter the Airport's main terminal upon exiting the plane. Put simply, enforcement of the 2005 Amendment against Plaintiffs would bring their operations at the Airport to a screeching halt. The County knows this, yet they refused to make any accommodation that would enable Plaintiff to operate in the terminal.

---

[7] Plaintiffs operate compliant with all federal laws. Edmondson Decl. ¶ 5; Khurana Decl. ¶ 4.
[8] *See Aviation Programs*, TSA, https://perma.cc/Z8L2-7548 (last visited July 19, 2024) (the requirement for screening through a TSA security checkpoint "applies to all scheduled passenger service operating into or out of a TSA controlled sterile area").

Loss of operations at the Airport is no small matter for Plaintiffs. As noted, Plaintiffs fly dozens of flights out of the Airport each week. *See supra* p.6. This amounts to thousands of passengers each month. *See supra* p.6. If Plaintiffs could no longer offer routes to the Airport because of the 2005 Amendment, that would result in a major loss of business revenue. *See* Edmondson Decl. ¶¶ 49-51; Khurana Decl. ¶¶ 29-30. JSX, for example, would not be able to operate its current and planned routes into the Airport from Miami/Opa-Locka Airport, Boca Raton Airport, Naples Airport, and West Palm Beach Airport, as those flights originate from FBOs and the passengers are not screened at TSA security checkpoints. Edmondson Decl. ¶ 47. XO Global would similarly be unable to operate its routes into the Airport from Fort Lauderdale International Airport and Palm Beach International Airport—which also originate from FBOs. Khurana Decl. ¶ 29. These are very popular routes. Edmondson Decl. ¶ 47; Khurana Decl. ¶ 30.

This disruption in routes would require the cancelation of hundreds of flights. JSX, for example, has booked hundreds of flights after the October 31 grace period through next March. Edmondson Decl. ¶ 51. If forced to comply with the 2005 Amendment after October 31, JSX would need to cancel those flights. *Id.* Future ticket sales would be affected, too. Those who had tickets canceled may be hesitant to buy future tickets for fear of similar cancelation. *Id.*

Operation from the main terminal (even if Plaintiffs could legally do so) would also cut at the heart of Plaintiffs' business model. One of the primary selling points for Plaintiffs' air transportation services is that they operate out of FBOs and offer conveniences that are not available in main terminals. *Id.* ¶ 45; Khurana Decl. ¶ 27. Flying from FBOs does not entail all the crowds, frustration, and delays associated with flying from airport terminals. Passengers can arrive just 20 to 30 minutes before takeoff and board 15 minutes before takeoff. Edmondson Decl. ¶ 17; Khurana Decl. ¶¶ 11, 37. They may also enjoy services like valet parking; shuttles; concierges; private

lounge access; and speedier check-in and boarding processes. Khurana Decl. ¶ 12. Plaintiffs offer these comforts and conveniences only because they operate out of FBOs. If forced to operate out of the main terminal, Plaintiffs will no longer be able to offer them. *Id*. ¶ 35. And without those efficiencies, Plaintiffs will not be able to compete with other airlines who also operate out of the main terminal.

In short, enforcement of the 2005 Amendment would not only cause Plaintiffs to suffer a loss of valuable "business opportunities," *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004), but would end Plaintiffs' operations at the Airport altogether. The Second Circuit has long held that "[m]ajor disruption of a business can be as harmful as termination" and "'can constitute irreparable injury.'" *Nemer Jeep-Eagle*, 992 F.2d at 435 (citation omitted). This includes major disruption that results from "a distributor's inability to supply its customers with the terminated product." *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990).

*Second*, Plaintiffs would face "loss of reputation" and "good will." *Register.com*, 356 F.3d at 404. As noted, enforcement of the 2005 Amendment would force Plaintiffs to cancel hundreds of flights into next year. *See supra* p.12. This would harm their reputations as reliable air transportation providers. It could also confuse consumers, who are unlikely to appreciate why Plaintiffs' services differ fundamentally between the Airport and other airports. Plaintiffs have invested years and millions of dollars in building their reputations as trusted and reliable air carriers. Edmondson Decl. ¶ 52; Khurana Decl. ¶¶ 31-32. Enforcement of the 2005 Amendment threatens to undo all of that. Likewise, if Plaintiffs are no longer able to offer their services, Plaintiffs will be required to terminate contracts with local vendors. Edmondson Decl. ¶ 52; Khurana Decl. ¶ 41. This would only further harm Plaintiffs' reputation as dependable business partners.

Such reputational damage is difficult to repair because, even if the opportunity to operate out of FBOs is restored, "customers may . . . refuse to return . . . because of [the company's] lack of dependability in supplying its product." *Rex Medical L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 623 (S.D.N.Y. 2010); *see Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("[I]t would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come."); *Reuters*, 903 F.2d at 908 (district court abused discretion by failing to consider injury from termination of services to customers).

*Third*, each of Plaintiffs' claims alleges constitutional violations, and the possible deprivation of constitutional rights itself constitutes irreparable harm. *See, e.g.*, *Connecticut Dep't of Env't Prot. v. OSHA*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of irreparable injury." (citations omitted)); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) ("[I]t is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm.").

**B.      Plaintiffs' Appeal Presents Serious Questions that the Second Circuit Is Likely to Resolve in Their Favor.**

The Second Circuit has made clear that *Nken* "did not suggest that [the likelihood of success] factor requires a showing that the movant is 'more likely than not' to succeed on the merits." *Citigroup*, 598 F.3d at 37. Rather, it "contemplates that a movant may be granted relief even if it demonstrates something less than a likelihood of success on the merits." *Sutherland v. Ernst & Young LLP*, 856 F. Supp. 2d 638, 640 (S.D.N.Y. 2012). To warrant a stay, the moving party need only have shown "'a *substantial* possibility . . . of success' on appeal." *Doe v. Trump Corp.*, No.

14

18 CIV. 9936 (LGS), 2020 WL 2538400, at *2 (S.D.N.Y. May 18, 2020) (emphasis added) (citation omitted). And the "probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [the movant] will suffer absent the stay." *Thapa*, 460 F.3d at 334 (citation omitted). Where, as here, the balance of hardships tips "decidedly" in the moving party's favor, the moving party need show only "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Citigroup*, 598 F.3d at 35.

None of this means that the Court must conclude that its own opinion, issued just weeks ago, was wrong. *See Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844-45 (D.C. Cir. 1977) ("[T]ribunals may properly stay their own orders when they have ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained."). Rather, a plaintiff may "sufficiently demonstrate[] a likelihood of success on the merits" if it has shown that "the Court of Appeals may disagree" with the district court, even if the district court "remains confident in the soundness of [its] reasons." *Jock v. Sterling Jewelers, Inc.*, 738 F. Supp. 2d 445, 447 (S.D.N.Y. 2010). Where an appeal raises an issue of first impression in the Second Circuit, the likelihood of disagreement is heightened. *Jock*, 738 F. Supp. 2d at 447; *see also Nat'l Immigr. Project of the Nat'l Lawyers Guild v. DHS*, 842 F. Supp. 2d 720, 733 (S.D.N.Y. 2012) ("[W]here the district court has had to address issues as to which the appellate courts have provided little direct guidance, the likelihood that an appellate court will take a different approach increases. In such circumstances, a court should hesitate to impose irreparable harm on a party who may seek appeal.").

Plaintiffs' appeal presents multiple serious questions of federal law over which there is at least a substantial possibility the Second Circuit will disagree with the Court.

*First*, there is at least a substantial possibility the Second Circuit will conclude that the 2005 Amendment is preempted under the Supremacy Clause. Under the Supremacy Clause, "state and local laws that conflict with federal law are 'without effect.'" *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (citation omitted). This prevents a patchwork of local regulations that would thwart federal law, and ensures that interstate commerce is not negatively impacted by idiosyncratic local rules. Such a patchwork would be particularly detrimental in the area of air travel, where the "likelihood of multiple, inconsistent rules would be a dagger pointed at the heart of commerce and the rule applied might come literally to depend on which way the wind was blowing." *Brit. Airways Bd. v. Port Auth. of N.Y.*, 558 F.2d 75, 83 (2d Cir. 1977); *see also In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 160 (2d Cir. 2012) ("[S]tate-based variations 'would be confusing and burdensome to airline passengers, as well as to the airlines.'" (citation omitted)).

Congress has therefore enacted several laws that preempt state and local aviation regulations, such that state and local governments are generally not permitted to directly or indirectly regulate the air carrier industry. *See City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 633-34 (1973) ("Planes do not wander about in the sky like vagrant clouds. They move only by federal permission, subject to federal inspection, in the hands of federally certified personnel and under an intricate system of federal commands." (citation omitted)); *cf. Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 225 (2d Cir. 2008) ("Congress intended to occupy the entire field and thereby preempt state regulation of air safety."). Plaintiffs' claims here are preempted by two such federal laws regulating air transportation: ANCA and the ADA.

**ANCA.** ANCA was adopted to ensure a uniform federal aviation policy regarding airport noise and access restrictions. *See* 49 U.S.C. § 47521(2)-(3) (redressing the "uncoordinated and

inconsistent restrictions on aviation that could impede the national air transportation system"). Under ANCA, an airport sponsor like the County can impose a noise or access restriction for aircraft like Plaintiffs'[9] "only if" it (1) obtains FAA approval for the restriction or (2) obtains the unanimous consent of all aircraft operators affected by the restriction. 49 U.S.C. § 47524(c)(1).

There is no serious dispute that the 2005 Amendment qualifies as a noise or access restriction under ANCA. *See* ECF 120 at 13; *id.* at 15 ("[T]here is no genuine dispute that the 2005 Law was meant to regulate airport access. . . ."). And the County here secured neither FAA approval nor the permission of all affected operators in adopting the 2005 Amendment. *See* ECF 116-1 ¶ 63. The Court nonetheless determined that the 2005 Amendment was not preempted by ANCA because it was "grandfathered." ECF 120 at 13. ANCA's grandfather clause provides that ANCA's approval requirements do not apply to "a subsequent amendment to an airport noise or access agreement or restriction in effect [when ANCA was enacted], that does not reduce or limit aircraft operations or affect aircraft safety." 49 U.S.C. § 47524(d)(4). The Court determined that this provision applied here because the restrictions codified in the 2004 TUPs predated ANCA's enactment, and the 2005 Amendment was a mere "clarification" that "did not change the aircraft operations to which the TUPs already applied." ECF 120 at 10, 13.

Respectfully, there is at least a substantial possibility the Second Circuit will disagree. The Second Circuit has provided "little direct guidance" about the scope of ANCA's grandfather clause. *Nat'l Immigr. Project*, 842 F. Supp. 2d at 733. The Court cited only one Second Circuit case citing ANCA's grandfather clause, ECF 120 at 9-13 (citing *Friends of the E. Hampton*

---

[9] Plaintiffs' aircraft are what are known as "Stage 3" aircraft. Under ANCA, "[a]ircraft are classified roughly according to the amount of noise they produce, from Stage 1 for the noisiest to Stage 3 for those that are relatively quieter." *City of Naples Airport Auth. v. FAA*, 409 F.3d 431, 433 (D.C. Cir. 2005).

*Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133 (2d Cir. 2016)), and that case did not probe the scope of the clause as this appeal will. The novelty of the ANCA issue counsels in favor of a stay.

Furthermore, the 2005 Amendment fundamentally changed the scope and effect of the TUPs such that it "reduce[s] or limit[s] aircraft operations." 49 U.S.C. § 47524(d)(4). The 2004 TUPs by their terms did not apply to air carriers like Plaintiffs that provide Part 380 public charters. Plaintiffs' Part 380 services do not qualify as "scheduled passenger service" under the governing federal definition. ECF 112-2 at 12; *see supra* p.7. And as such, Plaintiffs were prohibited from using the terminal ramp, which was reserved for "Airlines providing scheduled passenger service." ECF 112-2 at 12. The 2004 TUPs also did not impose any affirmative requirement on any airlines to operate out of the terminal. The 2005 Amendment, by contrast, removed the "scheduled" limitation and now applies to any "Passenger Service." ECF 112-3 at 11; *see* Westchester Cnty. Mun. Code § 712.462(2)(j). It also now *requires* (unlike the 2004 TUPs) that "*[a]ll* Passenger Service provided at the Airport shall be provided at the Terminal." ECF 112-3 at 9 (emphasis added); *see* Westchester Cnty. Mun. Code § 712.462(1).

If read to apply to Plaintiffs, as the County urges, the 2005 Amendment's broader scope and affirmative obligation to operate out of the terminal reduce and limit Plaintiffs' operations in several ways. Plaintiffs are no longer free to operate from an FBO, as federal law authorizes them to. They are now limited to operating from the main terminal—which, as set forth above, they cannot do consistent with federal law. *See supra* p.11. Further, the requirement that Plaintiffs operate out of the main terminal in turn reduces their operations by requiring them to cancel routes. *See supra* p.12. It also limits their operations by eliminating the services and conveniences that draw passengers to their flights in the first place. *See supra* p.13-14. And if Plaintiffs are forced to operate out of the terminal, they must enter into an agreement that would impose numerous other

limitations on their operations. *See supra* p.6. Because the 2005 Amendment "reduce[s] or limit[s]" aircraft operations," 49 U.S.C. § 47524(d)(4), it falls outside the scope of the grandfather clause and is preempted by ANCA.

**ADA.** The ADA was enacted "to promote 'efficiency, innovation, and low prices'" in the airline industry." *Nw., Inc. v. Ginsberg*, 572 U.S. 273, 280 (2014) (citation omitted). Under the ADA's preemption provision, "a State [or] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier." 49 U.S.C. § 41713(b)(1). The Supreme Court has "repeatedly emphasized the breadth of the ADA's preemption provision." *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 222 (2d Cir. 2008) (citing cases). In line with the ADA's broad language and pro-competitive aim, the Supreme Court and Second Circuit have repeatedly read the ADA's preemption provision broadly. *See, e.g.*, *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-85 (1992) (ADA preempted state consumer protection laws); *Nw.*, 572 U.S. at 281 (ADA preempted state common-law claims); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 697 F.3d 154, 164 (2d Cir. 2012) (ADA preempted certain state regulation of air carriers); *Air Transp. Ass'n*, 520 F.3d at 223 (ADA preempted regulation of "matters incidental to and distinct from the actual transportation of passengers").

As the Court noted, the County did not seriously dispute that the "2005 Law may be characterized as a regulation touching upon a 'price, route or service' of an air carrier." ECF 120 at 13-14. The Court nonetheless determined that the 2005 Amendment was not preempted by the ADA because, according to the Court, it fell within the ADA's "proprietor exception" for "acts passed by state and local agencies in the course of 'carrying out [their] proprietary powers and rights.'" *Id.* at 14 (quoting *Nat'l Helicopter Corp. of Am. v. City of N.Y.*, 137 F.3d 81, 88 (2d Cir. 1998)).

Respectfully, there is at least a substantial possibility the Second Circuit will disagree. As an initial matter, whether a regulation forcing an air carrier to operate out of a main terminal rather than an FBO is preempted by the ADA is a question of first impression in the Second Circuit. This counsels in favor of a stay. *See Jock*, 738 F. Supp. 2d at 447.

Furthermore, the Second Circuit is likely to disagree with the Court's determination that the proprietor exception applies. As courts have stressed time and again, the proprietor exception is "narrow[]." *Nat'l Helicopter*, 137 F.3d at 89; *see also, e.g.*, *Am. Airlines, Inc. v. Dep't of Transp.*, 202 F.3d 788, 806 (5th Cir. 2000) ("extremely limited" (citation omitted)). And it must not "be allowed to produce a patchwork of 'uncoordinated and inconsistent' airport restrictions that impede the national transportation system." *Friends*, 841 F.3d at 154 (citation omitted). The proprietor exception typically encompasses, for instance, regulations of "noise and other environmental concerns." *Nat'l Helicopter*, 137 F.3d at 89.[10]

The Court here reasoned that the 2005 Law "regulat[es] *airport access* so as to allocate scarce space and landing and takeoff slots," deeming that "a matter wholly within Defendant's proprietary rights and powers." ECF 120 at 15 (emphasis added). But restricting "airport access" is not the sort of function the proprietor exception is meant to capture. Such a reading would allow that exception to swallow the rule, permitting localities to enact precisely the sort of restrictions on air carrier "route[s]" and "service[s]" that the ADA preempts. 49 U.S.C. § 41713(b)(1). And it would risk exactly the sort of patchwork the ADA is meant to prevent. This case illustrates the point: Air carriers like Plaintiffs that operate out of FBOs pursuant to federal law cannot operate

---

[10] The proprietor exception is further limited to local regulations that are "reasonable, nonarbitrary and non-discriminatory." *Nat'l Helicopter Corp*, 137 F.3d at 89; *see also Brit. Airways Bd. v. Port Auth. of N.Y.*, 564 F.2d 1002, 1011 (2d Cir. 1977). For reasons explained below, that requirement is not satisfied here. *See infra* p.21-22.

in airports where they would be required to deplane into a terminal that requires TSA checkpoint screening. *See supra* p.11. Local laws setting such requirements operate to thwart federal policy allowing such carriers to operate out of FBOs. The ADA was enacted to prevent this result.

*Second*, there is at least a substantial possibility the Second Circuit will conclude that the Court erred in granting summary judgment to the County on Plaintiffs' claim that the 2005 Amendment violates the Fourteenth Amendment by singling Plaintiffs out for disfavored treatment.

The Equal Protection Clause protects against "invidious discrimination at the hands of government officials." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001). The Court determined that the 2005 Amendment did not violate equal protection because Plaintiffs neither established that other air carriers were similarly situated to nor treated differently from other air carriers at the Airport for irrational reasons. ECF 120 at 16-23. There is at least a substantial possibility that the Second Circuit will determine that the Court misapplied the summary judgment standard in doing so.

In deciding a motion for summary judgment, the court must draw "all inferences . . . in favor of the nonmoving party," *Harlen*, 273 F.3d at 499 (citation omitted), and grant summary judgment only if there exists "no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a). Here, the Court noted that both "parties . . . are relying upon the same evidence to reach opposing conclusions." ECF 120 at 19. "Ordinarily," the Court explained, "this kind of circumstance would suggest the existence of an issue of material fact precluding summary judgment." *Id*. But the Court instead read the evidence to favor the County. There is a substantial likelihood the Second Circuit will determine that was error, and that the conflicting interpretations of the same evidence created a genuine dispute of material fact improper for resolution on summary judgement. *See, e.g.*, *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) ("[C]hoices between conflicting versions of the

facts are matters for the jury, not for the court on summary judgment."); *Meaders v. Helwaser*, 436 F. Supp. 3d 677, 680 (S.D.N.Y.), *aff'd*, 831 F. App'x 595 (2d Cir. 2020) ("It is not appropriate for the Court to make credibility assessments or resolve conflicting versions of event presented.").

### C.    The Public Interest and Equities Favor a Stay.

Where, as here, "the government is the party opposing the stay, the third and fourth factors 'merge,'" *Sarr v. Garland*, 50 F.4th 326, 335 (2d Cir. 2022) (quoting *Nken*, 556 U.S. at 435), and "are considered as one factor," *United States v. Halkbank*, No. 15 CR. 867 (RMB), 2020 WL 6273887, at *5 n.4 (S.D.N.Y. Oct. 26, 2020). That factor tips decidedly in favor of a stay here for four primary reasons.

*First*, the public has an interest in the execution of air travel as planned. Plaintiffs' continued operation out of FBOs is critical not just to Plaintiffs, but also to all of Plaintiffs' many customers in New York and elsewhere who have booked (and plan to book) tickets for their upcoming air travel. If Plaintiffs are forced to comply with the 2005 Amendment by October 31, they will have to cancel hundreds of flights that have been booked well into 2025. Edmondson Decl. ¶ 51. This would include flights around the Thanksgiving and winter holidays. *Id.* The customers across the country who have purchased or plan to purchase tickets on these flights—as well as the friends, families, and business associates they are planning to see—all have a strong interest in preservation of the status quo to prevent disruptions to their planned and upcoming air travel. If their tickets on Plaintiffs' flights are canceled now, they will need to make new plans with different air carriers that are unlikely to offer the conveniences and comforts that drew them to Plaintiffs in the first place. Furthermore, health care workers and emergency responders regularly fly with Plaintiffs. *Id.* ¶ 6. And the public has an interest in ensuring that these health care workers and emergency

responders are able to travel to the destinations where they are needed to provide their valuable services to the public.

*Second*, the public has an interest in the innovation that comes with continued operation of Plaintiffs' services. Plaintiffs' businesses fill an underserved niche in the market for air travel by presenting a convenient and pleasant but affordable and safe flight option that falls somewhere between large commercial airlines and private jets. *See supra* p.4-5. Travelers have an interest in keeping that option available not only to increase their own purchase options for air travel, but also because of the positive benefits that attend Plaintiffs' innovation. Plaintiffs' flight offerings help minimize noise and the impact of private jets by aggregating in a single charter passengers who may otherwise charter their own individual aircraft. Edmondson Decl. ¶ 21; Khurana Decl. ¶ 14.

*Third*, the County cannot credibly claim any serious injury from delayed enforcement of the 2005 Amendment against Plaintiffs. The County did not seek to enforce the 2005 Amendment against Plaintiffs for six years. From 2015 to 2021, Defendants permitted Plaintiffs to operate out of FBOs without issue. *See supra* p.8. If non-enforcement were so harmful, presumably the County would have sought to enforce the 2005 Amendment sooner. It also presumably would be seeking to enforce the 2005 Amendment sooner than October 31. Earlier this week, the County took the position that the Court's order permits them to enforce the 2005 Amendment against Plaintiffs. Edmondson Decl., Ex. G; Khurana Decl., Ex. L. Although it seeks an immediate commitment, the County does not seek compliance until October 31. Edmondson Decl., Ex. J; Khurana Decl., Ex. M. If the County does not feel like it will suffer harm during three and a half additional months of non-enforcement, surely it will not suffer harm if that non-enforcement is briefly extended for the time the Second Circuit needs to resolve the potentially expedited appeal.

Furthermore, Plaintiffs have proposed to the County multiple accommodations that would allow Plaintiffs to operate out of a non-sterile area of the terminal in compliance with federal law. Edmondson Decl. ¶¶ 32, 36, 38, 42. The County has refused to make any of these accommodations. *Id.* ¶¶ 33, 36, 38, 43. The County's refusal to make such accommodations to allow Plaintiffs to operate at the terminal indicates that Plaintiffs' operation at the terminal is not in fact vital for the County.

*Fourth*, when "a plaintiff alleges constitutional violations, the balance of hardships tips decidedly in the plaintiff's favor." *Torres-Jurado v. Biden*, No. 19 CIV. 3595 (AT), 2023 WL 7130898, at *5 (S.D.N.Y. Oct. 29, 2023) (citation omitted). As explained above, all of Plaintiffs' claims allege constitutional violations, which is sufficient to tip this factor in favor of a stay.

## II. Alternatively, the Court Should Enjoin the County from Enforcing the 2005 Amendment Pending Appeal.

In the alternative, the Court should temporarily enjoin the County from enforcing the 2005 Amendment against Plaintiffs pending resolution of their appeal. District courts have the "inherent power" to "make whatever order is deemed necessary to preserve the status quo and to ensure the effectiveness of the eventual judgment" after appeal. *Flatiron*, 602 F. Supp. 3d at 486 (citation omitted). In this case, the status quo is non-enforcement of the 2005 Amendment. That status quo has been maintained in these proceedings through a Court-approved stipulation that the Court recognized provides Plaintiffs the "very relief a preliminary injunction would secure." ECF 57 at 5-6. If that stipulation is no longer operative, and its injunctive effect no longer in place, then this Court should continue to maintain the status quo pending appeal through an injunction.

A party seeking an injunction pending appeal must satisfy the traditional standard for injunctive relief. *See, e.g.*, *IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 429, 431 (D. Vt. 2009). That standard "overlap[s] substantially" with the above-described standard for a stay pending appeal.

*Citigroup*, 598 F.3d at 37. That standard is satisfied here, *see supra* pp.10-24, and this Court did not hold otherwise in denying Plaintiffs' previous motion for a preliminary injunction based solely on the parties' stipulation—which gave Plaintiffs the "very relief a preliminary injunction would secure." ECF 57 at 5-6. The County has now taken the position that the stipulation no longer applies, *see* Edmondson Decl., Ex. G; Khurana Decl., Ex. L, such that an injunction to preserve the status quo is now very much needed.

### III.    At Minimum, the Court Should Grant an Administrative Stay.

Plaintiffs respectfully request that the Court grant a temporary administrative stay of its order pending resolution of this motion. And, if the Court is not inclined to grant the motion, Plaintiffs also request an administrative stay pending the Second Circuit's resolution of a Federal Rule of Appellate Procedure 8 motion.[11] The County has requested that Plaintiffs commit by July 29, to comply with the 2005 Amendment by October 31. Edmondson Decl., Ex. J; Khurana Decl., Ex. M. An administrative stay would allow both this Court and the Second Circuit to consider a stay pending appeal on a non-emergency basis, with full briefing.

### CONCLUSION

The Court should stay effectiveness of its order pending resolution of Plaintiffs' appeal. In the alternative, the Court should enjoin the County from enforcing the 2005 Amendment against Plaintiffs pending resolution of Plaintiffs' appeal. The Court should also grant a temporary administrative stay of the Court's order pending resolution by the Court and the Court of Appeals of this motion and any subsequent Rule 8 motion.

---

[11] Should the Court grant an administrative stay pending the Second Circuit's resolution of a stay motion, Plaintiffs will promptly inform the Court of any Second Circuit decision on that motion.

Dated: July 19, 2024                                Respectfully submitted.

*/s/ Jonathan B. Nelson*
Jonathan B. Nelson, Esq.
Paul J. Noto, Esq.
Christina L. Grimes, Esq.
Dorf Nelson & Zauderer LLP
555 Theodore Fremd Ave.
Rye, New York 10580
(914) 381-7600

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have served a copy of the foregoing to all counsel of record by filing same with the Court via CM/ECF on July 19, 2024, which will provide notice to all counsel.

<u>*/s/ Jonathan B. Nelson*</u>
Jonathan B. Nelson, Esq.